1
2
3
4
5

**BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.**
Andrew S. Friedman (*admitted Pro Hac Vice*)
afriedman@bffb.com
Francis J. Balint, Jr. (*admitted Pro Hac Vice*)
fbalint@bffb.com
2325 East Camelback Road, Suite 300
Phoenix, Arizona 85016
(602) 274-1100; Fax: (602) 274-1199

6
7
8
9
10

**CONSUMER WATCHDOG**
Harvey Rosenfield (SBN: 123082)
harvey@consumerwatchdog.org
Jerry Flanagan (SBN: 271272)
jerry@consumerwatchdog.org
6330 San Vicente Blvd., Suite 250
Los Angeles, CA 90048
(310) 392-0522; Fax: (310) 392-8874

**THE MOSKOWITZ LAW FIRM**
Adam M. Moskowitz
(*admitted Pro Hac Vice*)
adam@moskowitz-law.com
Howard Bushman
(*admitted Pro Hac Vice*)
howard@moskowitz-law.com
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
(305) 479-5508

11
12

[Additional Counsel on Signature Page]
*Attorneys for Plaintiffs*

13

## UNITED STATES DISTRICT COURT

14

## CENTRAL DISTRICT OF CALIFORNIA

15
16
17
18
19
20
21
22
23
24
25
26
27
28

GAIL THOMPSON, HANS SUNDER in his capacity as Trustee for the SUNDER IRREVOCABLE TRUST, BELINDA BUCCI, in her capacity as Trustee of the NANCY AND CHARLES BARCELONA IRREVOCABLE TRUST, DEBRA LEWIS, DIANA LEWIS, MICHAEL H. STEPHENS, SANDRA ROSNER in her capacity as Trustee of the ROSNER 1998 IRREVOCABLE TRUST DATED 5/19/98, KATHLEEN M. SWIFT, and MARC SOBLE, as Trustee for the MARILYN B. SOBLE IRREVOCABLE TRUST DATED 11/19/1997, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

TRANSAMERICA LIFE INSURANCE COMPANY,

Defendant.

Case No. 2:18-cv-05422-CAS-GJSx

**FIRST AMENDED CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL**

1. Breach of Contract
2. Breach of the Implied Covenant of Good Faith and Fair Dealing
3. Breach of Duty of Good Faith and Fair Dealing
4. Injunctive and Restitutionary Relief pursuant to Cal. Bus. & Prof. Code §17200, *et seq.*
5. Declaratory Relief
6. Preliminary and Permanent Injunctive Relief
7. Elder Abuse pursuant to Cal. Wel. & Inst. Code §15657.5, *et seq.*

CLASS ACTION COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated against Defendant Transamerica Life Insurance Company ("Transamerica"). Plaintiffs allege the following on information and belief, except as to those allegations that pertain to the named Plaintiffs, which are alleged on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of themselves and all similarly situated owners (the "Policyholders") of Transamerica TransUltra 115 and TransSurvivor 115 universal life policies (collectively, the "Policies"). Unlike whole life insurance policies that require fixed monthly premium payments, the premiums required for universal life policies are flexible and need only be sufficient to cover cost of insurance charges – denominated in the Transamerica Policies as the "Monthly Deduction" – and certain other specified expenses. The Monthly Deduction charge – an amount calculated using a Monthly Deduction Rate ("MDR") – is the highest policy charge that the Policyholder pays.

2.      Under the Policies, Transamerica agreed that any changes in the MDRs (a) would be subject to its "expectations as to future cost factors" and (b) would not "recover prior losses" so as to increase the profitability of the Policies in future years to a level higher than Transamerica projected for those Policies based on reasonable assumptions for the same years when it issued the Policies. Transamerica also agreed that it would credit interest to the Policies' accumulation values at a guaranteed annual rate of 4.0%.

3.      The Policies were marketed with an optional rider known as the Endorsement to Modify Grace Period or Assured Coverage Endorsement or other similar no-lapse provisions (collectively "No-Lapse Endorsement"). Under the No-Lapse Endorsement, Transamerica promised to provide guaranteed-for-life coverage (also known as a no-lapse guarantee, guaranteed death benefit or

CLASS ACTION COMPLAINT

"secondary guarantee") ensuring that the Policy would remain in effect for a guaranteed period even if the Policy's accumulation value was insufficient to cover the required Monthly Deductions withdrawn from the accumulation account.

4.    The TransUltra 115 and TransSurvivor 115 Policies were issued twenty or so years ago. Consequently, a majority of the Policyholders are now elderly; many of them are 75 years old or older. Plaintiffs and the other members of the proposed classes bought the Policies so that they and their families would be protected by life insurance coverage as they entered their senior years. To that end, the Policyholders were promised the protection of the contractual guarantees that their Policies would be credited with interest not less than 4% and that Transamerica would not raise the MDRs to increase its own profits at their expense. Those Policyholders who purchased the No-Lapse Endorsement and complied with its terms received the additional contractual protection that their Policies would not lapse even if the accumulation value at some point in the future became insufficient to pay required Monthly Deductions due to declining interest rates or legitimate MDR increases.

5.    Effective October 1, 2017, however, Transamerica suddenly, unilaterally, and massively began increasing the MDRs applicable to the TransUltra 115 Policies occurring on the next policy anniversary dates (the "TransUltra MDR Increases"). Effective June 1, 2018 Transamerica likewise unilaterally and massively began increasing the MDRs applicable to the TransSurvivor 115 Policies occurring on the next policy anniversary dates (the "TransSurvivor MDR Increases"). Certain of the Policies were subjected to a level rate increase of 47% and 58%, respectively. Others were hit with a 39% increase effective on the next policy anniversary date, followed by another 39% increase in each of the following two years, *compounded* each year, effectively ratcheting the increase to 169% after the third contemplated increase. The massive TransUltra MDR Increases and

TransSurvivor MDR Increases (collectively, "the MDR Increases") have depleted (and unless enjoined will continue to deplete) the Policies' accumulation values to the point where they are or will be insufficient to pay the exponentially higher Monthly Deductions, which in turn will trigger certain termination provisions of the No-Lapse Endorsements resulting in forfeiture of the promised no-lapse protections.

6.      In its notices to Policyholders announcing the MDR Increases, Transamerica stated that the increases are "in addition to the customary increases that are associated with age," and attributed them to Transamerica's "current expectations about our future costs to provide this coverage." Transamerica's true reasons for imposing the drastic MDR Increases, however, were: (a) to increase its own projected future profits at the expense of the Policyholders, thereby contravening the contractual prohibitions against recouping past losses or imposing MDR increases for reasons other than legitimate cost factors; (b) to avoid its own contractual obligations to pay guaranteed interest under the Policies and to provide no-lapse coverage under the No-Lapse Endorsement, thereby contravening its duty to treat Policyholders in good faith; and (c) to induce policy terminations by elderly Policyholders, also in bad faith.

7.      As a direct result of the MDR Increases, the largely elderly Policyholders are now suddenly facing termination of their life insurance at a time when they can no longer obtain replacement coverage.

8.      As alleged below, the MDR Increases violate the express and implied terms of the Policies and were imposed on the Policyholders in bad faith and in contravention of California's Unfair Competition Law ("UCL"), and a violation of California's Elder Abuse Statutes. Plaintiffs in this action seek injunctive and equitable relief, and ancillary damages, to halt and reverse Transamerica's massive MDR Increases. These increases have already injured Plaintiffs and, if allowed to

proceed, will continue to cause irreparable injury to Plaintiffs and other members of the putative classes (collectively "Class Members").

## THE PARTIES

9.      Plaintiff Gail Thompson ("Thompson") is a 68-year-old elderly woman and citizen of the State of California. Thompson is the owner and primary beneficiary of a TransSurvivor 115 universal life insurance policy (Policy No. 60060850) issued on or about July 1, 2000, with a face amount of $500,000.

10.      Plaintiff Hans Sunder ("Sunder") is a citizen of the State of Texas. Sunder is the Trustee of the Sunder Irrevocable Trust (the "Sunder Trust"). The Sunder Trust is the owner of a TransSurvivor 115 universal life insurance policy (Policy No. 60063911) insuring the life of Klaus Sunder. The policy was issued to the Sunder Trust on or about October 1, 2000, with a face amount of $2,000,000.

11.      Plaintiff Belinda Bucci ("Bucci") is a citizen of the State of Pennsylvania. Bucci is the Trustee of the Charles and Nancy Barcelona Irrevocable Trust dated May 12, 1998 (the "Barcelona Trust"). The Barcelona Trust holds in trust a TransSurvivor 115 universal life insurance policy (Policy No. 60027315) jointly insuring the lives of Charles Barcelona, currently 89 years old, and his wife, Nancy Barcelona, currently 88 years old, with the Barcelona Trust as the owner and Charles and Nancy Barcelona's three children as the primary beneficiaries. The policy was issued on or about June 21, 1998, with a face amount of $2,000,000.

12.      Plaintiff Debra Lewis is a citizen of the State of Pennsylvania and the owner of a TransSurvivor 115 universal life insurance policy (Policy No. 60027700) issued on or about June 3, 1998, with a face amount of $375,000, jointly insuring the lives of her parents Griffin Lewis, who passed away in October 2018, and his wife Fabronia Lewis, currently approximately 90 years old.

13.      Plaintiff Diana Lewis is a citizen of the State of New York and the owner a TransSurvivor 115 universal life insurance policy (Policy No. 60026807)

issued on or about June 3, 1998, with a face amount of $375,000, jointly insuring the lives of her parents Griffin Lewis, who passed away in October 2018, and his wife Fabronia Lewis, currently approximately 90 years old.

