# EXHIBIT B

1   **BONNETT FAIRBOURN**
      **FRIEDMAN & BALINT, PC**
2   Andrew S. Friedman (*Pro Hac Vice*)
    afriedman@bffb.com
3   Francis J. Balint, Jr. (*Pro Hac Vice*)
    fbalint@bffb.com
4   2325 E. Camelback Road, Suite 300
    Phoenix, AZ 85016
5   Tel: (602) 274-1100
    Fax: (602) 274-1199
6

7   **CONSUMER WATCHDOG**            **THE MOSKOWITZ LAW FIRM**
    Harvey Rosenfield (SBN: 123082)   Adam M. Moskowitz (*Pro Hac Vice*)
8   harvey@consumerwatchdog.org       adam@moskowitz-law.com
    Jerry Flanagan (SBN: 271272)      Howard Bushman (*Pro Hac Vice*)
9   jerry@consumerwatchdog.org        howard@moskowitz-law.com
    6330 San Vicente Blvd., Suite 250  2 Alhambra Plaza, Suite 601
10  Los Angeles, CA 90048             Coral Gables, FL 33134
    Tel: (310) 392-0522               Tel: (305) 479-5508
11  Fax: (310) 392-8874               Fax: (786) 298-5737

12  [Additional Counsel on Signature Page]
    *Attorneys for Plaintiffs*
13

14                    **UNITED STATES DISTRICT COURT**

15                    **CENTRAL DISTRICT OF CALIFORNIA**

16  GAIL THOMPSON, individually and on
    behalf of themselves and all others        Case No. 2:18-cv-05422-CAS-GJSx
17  similarly situated,

18              Plaintiffs,                     **DECLARATION OF LARRY N.
                                                STERN IN SUPPORT OF
19       vs.                                    MOTION FOR CLASS
                                                CERTIFICATION**
20  TRANSAMERICA LIFE INSURANCE
    COMPANY,                                    Hon. Christina A. Snyder
21
                Defendant.                      Hearing Date: November 25, 2019
22                                              Time: 10:00 am
                                                Court: Courtroom 8D
23
                                                Complaint filed: June 18, 2018
24

25

26          **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED
                              UNDER SEAL**
27

28

I, Larry N. Stern, FSA, MAAA, declare as follows:

## I.  QUALIFICATIONS

1.  I am President of Canterbury Consulting, LLC, an actuarial consulting firm and licensed reinsurance intermediary in Charlotte, North Carolina. I am a Fellow of the Society of Actuaries and a Member of the American Academy of Actuaries. I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained herein. A copy of my curriculum vitae summarizing my background and experiences is attached to this report as **Exhibit A**.

2.  I have held numerous actuarial positions over the course of my career. For twenty years, I worked at three separate direct writing insurance companies, last serving for eight years as a Senior Vice President and Chief Actuary.  I worked for nine years at a global management and actuarial consulting firm serving as a Principal and Consultant and as the firm's practice leader for product development of life insurance and annuity products. For two years I worked at an international reinsurance company serving as Executive Vice President and Group Head, Financial Solutions. And for the last seventeen years I have served as President of Canterbury Consulting, LLC.

3.  I am familiar with universal life insurance products including the type of products at issue in this litigation. As a practicing actuary, I have designed, developed, and priced many universal life products for life insurance companies at which I was employed and for life insurance companies for which I was a consultant.

## II.  SUMMARY OF OPINIONS

4.  I have been engaged by counsel for Plaintiffs on behalf of the named Plaintiffs and all similarly situated TLIC policyholders to address and express opinions on the common nature of the actuarial issues raised by the claims Plaintiffs seek to certify in their motion for class certification in this case. I have reviewed the

First Amended Class Action Complaint (the "Complaint") filed in this action on May 8, 2019.

5.     According to the Complaint, Transamerica Life Insurance Company ("TLIC") increased the Monthly Deduction Rates ("MDRs") on a group of universal life ("UL") policies known as the TransUltra 115 policies ("TransUltra Policies"), effective October 1, 2017 ("TransUltra MDR Increase").

6.     According to the Complaint, TLIC increased the MDRs on another group of  UL policies known as the TransSurvivor 115 policies ("TransSurvivor Policies"), effective June 1, 2018 ("TransSurvivor MDR Increase").

7.     I have reviewed and analyzed extensive information and documents produced by TLIC through discovery in this action concerning the TransUltra MDR Increases and TransSurvivor MDR Increases (collectively the "MDR Increases").

8.     I understand Plaintiffs seek certification of the breach of contract claims on behalf of nationwide classes encompassing the owners of the TransUltra Policies and TransSurvivor Policies for which the applicable MDRs were increased as a result of the MDR Increases (collectively the "Class Policies").