14.     Plaintiff Michael H. Stephens ("Stephens") is a citizen of the State of Texas and the owner of a TransUltra 115 universal life insurance policy (Policy No. 60037601) issued on or about November 25, 1998, with a face amount of $500,000.

15.     Plaintiff Sandra Rosner ("Rosner") is a citizen of the State of New York. Rosner is the Trustee of the Rosner 1998 Irrevocable Trust dated 5/19/98 (the "Rosner Trust"). The Rosner Trust holds a 50% interest in TransUltra 115 universal life insurance policy (Policy No. 60026965) insuring the life of Elena Rosner, currently 93 years old. The policy was issued to the Rosner Trust on or about January 16, 1999, with a face amount of $500,000.

16.     Plaintiff Kathleen M. Swift is a citizen of the State of Colorado and the owner of a TransUltra 115 universal life insurance policy (Policy No. 60041474) issued on or about April 21, 1999, insuring herself in the face amount of $250,000.

17.     Plaintiff Marc Soble ("Soble") is a citizen of the State of Michigan. Soble is a Trustee of the Marilyn B. Soble Irrevocable Trust dated 11/19/1997 (the "Soble Trust"). The Soble Trust is the owner of TransSurvivor 97 universal life insurance policy (Policy No. 60021270) insuring the lives of Jerome S. Soble and Marilyn B. Soble. The policy was issued to the Soble Trust on or about December 23, 1997, with a face amount of $2,200,000.

18.     Defendant Transamerica is a corporation organized under Iowa law, with its principal place of business located at 4333 Edgewood Road NE, Cedar Rapids, Iowa, 52499. Transamerica is a citizen of the State of Iowa.

19.     In the 1990s, Transamerica Occidental was a corporation organized under California law, with its Home Office and principal place of business at 1150 S. Olive Street, Los Angeles, California, 90015.

20.     On or about October 1, 2008, Transamerica Occidental was merged into Transamerica, making Transamerica its successor-in-interest. Transamerica Occidental and Transamerica are collectively referred to as "Transamerica."

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the Plaintiffs in this action, who have voluntarily filed in this forum.

22.     Jurisdiction over Transamerica is proper because Transamerica has registered with the California Secretary of State, purposely availed itself of the privilege of conducting business in California, and because it currently maintains systematic and continuous business contacts with this State. Transamerica regularly transacts business in California, and thousands of the putative Class Members are California residents.

23.     The Court has general and extraordinary jurisdiction over Transamerica. Transamerica's operations in California are so substantial as to render Transamerica "at home" there, as well as in Iowa where Transamerica currently has its principal place of business. After 90 years as the quintessential California company, Transamerica only recently, in December 2016, announced the closure of its operating offices in Los Angeles and Folsom, California. Even so, Transamerica continues to own substantial real estate in California, including the iconic Transamerica Pyramid in San Francisco. Transamerica furthermore continues to service tens of thousands life insurance contracts in California with premiums totaling over $400 million, far more than in any other state in the union. Transamerica thus does more business in California than it does anywhere else in the country, including Iowa.

24.     In addition, the Court has specific jurisdiction over Transamerica because Transamerica purposefully directed its activities at California and purposefully availed itself of the privilege of doing business in the state, and the

injuries alleged herein arise out of certain activities of Transamerica within California. The Transamerica Policies were designed, originally priced and executed by Transamerica at its then-home office in Los Angeles, California. The contract provisions at issue in this action were drafted by Transamerica in California. All of the crucial original pricing assumptions for the Policies were determined there. Transamerica thus conducted key aspects of the Policy formation in California, and furthermore in part planned the challenged MDR Increases in California, including specifically modeling and data analysis for the increases. Members of Transamerica's MDR increase project team are based in California, and the notices of the MDR increases were developed there. Finally, the Transamerica employee responsible for administratively implementing the MDR increases resides in California.

25.    This Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. Plaintiffs and Transamerica are diverse citizens. Plaintiffs furthermore allege claims on behalf of a national class of Policyholders who are minimally diverse from Transamerica, and the aggregate of these claims exceed $5,000,000. This Court accordingly has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Supplemental jurisdiction over Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

26.    Venue is proper in this District under 28 U.S.C. § 1391 because Transamerica maintains substantial operations in this District; thousands of Class Members either reside or did business with Transamerica in this District; Transamerica engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Transamerica entered into transactions and received substantial profits from Policyholders who reside in this District.

CLASS ACTION COMPLAINT

# FACTUAL ALLEGATIONS

## A.    Background on Universal Life Policies and No-Lapse Guarantees.

27.    Unlike whole life insurance policies that require fixed monthly premium payments, the premiums required for universal life policies are flexible and need only be sufficient to cover the Monthly Deductions (also known as cost of insurance charges) and certain other specified expenses. Premium payments are deposited in an accumulation account from which Monthly Deductions and expense charges are deducted. The accumulation account is credited with monthly interest at a non-guaranteed declared rate, but not less than the guaranteed interest rate specified in the policy contract. Universal life insurance policies allow Policyholders to modify the amount and frequency of premium payments as long as their policy contains sufficient cash value to cover monthly deductions.[1]

28.    Thus, universal life policies will normally lapse if the accumulation account value dwindles to the point that it is insufficient to cover the Monthly Deduction charges for the cost of insurance and expenses. In the 1990s, however, Transamerica and other life insurance companies developed and began selling universal life policies that included an endorsement (rider) providing a "no-lapse" feature, also known as a "secondary guarantee," promising that the policy will remain in effect for a guaranteed period if a specified periodic premium is paid on time, even when the accumulation account is insufficient to pay the required Monthly Deductions.

29.    In the years after universal life policies with no-lapse guarantees were introduced, companies like Transamerica incorporated increasingly aggressive

---

[1] *Universal Life Insurance*, TRANSAMERICA, https://www.transamerica.com/individual/products/insurance/universal-life/ (last visited on May 8, 2019).

CLASS ACTION COMPLAINT

pricing to illustrate lower premiums to prospective Policyholders. Consequently, no-lapse universal life policies became one of the largest selling insurance products in the market, with increasing sales spurred by the burst of the 1990s stock bubble and the steady decline in interest rates making the promised guarantees more attractive to consumers. The allure of no-lapse universal life was increased by the fact that the aggressively-priced illustrated premiums for these products were often less than one-half the premiums associated with traditional guaranteed products like whole life insurance.

30.   However, no-lapse universal life policies carry many risks for Policyholders, including the dire consequences of a single late premium payment and the insurance company's financial inability to honor its guarantees. A clear conflict of interest exists between the insurance company and the Policyholders, creating an incentive for the company to increase cost of insurance charges on the policy with the relatively low cash values reducing any buffer against policy lapse. A single missed or late premium payment may result in termination of the policy, with little or no cash surrender value, and forfeiture of tens or hundreds of thousands of premium dollars paid in prior years.

31.   These risks were exacerbated by the companies' incorporation of "shadow accounts" to minimize the reserves required to support the no-lapse guarantees, thereby allowing for even more aggressive pricing while increasing the risk of financial strain and the motivation for insurance companies to raise cost of insurance charges to shore up their capital and increase profits. If the shadow account fell to an amount less than zero, the no-lapse guarantee would not apply, and the policy would enter the grace period resulting in termination unless the policy owner paid a specified amount during the grace period.

32.   Unlike regular accumulation account values, the so-called "shadow account" values are not available to the Policyholders through a surrender or loan,

and maintenance of the shadow account and associated no-lapse guarantee requires the timely payment of the required premium. Furthermore, the shadow account amount is not disclosed in policy illustrations, within the policy contract itself, in the annual statements provided to Policyholders, or on grace notices. Thus, a policy owner has no way of knowing the amount of the shadow account or how it is computed and receives no advance warning when the shadow account is about to fall below zero.

**B.    The TransUltra 115 and TransSurvivor 115 Policies.**

33.    Transamerica began selling the TransUltra 115 and TransSurvivor Life 115 Policies in 1997 and withdrew them from the market in 2000 (the same year Actuarial Guideline XXX became effective). The TransUltra 115 product is a single life universal policy while the TransSurvivor 115 product is a joint life universal policy. The Policies are flexible-premium, universal life policies that permit the policy owner to determine the premium payment amounts after the expiration of an initial 5-year period during which specified minimum premium payments are required.

34.    Policyholders can adjust both the amount and frequency of their premium payments so long as the Policy accumulation value is sufficient to cover the Monthly Deduction charges due under the Policies. Under the Policies, the policyowner establishes a Planned Periodic Premium for a required premium period of five years. The Policies generally include a surrender period and mature at age 115.

35.    Under the uniform provisions of the Policies, an "Accumulation Value" is established for each Policy, into which the Policyholder's premium payments are deposited. The accumulation account earns interest at a declared interest rate not less than the guaranteed interest rate of 4% specified in the Policy.

36.    At the end of each policy month, Transamerica withdraws a Monthly

Deduction from the Policy's accumulation account value. The Monthly Deduction is equal to the following: (a) the application of a "Monthly Deduction Rate" ("MDR") to the difference between the death benefit and the accumulation value at the beginning of the year; (b) the monthly deduction for any policy riders; and (c) a policy fee.

37.     Transamerica determines the MDRs for each policy year at the beginning of the year, using the insured's age as of that policy year. The MDR is by far the most costly and important component of the Monthly Deduction charge. Consequently, the higher the MDR, the greater the amount of the premiums required to maintain a positive policy value balance and avoid a lapse of the policy. Even small changes in the MDR can produce a dramatic increase in the dollar amount of the Monthly Deduction charged by Transamerica, particularly at older attained ages.