9.     Based on my analysis of the information and documents I have considered, I have concluded:

      a) the Class Policies and their owners are objectively identifiable from TLIC's business records;

      b) the Class Policies  share the same contract provisions governing the determination of MDRs;

      c) the MDR Increases for the  Class Policies were developed using the same general methodology;

      d) the MDR Increases had a common impact on all Class Policies in that the increases raised the MDR rates applicable to all Class Policies;

      e) the same factual determinations will establish for all Class Policies whether the MDR Increases comply with the contract provisions

governing the determination of MDRs, including whether the increases improperly seek to recoup past losses or were otherwise impermissible; and

f) the same factual determinations will establish for all Class Policies whether the MDR Increases were based on improper, biased or unwarranted assumptions about TLIC's expectations as to future cost factors applicable to the Class Policies, both (a) at the time the Policies were priced, and (b) at the time of the MDR Increases.

10.   I do not in this declaration address the merits of Plaintiffs' claims. I will do so, if asked, through future expert disclosures and reports which I understand will be submitted after the Court has ruled on Plaintiffs' motion for class certification. Also, as I am not an attorney, I do not render in this declaration any opinions concerning the legal issues raised in the Complaint. I understand the Court will decide all issues of law relating to Plaintiffs' claims and any defenses asserted by TLIC.

11.   My opinions are based on the documents and data described or otherwise referenced in this declaration. I reserve the right to supplement these opinions and analysis as discovery progresses.

## III.   SUMMARY OF THE PERTINENT CLASS POLICY PROVISIONS

### A.   The TransUltra Policies

12.   The TransUltra Policy is a flexible-premium universal life policy issued by TLIC between 1997 and 2001.[1]

13.   At the beginning of each policy month, Transamerica withdraws an amount ("Monthly Deduction" or "MD") from the TransUltra Policy's Accumulation Value. The MD is equal to (a) the application of a monthly deduction rate ("MDR") to the difference between the death benefit and the Accumulation Value at the beginning of the year ("Net Amount at Risk" or "NAR"), plus (b) the

---

[1] TLIC17_153 at 159; TLIC17_169255, worksheet "MIN91216.V.POLC." A more detailed description of the Class Policies is provided in the attached **Appendix A**.

3

MD for any policy riders, plus (c) a policy fee.[2]

14.     Because MDR rates are one of several non-guaranteed elements ("NGE") of UL products, TLIC has discretion to adjust rates provided it does so in compliance with the provisions of the policy contract forms, TLIC's established NGE determination procedures, applicable law, and other actuarial constraints described below.

15.     The MDR is the most expensive component of the MD charge. The size of the MDR is important to the Policyholders for at least two reasons: (a) the MD charge is typically the highest expense a Policyholder pays on an ongoing basis; and (b) the MD charge is deducted from the Accumulation Value (i.e., the savings component) of the Policy, so the Policyholder forfeits the entire MD charge to Transamerica. Even small changes in the MDR produce a dramatic increase, particularly at older attained ages, in the dollar amount of the MD charged by TLIC. And consequently, the higher the MDR rate, the greater the amount of the premiums required to maintain the positive Accumulation Value necessary to avoid a lapse of the Policy, subject to the terms of an Endorsement to Modify Grace Period ("the No-Lapse Endorsement").

16.     At the time the Policy is issued, TransUltra Policyholders selecting the level death benefit option are eligible for the No-Lapse Endorsement,[3] which provides a contractually guaranteed death benefit for the earlier of 50 policy years or until the policy anniversary nearest age 100 ("the No-Lapse Select Period"),[4] without regard to fluctuating interest rates or MDR increases provided the Policyholder meets the cumulative premium requirements.[5]

---

[2] *Id.*

[3] TLIC17_128 at 136.

[4] This period was set at 40 years or age nearest 95 in the 1998 version of the TransUltra Policy. TLIC17_62 at 75.

[5] TLIC17_128 at 139.

17.    Because of the No-Lapse Endorsement, the TransUltra Policy is considered a "secondary guarantee product." Around the time this product was launched, TLIC noted that the secondary guarantee feature is "very appealing" to the mature market.[6]

### 2.    The TransSurvivor Policies

18.    The TransSurvivor Policy is a flexible premium universal life policy issued by TLIC between December 1996 and 2001.[7] The TransSurvivor product is a "second-to-die policy," meaning the death benefit is paid upon the death of the second insured to die.[8] Like the TransUltra product, the TransSurvivor product is a "secondary guarantee product." TLIC revamped the TransSurvivor product in 1997 to include the No-Lapse Endorsement.[9]

19.    For purposes of determining the MDRs, each joint insured is classified separately by age, sex, risk classification and face amount.[10] The mortality assumptions for both insureds are blended together to create a unique MDR for the Policy.[11] Once the MDR is calculated, the MDs are determined in the same manner as described for the TransUltra Policy.[12]

### 3.    The Challenged MDR Increases
### a.  The TransUltra MDR Increase

20.    The TransUltra MDR Increase, which was effective October 1, 2017, raised the MDRs for impacted TransUltra Policies by 58%.[13] The TransUltra MDR Increases were developed ███████████████████████.[14] The modeling

---

[6] TLIC17_62 at 74.

[7] TLIC18_132963, worksheet "MIN91216.P.POLC".

[8] TLIC18_24 at 29.

[9] TLIC18_73 at 73.

[10] TLIC18_24 at 36.

[11] *Id.*

[12] *Id.*

[13] TLIC_Jurisdictional_588 at 589.