38.     The Policies included the option for consumers to purchase a No-Lapse Endorsement. For the no-lapse protection of the No-Lapse Endorsement to apply, the policyholder must pay a specified Select Monthly Premium, for a specified Select Period extending to age 100. If the policyholder fails to timely pay the Select Policy Premium in any month, the no-lapse guarantee terminates, in which event the Policy will lapse unless there is sufficient account value and/or additional premiums are paid to cover the current Monthly Deduction charges.

39.     In addition, certain of the No-Lapse Endorsements utilize a "shadow account" to determine whether the no-lapse guarantee will remain in effect. The shadow account is calculated separately from the accumulation value. The shadow account amount is increased by the premiums paid by the Policy owner on the base policy and for any riders, plus interest calculated using a schedule of interest rates for specified policy durations. The shadow account is decreased by the amount of threshold premiums applicable to the Policy and any riders and by any partial

surrenders.

40.     As alleged above, the shadow account amount does not appear in policy illustrations issued by Transamerica or within the policy contract itself. In addition, the shadow account amount is not reported in the annual statements provided to Policyholders or on grace notices. Thus, the Policyholders have no way of knowing the amount of the shadow account and they receive no advance warning when the shadow account is about to fall below zero. Policyholders who have purchased the No-Lapse Endorsement only learn that the shadow account has fallen to zero when they receive a grace notice from Transamerica.

41.     When the accumulation value of the base policy is insufficient to pay the required Monthly Deduction, Transamerica issues a grace notice giving the Policy owner 60 days to pay sufficient premiums to keep the policy from lapsing (i.e. premiums in an amount sufficient to pay two Monthly Deductions). Similarly, the No-Lapse Endorsement also has a grace period of 60 days, which is triggered when the shadow account falls below zero. Thus, if the Policyholder who has purchased a No-Lapse Endorsement with a shadow account wishes to keep the no-lapse guarantee in effect, he or she has 60 days to pay premiums sufficient to bring the Policy threshold shadow account, net of any policy loans, to zero or more or, under other endorsements, to pay additional premiums due under the rider. If that amount is not paid within 60 days, the No-Lapse Endorsement terminates. Furthermore, if premiums sufficient to replenish the shadow account are not paid within the 60-day grace period, the Policy owner must pay additional premiums in an amount sufficient to pay two Monthly Deductions or the Policy will lapse.

42.     The amount necessary to restore the premium threshold shadow account values to avoid termination of the No-Lapse Endorsement is typically substantially higher than the minimum premiums necessary to pay the required Monthly Deductions under the base policy.

**C.      The Standardized Policy Provisions at Issue in this Case.**

43.      The Policies are all form contracts containing uniform, standardized terms. Because prospective Policy purchasers are not permitted to negotiate different terms, the Policies are contracts of adhesion.

44.      The Policies have standardized, uniform language with respect to the policy provisions at issue in this action. Those provisions constrain Transamerica's discretion to set or increase the Monthly Deduction Rates in several different ways.

45.      First, the Policies all contain the following contractual provisions limiting Transamerica' ability to increase the MDRs ("the Cost Factor Provision"):

> Any change in the monthly deduction rates will be prospective and will be subject to our ***expectations as to future cost factors***. Such cost factors may include but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

(emphasis added). This contractual limitation has a well-recognized actuarial meaning, namely that any increase in the MDRs must be based on Transamerica's actual expectations as to future "cost factors" (as opposed to revenues or profits) and that MDRs may be increased only if the expected future cost factors are less favorable than the corresponding cost assumptions made when the Policies were priced.

46.      Second, the No-Lapse Policies also contain the following additional contractual limitation on Transamerica's ability to increase the MDRs (the "Non-Recoupment Provision"):

> ***We do not*** distribute past surplus or ***recover past losses by changing the monthly deduction rates.***

(emphasis added). This contractual limitation also has a well-recognized actuarial meaning, namely that Transamerica may not raise MDRs to increase the profitability of the Policies in future durations to a level higher than the profits projected for the Policies when they were priced and issued to the Policyholders.

47.     Thus, Transamerica agreed in the Policies that any changes in the MDRs would be prospective only, would be based its "expectations as to future cost factors" and would not "recover prior losses" so as to increase the profitability of the Policies in future years to a level higher than Transamerica initially projected for the persisting Policies in those same future years. Transamerica also agreed that it would credit interest to the Policies accumulation values at the guaranteed annual rate of 4.0%.

48.     The Cost Factor Provision and the Non-Recoupment Provision operate in tandem to restrict the circumstances under which Transamerica may raise the MDRs. The Cost Factor Provision specifies that Transamerica may raise MDRs based only on its true expected ***future*** experience with respect to legitimate ***cost factors*** resulting from a deviation between actual and assumed experience using actuarially sound practices. The Non-Recoupment Provision, in turn, sets an upper limit on the amount of any MDR increases by specifying that Transamerica may not increase the MDRs to avoid future projected losses or to earn future profits higher than the level projected at the time the Policies were priced and issued.

49.     Thus, under the Policies, Transamerica may not increase MDRs to recoup past losses, to avoid future losses, or to make the Policies more profitable than assumed at issuance. Furthermore, Transamerica may not increase the MDRs when there is no reasonable expectation of future adverse changes in legitimate cost factors. Nor may Transamerica increase MDRs to avoid its obligations to pay guaranteed interest or to avoid, subsidize or defray the costs associated with its own no-lapse guarantees.

50.     Accordingly, the Policies do not authorize or permit Transamerica to do any of the following:

- set or increase the MDRs in whatever amount or by whatever method it determines;

- increase MDRs to recoup past losses in violation of the Non-Recoupment Provision;

- increase MDRs in order to negate or offset Transamerica's obligation to pay credited interest to the Policies at the minimum guaranteed rates;

- increase MDRs for reasons other than those permitted by Cost Factor Provision;

- increase MDRs in order to negate or offset Transamerica's obligations to provide no-lapse coverage under the No-Lapse Endorsements; and

- increase MDRs to induce policy lapses in order to evade Transamerica's obligations to pay interest at the guaranteed rates or to provide no-lapse coverage under the No-Lapse Endorsements.

**D.    Transamerica's Massive MDR Increases.**

51.    Beginning in August of 2017, Transamerica suddenly announced the MDR Increases, stating that it was going to unilaterally increase the Monthly Deduction charges under the Policies based on a massive MDR increases.

52.    Certain of the Policies were subjected to a level rate increase of between 47% and 58%. Others were hit with a 39% increase on the next anniversary date, followed by another 39% increase in each of the following two years, *compounded* each year (resulting in an overall increase for these Policies of 169% after the third contemplated increase).

53.    In the notices to Plaintiffs and the other Policyholders announcing the MDR Increases, Transamerica stated that the increases are "in addition to the customary increases that are associated with age" and that the increases are attributable to Transamerica's "current expectations about our *future costs to provide this coverage.*" (Emphasis added.) As alleged below, however, the MDR Increases impermissibly operate to recoup losses in violation of the Non-Recoupment Provision, are not attributable to the Transamerica's true expectations about future cost factors allowable under the Cost Factor Provision, and were

adopted by Transamerica in bad faith as a pretext to avoid its own obligations under the Policies and the No-Lapse Endorsement and to cause elderly Policyholders to lapse or surrender their Policies (an inevitable consequence of the sudden MDR increases, known as "shock lapses").

### E.   The MDR Increases Breach the Applicable Policy Provisions.

#### 1.   The MDR Increases Violate the Non-Recoupment Provision.

54.   As noted above, all of the Policies contain the Non-Recoupment Provision explicitly prohibiting Transamerica from increasing MDRs to recover past losses. An insurance company recovers past losses whenever it increases cost of insurance rates (MDRs) on universal life products to produce more favorable future profits than those assumed, based on reasonable pricing assumptions, when the particular Polices were priced and issued. This prohibition against recovering past losses prevents Transamerica from "changing the rules of the game" mid-stream, to penalize persisting Policyholders through increased MDRs generating profits at a level higher than the company expected during future periods based on initial reasonable pricing assumptions for the persisting cohort of policies. As alleged in the following paragraphs, the MDR Increases operate to recover past losses in violation of the Non-Recoupment Provision.

55.   The market for universal life policies throughout the 1990's was extremely competitive as insurance companies jockeyed to capture new business. By virtue of the flexible premium design of universal life products, sales illustrations were the predominant tool used by insurance companies to sell universal policies to consumers. In their quest to illustrate the most competitive (i.e., providing higher death benefits and policy values for a lower cost), Transamerica and other insurance companies adopted overly aggressive pricing assumptions. An "illustration war" sparked by "illustration shoot outs" erupted, ultimately culminating in model regulations promulgated by the National Association of

16

1    Insurance Commissioners and adopted by states across the country to curtail the
2    illustration abuses.

3          56.    Traditional universal life policies, first introduced in the high interest
4    environment of the early 1980s, provided flexibility in premium payments while
5    purportedly allowing Policyholders to obtain insurance for a lower cash outlay in
6    exchange for giving up the certainty of guaranteed premiums. In response to
7    declining interest rates, which made sales illustrations less attractive, Transamerica
8    and other companies developed secondary guarantee products like the TransUltra
9    115 and the TransSurvivor 115 Policies. As alleged above, the no-lapse guarantee
10   feature provided by the No-Lapse Endorsement provides that if stated premiums are
11   paid, subject to strict conditions, the Policy will not lapse even if the Policy
12   accumulation account were insufficient to pay the otherwise required Monthly
13   Deductions.