[14] TLIC_Jurisdictional_588 at 589.

associated with the TransUltra MDR Increase was performed ██████████
████████████████████████████████████. The TransUltra MDR Increase

purportedly ████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████,"[15]

### b.   The TransSurvivor MDR Increase

21.   Effective June 1, 2018, TLIC implemented an MDR increase on all impacted TransSurvivor Policies.[16]

22.   The MDRs for the 1997 version of the TransSurvivor Policy were increased by 47%.[17]

23.   For the 1998 and 1999 versions of the TransSurvivor Policy, TLIC imposed a laddered MDR increase of 39% compounded annually for three consecutive years.[18]   Cumulatively, the TransSurvivor MDR Increase raised the MDRs on the 1998 and 1999 TransSurvivor ████████████████████████[19]

24.   The TransSurvivor MDR Increases ██████████████████████████
██████████████████████.[20] The purported goal of the TransSurvivor MDR Increase was to develop an MDR Increase that "██████████████████████████████
█████████████████████████████████████████████." [21] The modeling was performed by TLIC ████████████████████████████████████████████.[22]

### B.   Plaintiffs' Breach of Contract Claims

25.   Plaintiffs allege the MDR Increases breached the terms of the Class

---

[15] *Id.*

[16] TLIC_Jurisdictional_620 at 621.

[17] *Id.*

[18] *Id.*

[19] TLIC_Jurisdictional_620 at 624; TLIC18_171 at 171.

[20] TLIC_Jurisdictional_620 at 624.

[21] *Id.* at 621.

[22] *Id.*

Policies. I understand Plaintiffs assert, among other things, the MDR Increases were contractually impermissible because:

a) the MDR Increases are based on impermissible considerations not included in the cost factors for MDR adjustments set forth in the Class Policies;

b) the MDR Increases are premised on improper, biased or unwarranted assumptions concerning TLIC's future costs, assets and reserves associated with the Class Policies;

c) the MDR Increases operate to recover past losses in violation of the terms of the Class Policies; and

d) the MDR increases were designed and implemented by TLIC to avoid its own contractual obligations to pay guaranteed interest under the Class Policies and to provide no-lapse coverage under the No-Lapse Endorsement.

26.    I understand Plaintiffs seek a judgment determining the MDR Increases are invalid and awarding restitution equal to the difference between the MD charges imposed after the MDR Increases and the MD charges that would have been imposed but for the MDR Increases.

C.    **Class Demographics**

27.    TLIC has produced electronic policy-level data from its business records reflecting among other things the designated state where each Class Policy was issued.[23] The Class Policy data contain an indicator as to whether each individual policy was active as of the effective dates of the MDR Increases.[24] Using this information, I derived the chart in Paragraph 28 to include those Policies (1) active as the beginning implementation dates for the MDR Increases, and (2)

---

[23] *See* TLIC17_169255, worksheet "MIN91216.V.POLC"; TLIC18_132963, worksheet "MIN91216.P.POLC".

[24] *Id.*

1    subjected to MDR overcharges as of June 2019.[25]

2        28.    I understand Plaintiffs' motion for class certification asks the Court to

3    certify nationwide classes of owners of TransUltra Policies and owners of

4    TransSurvivor Policies for Plaintiffs' breach of contract claims.   The following

5    table provides a summary of the Class Policies nationwide by policy count and face

6    amount taken from the Policyholder transaction data produced by TLIC:

| Product | Policy Count | Face Amount |
|---|---|---|
| TransUltra | | |
| TransSurvivor | | |
| **TOTAL** | | |

**D.    The Class Policies and Their Owners Are Objectively Identifiable from TLIC's Business Records**

29.    TLIC has produced electronic data extracted from its in-force file.[26]
This data contains the policy information for all Class Policies impacted by the

_____

[25] To arrive at the numbers in the chart, I began by filtering column DG
("                                    ") in each of the policy census worksheets (i.e.,
TLIC17_169255 and TLIC18_132963)                                    y. As
produced, the TransUltra census (TLIC17_169255)

                                                    The count for the TransUltra Policies in the
chart    are    based    on    the    census    spreadsheet    as    modified.   *See*
TLIC17_169255_modified.   The count for the TransSurvivor Policies
                                                    .   These numbers
represent an estimate of the total number of Class Policies based on the accuracy
and completeness of the data in TLIC17_169255_modified and TLIC18_132963.
[26] *Id.*

8

MDR Increases.  The Class Policies were maintained on TLIC's Lifepro system.[27]

30.   TLIC accessed the Lifepro system to generate letters to agents and Policyholders notifying them of the MDR Increases.[28] Based on my experience and understanding of how insurance companies maintain and administer insurance policies and my understanding of TLIC's administration systems, I conclude TLIC's business records contain reliable information identifying the owners of the Class Policies as well as generally reliable mailing addresses for the class members as of the date of the MDR Increases.  Accordingly, the owners of the Class Policies in-force when the MDR Increases were implemented can be objectively and reliably determined from TLIC's normal business records.