14         57.    Secondary guarantee no-lapse policies quickly became one of the
15   hottest insurance products in the market, providing agents with the ability to sell
16   insurance providing coverage for ostensibly guaranteed rates that were still lower
17   than whole life products while providing companies with the opportunity for
18   increased sales and short-term profits. As no-lapse products proliferated,
19   Transamerica and other companies rushed to provide policies with increasingly
20   lower premiums to garner sales in a highly competitive price-driven market.

21         58.    To gain a competitive advantage, while at the same time reaping short-
22   term profits, Transamerica designed the TransUltra 115 and TransSurvivor 115
23   Policies, and the No-Lapse Endorsement, to generate high profits in early policy
24   durations, followed by losses in later durations. Transamerica achieved these early
25   profits, in part, by using "reverse select ultimate" MDRs that allowed the company
26   to reap high mortality profits in early durations, thereby front-loading those profits,
27   followed by mortality charges in later durations that were insufficient to cover the
28

cost of anticipated death claims. As a stock company, Transamerica was able to boost its reported short-term profits due to the difference between GAAP accounting and statutory reserve accounting (allowing the company to show early profits on the difference between Monthly Deductions and death benefits paid plus any profit on expenses charged to Policyholders less those paid or assessed). Transamerica thus delayed its long-term obligations and projected late-duration losses to far distant reporting periods and discounted those liabilities and future losses using favorable assumptions.

59.     Transamerica also used lapse-supported pricing in the design of the Policies. Rather than traditional conservatively priced policies, where profitability improves if lapses are less than assumed, the lapse-supported Policies become less profitable when fewer Policies lapse. Transamerica knew when it designed the products that the Policies would be unprofitable if all or a substantial percentage of purchasers persisted until death benefits were paid on their contracts. Thus, for the cohort of Policies owned by Plaintiff and the other putative class members, which have persisted for the last two decades, the current in-force Policies were priced to have losses in the late durations, with such losses having minimal impact on pricing metrics since they were far in the future and substantially discounted to the time of pricing. Transamerica's attempt to saddle these Policies with higher MDRs under the MDR Increases, in order to avoid the projected future losses, impermissibly seeks to recoup past losses in violation of the Non-Recoupment Provision.

60.     In addition, because the Policies were marketed based on the no-lapse secondary guarantees, they were priced to have relatively low accumulation and cash surrender values and relatively high early duration policy charges. Furthermore, for competitive reasons, Transamerica could price the Policies based on very low interest rate spreads. The interest rate spread is the difference between the rate earned by Transamerica on the assets (primarily bonds) purchased with

policy premiums and the non-guaranteed interest rate credited to the Policies, net of certain charges. The interest spread thus represents Transamerica's projected interest earnings on the Policies. Transamerica's decision to assume low accumulation values, modest interest spreads, and high early costs, contributed to the priced for profit pattern of front-loaded profits followed by late duration losses.

61.     Furthermore, Transamerica designed certain of the No-Lapse Endorsements for the Policies using "shadow accounts" which allowed Transamerica to avoid booking reserves as liabilities that would reduce its bottom line profits. Transamerica thus delayed its long-term obligations to far distant reporting periods and discounted those liabilities and future losses using favorable assumptions.

62.     The Policies thus were designed to allow Transamerica to realize high mortality profits in the early years, immediately after the Policies were priced and issued. But as the Policies progressed to the later durations, Transamerica faced constrained future profits and looming future losses resulting from its policy design choices.

63.     When that day of reckoning arrived, Transamerica reacted by saddling the Policyholders with the MDR Increases, imposed to recoup losses in contravention of the Non-Recoupment Provision. The MDR Increases were imposed to mitigate or avoid those losses, making the Policies more profitable in future years than the profit levels based on original pricing assumptions using Transamerica's own mortality assumptions.

64.     The sudden, massive MDR Increases – some of which are as high as 169% – can only be explained as an attempt to recoup losses. Insurance company actuaries are required to closely monitor and report on trends affecting non-guaranteed elements of its insurance policies. Material deviations between current and expected future expected profitability do not occur overnight; they are gradual

trends for which actuaries can and do make incremental adjustments.

65.    In its Statements of Nonguaranteed Elements, filed with insurance regulators each year, Transamerica consistently represented that mortality charges (MDRs) on its universal life products are closely monitored and determined periodically based on the company's experience, that expense charges are adjusted when anticipated future experience deviates from original pricing assumptions, and that credited interest rates are reviewed on a monthly basis. Yet during the period from December 31, 2010 through December 31, 2016, Transamerica expressed no indication of any need to increase the Monthly Deduction Rates from those illustrated to Policyholders of secondary guarantee universal life policies due to any adverse change in mortality rates or any other anticipated experience factors. Not until publishing its 2017 NGE Statement did Transamerica announce that changes to anticipated experience may result in increases to the Monthly Deduction Rates in 2018. As a consequence, it is inconceivable that the MDR Increases (as high as 169%) are attributable to changes in current or anticipated experience factors relating to the cost of providing insurance that emerged only recently.

### 2.    The MDR Increases Violate the Cost Factor Provision.

66.    The massive MDR Increases are not truly based on adverse changes in Transamerica's "current expectations about the future costs to provide this coverage" allowable under the Cost Factor Provision, as Transamerica represented in its notice letter to the Policyholders. Under the Cost Factor Provision, Transamerica may increase MDRs based *only* on "***future cost factors,***" including mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

67.    Importantly, the Cost Factor Provision permits Transamerica to increase MDRs only where expected future cost factors associated with the cohort of in-force Policies are less favorable than Transamerica assumed for those same

CLASS ACTION COMPLAINT

cost factors when the Policies were priced and issued. The Cost Factor Provision does not, for example, permit Transamerica to increase MDRs because the amount of premiums paid (i.e. funding levels) are less than projected at pricing since premiums are a revenue rather than a cost of providing. Similarly, Transamerica may not increase MDRs because the interest spreads are lower than assumed at pricing since interest spreads represent a source of profit rather than a cost of providing coverage. In addition, the Cost Factor Provision only permits Transamerica to increase MDRs where the expected future costs applicable to the particular Policies in-force at the time of the increase are less favorable than the corresponding cost factors assumed at pricing. Transamerica admitted as much in its notice to in-force Policyholders about the MDR Increases, where it said the increases were "based on our current expectations about the future costs to provide this coverage" (i.e. the cost to provide coverage under the recipient's in-force Policy).

68.    As alleged in the following paragraphs, Transamerica has not experienced any substantial deterioration in the cost factors applicable to the Policies that would support a sudden rate hike of the magnitude imposed by the MDR Increases.

69.    First, MDR Increases are not justified by adverse mortality. Nationwide, mortality has continuously *improved* since the Policies were issued. Beginning at least as early as 1941, the NAIC has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables. These are industry-standard mortality tables that were commonly used by insurers at the time the policies were priced to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. In 2001, at the request of the NAIC, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("Academy") produced a proposal for a new CSO mortality Table. The accompanying report from June 2001 explained that

(a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued. The SOA published an update of the CSO tables in 2017.[2] An investigative report on the update of the CSO tables by the SOA was published in June 2015 and showed further significant reductions in insurance company reserves compared to 2001 CSO due to continuous mortality improvements since 2001.[3]

70. Consistent with national results, Transamerica's projected mortality margin for the Policies based on its current experience at the time of the MDR Increases was *more favorable* than assumed at pricing.

71. Furthermore, the reference to "mortality" in the Cost Factor Provision means the rate of death (as opposed to amount of death claims or any similar metric) based on Transamerica's own past, emerging, and projected experience relating to the Policies within the same class. It does not include reinsurance, which is a transfer of risk that the insurer voluntarily undertakes with an undisclosed third-party; such outsourcing of risk is not a cost of directly administering the policy and reinsurance premiums are not guaranteed.

72. To whatever extent Transamerica claims that any of its third-party reinsurance companies demanded premium increases, or that Transamerica recaptured certain liabilities associated with the Policies to avoid increased reinsurance premiums, any such increases would be a direct result of Transamerica's own past failure to adhere to the underwriting standards used to price the reinsurance treaties rather than any future change in Transamerica's expected mortality experience.

---

[2] https://www.soa.org/experience-studies/2015/2017-cso-tables/ (last accessed May 8, 2019).

[3] https://www.soa.org/research-reports/2015/research-cso-impact-study/ (last accessed May 8, 2019).

73.     Second, changes in Transamerica's projected future expenses could not conceivably justify the massive MDR Increases. Such expenses have at most only a minor impact on the expected future profitability of the Policies. Because the Policies were discontinued eighteen years ago in 2000, Transamerica is incurring no further sales or acquisition costs (such as agent commissions) in connection with Policies. The administrative expenses associated with the Policies are stable and predictable. In January 2018, Transamerica announced that it entered an agreement with Tata Consultancy Services ("TCS"). According to the press release issued by Transamerica, "TCS will administer Transamerica's life insurance [business] . . . and take on administration of over 10 million policies."[4] The TCS agreement is expected to result in annual administrative expense savings to Transamerica of approximately $70 million initially, growing to annual savings of $100 million over time. *Id.* If anything, Transamerica's projected future expenses associated with the No-Lapse Policies is more, not less favorable, than in the past.