**E.    The Class Policies Contain the Same Pertinent Contract Provisions**

31.   I have reviewed sample TransUltra Policy and TransSurvivor Policy forms.  The Class Policies are standardized contracts containing the following uniform contract provisions:

a)  Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include but are not limited to mortality; expenses; interest; persistency; and any applicable federal, state and local taxes ("the Cost Factor Provision");[29] and

b)  We do not distribute past surplus or recover past losses by changing

---

[27] TLIC17_225 at 225 (Implementation memo for TransUltra 115 indicating the policies would be administered on LifePro system); TLIC18_59 at 59 (Implementation memo for TransSurvivor 115 indicating the policies would be administered on LifePro system).

[28] TLIC18_163.

[29] Deposition of John Mahoney dated June 26, 2019 ("Mahoney Dep. II") at 241:4-24; *id.* at 243:21-244:8; Mahoney Dep. II., Ex. 15 at 16 (TransUltra Policy); Ex. 16 at 13 (TransSurvivor Policy).

the monthly deduction rates. ("the Non-Recoupment Provision").[30]

32.     The contract language prohibiting recoupment of past losses has a well-established and generally accepted technical meaning within the actuarial profession.[31] Several states have, from time to time, adopted regulatory prohibitions against recouping past losses.[32] This prohibition against MDR rate increases operating to recoup past losses, which applies to all of the Class Policies, is described in more detail below in Section H.3 of my declaration.

**F.     The MDR Increases Were Developed Using a Common Methodology**

33.     TLIC applied a common methodology to determine the TransUltra and TransSurvivor MDR Increases (the "MDR Increase Methodology") following the same steps to derive the final MDR Increases. Importantly,

[33]

34.     The MDR Increases were calculated using computer models (the "MDR Increase Model(s)") for the TransUltra Policies and TransSurvivor Policies, specifically designed

---

[30] Mahoney Dep. II at 241:25-242:14; 244:9-20; Mahoney Dep. II., Ex. 15 at 23 (TransUltra Policy); Ex. 16 at 24 (TransSurvivor Policy).

[31] *See generally*, E. Paul Barnhart, Adjustment of Premiums Under Guaranteed Renewable Policies, 12 Transactions of Society of Actuaries, No. 34, 472 (1960); Non-Participating Life Products with Non-Guaranteed Premiums, 6 Record of Society of Actuaries, Vol. 6, 669, 672 (1980).

[32] *See* 11 NYCRR, § 48.2 (b)(6) (New York); WAC 284-84-100 (Washington); N.J.A.C. 11:4-47 (h) (New Jersey).

[33] Mahoney Dep. II at 244:21-245:21; 246:13-25; 247:22-248:9; 250:19-251:13.

10

[REDACTED].

35.    The following is a summary of each step of the MDR Increase Methodology used by TLIC to calculate the MDR Increases:[34]

Step 1:    [REDACTED],[35]

Step 2:    [REDACTED],[36]

Step 3:    [REDACTED],[37]

Step 4:    [REDACTED],[38]

Step 5:    [REDACTED]

---

[34] For general descriptions of the MDR Increase Methodology, *see* TLIC_Jurisdictional_588 at 590; TLIC_Jurisdictional_620 at 622.

[35] Mahoney Dep. II at 263:9-269:19; 271:1-4; 276:24-277:22; TLIC_Jurisdictional_588 at 590; TLIC_Jurisdictional_620 at 622.

[36] Mahoney Dep. II at 271:5-10; 272:7-11; 276:24-277:22.

[37] *Id.* at 273:20-274:6; 275:18-276:5; 276:24-277:22.

[38] *Id.* at 276:6-10; 276:24-277:22.

Step 6:

;[39] and

.[40]

36.     Because     TLIC's     MDR     Increase     Methodology     uses     common assumptions for the TransUltra Policies and for the TransSurvivor Policies

.[41]

37.     Accordingly, as an actuarial matter, proof of the named Plaintiffs' claims will establish the same claims on behalf of all other similarly-situated owners of the corresponding Class Policies because the MDR Increase Methodology itself groups the Class Policies by product and applies a common set of assumptions to derive the applicable MDR Increases.

**G.     The MDR Increases Impacted All Class Policies in a Common Fashion**

38.     As noted above, I understand the proposed class definitions include only the owners of those TransUltra Policies and TransSurvivor Policies subjected to the MDR Increases.

39.     The methodology adopted by TLIC to derive the TransUltra MDR

---

[39] *Id*. at 276:16-23; 276:24-277:22.

[40] *Id*. at 276:24-277:22.

[41] *Id*. at 291:24-293:3.