74.     Nor can the MDR Increases be justified by any projected increase in state or federal tax expense in light of the Tax Reform Act of 2017. Rather than increased expenses, Transamerica will realize *lower* projected federal taxes as a result of reduce rates and other benefits to insurance companies. Aegon N.V., a Netherlands corporation, acquired Transamerica in 1999. According to Aegon's reported financial results for the fourth quarter of 2017, its shareholders' equity "increased by EUR 1.0 billion . . . resulting from US tax reform, due to a reduction in net deferred tax liabilities, of which EUR 554 million was recognized in the profit

---

[4]https://www.prnewswire.com/news-releases/transamerica-partners-with-tata-consultancy-services-to-transform-its-insurance-and-annuities-administration-300581697.html (last accessed May 8, 2019).

and loss account."[5]

75. Third, the MDR Increases also cannot be justified by changes in Transamerica's interest experience. The No-Lapse Policies were priced and issued during 1997–2000, the same time when Transamerica priced and issued other TransUltra and TransSurvivor policies that did not include no-lapse guarantees. Transamerica used comparable interest assumptions in pricing these contemporary policies because all of them were part of the same product line priced during the same interest rate environment, supported by the same classes of assets with comparable durations.

76. The other TransUltra and TransSurvivor policies priced during the same time as the Policies were subjected to MDR increases in 2016. Transamerica purportedly focused only on purported "interest spread" deficiencies for those policies. The increases for the other TransUltra and TransSurvivor policies ranged between 5% and 17% – far lower than the MDR Increases as high as 169% that Transamerica imposed on the Policies. The massive MDR Increases cannot be justified, therefore, based on changes in Transamerica's future expected interest costs.

77. Moreover, as alleged above, Transamerica designed the Policies with very low interest spreads and low projected account values in the first place. Consequently, the massive MDR Increases cannot be explained or justified by the "interest" factor enumerated in the Cost Factor Provision, nor can it be justified by any purported deviation between projected and actual funding levels. Even if Transamerica's current expectation is that the company will experience spread compression or even negative interest spreads with respect to the No-Lapse Policies, that would not and could not justify an MDR increase of between 39% and

---

[5]https://www.businesswire.com/news/home/20180214006525/en/Aegon-concludes-2017-solid-fourth-quarter-results (last accessed May 8, 2019).

169%.

78.     Furthermore, although the Policies have a guaranteed interest rate of 4%, Transamerica currently earns approximately 5% on the portfolio of assets supporting the Policies. Interest rates are projected to increase in future years. Thus, notwithstanding the current low interest rate environment, Transamerica is still earning a positive interest spread on the Policies and, as such, its 4% guaranteed interest obligation cannot properly be viewed as a "cost"; rather, to the extent future expected interest spreads may be lower than projected when the Policies were priced and issued, at most Transamerica is earning lower *interest profits*.

79.     The Cost Factor Provision allows MDRs to be increased only based on future costs. Lower profits are not a true cost, and none of the enumerated "cost factors" includes the desire for increased profits as a permissible basis for MDR increases. And, in any event, the 4% interest rate that Transamerica was crediting to the Policies at the time of the MDR Increases was lower than the interest crediting rates that Transamerica assumed at pricing, making any purported "cost" associated with interest credits lower than the corresponding pricing assumption.[6]

80.     Transamerica's expectations of future investment returns could not reasonably be materially lower than what Transamerica originally expected, as adjusted from time to time – and any change in investment returns would be far too small to justify an MDR increase of the massive size imposed by the MDR Increases, especially when combined with the dramatic *improvements* in mortality that have occurred since the Policies were priced.

81.     Finally, the MDR Increases are not justified based on Transamerica's

_____

[6] Transamerica does have discretion under the Policy contract to reduce credited interest rates (so long as they are not reduced below the guaranteed 4% rate) to help attain the profits assumed at pricing. But as long as its portfolio rate is higher than the credited interest rate, thereby generating a positive interest spread and associated interest profits, the credited rate cannot properly be considered a "cost."

25
CLASS ACTION COMPLAINT

expectation that persistency of the Policies is *higher* than assumed when the Policies were priced. The only "cost" associated with persistency is incurred when Policies are surrendered, requiring Transamerica to pay terminating Policyholders the cash surrender value of the surrendered Policy. Where persistency is higher than Transamerica assumed at pricing, thereby resulting in fewer surrenders, the costs attributable to cash surrender payments are lower, not higher, than projected when the Policies were priced. Accordingly, to the extent Transamerica expected future persistency to be higher than it assumed when the Policies were designed and issued, that "cost factor" would suggest a lower MDR, and certainly would not support or justify an MDR increase.

82. As alleged above, the base Policies were designed as lapse-supported products that would generate high profits in early durations followed by losses in later durations, thereby allowing Transamerica to extract high short-term profits. However, Transamerica should have used a relatively low lapse rate in its pricing assumptions to account for the secondary guarantees contained in the No-Lapse Endorsements. Consequently, even if the Policies experienced a lower lapse rate than Transamerica assumed at pricing and those lower lapses were encompassed by the "persistency" cost factor, the discrepancy would not explain or justify the draconian MDR Increases.

83. In short, any future underperformance of the Policies is attributable to Transamerica's own conduct, including erroneous internal modeling, rather than any change in underlying experience relating to the cost factors that would permit an increase under the Cost Factor Provision. Transamerica made numerous errors relating to the profit models relating to its universal life products. In an analyst conference call on January 13, 2016, Transamerica admitted that it was required to book hundreds of millions in charges to earnings because "the combination of sustained low interest rates and more sophisticated policyholder behavior was not

adequately captured by our models."[7]

84.    Similarly, Transamerica in many instances failed to enforce or adhere to its underwriting standards; failed to conduct adequate investigation or evaluation of cases submitted by producers, including obtaining third party confirmation of net worth and health-related representations by the insureds; allowed or promoted table shaving (a program offering improved ratings for prospects with substandard table ratings due to health issues); and made business-decisions to underwrite to a lower rating than provided by their underwriting manuals as an incentive to receive more cases from preferred agents or in an effort to match or best competing product offers.

85.    The cost of insurance factors enumerated in the Cost Factor Provision, separately or in combination, do not explain or justify the MDR Increases. Nor is there any other legitimate cost factor, in addition to those enumerated in the Cost Factor Provision itself, that can plausibly explain or justify the MDR Increases.

86.    In sum, based on and in addition to the foregoing allegations, Transamerica breached the Policies by systematically calculating and imposing the challenged MDR Increases which among other things: (1) are based on assumptions that are not "cost factors" within the meaning of the standardized policy language; (2) attempt to recover past losses in contravention of the uniformly applicable Policy provisions; (3)  treat Policies in a non-uniform fashion; (4) use  aggregate or inapplicable data to saddle persisting Policies with excessive MDR Increases; (5) include "converted" Policies in the MDR calculations; (6) use unreasonable assumptions relating to Policies with secondary guarantees and second-to-die provisions and with respect to the reserves associated with those Policies; (7)

---

[7] http://docplayer.net/48358805-Event-id-event-name-aegon-nv-a-i-conference-event-date-january-13-2016-3-45-am-est.html (quoting Aegon NV's CFO at page 17 of transcript of meeting) (last accessed May 8, 2019).

impute increased interest spreads to achieve target spreads higher than those used to price the Policies; (8) fail to account properly for third-party reinsurance premiums or for the positive financial impact of captive reinsurance; (9) overstate the reserves assumed in modeling the MDR Increases; (10) manipulate the assumptions and other model inputs used to determine the MDR Increases (including the inputs used to calculate the present value of profits based on both the "original pricing" assumptions and Transamerica's assumed "current" expectations); (11) use inaccurate, incomplete and unreasonable purported "original pricing" assumptions; and (12) use different modeling platforms (such as TAS, MoSes, and AXIS) producing inconsistent profits for the same inputs.

## F.    The MDR Increases Were Adopted in Bad Faith.

87.    Through the sudden and massive MDR Increases, Transamerica is attempting to avoid its obligation to credit the guaranteed interest rates under the Policies and its obligations under the no-lapse endorsements – thereby denying Policyholders their contractual benefits under the Policies. Transamerica has imposed the MDR Increases to offset or subsidize its credited interest and no-lapse guarantees.

88.    As alleged above, Transamerica has saddled Plaintiffs and other Class Members with the onerous MDR Increases not because of any adverse mortality experience or other legitimate cost of insurance factors but, instead, to defray its contractual obligations to pay guaranteed interest under the Policies, to avoid its contractual obligations under the No-Lapse Endorsements (thereby recouping losses stemming from Transamerica's own actions), and to increase profits going forward from those originally anticipated when the products were priced.

89.    Transamerica knows, and fully expects, that the massive MDR Increases will cause thousands of Class Members to surrender their Policies and cause thousands of other Policies to lapse as the increased Monthly Deduction

charges exhaust the funds in the Policies' accumulation accounts. Indeed, Transamerica has acted intentionally to provoke Policy surrenders in an effort to wipe from its books life insurance policies insuring vulnerable elderly Policyholders that Transamerica has by its own conduct rendered unprofitable.

90.    The likelihood of a surrender or lapse increases dramatically when there is an increase in MDRs, and the Policyholder must decide whether he or she can afford to maintain the Policy, especially when the information supplied to the Policyholder is deliberately designed to provoke surrender or lapse.

91.    Transamerica has actively sought to encourage and provoke Plaintiffs and Class Members to terminate their Policies or reduce the face amount of coverage enough to allow Transamerica to collect the increased monthly deduction charges. In its form letters announcing the MD Increase, Transamerica suggested that Policyholders "may choose to surrender your policy for the cash value . . . You can take this in cash or you may be able to exchange it for another life insurance policy that accumulates cash value." Transamerica also suggested an alternative "Reduced Face Amount Option," which would drastically reduce the insurance coverage while still allowing Transamerica to pocket the increased Monthly Deductions as long as the Policy remained in force. *Id.*

92.    Transamerica also has created obstacles that preclude Policyholders from obtaining the information they need to evaluate their options. For instance, Transamerica systematically directs Policyholders to speak with its "customer service" representatives or its "Product Specialist Team" to obtain information and answers to questions about the MDR Increases. However, this call center is staffed by representatives who lack sufficient training or information to provide meaningful guidance to Policyholders. Policyholders are often given confusing or conflicting answers to their questions or presented with alarming doomsday scenarios intended to encourage surrenders or lapses.