Increase resulted in a single MDR percentage adjustment applicable to the owner of each impacted TransUltra Policy, which did not vary by underwriting class, gender, issue or attained age, or face amount.[42]

40.     Because TLIC used the same methodology to determine the TransSurvivor MDR Increase, the model derived a single MDR percentage adjustment applicable to all of the 1997 TransSurvivor Policies and a single set of MDR percentage adjustments applicable to all of the 1998 and 1999 TransSurvivor Policies, which again did not vary by underwriting class, issue or attained age, gender or face amount.[43]

41.     Thus, the MDR Increases operated in the same fashion and had a shared impact on all Class Policies. The MDR Increases raised the MDRs applicable to all Class Policies without regard to the individual circumstances of any Class Members.  The MDR Increases imposed uniform percentage increases on the MDR schedules applicable to all Class Policies that did not vary by age, gender, underwriting class, face amount or any other individualized characteristics or circumstances of any Class Policies.  Furthermore, the MDR Increases increased the rate by which all Class Policies' Accumulation Values decrease and/or reduced the growth rate of the Accumulation Values, including those Class Policies with secondary guarantee provisions.

**H.     The Class Claims Will be Proven or Disproven through Common Evidence**

42.     I am informed Plaintiffs allege, among other things, the MDR Increases: (a) are based on certain impermissible considerations not permitted by the uniform Cost Factor Provision of the Class Policies; (b) are premised on improper assumptions concerning TLIC's expected future experience with respect to certain of the cost factors permitted by the Cost Factor Provision; and (c)

---

[42] *Id*. at 246:13-25; 247:22-248:9; 280:18-25; 290:1-13.

[43] *Id*. at 250:19-251:13; 290:1-13.

improperly seek to recover past losses in violation of the uniform Non-Recoupment Provision of the Class Policies.

43.     Because these claims challenge the propriety of the MDR Increase Methodology itself and the assumptions used in the MDR Increase Model, TLIC's liability will be determined for all Class Policies through actuarial analysis based on data and facts applicable to all TransUltra Policies or all TransSurvivor Policies. Common evidence will establish whether the MDR Increase Model used contractually impermissible and actuarially unwarranted assumptions to develop the priced-for profits and future expected profits for the Class Policies.

**1.     Impermissible Factors Unrelated to Costs of Insurance**

44.     Plaintiffs assert the MDR Increases are not based solely on TLIC's expectations as to future "cost factors" as required by the Cost Factor Provision of the Class Policies because the MDR Increase Models include assumption inputs for items not constituting costs to TLIC. Such impermissible factors would include, for example, MDR Increase Model input ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ From an actuarial perspective, items (a) – (c) constitute "revenue" or "profit" items rather than "cost factors" and item (d) is not properly considered as an "expense" or "cost" under the Cost Factor Provision.

45.     In addition, various TLIC documents indicate ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████.

14

46.     For example, in 2015 as part of its "Model Validation" TLIC observed

."44

45

.

47.                                                                                                            . If the

Court or jury determines any of these assumptions do not qualify for consideration or inclusion in the MDR redetermination calculus as a permissible "cost factor" under the Cost Factor Provision then the MDR Increases would be overstated and invalid for all Class Members owning impacted TransUltra Policies or TransSurvivor Policies.

---

[44] TA_0822006 at 2008.
[45] *Id.*

### 2.     Improperly Determined Cost Factors

48.    The same conclusion follows as to Plaintiffs' assertion the MDR Increases were premised on improper assumptions not accurately reflecting TLIC's expected future experience with respect to mortality, expenses, interest, persistency or other cost factors permitted by the Cost Factor Provision of the Class Policies. For example, the MDR Increase Models include future mortality input assumptions for older Class Members substantially higher than the corresponding pricing assumptions for the Class Policies. The following graph taken from an internal management analysis

[46]

---

[46] TLIC17_169503.

49.    ████████████████████████████████



████████████████████████████████████

50.    If Plaintiffs establish the older-age mortality increases assumed for the Class Policies is improper because it is inconsistent with TLIC's own experience or for other reasons, the resulting MDR Increases for all Class Policies would be impermissibly high and invalid as alleged by Plaintiffs.

51.    Similarly, if the MDR Increase Model ████████████████

---

[47] The graph in paragraph 49 was generated using the data in TLIC18_135143 and the work is reflected in TLIC18_135143_mortality calculations with graph.

████████████████████████████████████████████████████

████████████████████████████████████[48]

52.     Because the MDR Increases operated to make the Class Policies profitable on a going forward basis, ████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████.

### 3.     Recoupment of Past Losses

53.     As noted above, the Non-Recoupment Provision contained in all the Class Policies expressly prohibits TLIC from increasing MDRs to recover past losses. This prohibition, which is commonplace in universal life policies of the same vintage as the TLIC Policies, is well understood by actuaries, as it has been referenced in Actuarial Standards of Practice promulgated by the Actuarial Standards Board ("ASB").[49]

54.     Whether the MDR Increases operate to recover past losses is an issue to be determined for all Class Policies through actuarial analysis based on data and facts applicable to all TransUltra Policies or all TransSurvivor Policies.   The following paragraphs provide examples showing how that determination – ████████████████████████████████████████████████████████████████ – will be based on common evidence applicable to all such policies.

55.     An insurance company impermissibly recovers past losses if it

---

[48] TA_0827489 at 499.