93.    In addition, Transamerica is now refusing to provide Policyholders with illustrations showing how their Policies will perform as a result of the MDR Increases. Instead, Transamerica will now only provide policy illustrations depicting how the Policies would perform if the MDRs were raised to a level even higher than the rates imposed by the MDR Increases. These illustrations depict the most pessimistic scenario possible, showing that the Policies will terminate far sooner than they will as a result of the MDR Increases. By doing so, Transamerica hopes to induce elderly Policyholders to surrender their Policies.

94.    Transamerica's attempt to deprive Plaintiff and Class Members of the primary benefit of their Policies – paid for through years of contributions to the accumulation account – violates Transamerica's express and implied obligations under the Policies, constitutes "unfair" conduct under the UCL, and statutory elder abuse in the case of Plaintiff Thompson and other California Policyholders aged 65 years or older.

## G.    Transamerica's Unconscionable Conduct Must Be Enjoined.

95.    The Class Members hardest hit by Transamerica's unconscionable business practices are elderly Policyholders who have dutifully paid premiums for nearly 20 years based on the expectation that in their twilight years the Policies would provide protection for their families. Due to age-related underwriting considerations, life insurance protection for these elderly Policyholders is now either unavailable or prohibitively expensive.

96.    The majority of Transamerica Policyholders affected by this increased MDRs are elderly; many are now in their mid-to-late 80s, at an age at which most insurers will not offer new insurance policies. These Policyholders have faithfully paid the scheduled premiums for years. Due to their advanced age, these individuals cannot obtain alternative life insurance coverage and will lose the cash value of the Policy if they cannot pay the increased costs to maintain the Policy.

97.    Transamerica for many years and as recently as late 2015, supplied Policyholders with illustrations and other information using existing MDRs that provided no hint of any impending change in those rates. Current Policyholders thus had no way of knowing or expecting that this dramatic increase in the MDRs would happen after almost twenty years of stable premiums.

98.    These elderly Policyholders, who are effectively uninsurable due to their advanced ages, face the prospect of: (1) surrendering their Policies and losing their death benefits at an age when purchasing other life insurance coverage is practically impossible; (2) permitting Transamerica to deplete their Policy values through its "cost of insurance" increases until there is nothing left and the Policy "shock lapses"; (3) paying vastly increased premiums with no assurance the cost of insurance will not continue to increase; or (4) accepting cuts in death benefits.

99.    As a result of Transamerica's actions, thousands of Class Members are faced with the difficult decision of either paying the exorbitant and unjustified new charges or forever forgoing the life insurance benefits for which they have dutifully paid premiums for many years.

100.    Plaintiffs therefore seek immediate preliminary injunctive and equitable relief to preserve the status quo *pendente lite* by enjoining the MDR Increases. Unless Transamerica is enjoined, Policyholders will be irreparably damaged and Transamerica will succeed with its plan to cause mass cancellations of the Policies – leaving tens of thousands of Policyholders without coverage based on unlawful, unfair, and abusive MDR Increases. Plaintiffs also seek permanent declaratory and injunctive relief requiring Transamerica to reverse the unlawful increase in Monthly Deductions charged on the Policies. Plaintiffs also seek ancillary damages flowing directly from Transamerica's unlawful conduct.

## PLAINTIFF-SPECIFIC ALLEGATIONS

101.    On or about, July 1, 2000, Transamerica from its Los Angeles,

California office issued to Plaintiff Thompson a TransSurvivor 115 policy insuring the life of her parents, Lois Thompson and Emory Thompson, with a face amount of $500,000.  Thompson is the owner and primary beneficiary of the policy. For the past three or so years, Thompson has paid the policy premiums. Thompson's policy remains in force with Transamerica and was subject to Transamerica's TransSurvivor MDR Increase until the policy lapsed on or about December 4, 2018.

102.  On or about October 1, 2000, Transamerica from its Los Angeles, California office issued to the Sunder Trust a TransSurvivor 115 policy insuring the life of Klaus Sunder, with a face amount of $2,000,000. Plaintiff Hans Sunder is the Trustee of the Sunder Trust.  The Sunder Trust has made all premium payments for the Sunder Policy; the policy remains in force with Transamerica and is subject to Transamerica's TransSurvivor MDR Increase.

103.  On or about May 12, 1998, Transamerica from its Los Angeles, California office issued to the Barcelona Trust a TransSurvivor 115 policy jointly insuring the lives of Charles Barcelona and his wife Nancy, with a face amount of $2,000,000. The policy contains an Endorsement to Modify Grace Period. Plaintiff Belinda Bucci is the Trustee of the Barcelona Trust.  The Barcelona Trust is the owner of the policy, and the primary beneficiaries of the policy are Charles and Nancy Barcelona's three children. The Barcelona Trust has made all premium payments since the policy was purchased. The Barcelona Trust's policy was subject to Transamerica's TransUltra MDR Increase until the policy lapsed on or about July 13, 2018.

104.  On or about June 3, 1998, Transamerica from its Los Angeles, California office issued to Plaintiff Debra Lewis a TransSurvivor 115 policy jointly insuring the lives of her parents Griffin and Fabronia Lewis, with a face amount of $375,000.  Plaintiff Debra Lewis is the owner and primary beneficiary of the policy. Plaintiff Debra Lewis has made all premium payments for more than the past five

years, and the policy remains in force with Transamerica and is subject to Transamerica's TransSurvivor MDR Increase.

105.   On or about June 3, 1998, Transamerica from its Los Angeles, California office issued to Plaintiff Diana Lewis a TransSurvivor 115 policy jointly insuring the lives of her parents Griffin and Fabronia Lewis, with a face amount of $375,000.  Plaintiff Diana Lewis is the owner and primary beneficiary of the policy. Plaintiff Diana Lewis has made all premium payments for more than the past five years, and the policy remains in force with Transamerica and is subject to Transamerica's TransSurvivor MDR Increase.

106.   On or about November 25, 1998, Transamerica from its Los Angeles, California office issued to Plaintiff Michael H. Stephens a TransUltra 115 policy insuring his life, with a face amount of $500,000. Plaintiff Stephens is the owner of the policy, and has made all premium payments; the policy remains in force with Transamerica and is subject to Transamerica's TransUltra MDR Increase.

107.   On or about January 16, 1999, Transamerica from its Los Angeles, California office issued to the Rosner Trust a TransUltra 115 policy insuring the life of Elena Rosner, with a face amount of $500,000. Plaintiff Sandra Rosner is the Trustee of the Rosner Trust.  Since 2004, the Rosner Trust is the 50% owner of the policy, and has paid 50% of each premium payment; and the policy remains in force with Transamerica and is subject to Transamerica's TransUltra MDR Increase.

108.   On or about, April 21, 1999, Transamerica from its Los Angeles, California office issued to Plaintiff Swift a TransUltra 115 policy insuring the life of Kathleen M. Swift, with a face amount of $250,000. Plaintiff Swift is the owner and primary beneficiary of the policy, and made all premium payments for the policy. Swift's policy was subject to Transamerica's TransUltra MDR Increase until the policy lapsed on or about June 23, 2018.

109.   On or about December 23, 1997, Transamerica from its Los Angeles,

California office issued to the Soble Trust a TransSurvivor 97 policy insuring the lives of Jerome S. Soble and Marilyn B. Soble, with a face amount of $2,200,000. Plaintiff Marc Soble is a Trustee of the Soble Trust, which is the owner of the policy, and has made all premium payments; the policy remains in force with Transamerica and is subject to Transamerica's TransSurvivor MDR Increase.

## CLASS ACTION ALLEGATIONS

110.  This action is brought by Plaintiffs individually and on behalf of the National Classes and the California Subclasses described below (collectively, the "Classes") pursuant to Rule 23, subdivisions (a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

111.  ***Definition of Classes:*** Plaintiffs seek certification of the following classes:

- **National Classes:**

  All persons who own or owned a Policy that was subjected to the TransUltra MDR Increases.

  All persons who own or owned a Policy that was subjected to the TranSurvivor MDR Increases.

- **California Subclass I:**

  All California residents who own or owned a Policy that was subjected to the TransUltra MDR Increases and/or the TranSurvivor MDR Increases.

- **California Subclass II: Senior Policyholders**

  All California residents (a) who own or owned a Policy that was subjected to the TransUltra MDR Increases and/or the TranSurvivor MDR Increases, and (b) who were 65 years old or older at the time of that increase.

112.  ***Size of Classes:*** There are thousands of members of each of the Subclasses described in the foregoing paragraph. Accordingly, the Class consists of thousands of Transamerica Policyholders and is thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of these

Subclasses can be readily ascertained from business records maintained by Transamerica.

113. **_Adequacy of Representation_**: Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Classes.

114. The self-interests of Plaintiffs are co-extensive with and not antagonistic to those of absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members.

115. Plaintiffs have engaged the services of counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and the putative Class members.