[49] ASOP 2 instructs the actuary to consider applicable policy provisions, the company's formal policy on the determination of non-guaranteed charges, and applicable law in formulating recommendations relating to potential increases in cost of insurance charges like the MDRs. ASOP 2, §3.1 ("The actuary should consider relevant policy provisions and applicable law.") and §3.2 ("The actuary should recommend nonguaranteed charges…that are consistent with the insurer's determination policy.").

increases cost of insurance charges or other nonguaranteed elements of UL policies to produce more favorable future profits than those reasonably assumed at pricing *for the policies in force at the time of the cost of insurance increase.* This requires (a) cost of insurance rate adjustments must be based on *all* relevant experience factors permitted by the applicable policy form and (b) the insurer cannot increase cost of insurance rates to produce profits higher than the priced-for profit levels projected using appropriate pricing assumptions.

56.   The MDR Increase Methodology ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[50]

57.   TLIC's documents and the testimony of TLIC Actuary Mahoney make clear ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[51] TLIC should not have relied ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[50] In addition, it is noteworthy different actuarial models will typically generate different results even if the same basic assumptions are incorporated in each of the models. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See e.g.* TLIC17_180952 at 956 and 959.

[51] Documents produced by TLIC indicate the MDR Increase Model for the TransUltra Policies actually ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ TLIC17_396, "QE_2016Q3_TUL9899_Comb" worksheet.



1                                     .[52]

2        58.    When TLIC priced the Class Policies,

11 .

12        59.    The Class Policies as a group

18 Because independent producers and investors compare products to identify the

19 lowest cost policies, actual sales tend to be skewed towards pricing cells exhibiting

20 lower profits.

21        60.    Consequently, to the extent the future profits for the Class Policies

22 projected in the MDR Increase Model based on

---

[52] Corporate representative Mahoney testified TLIC did model the current in force policies against the pricing assumptions but did not use this modeling when determining the MDR Increases.  Mahoney Dep. II at 279:18-280:3.

[REDACTED][53]

61.     In addition, if improper inputs or assumptions are used in the applicable MDR Increase Model resulting in pricing profitability **_higher_** than the priced for profitability for the in-force policies using appropriate pricing assumptions, then all other things being equal the model will yield impermissibly high MDR Increases improperly recouping past losses.  Examples of biased pricing assumptions overstating the priced-for projected profits for the Class Policies would include: (a) understated mortality or use of a mortality table with a flat late duration slope; (b) failure to account for the anticipated adverse mortality associated with term conversion or table-shaved policies; (c) understated reinsurance premiums failing to account for point-in-scale adjustments for conversion policies under the applicable treaties and (d)  premium payment patterns assuming an unreasonably high distribution of single pay or level-premium payment patterns or failing to account for minimum funding premium payments by investors or other policy owners.

62.     Likewise, if improper assumptions are used in the applicable MDR

---

[53] The MDR Increase Methodology is further flawed because it determines the MDR Increases [REDACTED] This means, for example, the MDR Increase Methodology could result in MDR Increases even where there has been no change in the cost factors assumed at pricing for the Class Policies and TLIC's actual experience with respect to those same cost factors.

Increase Model resulting in future expected profitability for the in-force policies *lower* than the projected profitability for those policies using correct assumptions, then all other things being equal the model also will yield impermissibly high MDR Increases operating to recover past losses.  In addition to the items described in Paragraphs 50-52 above, additional assumptions understating future expected profitability of the Class Policies would include ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

63.    Once again, because the MDR Increase Methodology was calculated to develop a single percentage increase or series of single percentage increases for all Class Policies, and the MDR Increase Model applied a common set of assumptions to all TransUltra Policies and to all TransSurvivor Policies, if the Court or jury determines the MDR Increases operate to recoup past losses for the particular policies owned by Plaintiffs, the same result will apply to the comparable Class Policies owned by all other similarly situated Class Members. Therefore, the same facts and actuarial determinations will prove the claims of all such Class Members.

I declare under penalty of perjury the foregoing is true and correct.  Executed this 23rd day of September 2019 at Charlotte, North Carolina.

Larry N. Stern, FSA, MAAA

# APPENDIX A
## Summary of TransUltra Policy and TransSurvivor Policy Features

## I.    THE TRANSULTRA 115 POLICIES

### A.    Premiums

1.    The TransUtra Policy is a flexible-premium universal life policy issued by TLIC between 1997 and 2001.[1] There is a minimum required annual premium ("RAP") for the first 10 years and for issues ages 45-80, and for the first five years for ages 81-89.[2] Premiums are deposited into an accumulation account.[3] As long as a policyholder satisfies his or her RAP commitment, the TransUltra offers the policyholder the option to adjust both the amount and frequency of their premium payments so long as the cumulative premium payments do not exceed limits defined in the Internal Revenue Code.[4]

2.    The accumulation account is credited with interest at a discretionary rate, but TLIC is obligated to credit not less than the minimum guaranteed rate (4.0%) specified in the operative policy form.[5] When a policyholder pays the RAP in full on or before each year-end anniversary during the RAP period, TLIC will add to the accumulation value a Premium Qualification Credit, equal to 2% of the RAP amount.[6]

### B.    Death Benefit

3.    The TransUltra Policy has three death benefit options:[7]

- Option 1 – Level death benefit is "equal to the face amount less any outstanding loans";

---

[1] TLIC17_153 at 159; TLIC17_169255, worksheet "MIN91216.V.POLC".