116. **_The Commonality of Questions of the Law and Fact_**: The claims of Plaintiffs and putative Class Members involve common questions of law and fact, including:

    a. Whether Transamerica's imposition of the MDR Increases are permitted under the terms of the Policies;

    b. Whether Transamerica breached its contractual obligations owed to Plaintiffs and Class Members;

    c. Whether Transamerica breached its implied duty of good faith and fair dealing owed to Plaintiffs and Class Members;

    d. Whether Transamerica has engaged in unfair business practices in its dealings with Plaintiffs and Class Members;

    e. Whether Transamerica has engaged in the financial abuse of elders within the meaning of California's Elder Abuse Statute;

f. Whether Plaintiffs and Class Members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

g. Whether Plaintiffs and Class Members are entitled to declaratory relief; and

h. Whether Plaintiffs and Class Members are entitled to preliminary and permanent injunctive relief, or other equitable relief, against Transamerica.

117. ***Typicality of the Claims or Defenses of the Class Representatives***: Plaintiffs' claims and defenses are typical of the claims and defenses of the putative Class Members.

118. ***Rule 23(b)(2)***: This action is appropriate as a class action pursuant to Rule 23 (b)(2). Plaintiffs seek injunctive relief and corresponding declaratory relief for each of the Classes. Transamerica has acted in a manner generally applicable to each member of the Classes by imposing the MDR Increases on all Policies owned by Class Members.

119. Transamerica's unlawful MDR increases, if not enjoined, will subject Plaintiffs and Class Members to enormous continuing future harm and will cause irreparable injuries to such Policyholders, who are compelled to surrender valuable life insurance policies with no economically viable option for alternative life insurance. The adverse financial impact of Transamerica's unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiffs and Class Members.

120. ***Rule 23(b)(3)***: This action is also appropriate as a class action pursuant to Federal Rule of Civil Procedure 23 (b)(3).

121. The common questions of law and fact listed above predominate over any individualized questions.

122. A class action is superior to other available methods for the fair and

efficient adjudication of this controversy, for the following reasons:

    a.    Given the age of Class Members, many of whom are elderly and have limited resources, the complexity of the issues involved in this action and the expense of litigating the claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs that Transamerica has committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    b.    Once Transamerica's liability has been adjudicated respecting the MDR Increases, claims of all Class Members can be determined by the Court;

    c.    This action will ensure an orderly and expeditious administration of the Class's claims and foster economies of time, effort, and expense, and ensure uniformity of decisions and compliance by Transamerica with the Policies;

    d.    Without a class action, many Class Members would continue to suffer injury, and Transamerica's violations of law will continue without redress while it continues to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

    e.    This action does not present any undue difficulties that would impede its management by the Court as a class action.

123. A class action is superior to other available means for the fair and efficient adjudication of this controversy. The injuries suffered by individual Class Members are, though important to them, relatively small compared to the burden and expense of individual prosecution needed to address Transamerica's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the

37

benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

124. ***Nature of Notice to the Proposed Classes.*** The names and addresses of all Class Members are contained in the business records maintained by Defendant and are readily available to Defendant. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## FIRST CAUSE OF ACTION

*(Breach of Contract – All Classes)*

125. Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

126. Prior to the MDR Increases, the Plaintiffs' Policies were valid, enforceable contracts between Plaintiffs and Class Members and Transamerica.

127. At all relevant times, Plaintiffs and Class Members have paid premiums to Transamerica through Monthly Deduction charges established at the inception of the Policies and have otherwise performed all their obligations under the Policies.

128. As alleged above, Transamerica owed duties and obligations to Plaintiffs and Class Members under the Policies including, but not limited to, refraining from imposing Monthly Deduction charges except as authorized under the terms of the Policies.

129. Through the MDR Increases, Transamerica has materially breached the terms and provisions of the Policies for reasons not permitted under the Policies; that is, in order to avoid its guaranteed interest and no-lapse obligations to Plaintiffs and the Class and to recoup past losses in violation of the Non-Recoupment Provision, by dramatically depleting the Policyholders' accumulation accounts.

130. At a minimum, the MDR Increases are of such a magnitude that, even

if legitimate MDR increases were a factor, Transamerica necessarily considered factors other than those permitted by the Cost Factor Provision in setting the level of the 2017 MD Increases.

131.   Transamerica's conduct and material breaches of the Policies have proximately caused damage to Plaintiffs and the Class Members in an amount to be determined at trial.

132.   In addition, unless Transamerica is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the Class Members will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## SECOND CAUSE OF ACTION

*(Contract Breach of the Implied Covenant of Good Faith and Fair Dealing –
Plaintiff Thompson and California Subclass I)*

133.   Plaintiff Thompson refers to the prior paragraphs of this Complaint and incorporates those paragraphs as though set forth in full in this cause of action.

134.   Prior to the MDR Increases, Plaintiffs' Policies were valid, enforceable contracts between Transamerica and Plaintiffs or the Class Members.

135.   Implied in each Policy is a contractual covenant of good faith and fair dealing through which Transamerica owed Plaintiffs and the other members of California Subclass I a duty to act in good faith and deal fairly, and in a manner that did not frustrate their reasonable expectations under the Policies.

136.   Transamerica contractually breached the covenant of good faith and fair dealing because, to the extent Transamerica had the discretion to increase the MDRs, that discretion was sufficiently constrained under the terms of Policies to support an implied obligation of good faith and fair dealing with respect to the MDR Rate Increases.

137.   Transamerica exercised its discretion under the Policies in bad faith

and breached the implied covenant of good faith and fair dealing by, among other things:

    a.    Exercising its discretion to increase the MDRs to recoup past losses;

    b.    Misleading Plaintiffs and California Subclass I members as to the reasons for the MDR Increases;

    c.    Intending for the MDR Increases to force Plaintiffs and the other members of California Subclass I to surrender their policies so Transamerica would not have to pay the death benefits; and

    d.    Negating the value of what were intended to be guarantee interest rates and no-lapse protections, which Transamerica has no right to do.

138.   Transamerica's contractual breach of the covenant of good faith and fair dealing has proximately caused damage to Plaintiffs and the members of California Subclass I in an amount to be determined at the time of trial.

139.  In addition, unless Transamerica is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the other members of California Subclass I will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## THIRD CAUSE OF ACTION

*(Tortious Breach of the Duty of Good Faith and Fair Dealing –*
*Plaintiff Thompson and California Subclass I)*

140.  Plaintiff Thompson refers to the prior paragraphs of this Complaint and incorporates those paragraphs as though set forth in full in this cause of action.

141.  Prior to the MDR Increases, the Policies were valid, enforceable contracts between Transamerica and Plaintiffs and the other members of California Subclass I.

142.  Life insurance policies, like those owned by Plaintiff Thompson and the other members of California Subclass I, protect them from the economic harm

and risk presented by death. As is the case with most insurance contracts, Transamerica and the Policyholders' financial interests are directly at odds: Transamerica benefits from increasing the charges to Policyholders and the Policyholders are harmed by such increases. As explained above, Transamerica benefits if Plaintiff Thompson and the other members of California Subclass I were to forfeit the Policies because it will have obtained premium payments without having to pay death benefits or the promised credited interest rates.

143.   For these reasons, Transamerica owes Plaintiff Thompson and the other members of California Subclass I a heightened duty of good faith and fair dealing. Among other things, Transamerica must refrain from doing anything to injure Policyholders' right to receive the benefits of the Policies. Transamerica is required to give at least as much consideration to the welfare of the Policyholders as it gives to its own interests. Furthermore, Transamerica has a duty to reasonably inform Plaintiff Thompson and the other members of California Subclass I of their rights and obligations under the Policies.

144.   As alleged above, Transamerica has breached these duties in connection with the MDR Increases, thereby frustrating the reasonable expectations of Plaintiff Thompson and the other members of California Subclass I and tortuously depriving them of benefits under the Policies. In increasing the MDRs, Transamerica did not give proper consideration to the welfare of Plaintiff Thompson and the other members of California Subclass I and served solely its own interests at their expense. In addition, Transamerica has failed to truthfully, let alone reasonably, disclose or describe its course of conduct, or the basis and reasons for its course of conduct.

145.   Transamerica's alleged acts and omissions were and are unreasonable and without proper cause. If left unabated, Transamerica's conduct will frustrate and deprive Plaintiff Thompson and the other members of California Subclass I of

the reasonably expected benefits of the Policies.

146.   Transamerica has, in particular, improperly withheld benefits due Plaintiff Thompson and the other members of California Subclass I under the Policies because the unlawful increase in the MDRs has both (a) reduced the value of their accumulation account, and (b) reduced the amount of interest credited on their accumulation accounts.

147.   Transamerica's tortious breach of the covenant of good faith and fair dealing has proximately caused damages to Plaintiff Thompson and the other members of California Subclass I in an amount to be determined at the time of trial.

148.   Transamerica's conduct was intentional, deliberate, and constitutes oppression and malice. Plaintiff Thompson and the other members of California Subclass I are entitled to recover punitive and exemplary damages in an amount to be determined by the trier of fact. Plaintiff Thompson and the other members of California Subclass I also seek an order requiring Transamerica to disgorge all profits that it received in connection with the above referenced wrongful acts and omissions.

149.   In addition, unless Transamerica is preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiff Thompson and the other members of California Subclass I will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## **FOURTH CAUSE OF ACTION**

*(Injunctive and Restitutionary Relief Pursuant to UCL –
Plaintiff Thompson and California Subclass I)*

150.   Plaintiff Thompson refers to the prior paragraphs of this Complaint and incorporates those paragraphs as though set forth in full in this cause of action.