[2] TLIC17_153 at 162; TLIC17_128 at 137.

[3] Mahoney Dep. II., Ex. 15 at 5, 14-15 (TransUltra Policy).

[4] TLIC17_128 at 138-139.

[5] TLIC17_128 at 141.

[6] TLIC17_153 at 162; TLIC17_128 at 137

[7] TLIC17_128 at 135.

1

- Option 2 - Plus death benefit is "equal to the face amount plus the accumulation value less any outstanding loans"; and

- Option 3 – Plus Premium death benefit is "equal to the face amount plus all gross premiums paid as of the date of death less any premium refunds, withdrawals, partial surrenders, and outstanding loans."

## C.   Endorsements and Riders

### (1)   No Lapse Endorsement

4.      At the time the policy is issued, TransUltra policyholders selecting the level death benefit option are eligible for the Assured Coverage Endorsement otherwise known as the Endorsement to Modify Grace Period ("the No-Lapse Endorsement").[8] The No-Lapse Endorsement provides a contractually guaranteed death benefit the No-Lapse Select Period, without regard to fluctuating interest rates or MDR increases provided the policyholder meets the cumulative premium requirements.[9]

5.      In order to maintain the No-Lapse Endorsement, policyholders must pay a cumulative monthly No-Lapse premium for the No-Lapse Select Period.  A policyholder will be disqualified from coverage under the No-Lapse Endorsement if the net deposits do not meet the cumulative monthly No-Lapse premium.[10] Under these circumstances, a policy whose accumulation value is insufficient to cover the monthly deductions and other administrative charges will enter the grace period and ultimately lapse unless sufficient additional premiums are paid.[11]  As long as the policy is still in the No-Lapse Select Period and no policy loan has been taken,[12] a policyholder who lost coverage under the No-Lapse Endorsement due to non-

---

[8] TLIC17_128 at 139.

[9] TLIC17_128 at 139.

[10] *Id.*

[11] *Id.*

[12] The Class Policies allow the owner to obtain a policy loan secured by the policy value and bearing interest at a rate specified in the policy. TLIC17_128 at 143-144.

2

payment of the required No-Lapse premiums may reinstate this coverage by paying additional premium sufficient to meet the cumulative monthly No-Lapse premium.[13]

(2)   Full Death Benefit Rider

6.   After the policy anniversary nearest age 100, the death benefit equals the accumulation value times the death benefit factor.  To secure the continuation of the death benefit after the policy anniversary nearest age 100 until the policy anniversary nearest age 115, a policyholder may purchase the Full Death Benefit Rider ("FDBR"). [14]  The cost of the FDBR is $3.50 per thousand dollars of NAR.[15]

## II.   THE TRANSSURVIVOR 115 POLICIES

7.   The TransSurvivor product is a second-to-die policy, meaning the death benefit is paid upon the death of the second insured to die.[16] Like the TransUltra product, the TransSurvivor product is a secondary guarantee universal life product. TLIC revamped the TransSurvivor product in 1997 to include the No-Lapse Endorsement. [17]  TLIC priced the TransSurvivor Policies based on exact ages rather than using to a joint equal age.[18]  TLIC noted the ███████████████████████████████████████████████████████████████[19]   TLIC revised the TransSurvivor product in 1998 primarily to incorporate four premium bands ($100,000, $250,000, $1,000,000 and $3,000,000+) with the hope that this would encourage higher face amount sales.[20]

---

[13] *Id.*

[14] TLIC17_128 at 135.

[15] *Id.* at 140.

[16] TLIC18_24 at 29.

[17] TLIC18_73 at 73.

[18] TLIC18_135282 at 282.

[19] *Id.* at 287.

[20] TLIC18_59 at 60.  TSSL 115 was modified in 1999 to add a fifth premium band. TLIC_5508.

The TransSurvivor was again modified in 1999 to add a $5,000,000 premium face band.[21]

8.     The TransSurvivor Policy is a flexible premium universal life product. TransSurvivor Policyholders must pay a cumulative RAP for the first 5 policy years.[22]   Thereafter, premium payments are flexible for all ages.[23]   Premiums are deposited into an accumulation account.[24]

9.     The TransSurvivor Policy includes the same death benefit options, No-Lapse Endorsement, and FDBR as the TransUltra Policy.[25]

---

[21] TLIC_Jurisdicational_652 at 654.

[22] TLIC18_24 at 29.

[23] TLIC18_24 at 34.

[24] Mahoney Dep. II., Ex. 16 at 5. 12 (TransSurvivor Policy).

[25] *Id.* at 39-40.

# EXHIBIT A



# LARRY N. STERN, FSA, MAAA
**5719 Old Well House Road**
**Charlotte, NC 28226**
**704 904 8204**
**lstern@canterburyconsultingllc.com**

**Education:**
>  Indiana University - Bloomington, Indiana
>  B. S. Business with Honors and Distinction, 1971
>  Beta Gamma Sigma Business Scholastic Honorary

Insurance Industry Recognition:
>  Fellow Society of Actuaries, 1983
>  Member American Academy of Actuaries, 1980.