151.   Transamerica committed acts of unfair competition by engaging in,

among others, the following practices:

    a.    Marketing and selling the Policies on the premise that they were a solid and good life insurance product that would provide a certain death benefit for a certain cost and duration and subsequently taking steps to prevent Policyholders from receiving the promised benefits from those Policies by suddenly, massively, and unlawfully increasing the cost of the Policies through the MDR Increases.

    b.    Imposing the MDR Increases even though Transamerica's expected future mortality has improved and is better than the mortality upon which the original MDR schedule is based -- in order to increase premiums, recoup past losses, and/or force its insureds to surrender (cancel) their Policies, all of which was, and is, contrary to, and precluded by, the express terms of the Policies. The Monthly Deduction charges were increased effective on policy anniversary dates after August 1, 2017, so that Transamerica could reduce the size of an unprofitable block of life insurance policies, to eliminate long-anticipated losses on the Policies, and to cause many of the Policyholders to surrender their Policies. Transamerica breached its duties under the Policies by improperly increasing the MDRs in order to recoup past losses and gain or retain an unfair competitive advantage over other life insurers.

    c.    After the sale of the Policies, continuing to send annual reports, policy servicing statements, illustrations and other documents and correspondence to Plaintiff Thompson and the other members of California Subclass I without disclosing that there would be sudden, dramatic, and cost-prohibitive increases in the Monthly Deduction charges effective August 1, 2017.

    d.    Failing to provide any meaningful advance warning that it intended to massively and suddenly increase the Monthly Deduction charges effective August 1, 2017, through the MDR Increases.

    e.    Ultimately providing a misleading explanation to Plaintiff Thompson and the other members of California Subclass I of the grounds for the MDR Increases.

CLASS ACTION COMPLAINT

152.   A claim under the UCL's "unfair" prong is predicated on a "business practice" that "violates established public policy" or is "immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits." *Eisen v. Porsche Cars N. Am., Inc.*, No. CV 11-9405 CAS (FEMx), 2012 WL 841019, at *5 (C.D. Cal. Feb. 22, 2012) (citing *McKell v. Washington Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (Ct. App. 2006). Transamerica violated the "unfair" prong by excessively raising the MDRs for reasons not authorized under the Policies, and unfairly shifting to Plaintiff Thompson and other members of California Subclass I: (a) losses suffered by Transamerica when the Policies ceased to be as profitable as Transamerica had hoped based on its original (but mistaken) pricing assumptions; and (b) Transamerica's cost of meeting its obligations to pay credited interest at the 4% annual and 5.5% effective guaranteed rates.

153.   Plaintiff Thompson is informed and believes and, on that basis, alleges that the "unfair" practices alleged above are continuing in nature and are widespread practices engaged in by Transamerica.

154.   On behalf of the general public and California Subclass I, Plaintiffs respectfully requests that the Court issue an injunction against Transamerica preliminarily and permanently enjoining it from continuing to engage in unfair conduct and preventing Transamerica from collecting the unlawfully and unfairly increased MDRs in violation of the Policies.

155.   On behalf of the general public and California Subclass I, Plaintiff Thompson furthermore respectfully requests that this Court order restitution to be paid by Transamerica to her and other members of California Subclass I for Monthly Deduction charges, premiums, and other amounts wrongfully required, obtained and collected as the result of the MDR Increases in violation of the Policies.

156.   Plaintiff Thompson respectfully requests an award of attorneys' fees

as the prevailing party in her request for injunctive relief and restitutionary relief against Transamerica on behalf of herself and the other members of California Subclass I.

## FIFTH CAUSE OF ACTION

*(For Declaratory Relief –All Plaintiffs and All Classes)*

157. Plaintiffs refer to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

158. An actual controversy has arisen and now exists between Plaintiffs and the Class Members, on the one hand, and Transamerica, on the other hand, concerning the respective rights and duties of the parties under the Policies.

159. Transamerica contends that it lawfully and appropriately increased MDRs effective beginning August 1, 2015, through the MDR Increases, has appropriately collected (and is still collecting) Monthly Deduction charges based on the elevated MDRs, and that it is permitted to continue to collect these charges for the duration of the Policies. On the other hand, Plaintiffs and Class Members maintain that Transamerica, through the MDR Increases, has inappropriately and unlawfully, in material breach of the express and implied terms of the Policies, collected inflated Monthly Deduction charges.

160. Plaintiffs, on behalf of themselves and the Classes, seek a declaration as to the parties' respective rights under the Policies and request the Court to declare that the MDR Increases are unlawful and in material breach of the Policies' terms so that future controversies may be avoided.

## SIXTH CAUSE OF ACTION

*(For Elder Abuse – Plaintiff Thompson and California Subclass II)*

161. Plaintiff Thompson refers to the prior paragraphs of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

162. This cause of action is brought under California's Welfare and

1   Institutions Code section 15610, *et seq.*

2   163. Plaintiff Thompson and each member of California Subclass II were

3   65 years or older at all times relevant to this claim.

4   164. By imposing the MDR Increases, Transamerica took, depleted,

5   appropriated and/or retained the personal property of Plaintiff Thompson and the

6   other members of California Subclass II in bad faith for a wrongful use, which

7   constitutes financial abuse as defined in California Welfare & Institutions Code

8   section 15610.30.

9   165. Transamerica is guilty of oppression and malice in the commission of

10  the above-described acts of abuse. At a minimum, Transamerica knew or should

11  have known that its conduct was likely to be harmful to elders.

12  166. Under California Civil Code section 3294 Transamerica is liable to

13  Plaintiff Thompson and the other members of California Subclass II for punitive

14  damages.

15  167. Under California Welfare & Institutions Code section 15657.5

16  Transamerica is liable to Plaintiff Thompson and the other members of California

17  Subclass II for reasonable attorney fees and costs.

18  ## **<u>PRAYER FOR RELIEF</u>**

19  WHEREFORE, Plaintiffs, individually and on behalf of the Classes, pray for

20  relief as follows as applicable for the particular cause of action:

21  A. An Order certifying this action to proceed on behalf of the National

22  Class and the California Subclasses, and appointing Plaintiffs and the counsel listed

23  below to represent the respective Classes;

24  B. An Order awarding Plaintiffs and Class Members entitled to such relief

25  restitution and/or disgorgement and such other equitable relief as the Court deems

26  proper;

27

28

C.     An Order enjoining Transamerica, its representatives, and all others acting with it or on its behalf from using MDRs based on the MDR Increases and from unlawfully charging excessive Monthly Deduction Rates for the Policies and requiring those rates to be at levels that are consistent with the terms of the policies, and other appropriate injunctive relief;

D.     An Order providing a declaration that the MDR Increases materially breach the Policies, and that Transamerica must determine the MDRs only on the grounds authorized under the Policies;

E.     An Order awarding Plaintiff Thompson and the other members of the California Subclasses who might be entitled to such relief actual, compensatory, statutory, punitive, and/or exemplary damages;

F.     An Order awarding Plaintiffs' attorneys' fees, expert witness fees and other costs pursuant to the state statutory causes of action set forth above that permit such an award; and

G.     An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

Dated: May 8, 2019.

**BONNETT FAIRBOURN FRIEDMAN & BALINT, PC**

By: */s/Andrew S. Friedman*
   Andrew S. Friedman (*admitted Pro Hac Vice*)
   Francis J. Balint, Jr. (*admitted Pro Hac Vice*)
   2325 East Camelback Road, Suite 300
   Phoenix, Arizona 85016
   Tel: (602) 274-1100; Fax: (602) 274-1199
   afriedman@bffb.com
   fbalint@bffb.com

**CONSUMER WATCHDOG**
   Harvey Rosenfield (SBN: 123082)
   Jerry Flanagan (SBN: 271272)
   6330 San Vicente Blvd., Suite 250

47
CLASS ACTION COMPLAINT

Los Angeles, CA 90048
Tel: (310) 392-0522; Fax: (310) 392-8874
Harvey@consumerwatchdog.org
jerry@consumerwatchdog.org

**THE MOSKOWITZ FIRM, PLLC**
Adam Moskowitz (*admitted Pro Hac Vice*)
Howard Bushman (*admitted Pro Hac Vice*)
Adam Schwartzbaum (*admitted Pro Hac Vice*)
2 Alahambra Plaza, Suite 601
Coral Gables, FL 33134
Tel: 305-740-1423; Fax: 786-298-5737
adam@moskowitz-law.com
howard@moskowitz-law.com
adams@moskowitz-law.com

**PATTERSON LAW GROUP**
James R. Patterson (SBN 211102)
Allison H. Goddard (SBN 211098)
Catherine S. Wicker (SBN 306494)
402 West Broadway, 29th Floor
San Diego, California 92101
Tel: (619) 756-6990; Fax: (619) 756-6991
jim@pattersonlawgroup.com
ali@pattersonlawgroup.com
catherine@pattersonlawgroup.com

**BARRACK, RODOS & BACINE**
Stephen R. Basser (SBN 121590)
Mark R. Rosen (SBN 139506)
Samuel M. Ward (SBN 216562)
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Tel: (619) 230-0800; Fax: (619) 230-1874
sbasser@barrack.com
sward@barrack.com
mrosen@barrack.com

**EMERSON SCOTT, LLP**
John G. Emerson (*to be admitted Pro Hac Vice*)
830 Apollo Lane
Houston, TX 77058
Tel: (281) 488-8854; Fax: (281) 488-8867
jemerson@emersonfirm.com

**EMERSON SCOTT, LLP**
David G. Scott (*to be admitted Pro Hac Vice*)
The Rozelle-Murphy House
1301 Scott Street
Little Rock, AR 72202
Tel: (501) 907-2555; Fax: (501) 907-2556
dscott@emersonfirm.com

*Attorneys for Plaintiffs*

48
CLASS ACTION COMPLAINT