**Employment History:**

October 2002 – Present:
>  Canterbury Consulting, LLC (CCL)

>  President

>  Responsible for securing reinsurance assignments from client companies to solve balance sheet financial needs through reinsurance and capital formation. Provide ad hoc actuarial consulting services and expert witness testimony for client litigation support.

>  Here is a list of some recent engagements in which CCL has actively participated:

- Secure for a UK ceding company client a suitable reinsurance partner for the assumption of a large payout annuity block of in-force business (£450 mil reserve value)
  - CCL is assisting another UK ceding company client to secure a similar reinsurance partner for a large payout annuity block of in-force business (£700 mil reserve value)
- Secure for a U S ceding company client reinsurance on new business variable annuity production (base contract and living benefit riders). Initially, this reinsurance cover was for a 5% quota share with one reinsurer; within three years CCL was instrumental in creating a pool of three reinsurers wherein 45% of new business was reinsured

1

- CCL is pursuing a similar reinsurance structure on behalf of several other US ceding company clients for their variable annuity in-force and new business living benefit riders
- Secure for a U S corporate client reinsurance of term insurance redundant reserves (XXX) for two subsidiaries with an offshore reinsurer.
- Assist and direct client activities to form an onshore/offshore captive reinsurance subsidiary for reinsurance of term insurance redundant reserves and secure long-term LOC financing (for two clients)
- Perform the duties of Appointed Actuary for several Bermuda based insurers/reinsurers
- Secure for a U S ceding company client risk-based capital relief involving a $1.2 bil in-force block of deferred annuities.
- Provide consulting actuarial services for a U S life insurance client to develop cash flow testing projections
- Provide actuarial services as a consulting/testifying expert witness in several insurance/reinsurance-related litigations

August 2000 – September 2002:
    Scottish Annuity & Life Holdings

    Executive Vice President and Group Head, Financial Solutions
    Grand Cayman Location (August 2000 – January 2001)
    Charlotte, NC Location (February 2001 – December 2001)

    Direct responsibility for the business and financial results of the financial reinsurance line of business for the Scottish Annuity & Life Holdings group of companies.  From August 2001 to December 2001 Chief Corporate Actuary - oversight of all actuarial functions enterprise-wide.  Serves as a member of top management's team for strategy planning and implementation.

    President, Scottish Solutions (January 2002 – September 2002)

    This was a newly formed reinsurance intermediary subsidiary.  Responsible for securing reinsurance assignments from client companies to solve balance sheet financial needs through reinsurance and capital formation.

March 1991 – July 2000:
    Tillinghast - Towers Perrin

    Principal and Consulting Actuary
    Hartford, CT (March 1991 – December 1995)
    Indianapolis, IN (January 1996 – July 2000)

    Practice leader in product development and specialized in areas of marketing and corporate management strategy; interest-sensitive, variable and traditional life insurance and annuity product development; structured settlements; cash flow and financial projection analysis; and expert witness testimony for client

litigation support.  Served as an approved actuary for several Bermuda and Isle of Mann life insurance and reinsurance companies.

March 1983 - March 1991:
United Presidential Life Insurance Company
Kokomo, IN

Senior Vice President and Chief Actuary

Responsible for all facets of actuarial work for the company, and actively participated in underwriting and reinsurance functions. Served as a member of top management's team for strategy planning and implementation.  As a member of the company's investment committee, contributed in decisions to establish investment choices and setting interest-crediting rates for interest-sensitive products.

March 1981 - March 1983:
Durham Life Insurance Company
Raleigh, NC

Associate Actuary, Individual Product Development

June 1971 - March 1981:
State Life Insurance Company
Indianapolis, IN

Various actuarial positions beginning with Actuarial Student to Assistant Actuary and Manager of the Actuarial Department

Insurance Industry related activities:
- Served as Chairperson of the Society of Actuaries Product Development Section November 2000 – October 2001;
- Served as Chairperson of the Society of Actuaries Entrepreneurial Actuaries Section November 2009 – October 2010;
- Served as Chairperson of the Society of Actuaries Reinsurance Section November 2010 – October 2011;
- Served as Chairperson of Society of Actuaries Nominating Committee November 2013 – 2014;
- Served as Chairperson of the American Academy of Actuaries Reinsurance Subcommittee January 2011 – December 2011.

A frequent speaker at industry meetings and seminars and has authored many articles appearing in the National Underwriter, Best's Review, Loma Resource, and Society of Actuaries periodicals.

3

University related activities:

- Queens University (Charlotte) Entrepreneur Leadership Circle – an invitation only group of 50 local entrepreneurs who assist students in the McColl School of Business; mentoring two graduate students
- University of North Carolina, Charlotte (UNCC) - acting as an informal advisor to risk management/finance/economics students as mentor and guest speaker
- University of California, Santa Barbara – member of the advisory board for the Center for Financial Mathematics and Actuarial Research
- Columbia University – assisting in the planning for a soon to be created graduate program in risk management studies
- Indiana University Alumni Association, Charlotte Chapter – board member and chair of scholarship committee