# EXHIBIT C – Part 1

**BONNETT FAIRBOURN**
  **FRIEDMAN & BALINT, PC**
Andrew S. Friedman (*Pro Hac Vice*)
afriedman@bffb.com
Francis J. Balint, Jr. (*Pro Hac Vice*)
fbalint@bffb.com
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199

**CONSUMER WATCHDOG**
Harvey Rosenfield (SBN: 123082)
harvey@consumerwatchdog.org
Jerry Flanagan (SBN: 271272)
jerry@consumerwatchdog.org
6330 San Vicente Blvd., Suite 250
Los Angeles, CA 90048
Tel: (310) 392-0522
Fax: (310) 392-8874

**THE MOSKOWITZ LAW FIRM**
Adam M. Moskowitz (*Pro Hac Vice*)
adam@moskowitz-law.com
Howard Bushman (*Pro Hac Vice*)
howard@moskowitz-law.com
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Tel: (305) 479-5508
Fax: (786) 298-5737

[Additional Counsel on Signature Page]
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAIL THOMPSON, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>        Defendant. | Case No. 2:18-cv-05422-CAS-GJSx<br>**DECLARATION OF ANDREW S. FRIEDMAN IN SUPPORT OF MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**<br><br>Hon. Christina A. Snyder<br><br>Hearing Date: November 25, 2019<br>Time: 10:00 am<br>Court: Courtroom 8D<br><br>Complaint filed: June 18, 2018 |

**UNREDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

I, Andrew S. Friedman, declare as follows:

1.     I am a shareholder of Bonnett Fairbourn Friedman & Balint, PC, and have been by Court order dated July 1, 2019, appointed to serve with others as Interim Class Counsel in the above-captioned putative class action ("this Action"). [Dkt. 104]. I have personal knowledge of the facts set forth below and, if called as a witness, I could and would competently testify thereto.

2.     Class Plaintiffs have in this Action asserted claims against Transamerica Life Insurance Company ("TLIC") challenging increases in the Monthly Deduction Rates (the "MDR Increases") TLIC imposed as cost of insurance ("COI") charges on owners of its TransUltra 115 and TransSurvivor 115 flexible premium universal life insurance policies (collectively, "the Class Policies").  Class Plaintiffs contend, *inter alia*, that the MDR Increases breached the express contractual terms of the Class Policies.

3.     I respectfully submit this declaration in support of Plaintiffs' Motion for Class Certification, for Appointment of Class Representatives, and Appointment of Class Counsel. Class Plaintiffs' Motion is also supported by the Declaration of actuarial expert Larry N. Stern, FS, MAAA ("Stern Decl.") and the declaration of economist expert Robert Mills ("Mills Decl.").

4.     At this time Class Plaintiffs seek certification of only their express breach of contract claims[1] on behalf of the following two Nationwide Classes:

> All owners of TransUltra 115 series life insurance policies subjected to the monthly deduction rate increase imposed by TLIC on or after October 1, 2017.

and:

> All owners of TransSurvivor 115 series life insurance policies subjected to the monthly deduction rate increase imposed by TLIC on

---

[1] Class Plaintiffs have alleged several other claims against TLIC in the alternative. FAC ¶¶ 140-167. Class Plaintiffs may upon completion of further discovery seek appropriate class certification of these alternative claims as well.

1

or after June 1, 2018.

Excluded from the Classes are: (a) the Honorable Christina A. Snyder, United States District Court Judge of the Central District of California (or other Circuit, District, or Magistrate Judge presiding over the Consolidated Actions through which this matter is presented for settlement) and court personnel employed in Judge Snyder's (or such other Judge's) chambers or courtroom; (b) TLIC and its parents, affiliates, subsidiaries, successors, predecessors, and any entity in which TLIC has a controlling interest and their current or former officers and directors; (c) any officer or director of TLIC reported in its Annual Statements, or entity in which TLIC had a controlling interest at any relevant time, any member of those persons' immediate families and legal affiliates, heirs, controlling persons, agents, successors and predecessors in interest or assigns of any such excluded person or entity; (d) Policyholders who properly execute and timely file a request for exclusion from the Classes; (e) those Policyowners challenging the cost of insurance rate increase on an individual basis in pending or resolved actions against TLIC; and (f) the legal representatives, successors, or assigns of any of the foregoing excluded Policyholders (but only then in their capacity as legal representative, successor, or assignee).

5.     Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the deposition of TLIC actuary and Rule 30(b)(6) corporate designate John Daniel Mahoney, FSA, MAAA, taken in the above-captioned action on November 8, 2018 ("Mahoney Dep. I"). (Portions conditionally filed under seal)

6.     Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the deposition of TLIC actuary and Rule 30(b)(6) corporate designate John Daniel Mahoney, FSA, MAAA, taken in the above-captioned action on June 26, 2019 ("Mahoney Dep. II"). (Portions conditionally filed under seal)

7.     Mr. Mahoney works in TLIC's Actuarial Department, and his responsibilities include reviewing the profitability of blocks of life insurance

policies that are on TLIC's books, to see which blocks of business are "underperforming" in the sense that future profits on the block appear negative. **Exhibit 1**, Mahoney Dep. I at 20:20-21:24. Generally speaking, that analysis and review involves a comparison of (a) the projected future profits based upon current experience to (b) the profits were priced-for when the policies were originally designed. *Id.* at 21:25-22:11.

8.     The MDR Increases challenged in this action were applied to two TLIC blocks of business: (1) TransSurvivor 115 Series 1997, 1998 and 1999 (collectively, "TransSurvivor"), and (2) TransUltra 115 Series 1998 and 1999 (collectively, "TransUltra"). *Id.* at 23:15-24:24; *id.* at 26:8-27:8; **Exhibit 2**, Mahoney Dep. II at 194:17-195:12; *id.* at 196:9-19.

9.     In this action, Class Plaintiffs challenge the methodology by which TLIC determined the MDR Increases. In particular, Class Plaintiffs contend TLIC breached the Class Policies by systematically calculating and imposing the challenged MDR Increases which among other things: (1) are based on assumptions that are not "cost factors" within the meaning of the standardized policy language; (2) attempt to recover past losses in contravention of the uniformly applicable Policy provisions; (3) use aggregate or inapplicable data to saddle the persisting Class Policies with excessive MDR Increases; (4) use unreasonable assumptions relating to Policies with secondary guarantees and second-to-die provisions and with respect to the reserves associated with those Policies; (5) fail to account properly for third-party reinsurance premiums or for the positive financial impact of captive reinsurance; (6) overstate the reserves assumed in modeling the MDR Increases; (7) manipulate the assumptions and other model inputs used to determine the MDR Increases  (including the inputs used to calculate the present value of profits based on  both the "original pricing" assumptions and TLIC's assumed "current" expectations); (8) use inaccurate, incomplete and unreasonable purported "original pricing" assumptions; and (9) use different modeling platforms (such as

1    TAS, MoSes, and AXIS) producing inconsistent profits for the same inputs. FAC ¶

2    86; *see also* Stern Decl. ¶¶ 44-62.

3         10.    The Class Policies were designed, priced, modeled, and tested by TLIC

4    employees located in California. **Exhibit 1**, Mahoney Dep. I at 33:13-34:16; *id.* at

5    36:5-16.  The Class Policies recite that they were issued by TLIC from its home

6    office in Los Angeles, California.  **Exhibit 2**, Mahoney Depo. II, Exhibit 15, at 1,

7    5 & Exhibit 16, at 1, 5. A true and correct copy of the TransUltra Policy owned by

8    Kathleen Swift and marked as Exhibit 15 at the June 26, 2019 deposition of John

9    Mahoney is attached hereto as **Exhibit 3**. A true and correct copy of the

10   TransSurvivor Policy owned by Gail Thompson and marked as Exhibit 16 at the

11   June 26, 2019 deposition of John Mahoney is attached hereto as **Exhibit 4**. TLIC's

12   Los Angeles office ultimately closed at the end of 2017.  **Exhibit 1**, Mahoney Dep.

13   I at 30:13-17.

14        11.    The Class Policies are form contracts "sold to anyone;" their terms are

15   not negotiated. **Exhibit 2**, Mahoney Dep. II at 240:17-241:3; *id.* at 243:12-18.

16        12.    All Class Policies contain the following contractual provision

17   (hereinafter, the "Cost Factor Provision"):

18
19       Any change in the monthly deduction rates will be prospective and will
         be subject to our expectations as to future cost factors. Such cost
20       factors may include, but are not limited to: mortality; expenses;
         interest; persistency; and any applicable federal, state and local taxes.
21

22   **Exhibit 2**, Mahoney Dep. II at 241:4-24; *id.* at 243:21-244:8; Mahoney Dep. II.,

23   Ex. 15 at 16 (TransUltra Policy); Ex. 16 at 13 (TransSurvivor Policy).

24        13.    All Class Policies contain the following contractual provision (the

25   "Non-Recoupment Provision"):

26
27       We do not distribute past surplus or recover past losses by changing
         the monthly deduction rates.
28

1    **Exhibit 2**, Mahoney Dep. II at 241:25-242:14; *id.* at 244:9-20; **Exhibit 3** at 23;

2    **Exhibit 4** at 24.

3         14.    In early 2016, TLIC engaged in a two-month process of

4    "looking at whether or not there was an opportunity to improve the profits of the

5    TransUltra policies." **Exhibit 2**, Mahoney Dep. II at 206:5-13. TLIC considered

6    two options: ███████████████████████████████████████████ *Id.* at

7    206:18-22.  After projecting future profits, TLIC decided ███████████

8    ██████████████████████████████████████████████████████████

9    ████████████████ *Id.* at 210:12-23.

10        15.    TLIC then reviewed projected losses on the TransSurvivor policies in

11   May or June of 2018, to determine if an increase in the MDR ████████████

12   ███████████ *Id*. at 219:17-220:22. TLIC ███████████████████

13   ██████████████████████████████████████████████████████████

14   ███████████. *Id.* at 220:23-221:9. TLIC decided to move ahead and calculate the

15   TransSurvivor MDR increases between July and November, 2017. *Id.* at 229:14-

16   18.

17        16.    Actuary Mahoney prepared two ASOP 2 memoranda for the respective

18   sets of Class Policies to comply with Actuarial Standard of Practice No. 2 relating

19   to setting non-guaranteed elements such as the MDR applicable to the Class

20   Policies. **Exhibit 1**, Mahoney Dep. I at 51:15 – 52:12 (& Ex. 3); *id.* at 62:9-12 (&

21   Ex. 4); **Exhibit 2**, Mahoney Dep. II at 233:12-234:15; *id.* at 237:1-20.  These ASOP

22   2 memoranda memorialize the methodology followed in determining the MDR

23   Increase imposed on the Class Policies. **Exhibit 2**, Mahoney Dep. II at 244:21-24.

24   A true and correct copy of the TransUltra ASOP 2 memo, Bates numbered

25   TLIC_Jurisdictional_000000588-595 is attached hereto as **Exhibit 5** (conditionally

26   filed under seal).  A true and correct copy of the TransSurvivor ASOP 2 memo,

27   Bates numbered TLIC_Jurisdictional_00000620-628 is attached hereto as **Exhibit**

28   **6** (conditionally filed under seal).

17.   TLIC used █████████████████████████████████████
███████████████ **Exhibit 1**, Mahoney Dep. I at 70:19-75:19; **Exhibit 2**, Mahoney
Dep. II at 244:25-245:4.   Specifically, TLIC took █████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████ **Exhibit 1**, Mahoney Depo. I at 74:15-75:5. For
all the TransUltra policies, a single percentage increase was developed and applied
to the preexisting MDR schedule to the policies. **Exhibit 2**, Mahoney Dep. II at
246:8-18; 247:13-21.

18.   TLIC used the ███████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████t. **Exhibit 1**, Mahoney Dep. I at 103:24-104:6, 113:23-115:6, 118:8-16;
**Exhibit 2**, Mahoney Dep. II at 244:21-245:21; 276:24-277:22. Once again the result
████████████████████████. **Exhibit 1**, Mahoney Dep. I at 134:7-20; **Exhibit 2**,
Mahoney Dep. II at 273:20-274:6; 275:18-276:5; 276:24-277:22.

19.   TLIC thus used █████████████████████████████████████████
████████████████████████. **Exhibit 2**, Mahoney Dep. II at 276:24-
277:13; 280:18-25; 290:1-13. Mr. Mahoney described the common methodology
applied to the Class Policies as follows:

████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████
     ████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████



**Exhibit 1**, Mahoney Dep. I at 133:12-134:20. Mr. Mahoney was

**Exhibit 2**, Mahoney Dep. II at 260:1-25.

20.     TLIC made

**Exhibit 2**, Mahoney Dep. II at 290:20-291:16.

. *Id.* at 292:24-293:3.

21.     The methodology TLIC employed for the MDR Increases

**Exhibit 2**, Mahoney Dep. II at 330:21-331:9.

22.     TLIC's decision to impose the MDR Increases on the TransSurvivor policies and the TransUltra policies was made by the same TLIC Committee, known as the Americas Risk and Capital Committee, both based on the recommendation of Mr. Mahoney. **Exhibit 1**, Mahoney Dep. I at 169:12-21, 172:24-174:10.

23.     The MDR Increases for the Class Policies were implemented from TLIC's home office, and the notice letters to the owners of those policies were

drafted by TLIC employees and mailed from Pennsylvania. Declaration of John Daniel Mahoney in Support of Motion to Dismiss, filed September 19, 2018 [Dkt. 46], ¶ 13. The notice letters provided Class Policyowners a toll-free number to a call center located in TLIC's home office. *Id.; accord,* Defendant's Answer to First Amended Class Action Complaint [Dkt. 98], ¶ 92.

24.    Class Plaintiffs each own or owned either a TransSurvivor policy or a TransUltra policy made subject to the challenged MDR Increases. True and correct copies of the Class Plaintiffs' Declarations are attached hereto as **Exhibits 7-14**. We as proposed Co-Lead Class Counsel assert the same legal arguments to prove TLIC's liability for breach of express contract on behalf of the Class Plaintiffs and every other member of the Nationwide Class.

25.    Class Plaintiffs are ready, willing, and able to fairly protect the interests of the Nationwide Class as a whole and will devote the resources necessary to pursue this case vigorously. **Exhibits 7-14** at ¶¶ 4-5. Class Plaintiffs are sufficiently knowledgeable about the MDR Increases imposed on them by TLIC. *Id.* at ¶ 3.Class Plaintiffs' interests are completely coextensive with those of the unnamed members of the Nationwide Class; none of the Class Plaintiffs has any known conflict of interest with other members of the Nationwide Class that would preclude service as a Class Representative. *Id.* at ¶ 6.

26.    Class Plaintiffs ask that the same counsel previously appointed as Co-Lead Class Counsel in *Feller v. Transamerica Life Insurance Company*, No. 2:16-cv-01378 CAS (AJWx) [Dkt. 404, ¶ 6] – Andrew S. Friedman of Bonnett Fairbourn Friedman & Balint, PC, Harvey Rosenfield and Jerry Flanagan of Consumer Watchdog, and Adam M. Moskowitz now of The Moskowitz Law Firm – be appointed as Co-Lead Class Counsel for the Class in this action, and that Class Plaintiffs' other co-counsel be recognized as additional Class Counsel.

27.    Proposed Co-Lead Class Counsel have decades of experience as counsel of record in certified class actions, including specifically in several certified

COI class action cases. **Exhibit 15** – Firm Resume of Bonnett Fairbourn Friedman & Balint, PC; **Exhibit 16** – Firm Resume of Consumer Watchdog; **Exhibit 17** – Firm Resume of The Moskowitz Law Firm. *See also Feller* Final Order, Dkt. 444 at ECF 12 ("Co-Lead Class Counsel have demonstrated that they have fully and competently prosecuted all causes of action, claims, theories of liability, and remedies reasonably available to the Settlement Class Members.").

28.    Proposed Co-Lead Class Counsel have already expended significant time, effort and expenses in pursuing this case on behalf of the proposed Nationwide Class, including (a) conducting jurisdictional discovery; (b) briefing and presenting argument on TLIC's unsuccessful motion to dismiss; (c) formulating and issuing comprehensive discovery requests and a detailed Rule 30(b)(6) Notice of Deposition; (d) conducting the first session of the substantive Rule 30(b)(6) deposition; (e) engaging in meet and confers with TLIC's counsel on the discovery requests, including the jurisdictional discovery requests; (f) reviewing the more than 50,000 pages of documents produced by TLIC and non-parties; (g) securing the necessary MoSes license needed to understand and model the actuarial analysis underlying the MDR Increases; (h) taking steps to secure the capability to access to AXIS in order to understand and model the actuarial analysis underlying the MDR Increases; and (i) retaining capable and experienced experts for class and merits purposes.

29.    Proposed Co-Lead Class Counsel have thus demonstrated a sound knowledge of the legal issues pertaining to TLIC's MDR Increases, have retained experts needed to address the esoteric actuarial issues that will arise, and have successfully steered this putative class action past TLIC's motion to dismiss.

30.    Given the complex actuarial issues surrounding an insurance company's methodology for changing COI rates, many of which require expert testimony, in my experience few owners of the Class Policies could afford to seek legal redress for TLIC's actions on their own, especially against a defendant with

deep resources to litigate like TLIC.

31.   Given TLIC's common application of the MDR Increases confirmed by Class Plaintiffs' actuarial expert Larry Stern and the straightforward mathematical damages calculations endorsed by Class Plaintiffs' economist expert Robert Mills, this case should be far more manageable than many class actions that are regularly certified.

32.   Beyond *Hamra v. Transamerica Life Insurance Co.*, Case No. 2:18-cv-06262-CAS-GJSx, presently pending before this Court, I am aware of only one other action – *Shupe v. Transamerica Life Insurance Co.*; Case No. 1:19-cv-00045-KEM (N.D. Iowa) – in which an affected Policyowner has expressed the desire to challenge the MDR Increases on an individual basis.[2] Attached as **Exhibit 18** is a copy of the Declaration of Plaintiff Joyce Shupe, filed as Dkt. 30-1 in the *Shupe* Action, in which she states: "I do not want to be part of the *Thompson* case in California and would opt out of the class there if the *Thompson* court were to ever certify a national class.  I have no connection to California for the purposes of the claims I assert in this case and I do not want my individual claims to be delayed by the *Thompson* action in California."  *Id.* at ¶ 4. Because this particular policyowner has explicitly disavowed any interest in having any part of this action, she has been

---

[2] As the Court is aware, several institutional investors opted out of the *Feller* settlement with respect to the large portfolio of TLIC UL policies owned by these investors ("*Feller* UL Policies").  Recently Wells Fargo Bank and other institutional investors have filed litgation challenging the MDR increases imposed on the *Feller* UL policies.  A couple of these cases also list along with the *Feller* UL Policies a handful of TransUltra and TransSurvivor Polcies which are the subject the present litigation.  *See Wells Fargo Bank, N.A., v. Transamerica Life Ins. Co.*, Case No. 19-6791-CAS – filed August 5, 2019 (including 1 TransUltra Policy and 5 TransSurvivor Policies representing less than 1/3 of the total face amount of the UL policies implicated in the litigation); *Brighton Trustees LLC , et al.v. Transamerica Life Ins. Co.*, Case No. 19-4210 – filed May 15, 2019 (including 2 TransUltra Policy representing around 1/10 of the total face amount of UL the policies implicatred in the litigation). The primarly focus of these cases appears, however, to be the *Feller* UL Polcies.

excluded from the proposed Class.

I declare under penalty of perjury the foregoing is true and correct. Executed this 24th day of September, 2019, at Phoenix, Arizona.


/s/Andrew S. Friedman
Andrew S. Friedman

# EXHIBIT 1

**REDACTED VERSION OF EXHIBIT CONDITIONALLY FILED UNDER SEAL**

Page 1

1                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
2

3

    GAIL THOMPSON,              )
4   individually and as        )
    Power of Attorney for       )   Case No.
5   LOIS THOMPSON, on           )   2:18-cv-05422-CAS-GJSx
    behalf of themselves        )   CLASS ACTION
6   and all others             )
    similarly situated,        )
7                              )
              Plaintiffs,      )
8                              )
    VS.                        )
9                              )
    TRANSAMERICA LIFE          )
10  INSURANCE COMPANY,         )
                               )
11            Defendant.       )
12

13

                        ORAL DEPOSITION
14                           OF
                    JOHN DANIEL MAHONEY
15                   NOVEMBER 8, 2018
16

17                       Houston, TX
18

19

20

21

22

23

24  Reported by: KATERI A. FLOT-DAVIS
25  Job No. 150592

1

2

3

4          ORAL DEPOSITION OF JOHN DANIEL MAHONEY,

5     produced as a witness at the instance of the

6     Plaintiff and duly sworn, was taken in the

7     above styled and numbered cause on

8     November 8, 2018, from 9:09 a.m. to 1:47

9     p.m., before KATERI A. FLOT-DAVIS, CSR, CCR in

10    and for the State of Texas, reported by

11    machine shorthand, at the offices of McDowell

12    Hetherington, LLP, 1001 Fannin Street, Ste.

13    2700, Houston, Texas, pursuant to the Federal

14    Rules of Civil Procedure and the provisions

15    stated on the record herein.

16

17

18

19

20

21

22

23

24

25

                         EXAMINATION

 1

 2    BY MR. FRIEDMAN:

 3         Q.   Good morning.

 4         A.   Good morning.

 5         Q.   Would you please tell us your name.

 6         A.   I am John Daniel Mahoney.

 7         Q.   And I think you mentioned before

 8    the deposition, you go by Danny?

 9         A.   Yes.

10         Q.   With your permission, I'll call you

11    Danny today.  And feel free to call me Andy.

12         A.   Thank you.

13         Q.   Where do you reside?

14         A.   I reside in Cedar Rapids, Iowa.

15         Q.   What's your address there?

16    ██   ███████████████████   ███████████

██    ███████████████████████████████

18         Q.   And are you currently employed?

19         A.   Yes.

20         Q.   And who is your employer?

21         A.   Transamerica.

22         Q.   And that's Transamerica Life

23    Insurance Company?

24         A.   Yes.

25         Q.   If I say "Transamerica" today, I'm

1       for the Feller plaintiffs allegations that

2       that was the appropriate approach were?

3               MR. HETHERINGTON:  Same objections

4           and admonition.

5               THE WITNESS:  I'm going to have to

6           hear the question again.  I'm sorry.

7               MR. FRIEDMAN:  I'll withdraw the

8           question.

9           Q.   (BY MR. FRIEDMAN)  Let me ask you

10      this:  The policy language contained in the

11      TransUltra policies was drafted by

12      Transamerica employees located in California,

13      correct?

14          A.   I would presume, yes.

15          Q.   And the same is true for the

16      TransSurvivor policy forms, correct?

17          A.   Yes.

18          Q.   Okay.

19          ███████████████████████████

    █  █████████████████████████████

    █  █████████████████████████████

    █  ████████████████████████████████

    █  ██████████████████████████████

    █  ████████████████████████████████

    █  ████████████████████████████





Page 73



```
 1              ██      ████

    ██          █████████████

    ██     █████████████████████

    ██     ███████████████

    ██          ██      ████

 6         Q.   And that output was TAS output?

 7         A.   It was actually in a spreadsheet.

 8         Q.   Okay.

 9              A spreadsheet that resulted in the

10    output from the TAS pricing model?

11         A.   Yes.

12         Q.   And TAS is a proprietary model that

13    was used by Tillinghast?

14              It was a Tillinghast proprietary

15    model.

16         A.   Tillinghast Actuarial Software is

17    TAS.

18         Q.   Right.

19              ████████████████

    ██    █████████████████

    ██    █████████

    ██        ██    ████

    ██        ██ ██████████████

    ██    ███████████████

    ██    ███████████████
```

Page 74

1

Page 75

1   ███████████████████████████

█  ████████

█  ████  ██████████████████████

█  █████████

█  ███  █████████████████

█  ███  █████

█  ████████████████████████

█  ███████████████████████

█  █████████████████████████████

█  █████████████████████████████

█  █████████████████████████████

█  ████████

█  ███  ████████████

█  ███  ██████

█  ██████████████████████████

█  ████████████████████████

█  ███████████████████████

█  █████████████

█  ███  █████████████████████

20          Q.   The company now uses AXIS as a

21   model?

22          A.   Today.

23          Q.   And that does -- would have

24   permitted you to do it at the policy level,

25   correct?

1      Page 622, I think, to speed it along.

2               A.    Thank you.

3                     Yes.

4          Q.    So this spreadsheet that Pamela Lu

5      worked on in California provides the support

6      and documentation for the original pricing

7      assumptions used to evaluate the need for an

8      MDR increase on the TransSurvivor policies?

9               A.    Yes.

10         Q.    On the "Recommendation" tab, does

11     that reflect recommendations made by the

12     project team that included Pamela Lu, or are

13     those simply your recommendations?

14              A.    It was collaborative.

15              Q.    Okay.

16                    And the recommendations indicate

17     that, "The work done in this spreadsheet with

18     respect to determining the original pricing

19     assumptions will serve as our benchmark for

20     pricing."

21                    Do you see that?

22              A.    Yes.

23         Q.    At the time that this analysis was

24     done, was it the team's intention to apply the

25     same methodology that had been used for

Page 114

1      TransUltra?

2            A.    Yes.

3            Q.    Ultimately, a different methodology

4      was chosen, correct, to actually determine the

5      MDR increases?

6            A.    I don't think so.

7            Q.    Okay.

8            Look at your ASOP memo, and

9      specifically Page 621.  It could be that I'm

10     just not understanding the actuarial

11     discussion here.

Page 115

1 ████████████████████████

2 ██   ██   ████████████████████

3 ██   ██████████████████████████████

4 ██   ██   ██████

5 ██   ██████████████

6 ██   ██   ██████████████

7          Q.   Okay.

8               Why was a break even chosen rather

9     than using the -- strike that.

10              Why was the break even analysis

11    used rather than restoring the profitability

12    to the priced for levels?

13         A.   We had some concerns with the

14    internal reinsurance agreement and how to

15    comply with doing increases and being

16    compliant with what we were allowed to do with

17    them.

18         Q.   Who was the reinsurance treaty

19    with?

20         MR. HETHERINGTON:   Objection.

21         Outside the scope of the notice.

22         You can answer in your individual

23    capacity, if you know.

24         THE WITNESS:   I don't recall

25    specifically.

Page 118

1               And what format would that take?

2          A.    We would have had the spreadsheet

3     results somewhere.

4          Q.    Okay.

5               I'm not seeing it, but it could

6     just be the nature of production we're doing

7     right now.

Page 133

1       Q.    And it would have used the pricing

2    assumptions that had been developed by Ms. Lu

3    and you in the prior spreadsheet that we

4    looked at just earlier?

5       A.    Yes.

6       Q.    And here, like the analysis done

7    for the TransUltra policies, it was done in

8    the aggregate group level rather than in a

9    policy sale level, correct?

10      A.    For each of the three groups.

11      Q.    Right.

12

Page 134



21          Q.   Not adjusted for issue ages, for

22      example.

23               MR. HETHERINGTON:   Objection.

24      Outside the scope of the notice.

25               You can answer to the extent you

# EXHIBIT 2

## REDACTED VERSION OF EXHIBIT CONDITIONALLY FILED UNDER SEAL

Page 185

1                      UNITED STATES DISTRICT COURT

2                      CENTRAL DISTRICT OF CALIFORNIA

3

    GAIL THOMPSON                )  Case No.
4                                )  2:18-cv-05422-CAS-GJSx

            Plaintiff,           )        CLASS ACTION
5                                )

        vs.                      )
6                                )

    TRANSAMERICA LIFE            )
7   INSURANCE COMPANY,           )
                                 )
8           Defendant.           )

9

10

11

12

13

14

15  **********************************************************

16                         CONFIDENTIAL

17            CONTINUED ORAL AND VIDEOTAPED

18         30(B)(6) DEPOSITION OF JOHN DANIEL MAHONEY

19                       June 26, 2019

20  **********************************************************

21

22

23

24  Job Number:  163307

25  Reporter:  Abigail Guerra

Confidential

Page 186

1             ORAL AND VIDEOTAPED DEPOSITION OF JOHN DANIEL

2       MAHONEY, produced as a witness at the instance of the

3       Plaintiff, and duly sworn, was taken in the above-styled

4       and numbered cause on the 26th day of June, 2019, from

5       9:57 a.m. to 3:57 p.m., before Abigail Guerra, CSR, in

6       and for the State of Texas, reported by machine

7       shorthand, at the offices of McDowell Hetherington, 1001

8       Fannin, Suite 2700, Houston, Texas, pursuant to the

9       Federal Rules of Civil Procedure and the provisions

10      stated on the record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential

Page 192

1    us in-house counsel Chris Holt with Transamerica, and --

2              MR. FRIEDMAN:  -- and Kimberly C. Page of

3    my office as well is on the line.

4                   JOHN DANIEL MAHONEY,

5    having been first duly sworn, testified as follows:

6                   DIRECT EXAMINATION

7    BY MR. FRIEDMAN:

8         Q.   Okay.  Good morning.

9         A.   Good morning.

10        Q.   Danny, we met last time in a deposition taken

11   earlier in this case.

12              Do you remember that?

13        A.   Yes.

14        Q.   Okay.  And you were a -- produced as a witness

15   under a notice of deposition to speak for the company on

16   jurisdictional issues back then.

17              Do you recall that?

18        A.   Yes.

19              (Exhibit 13 marked.)

20        Q.   (BY MR. FRIEDMAN)  Do you have Exhibit 13

21   before you?

22        A.   Yes.

23        Q.   And Exhibit 13 is a copy of a notice of

24   deposition that was served in this case, and you

25   understand you've been designated to speak on behalf of

Confidential

Page 194

1          MR. GANER:  Yes.

2          MR. FRIEDMAN:  Okay.

3          (Exhibit 14 marked.)

4     Q.  (BY MR. FRIEDMAN)  If you'll take a look at

5     Exhibit 14, Danny, does this look to be a complete list

6     of the topics on which you are generally prepared to

7     address today?

8     A.  Yes.

9     Q.  And you recognize that you are appearing as a

10    representative of the company, and your testimony will

11    be deemed that of the company on these particular

12    topics, correct?

13    A.  Yes.

14    Q.  Okay.  Did you have a chance to review your

15    testimony from the prior deposition in this case?

16    A.  I have not.

17    Q.  Okay.  You do understand that this case

18    challenges certain increases in MDR rates, or monthly

19    deduction rates, that Transamerica implemented in 2017

20    and 2018, correct?

21    A.  Yes.

22    Q.  Okay.  And I want to -- the 2017 increases were

23    internally known as the Minotaur project?

24    A.  Yes.

25    Q.  And the -- that covered certain universal life

Confidential

1   policies, correct?

2       A.  Yes.

3       Q.  The -- and those MDR increases related to

4   policies known as the TransUltra 115 series?

5       A.  Yes.  But not all the TransUltra 115.

6       Q.  Can you identify which policies were

7   implicated?

8       A.  The 1998 and the 1999 series.

9       Q.  And when you say 1998/1999, does that mean

10  that's the date when those particular series of policies

11  were first began to be issued?

12      A.  Approximately.

13      Q.  And do you recall the date on which the MDR

14  increases on the TransUltra 115 policies that you

15  described were implemented?

16      A.  They were -- I believe they were in May of

17  2017.

18      Q.  You sure it wasn't --

19      A.  June 1.

20      Q.  You sure it wasn't October of 2017?

21      A.  Okay.  October 1.

22      Q.  Okay.  We can clarify that.  We have some

23  documents.  At some point soon, I'm going to put in

24  front of you the ASOP memoranda that you prepared, which

25  have a lot of granular information.  Once we have that

Confidential

Page 196

1    before you --

2          A.   -- it will say exactly?

3          Q.   Yeah.  Exactly.

4               And feel free, if you need to refer to

5    those documents or any other documents to help you

6    testify, just let us know, and we'll do our best to get

7    those to you, okay?

8          A.   I'd appreciate that.

9          Q.   Okay.  And the 2018 MDR increases were

10   internally known as Project Prometheus?

11         A.   Yes.

12         Q.   And those covered certain TransSurvivor 115

13   policy series?

14         A.   Yes.

15         Q.   And those were series in 1997, 1998, and 1999?

16         A.   Yes.

17         Q.   Okay.  And all of these policies are universal

18   life insurance policies, correct?

19         A.   Yes.

20         Q.   And do you recall a date of implementation for

21   Prometheus or for the TransSurvivor 115?

22         A.   June 1, 2018.

23         Q.   Okay.  I'd like to, sort of, clarify some

24   terminology to make sure we're talking about the same

25   thing when we refer to certain subjects during the

Page 206

1   the deposition, if I use the terminology "current

2   valuation model," you'll understand what I'm talking

3   about?

4       A.  Yes.

5       Q.  Okay.  So in early 2016, you began to review

6   the TransUltra policies and some others, which you don't

7   recall; and how long did that initial review process

8   take?

9       A.  Probably a couple months.

10      Q.  And what were you looking at during that review

11  process?

12      A.  We were looking at whether or not there was an

13  opportunity to improve the profits.

14            (Reporter clarification.)

15      Q.  (BY MR. FRIEDMAN)  Meaning, was there an

16  opportunity to increase monthly deduction rates?

17      A.  That was one option.

18

23      Q.  At the time -- when you talk about increase

24  interest rates, you're talking about credited interest

25  rates?

Confidential

Page 210

1    Q.   Okay.  How did you come to be assigned to this

2  review project?

3    A.   They asked me to do it.

4    Q.   Who is they?

5    A.   Tillie and John.

6    Q.   Okay.  Both of them asked you?

7    A.   I don't remember if they asked me at the same

8  time, but they asked me.

9    Q.   Okay.  And so at the end of the review process,

10 you reported the results to John Hunter, correct?

11   A.   Yes.

12   Q.   And what was the next step in the process by

13 which the 2017 MDR increases were ultimately determined?

14   A.   Well, the next step was he said move forward

15 with calculating, with moving forward with an MDR

16 increase.

17   ████  ████████████████████████████████████████████

   █  ████████████████████████████████████████████████

   █  ████████████████████████████████████████████████

   █     ████  ████████

21   Q.   So Mr. Hunter then directed you move forward

22 with developing the increases?

23   A.   Yes.

24   Q.   And do you know whether Mr. Hunter ultimately

25 had to obtain approval for others to move forward with

Confidential

1    A.   There were no interim approvals.

2         And what was the next question?   Reviews?

3    Q.   Interim reviews or recommendations.

4    A.   I don't specifically recall any steps at that

5    point other than -- no, I don't have any.   There were no

6    specific reviews or anything like that.

7    Q.   Did --

8    A.   Like by groups.

9    Q.   Did you or any other people involved with the

10   MDR increases put together a presentation package for

11   the committee?

12   A.   I would have put a -- yeah, Tillie and I would

13   have put something together for David Hopewell to

14   present.

15   Q.   That would have been a PowerPoint?

16   A.   It would have been a PowerPoint.

17   Q.   Let's talk about the 2018 MDR increase, when

18   did that review process begin for -- and these are the

19   TransSurvivor 115 policies?

20   A.   Yes.

21        We probably started somewhere around May of

22   2018.   Maybe even June.   I don't remember the exact

23   date.

24   Q.   Okay.   And did it begin with a similar review

25   process to what had been with respect to the TransUltra

1    policies?

2        A.  No.  No.

3



Confidential

Page 221

10    Q.  And can you just generally explain why it is or

11  how it is that an MDR increase would not improve the

12  projected future profits?

13    A.  Because some of those plans had secondary

14  guarantees, and all they had -- all the policyholder has

15  to do is pay the secondary guarantee premium and they

16  keep their -- and the policy continues.

17    Q.  So --

18    A.  So increasing an MDR wouldn't have changed the

19  premium that they pay.

20    Q.  So there were certain plans in which the

21  assumption was made that the policyholders would

22  exercise the right to pay the premiums required in order

23  for the secondary guarantee to provide coverage?

24    A.  Okay.  I think that misstates it a little.

25    Q.  Well --

Confidential

Page 229

1      A.  Oh, goodness.  Say that -- I'm sorry.  You're

2  going to have to say that again.

3      Q.  Sure.

4          When -- you indicated that the review

5  process for the TransSurvivor 115 policies began in

6  approximately May of 2017.  And my question is, at that

7  point had a decision been made to -- to move forward

8  with MDR increases?

9      A.  I don't think at that time the decision had

10  been made --

11      Q.  Okay.

12      A.  -- to move forward.  I think the decision was

13  to look at it.

14      Q.  Okay.  And approximately when was the decision

15  made to move forward with calculating recommended MDR

16  increases for the TransSurvivor 115 policies?

17      A.  It would have happened probably between July

18  and November.

19      Q.  Okay.  Can you be more specific?

20      A.  I would lean towards the earlier part of that

21  range --

22      Q.  Okay.

23      A.  -- but that's --

24      Q.  Is there --

25      A.  -- when it would have had to happen.

Confidential

Page 233

1      A.   It's a policy form, but...

2      Q.   For the TransUltra 115 product?

3      A.   It appears to be so.

4      Q.   And Exhibit 16 is a specimen -- strike that.

5           Exhibit 16 is a copy of a policy form for a

6   TransSurvivor 115 policy?

7      A.   It appears to be so.

8      Q.   You can set those aside for a moment.

9           MR. FRIEDMAN:  17?

10          THE REPORTER:  Yes.

11          (Exhibit 17 marked.)

12     Q.   (BY MR. FRIEDMAN)  Exhibit 17 is a copy of

13  Actuarial Standard of Practice No. 2, correct?

14     A.   Yes.

15     Q.   And it's also known as ASOP, A-S-O-P, 2?

16     A.   Yes.

17     Q.   And what is the -- strike that.

18          ASOP 2 provides certain guidance to

19  actuaries, correct?

20     A.   Yes.

21     Q.   And what is the purpose of ASOP No. 2?

22          MR. GANER:  Objection.  Outside the scope.

23          You can answer based on your personal

24  knowledge.

25     A.   I could read 1.1, and say what the purpose is.

Confidential

Page 234

1        Q.  (BY MR. FRIEDMAN)  Well, just try on your own

2    -- just based on your understanding.

3        A.  I mean, it's spelled out in the document right

4    here what the purpose is.

5        Q.  Tell us what your understanding is or your

6    purpose is.

7        A.  It's to provide guidance to actuaries with

8    respect to the determination for the development of

9    nonguaranteed charges.

10       Q.  Nonguaranteed charges would include MDRs on the

11   TransUltra and TransSurvivor policies, correct?

12       A.  Yes.

13       Q.  And this ASOP 2 provides guidance to actuaries

14   from the Actuarial Standards board?

15       A.  Yes.

16       Q.  And it provides guidance with respect to the

17   procedures that are to be employed in evaluating, making

18   recommendations concerning MDR increases?

19       A.  I think it's fair to say its guidance to

20   actuaries.  It's not contractual language by any means.

21   It's simply guidance to actuaries.

22       Q.  Right.

23            But it's the guidance would cover MDR

24   increases such as those that were done on the TransUltra

25   and TransSurvivor policies, correct?

Confidential

1      Q.   This is what's previously marked as Exhibit 3,

2    and that is a copy of the actuarial memorandum that you

3    wrote.  Strike that.

4             Exhibit 3 is a copy of an actuarial

5    communication document you wrote in part to comply with

6    the guidance provided by ASOP 2?

7      A.   Yes.

8      Q.   And this relates to the TransUltra 115

9    policies, correct?

10      A.   Yes.

11      Q.   And this was Exhibit No. 4, which we talked

12    about in your last deposition; and this is a copy of the

13    actuarial communication that you wrote with respect to

14    the TransSurvivor 115 MDR increases in accordance with

15    ASOP 2, correct?

16      A.   Yes.

17      Q.   And you prepared and signed both of these

18    actuarial communications?

19      A.   It doesn't look like I signed them, but I

20    prepared them.

21      Q.   There's also a reference to -- strike that.

22             In the first paragraph of each of these

23    documents, there's a reference to ASOP 2, correct?

24      A.   Yes.

25      Q.   There's also a reference to ASOP 41?

Confidential

Page 240

1    correct?

2         A.  Yes.

3         Q.  And that provisions states that, (as read):

4              "Any change in the monthly deduction rates

5    will be perspective and will be subject to our

6    expectations as to future cost factors.  Such cost

7    factors may include, but are not limited to, mortality,

8    expenses, interest, persistency, and any applicable

9    federal, state, and local taxes."

10             Did I read that correctly?

11        A.  You did.

12        Q.  And you indicated earlier that this is the sort

13   of policy provision that ASOP 2 provides should be

14   considered by the actuary in working on the MDR

15   increases, correct?

16        A.  Yes.

17        Q.  The Transamerica policy form is a standardized

18   insurance contract?

19             MR. GANER:  Objection.

20        A.  What do you mean by standardized?

21        Q.  (BY MR. FRIEDMAN)  It's a uniform contract

22   that's used in connection with sales of TransUltra

23   policies to policyholders, correct?

24        A.  It's -- yeah.  It's a simple -- it's one single

25   policy that would be sold to anyone.

Page 241

1      Q.  And those policy forms, to your knowledge, are

2  not negotiated, are they?

3      A.  To my knowledge, they're not negotiated.

4      Q.  And the provision that you quote in Exhibit 3

5  of your ASOP 2 -- strike that.

6           The language quoted in your ASOP 2

7  memorandum would be contained in all TransUltra

8  policies, correct?

9      A.  I would expect it to be in the TransUltra 115

10  policies, yes.

11      Q.  All right.  Your understanding at the time you

12  wrote this communication was that that same provision

13  was included in all TransUltra 115 policies, correct?

14      A.  Yes.

15      Q.  And you understood at the time that that was a

16  contractor?

17      A.  That language was pulled straight out of the

18  policy form.

19      Q.  Right.

20           And in working on the 2017 MDR increases,

21  it was your understanding that any such increases had to

22  comply with this particular language quoted in your

23  memo, correct?

24      A.  Yes.

25      Q.  And if you turn to Exhibit 16, the TransUltra

Confidential

Page 242

1    policy form.  And specifically if you turn to Page 24 of

2    the TransUltra 115 policy form, do you see a section

3    entitled, No Dividends are Payable?

4         A.   Yep.  Yes.

5         Q.   And that provision states that (as read):

6              "We do not distribute past surplus or

7    recover past losses by changing the monthly deduction

8    rates."

9              Do you see that?

10        A.   Yes.

11        Q.   And is it your understanding that that same

12   provision would be included in all of the TransUltra 115

13   policy forms, correct?

14        A.   Yes.

15        Q.   And, again, it was your understanding that

16   Transamerica was required in making any MDR changes to

17   comply with the provision of the TransUltra policies

18   stating that Transamerica does not recover past losses

19   by changing the monthly deduction rates, correct?

20              MR. GANER:  Objection.  Calls for a legal

21   conclusion; outside the scope.

22              You can answer.

23        Q.   (BY MR. FRIEDMAN)  I just want your

24   understanding as an actuary.

25        A.   My understanding as an actuary was we cannot --

Confidential

Page 243

1   we do not recover past losses.

2        Q.  And you understood consistent with ASOP 2's

3   guidance that you should comply with policy revisions

4   that it was required by virtue of this language that any

5   MDR increases would not operate to recoup losses,

6   correct?

7             MR. GANER:  Same objection.

8        Q.  (BY MR. FRIEDMAN)  Go ahead.

9        A.  It was my understanding we could not recoup

10  past gains and losses.  I should say would not recoup

11  past gains and losses.

12       Q.  With respect to the TransSurvivor policies,

13  those also are uniform standardized policy forms,

14  correct?

15       A.  Correct.

16       Q.  And, likewise, there's no negotiation to your

17  knowledge of the terms of those policies, correct?

18       A.  Correct.

19       Q.  And if you turn to Exhibit 4, your ASOP 2

20  memorandum for the Trans- -- strike that.

21             If you turn to Exhibit 4, your ASOP 2

22  memorandum with respect to the 2018 MDR increases, you

23  quote a version of the policy governing changes in the

24  monthly deduction rates, correct?

25       A.  Correct.

Confidential

1    Q.  And that is the same operative provision that

2  was concluded in the TransUltra policies, correct?

3    A.  It's the same one.

4    Q.  And you understood at the time that you worked

5  on the 2018 MDR increases that this same policy

6  provision was included within all of the TransSurvivor

7  115 policies, correct?

8    A.  Yes.

9    Q.  And they also included the same language that

10  provides that the company will not recoup past losses in

11  making MDR changes, correct?

12    A.  Or whatever the --

13    Q.  Do you want --

14    A.  Whatever the term is.

15    Q.  It's the same provision that --

16    A.  We do not recoup past surplus or recoup past

17  losses.

18    Q.  Same policy provisions in the TransUltra 115

19  policy forms, correct?

20    A.  Yes.

21    Q.  Now, your ASOP 2 memoranda described the

22  methodology that was employed in connection with the

23  2017 MDR increases and the 2018 MDR increases, correct?

24    A.  Correct.

25    Q.  Let's -- it's fair to say that Transamerica

Confidential

Page 245

1    applied the same methodology in determining the MDR

2    increases applicable to all TransUltra 115 policies,

3    correct?

4         A.  We had one methodology.  So, yes.

5         Q.  Okay.  And it's also true that Transamerica

6    applied the same methodology to determine the MDR

7    increases applicable to all of the TransSurvivor 115

8    policies, correct?

9         A.  A general statement would be --

10             MR. GANER:  Objection.  Form.  This is one

11   of those areas where because of his prior statement

12   about the two different TransSurvivor classes...

13             MR. FRIEDMAN:  Yeah.  I'm talking about the

14   methodology, not whether they're divided by separate

15   rate classes.

16        Q.  (BY MR. FRIEDMAN)  So the same methodology was

17   applied with respect to determining MDR increases

18   applicable to the TransSurvivor 115 policies, correct?

19        A.  Yeah.  I think it's fair to say what the

20   general methodology for all the policies was applied,

21   yes.  General methodology.

22        Q.  All of the TransUltra 115 policies were created

23   as part of the same rate class for purposes of the 2017

24   MDR increases rate increase, right?

25        A.  That is correct.

Confidential

Page 246

1      Q.  And what's the significance of that from an

2   actuarial perspective?

3      A.  Significance of a policy class is you treat

4   everybody within the class the --

5              THE REPORTER:  I'm sorry.  Significance...

6              THE WITNESS:  Significance of a policy

7   class is you treat everybody within the class similarly.

8      Q.  (BY MR. FRIEDMAN)  So that then means that the

9   2017 MDR increases were determined and implemented, you

10  know, in a common way for all of the TransUltra 115

11  policies, correct?

12     A.  Yes.

13     Q.  Okay.  And for the purpose of 2017 MDR

14  increases, a single percentage increase was developed

15  and applied to the preexisting MDR schedule applicable

16  to all TransUltra 115 policies, correct?

17     A.  Yes.  With the exceptions noted in the ASOP

18  memo.

19  ████  ████████████████████████████████

   █  ███████████

   █  ████  ███████████████████████████████  █

   █  █████████████████████████████████████

   █  ████████████████████████

   █  ████  ███████████████████████

   █  ████  ████████████████████████

Confidential

Page 247

1    Q.  Were they excluded from the increase?

2    A.  Yeah, they did not get the increase.

3    Q.  I'm sorry?

4    A.  They did not get the increase.  I don't see

5    where it says that.

6             MR. GANER:  I think its...

7    A.  I'm pretty sure it's in here somewhere.

8    Page 1?  Yeah, Page 1.

9    Q.  (BY MR. FRIEDMAN)  Okay.

10   A.  Bottom of Page 1.

11   Q.  They were excluded from the increases, correct?

12   A.  They did not get increases.

13   Q.  Okay.  So it's fair to say that a single

14   percentage increase was developed and applied to the

15   preexisting MDR schedule applicable to all of the

16   TransUltra 115 policies that were encompassed by the

17   increases, correct?

18   A.  Okay.  That sounds correct.

19   Q.  So it's fair to say that the -- and that was a

20   58 percent MDR increase for TransUltra, right?

21   A.  Yes.

22   Q.  Okay.  And it's fair to say that the MDR

23   increase percentage applied to the 115 policies did not

24   vary by underwriting risk class, correct?

25   A.  The increase did not vary by underwriting

Confidential

Page 248

1    class.

2         Q.   And it did not vary by issue age, correct?

3         A.   It did not vary by issue age.

4         Q.   It did not vary by attained age, correct?

5         A.   It did not vary by attained age.

6         Q.   It did not vary by gender?

7         A.   It did not vary by gender.

8         Q.   Nor did it vary by face amount, correct?

9         A.   Did not vary by face amount.

10        Q.   Now, with respect to the TransSurvivor 115

11   policies, there was -- they were split into two

12   different rate classes.  One applicable to the 1997

13   product plan code, TSSLEA, and a separate rate class for

14   the 1998/1999 products with the plan codes, TSSLEA '98

15   and TSSLEA '99, correct?

16        A.   Correct.

17        Q.   And can you explain the basis or rationale for

18   dividing the TransSurvivor 115 policies into two

19   different rate classes?

20        A.   I can read from the memo, if you'd like.

21        Q.   I'd prefer if you'd just give us your own

22   testimony.

23        A.   Okay.  Well, there were two different -- the

24   primary reasons were the policies had different rate

25   bands.  So the 1997 had one rate band, whereas, the '98

Confidential

Page 250

1      A.  I would have made the recommendation, and then

2   ran it by a couple of people.

3      Q.  At what point in the process did you decide

4   that it was appropriate to split the TransSurvivor 115

5   policies into two different rate bands?

6      A.  It would have been after Pamela had done the

7   research on finding all the different pricing documents.

8      Q.  That was at the beginning of the project?

9   Towards the beginning of the project?

10      A.  Towards the beginning of the project.

11      Q.  So before you actually began determining the

12   MDR increases, you decided at the beginning that there

13   would be two separate rate classes for the reasons

14   you've discussed?

15      A.  Yeah.

16          Once she was able to locate pricing

17   documents and we could make that determination, then

18   that's when we would have decided it.

19      Q.  Okay.  And it's fair to say that a single

20   percentage increase was developed and applied to the

21   preexisting MDR schedule applicable to all of the 1997

22   TransSurvivor 115 policies?

23      A.  A single rate was applied to those policies.

24      Q.  And a single set of rates was developed and

25   applied to the preexisting MDR rate schedule applicable

Confidential

Page 251

1    to the 1998 and 1999 TransSurvivor 115 policies,

2    correct?

3          A.  Correct.

4          Q.  And like the other -- strike that.

5               With respect to all the TransSurvivor

6    policies, the MDR increase percentages did not vary by

7    underwriting risk class, issue age, attained age,

8    gender, or policy face amount, correct?

9          A.  That is true.  Same exception note as --

10         Q.  I'm sorry?

11   ███  ████████████████████████████████████

     ███  ███  ████████████████████████████████████

     ███  ███  ███████

14         Q.  And what is the definition of foreign national

15   policies that you used?

16         A.  I didn't actually -- I was handed the list.

17         Q.  Okay.  So what's your understanding concerning

18   the circumstances under which a policy would denominated

19   as a foreign national policy?

20         A.  I'm not going to be the best person to say

21   this, but general understanding would be someone who

22   maybe lives in the foreign country, but maybe bought the

23   policy in the U.S.

24         Q.  Okay.

25         A.  May not be perfectly correct on that, so...

Confidential

Page 260



Confidential

Page 263

1   business in force today, right?

2      A.  Yes.  That's what I was trying to explain.

3   [redacted]

15      Q.  And was that TAS output?

16      A.  It would have been run from the TAS system at

17   that time.

18      Q.  And if we could open spreadsheet as produced as

19   TLIC17_396.

20           THE REPORTER:  Andy, is there where you

21   marked this?

22           MR. FRIEDMAN:  Yeah.  We're going to have a

23   slip sheet reflecting what electronic document we're

24   looking at.

25           (Exhibit 19 marked.)

Confidential

Page 264

1        Q.  (BY MR. FRIEDMAN)  If you look at the tab that

2   is TUL base, can you tell us what that is, what that is

3   on there?

4        A.  Yes.

5             So the left three columns is the output

6   that we would have found in the old pricing directories.

7   ████ ██████████████████████████████

    ██████████████████████████████

    ██ ████████████

    ██ ████ █████████████████████

    ██ ████ ████ █████████████████

    ██ ███████████████████████████████

    ██ ████ ████

    ██ ████ █████████████████████

    ██ ██████████████████████████

    ██ ████████████████████████████

    ██ ████████████████████

    ██ ██████

    ██ ████ █████████████

20        Q.  And what did the -- the next columns talk about

21   joint GAAP?

22        A.  It says GAAP.

23        Q.  Going back, is the output the left three or the

24   left five columns?

25        A.  Oh, I'm sorry.  It would be the left.  It would

Confidential

1    be A through E.

2         Q.   Okay.  And --

3         A.   Columns A through E.

4         Q.   Okay.  And if you scroll down to Row 70, you

5    see some area shaded in blue, correct?

6         A.   Yes.

7         Q.   And in the left-hand column, there is a --

8    reflects the duration?

9         A.   Yes.

10        Q.   And this reflects durations of the blue-shaded

11   area, is durations 17 through 19, correct?

12        A.   Yes.

13        Q.   And that's the durations that had been reached

14   as of the time that MDR increases for 2017 were being

15   calculated?

16        A.   Approximately, yes.

17

Confidential

Page 266

1 ▮▮▮▮▮

▮ ▮▮▮ ▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮

▮ ▮▮ ▮▮▮ ▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮▮▮▮

▮ ▮▮▮▮ ▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮

▮ ▮▮ ▮▮▮▮▮▮

9      Q.   Okay.   What is happening in Columns K through

10  M?  That's when you're backing out the interest on

11  target surplus, right?

12      A.   You know, these are just all present values.

13  So K is a present value of G.   L is a present value of

14  Column H.

15      Q.   Okay.

16      A.   L is a present value of Column I.

17 ▮▮ ▮▮▮▮▮▮▮▮

▮ ▮▮▮▮▮▮▮▮

▮ ▮▮ ▮▮▮ ▮▮▮▮

▮ ▮▮ ▮▮

▮ ▮▮ ▮▮

▮ ▮▮ ▮▮▮▮▮

▮ ▮▮ ▮▮▮▮▮▮▮

▮ ▮▮ ▮▮▮▮

▮ ▮▮ ▮▮▮▮▮

Confidential

Page 267

1        Q.  And just so we're clear, that would be what was

2   previously marked -- I'll give you a copy -- as

3   Exhibit 5 to our prior deposition, which is Bates

4   number -- well, which is already marked Exhibit 5.

5              Is that the --

6        A.  Oh, yes.  Sorry.



Confidential

Page 268

6      Q.   Okay.   So the after the -- what is shown in

7   Column M?

8      A.   M is the present value of Column I.

9      Q.   Okay.   And then in Column N, what is shown?

10     A.   N is the summation of K, L, M.

16     Q.   So what is Column P?

17     A.   It's just a cumulative sum of Column C.



Confidential

1 ██████████████████████████████████████████

2     A.  Hold on.  Let me address the first part.  Let

3 me go to the top.

4         So this is essentially all the policies for

5 the TransUltra '98 and '99.  It's got a lot of

6 particular information as to issue year, age, all kinds

7 of characteristics.

8     Q.  So is there the -- this is policy --

9 policy-level data?

10     A.  Yeah.

11     Q.  At least at the top part of this worksheet?

12     A.  Yes.

13 ██ ███ ██████████████████████████████

██ ██████████████████████████████████████

██ ████████████████████████████

██ ███████████████████████████████████████

██ ████████████████████████████

██ ███ ██████████████████████████████████

██ ██████████

20     Q.  Okay.  I want to walk generally through the

21 methodology reflected in your ASOP 2 memorandum and sort

22 of step by step.

23         MR. GANER:  Put this aside then?

24         MR. FRIEDMAN:  Yes.

25         MR. GANER:  Thank you.

Confidential

Page 271

1      Q.   But that first step dealt with the aggregate

2   book profits for all of the TransUltra 115 policies

3   considered together as a group, correct?

4      A.   Yes.

[REDACTED]

17      Q.   Okay.   Well, by the way, on the prior

18   spreadsheet where you're talking about policy-level

19   data, were those actual individual policies, or were

20   they model points?

21      A.   It looked like model points because I didn't

22   see 6,000 rows.

23      Q.   Right.

24            They're only 1,000 lines.

25      A.   They're 1,000 rows.

Confidential

Page 272

1      Q.   Okay.

2      A.   But there should have been about 6,000

3  policies.

4      Q.   And explain to us what a model point is.

5      A.   Model point is a group -- it's a grouping of

6  people with the same characteristics.



12      Q.   And, again, that was done in aggregate for all

13  of the TU -- strike that.

14

Confidential

Page 273



Confidential

Page 274



7    Q.  Right.

Confidential

Page 275



Confidential



Confidential

Page 277



23      Q.   So did you have access to the actual model used

24   to price the TransUltra 115 policies?

25      A.   We did -- we could not access it.   I don't know

Confidential

Page 279



1    policies considered as a group?

2        A.   Fine.

3        Q.   Is that correct?

4        A.   They're your words; but, yes.

Confidential

Page 280

1 ██████ ████████████████████████████

██ ████████

██ ████ ████

4      Q.  So -- just so we're clear, the 2017 MDR

5  increases were not based on any analysis applying the

6  original pricing assumptions to the TransUltra 115

7  policies actually in force at the time of the increase,

8  correct?

9      A.  That was not the method we used.

10     Q.  So it's fair to say that under the methodology

11 that Transamerica applied to compute the 2017 MDR

12 increases, the percentage increase applied to the

13 TransUltra 115 policies as a group and did not vary

14 based on the individualized circumstances of any policy

15 or policyholder, correct?

16     A.  I'm sorry, but that question made my head hurt.

17     Q.  You want me to read back.

18          It's fair to say that under the methodology

19 that Transamerica applied to compute the 2017 MDR

20 increases, the percentage increase that was applied to

21 the TransUltra policies applied as a group and did not

22 vary based upon individualized circumstances of any

23 policy or policyholder?

24     A.  Correct.  We applied the same percentage to all

25 of them.

Confidential

Page 290



9        Q.  And if I asked you the same questions for the

10   TransSurvivor policies and the 2018 MDR increases, the

11   answers would be the same because the same methodology

12   was applied, correct?

13        A.  That would be true.

14        Q.  For -- and the unit that is used to determine

15   the per-policy profitability is $1,000 of insurance?

16        A.  It was the face amount.

17        Q.  You could express on a per-unit basis?  It was

18   per 1,000, correct?

19        A.  Yes.

20        Q.  The -- we've already gone over this in part,

21   but the pricing assumptions for the TransUltra 115

22   product have various assumptions that would impact the

23   projected profitability of the policies, right?

24        A.  Yes.

25        Q.

Confidential

Page 291



Confidential

Page 292



Confidential

Page 293



```
10              MR. FRIEDMAN:  Could we bring up

11   spreadsheet --

12              It was T- -- it was jurisdictional

13   spreadsheet 139.

14              (Exhibit 20 marked.)

15      Q.  (BY MR. FRIEDMAN)  This was a spreadsheet that

16   was prepared by Pamela Liu, correct?

17      A.  Yes.

18      Q.  And it was done at your direction?

19      A.  Yes.

20
```

Confidential

Page 330

1  ████████████████  ██████████████████████

2  ██████████████

3  ██  ████████████████████████████████████

4  ██████████████████████

5  ██  ████████████████████████████

6      Q.  Okay.  Under option A?

7      A.  Option A it would be just the face.

8      Q.  Does business distribution effect

9  profitability?  You know, distribution business by face,

10  amount, risk class?

11      A.  Absolutely.

12      Q.  Are any of those expenses?

13      A.  There are assumptions that go into the

14  profitability.

15      Q.  But considered separately, they're not expense

16  items, are they?

17      A.  No.  They're not assumptions, which, in and of

18  itself, it's not an expense item, but it dictates

19  different levels of expense depending upon whose in

20  there.

21  ██  ████████████████████████████████

   ██████████████████████████████████████

   ██████████████████████████████████

   ██████████████████████████████████████

   ██████████████████████████████████████████

Confidential

Page 331



# EXHIBIT 3



**TRANSAMERICA OCCIDENTAL LIFE ® ℠**

Transamerica Occidental
Life Insurance Company
1150 South Olive Street
Los Angeles, CA  90015

**POLICY FORM   TRUL+-CVC**
Individual Life Insurance

3

| INSURED | KATHLEEN M SWIFT | █████ 474 | POLICY NUMBER |
|---|---|---|---|

| FACE AMOUNT | $250,000 | APR 21 1999 | DATE OF ISSUE |
|---|---|---|---|

While this policy is in force, Transamerica Occidental Life Insurance Company will pay the death benefit to the Beneficiary if the Insured dies before the policy anniversary nearest the Insured's age 115, or will pay the net cash value, if any, to the Owner on the policy anniversary nearest the Insured's age 115 if the Insured is living on that date.  All payments are subject to the provisions of this policy.

Signed for the Company at Los Angeles, California, on the date of issue.

*James W. Dederer*

*Thomas J. Cusack*

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

---

**Right to Examine and Return Policy Within 15 Days** -- At any time within 15 days after you receive this policy, you may return it to us or the agent through whom you bought it. We will cancel the policy and void it from the beginning.  We will refund to you any premiums paid.

**Adjustable Life Insurance**
**Minimum Premium Requirement**
**Shown in the Policy Data**
**Flexible Premiums Payable Thereafter**
During Life Of Insured Prior to Age 100
Subject to the Limitations Described
in the Premiums Provision

Death Benefit Payable at Death of
Insured Prior to Age 115
Net Cash Value, if Any, Payable at
Policy Anniversary Nearest Age 115

Nonparticipating − No Annual Dividends

**THIS POLICY CONTAINS A PREMIUM QUALIFICATION CREDIT PROVISION.  TO RECEIVE THIS CREDIT, YOU MUST PAY SPECIFIC PREMIUMS ON OR BEFORE THEIR DUE DATE.
SEE DETAILS ON PAGE 13**



Δ π EXHIBIT 15
Deponent_____
Date_____ Rptr._____
WWW.DEPOBOOK.COM

This policy is a legal contract between you, the Owner of this policy, and Transamerica Occidental Life Insurance Company.

## READ YOUR POLICY CAREFULLY

### POLICY SUMMARY

We will pay the death benefit to the Beneficiary if the Insured dies while the policy is in force before the policy anniversary nearest age 115.

You must pay at least the minimum premium per year during the required premium period shown in the Policy Data or your policy will lapse. If you request an increase in the face amount of this policy, you must also pay at least the minimum premium per year for the increased portion for that portion's required premium period following the date of the increase, or your policy will lapse. After that, you may vary the amount of premiums and how often you pay them, within certain limits, as described in the Premiums provision. Generally, you may pay premiums as long as the Insured is living, up to the policy anniversary nearest age 100. If the Insured is living at the policy anniversary nearest age 115, we will pay the net cash value, if any, to you.

Additional benefits, if any, are provided by rider.

This is only a brief description. The insurance is fully described in the various provisions of the policy.

### GUIDE TO POLICY PROVISIONS

| | Page |
|---|---|
| Accumulation Values | 14 |
| Alternative Paid-Up Life | 21 |
| Application Copy | after 25 |
| Beneficiary's Rights | 7 |
| Cash Value | 16 |
| Change of Beneficiary | 7 |
| Death Benefit | 7 |
| Definitions | 5 |
| Guaranteed Values | 14 |
| Grace Period | 12 |
| Misstatement of Age or Sex | 23 |
| Nonforfeiture Option | 20 |
| Option to Change the Face Amount | 19 |
| Ownership and Beneficiary Provision | 7 |

| | Page |
|---|---|
| Payment of Cash Value and Loans | 22 |
| Payment of Death Benefit | 7 |
| Policy Data | 2,3,4 |
| Policy Loans | 16 |
| Policy Statements and Illustrations | 22 |
| Premium Qualification Credit | 13 |
| Premiums | 11 |
| Reinstatement | 13 |
| Riders | after 25 |
| Table of Guaranteed Maximum Monthly Deduction Rates | 3 |
| Table of Policy Values | 4 |
| Table of Surrender Penalties | 4A |

POLICY DATA

| CLASS A LOAN | | | |
| INTEREST RATE | 5.21% IN ADVANCE | APR 21, 1999 | POLICY DATE |

CLASS B LOAN
INTEREST RATE  7.40% IN ADVANCE                        6.00%  REINSTATEMENT
                                                              INTEREST RATE

POLICY NUMBER         ███474                    ███  AGE OF INSURED

      INSURED  KATHLEEN M SWIFT

  FACE AMOUNT  $250,000                  APR 21, 1999  DATE OF ISSUE

DEATH BENEFIT
      OPTION  OPTION 1        STANDARD        NONSMOKER  CLASS OF RISK

      OWNER  MRS KATHLEEN M SWIFT

---------------------------------------------------------------------------

MINIMUM INITIAL PREMIUM: $386
PLANNED PERIODIC PREMIUMS: $193        MONTHLY

REQUIRED PREMIUM PERIOD: 10 YEARS

REQUIRED PREMIUM PER YEAR FOR THE BASE POLICY: $2,316

REQUIRED PREMIUM PER YEAR FOR THE BASE POLICY AND ALL
ADDITIONAL RIDERS: $2,316

PREMIUM QUALIFICATION CREDIT PERIOD: 10 YEARS
PREMIUM QUALIFICATION CREDIT PERCENTAGE: 2%

GUARANTEED MAXIMUM MONTHLY POLICY FEE: POLICY YEARS 1-10: $6.00
                                       POLICY YEARS 11 AND LATER: $10.00

GUARANTEED MAXIMUM MONTHLY EXPENSE CHARGE PER THOUSAND:
                              YEARS 1-5:    $0.12
                              YEARS 6-10:   $0.12
                              YEARS 11 & LATER:  $0.13

GUARANTEED MINIMUM INTEREST RATE:  4.00%

SELECT MONTHLY PREMIUM:        $247.71
SELECT PERIOD:    ███  YEARS

---------------------------------------------------------------------------

NOTE: THIS POLICY MAY TERMINATE PRIOR TO THE INSURED'S AGE 115 IF:
      (1)  THE CASH VALUE MINUS ANY LOAN(S) IS LESS THAN THE MONTHLY
           DEDUCTION DUE, OR
      (2)  THE REQUIRED PREMIUMS PER YEAR FOR THE BASE POLICY AND ANY
           RIDERS AND LAYERS IN THEIR REQUIRED PREMIUM PERIOD ARE NOT
           PAID.

POLICY DATA (CONTINUED)

TABLE OF GUARANTEED MAXIMUM MONTHLY DEDUCTION RATES PER $1,000
FOR BASE POLICY*

| POLICY YEAR | POLICY EXCLUDING RIDERS | POLICY YEAR | POLICY EXCLUDING RIDERS | POLICY YEAR | POLICY EXCLUDING RIDERS |
|---|---|---|---|---|---|
| 1 | 0.0708 | 34 | 9.6150 | | |
| 2 | 0.0991 | 35 | 10.7150 | | |
| 3 | 0.1233 | 36 | 11.8925 | | |
| 4 | 0.1458 | 37 | 13.1341 | | |
| 5 | 0.1775 | 38 | 14.4591 | | |
| 6 | 0.2133 | 39 | 15.8658 | | |
| 7 | 0.2525 | 40 | 17.3816 | | |
| 8 | 0.2966 | 41 | 19.0500 | | |
| 9 | 0.3183 | 42 | 20.9500 | | |
| 10 | 0.3541 | 43 | 23.2758 | | |
| 11 | 0.8316 | 44 | 26.4433 | | |
| 12 | 0.9175 | 45 | 31.3116 | | |
| 13 | 1.0191 | 46 | 39.5808 | | |
| 14 | 1.1291 | 47 | 54.6541 | | |
| 15 | 1.2475 | 48 | 83.3333 | | |
| 16 | 1.3675 | 49 | 0.0000 | | |
| 17 | 1.4883 | 50 | 0.0000 | | |
| 18 | 1.6175 | 51 | 0.0000 | | |
| 19 | 1.7666 | 52 | 0.0000 | | |
| 20 | 1.9450 | 53 | 0.0000 | | |
| 21 | 2.1658 | 54 | 0.0000 | | |
| 22 | 2.4350 | 55 | 0.0000 | | |
| 23 | 2.7516 | 56 | 0.0000 | | |
| 24 | 3.1100 | 57 | 0.0000 | | |
| 25 | 3.5033 | 58 | 0.0000 | | |
| 26 | 3.9258 | 59 | 0.0000 | | |
| 27 | 4.3775 | 60 | 0.0000 | | |
| 28 | 4.8708 | 61 | 0.0000 | | |
| 29 | 5.4266 | 62 | 0.0000 | | |
| 30 | 6.0633 | 63 | 0.0000 | | |
| 31 | 6.7991 | | | | |
| 32 | 7.6466 | | | | |
| 33 | 8.5858 | | | | |

-----------------------------------------------------------------------

* TO FIND THE AMOUNT OF MONTHLY DEDUCTION DURING EACH POLICY YEAR,
SEE THE GUARANTEED VALUES SECTION.  A POLICY FEE OF $6.00 WILL BE
ADDED INTO EACH MONTHLY DEDUCTION FOR THE FIRST TEN POLICY YEARS.
IN SUBSEQUENT YEARS, THE POLICY FEE WILL NOT EXCEED $10.00.  A
MONTHLY EXPENSE CHARGE PER THOUSAND WILL ALSO BE ADDED TO EACH
MONTHLY DEDUCTION.  THE GUARANTEED MAXIMUM MONTHLY EXPENSE CHARGE
PER THOUSAND IS SHOWN ON POLICY DATA PAGE 2.

TABLE OF POLICY VALUES AND BENEFITS

ILLUSTRATIVE PREMIUMS (1)
GUARANTEED BASIS (2)

| END OF POLICY YEAR | PLANNED ANNUALIZED PREMIUM | DEATH BENEFIT | ACCUMULATION VALUE (3) | CASH VALUE (4) |
|---|---|---|---|---|
| 1 | $2,316 | $250,000 | $1,522 | $0 |
| 2 | $2,316 | $250,000 | $3,068 | $0 |
| 3 | $2,316 | $250,000 | $4,606 | $0 |
| 4 | $2,316 | $250,000 | $6,140 | $1,340 |
| 5 | $2,316 | $250,000 | $7,643 | $3,643 |
| 6 | $2,316 | $250,000 | $9,104 | $5,904 |
| 7 | $2,316 | $250,000 | $10,512 | $8,112 |
| 8 | $2,316 | $250,000 | $11,851 | $10,251 |
| 9 | $2,316 | $250,000 | $13,186 | $12,386 |
| 10 | $2,316 | $250,000 | $14,475 | $14,475 |
| 11 | $2,316 | $250,000 | $14,374 | $14,374 |
| 12 | $2,316 | $250,000 | $13,971 | $13,971 |
| 13 | $2,316 | $250,000 | $13,250 | $13,250 |
| 14 | $2,316 | $250,000 | $12,171 | $12,171 |
| 15 | $2,316 | $250,000 | $10,685 | $10,685 |
| 16 | $2,316 | $250,000 | $8,760 | $8,760 |
| 17 | $2,316 | $250,000 | $6,365 | $6,365 |
| 18 | $2,316 | $250,000 | $3,437 | $3,437 |
| 19 | | | | |
| 20 | | | | |
| AGE 60 | $2,316 | $250,000 | $11,851 | $10,251 |
| AGE 65 | $2,316 | $250,000 | $13,250 | $13,250 |

--------------------------------------------------------------------------

(1) THE ACCUMULATION AND CASH VALUES RESULT FROM THE INTEREST RATES,
    MONTHLY DEDUCTIONS, PREMIUM QUALIFICATION CREDITS AND THE TIMELY
    PAYMENT OF THE PLANNED ANNUALIZED PREMIUMS.  PARTIAL SURRENDERS,
    SURRENDER-PENALTY-FREE WITHDRAWALS OR LOANS MAY CHANGE THESE
    RESULTS.

(2) RESULTS CALCULATED ON A GUARANTEED BASIS REFLECT GUARANTEED
    MAXIMUM MONTHLY DEDUCTIONS AND THE GUARANTEED MINIMUM INTEREST
    RATE OF  4.00%.

(3) ACCUMULATION VALUES ILLUSTRATED ON A GUARANTEED BASIS REFLECT
    ACCUMULATED NET PREMIUMS AND PREMIUM QUALIFICATION CREDIT AMOUNTS
    PLUS INTEREST AT THE GUARANTEED MINIMUM INTEREST RATE OF  4.00%
    LESS GUARANTEED MAXIMUM MONTHLY DEDUCTIONS WHICH INCLUDE THE
    POLICY FEE, THE GUARANTEED MAXIMUM MONTHLY EXPENSE CHARGE
    PER THOUSAND AND THE COST OF ANY RIDERS. WHILE A POLICY LOAN(S)
    EXISTS, THE INTEREST RATE APPLICABLE TO THE CASH VALUE SECURING
    THE LOAN(S) MAY DIFFER FROM THE INTEREST RATE APPLICABLE TO THE
    CASH VALUE NOT SECURING THE LOAN(S).

(4) THE DIFFERENCE BETWEEN THE ACCUMULATION VALUE AND THE CASH VALUE
    IS THE SURRENDER PENALTY.

PREMIUMS ARE SUBJECT TO REFUND UNDER CONDITIONS DESCRIBED IN THE POLICY.

```
          TABLE OF SURRENDER PENALTIES PER $1,000
                 OF BASE POLICY FACE AMOUNT


              POLICY                SURRENDER PENALTY
              YEAR                       FACTOR

                1                        32.00
                2                        28.80
                3                        25.60
                4                        22.40
                5                        19.20
                6                        16.00
                7                        12.80
                8                         9.60
                9                         6.40
               10                         3.20
               11+                        0.00
```

TO CALCULATE THE FULL SURRENDER PENALTY FOR THE BASE POLICY, FIND
THE FACTOR FOR THE CURRENT POLICY YEAR.  MULTIPLY THIS FACTOR BY
THE NUMBER OF THOUSANDS OF FACE AMOUNT OF THE BASE POLICY.

END OF POLICY DATA

**DEFINITIONS**

In this policy:

**We, our** or **us** means Transamerica Occidental Life Insurance Company.

**You** and **your** means the Owner of this policy.

**Accumulation Value** is the policy's total value as described in the Accumulation Values provision.

**Administrative Office** means Transamerica Occidental Life Insurance Company, Box 419521, Kansas City, Missouri 64141-6521.

**Age** means the Insured's age on the nearest birthday.

The **Base Policy** is this policy excluding any face increase layers and any riders.

The **Beneficiary** is the person to whom we will pay the death benefit if the Insured dies.

**Cash Value** means the accumulation value less any surrender penalty.

A **Gross Premium** is 100% of any premium you pay.

**Home Office** means Transamerica Occidental Life Insurance Company, Box 2101, Los Angeles, California, 90051-0101.

**Lapse** means termination of the policy at the end of the Grace Period due to insufficient premium or unloaned accumulation value. If there is remaining net cash value at the end of the Grace Period, it will be applied to the Nonforfeiture Option.

A **Layer** is the coverage provided by an increase in the face amount of this policy.

A **Layer Date** is the effective date of a layer of coverage.

A **Layer Required Premium Per Year** is the minimum amount of premium you must pay each year for a layer's Required Premium Period.

The **Maturity Date** is the policy anniversary nearest age 115.

The **Maximum Loan Value** is the largest amount you may borrow under the loan provisions.

A **Monthly Deduction** is an amount we withdraw from the accumulation value of the policy (or of each layer, respectively) at the beginning of each policy month.

The **Net Cash Value** is the cash value less any existing loans.

A **Net Premium** is 93.0% of any gross premium you pay; we take 7.0% of any gross premium as an administrative charge. All net premium payments will become part of the accumulation value.

The **Policy Fee** is part of the monthly deduction. We may change the policy fee at any time after the first policy year. The guaranteed maximum policy fees are shown in the Policy Data.

A **Policy Loan** is indebtedness to us for a loan secured by this policy.

**Reinstate** means to restore coverage after the policy has lapsed subject to the requirements in the Reinstatement provision.

The **Required Premium Per Year for the Base Policy** is the minimum amount of premium you must pay each year for the Required Premium Period.

The **Required Premium Period** is the total number of consecutive years that any required premium must be paid.  This period is shown in the Policy Data.  For the base policy, this period begins on the Policy Date.  For a layer, this period begins on the Layer Date.

A **Rider** is an attachment to the policy that provides an additional benefit.

**Written request** means a signed request in a form satisfactory to us that is received at our Administrative Office.

We will use the **Layer Date** to determine the layer anniversaries and layer years.

We will send any **notice** under the provisions of this policy to your last known address and to any assignee of record.

We will use the **Policy Date** shown in the Policy Data to determine the monthly dates, policy anniversaries and policy years.

**OWNERSHIP**

**Owner of the Policy** -- Only you, the Owner, are entitled to the rights granted under this policy while the Insured is living. If you are an individual and you die before the Insured, your rights will pass to the executor or administrator of your estate for disposition unless stated otherwise in this policy. If the Owner is a partnership, the rights belong to the partnership as it exists when a right is exercised.

**Assignment of the Policy** -- We are not responsible for the adequacy of any assignment. However, if you file the assignment with us and we record it at our Administrative Office, your rights and those of any revocable Beneficiary will be subject to it.

**THE BENEFICIARY**

**Who Receives the Death Benefit** -- If the Insured dies while this policy is in force, we will pay the death benefit to the Beneficiary. The Beneficiary is as designated in the application, unless changed as shown under "How to Change a Beneficiary" below. If the Beneficiary is a partnership, we will pay the death benefit to the partnership as it existed when the Insured died.

**Protection of the Death Benefit** -- To the extent permitted by law, no death benefit will be subject to the claims of the Beneficiary's creditors or to any legal process against the Beneficiary.

**If the Beneficiary Dies** -- If any Beneficiary dies before the Insured, that Beneficiary's interest in the death benefit will end. If any Beneficiary dies at the same time as the Insured, or within 30 days after the Insured, that Beneficiary's interest in the death benefit will end if no benefits have been paid to that Beneficiary. If the interest of all designated beneficiaries has ended when the Insured dies, we will pay the death benefit to you. If you are not living at that time, we will pay the death benefit to the executor or administrator of your estate.

**How to Change a Beneficiary** -- You may change the designated Beneficiary while the Insured is living by sending a satisfactory written notice to us. The change will not be effective until we record it at our Administrative Office. Even if the Insured is not living when we record the change, the change will take effect as of the date it was signed. However, any benefits we pay before we record the change will not be subject to the change.

A Beneficiary designated irrevocably may not be changed without the written consent of that Beneficiary.

**PAYMENT OF THE DEATH BENEFIT**

**Proof of Death** -- We will pay any benefit payable because of death when we receive due proof of the Insured's death while this policy was in force. The proof must be sent to us at our Administrative Office. We will send appropriate forms to the Beneficiary upon request. Any of our agents will help the Beneficiary fill out the forms without charge.

**Death Benefit** -- The amount of the death benefit may be affected by other policy provisions, such as Policy Loans, Misstatement of Age or Sex, or Partial Surrenders.

**Death Benefit Option** -- The death benefit before policy anniversary nearest age 100 will be based on whether you have chosen Option 1, Option 2 or Option 3 as shown in the Policy Data. If you do not choose an option in the application, Option 1 will automatically take effect. Prior to the policy anniversary nearest age 100, the death benefit is defined as follows:

Option 1: The death benefit will be the greater of:
(a)  the sum of:
   (i)   the total face amount of the base policy; plus,
   (ii)  the total face amount of any layers; or,
(b)  the death benefit factor multiplied by the total accumulation values of the base policy and any layers in effect on the date of the Insured's death.

Option 2: The death benefit will be the greater of:
(a)  the sum of:
   (i)   the total face amount of the base policy; plus,
   (ii)  the total face amount of any layers; plus,
   (iii) the total accumulation values of the base policy and any layers in effect on the date of the Insured's death; or
(b)  the death benefit factor multiplied by the total accumulation values of the base policy and any layers in effect on the date of the Insured's death.

Option 3: The death benefit will be the greater of:
(a)  the sum of:
   (i)   the total face amount of the base policy; plus,
   (ii)  the total face amount of any layers; plus,
   (iii) the total amount of all gross premium payments for the base policy and any layers, minus any withdrawals, surrenders, partial withdrawals, partial surrenders, surrender penalty free withdrawals, and premium refunds as of the date of death of the Insured; or,
(b)  the death benefit factor multiplied by the total accumulation values of the base policy and any layers in effect on the date of the Insured's death.

Beginning with the policy anniversary nearest age 100, the death benefit will be: the death benefit factor multiplied by the total accumulation values of the base policy and any layers in effect as of the date of the current policy month.

(See Accumulation Values provision for details.)

We will reduce the death benefit by any existing policy loans and by the portion of any grace period payment necessary to provide insurance to the date of the Insured's death.

This policy is intended to qualify under Section 7702 of the Internal Revenue Code as a life insurance contract for federal tax purposes. The death benefit under this policy is intended to qualify for the federal income tax exclusion. The provisions of this policy (including any rider or endorsement) will be interpreted to ensure tax qualification, regardless of any language to the contrary.

At no time will the amount of the death benefit under the policy ever be less than the amount needed to ensure tax qualification. To the extent that the death benefit is increased, appropriate adjustments will be made in any monthly deductions or supplemental benefits as of that time, retroactively or otherwise, that are consistent with such an increase. Such adjustments may be made by right of setoff against any death benefits payable.

## Death Benefit Factors

| Attained Age | Policy Years 1-10 | | Attained Age | Policy Years 1-10 | |
|---|---|---|---|---|---|
| | Male | Female | | Male | Female |
| 45 | 3.33 | 3.76 | 75 | 1.70 | 1.79 |
| 46 | 3.23 | 3.65 | 76 | 1.68 | 1.76 |
| 47 | 3.14 | 3.54 | 77 | 1.66 | 1.73 |
| 48 | 3.05 | 3.44 | 78 | 1.64 | 1.71 |
| 49 | 2.96 | 3.34 | 79 | 1.62 | 1.68 |
| 50 | 2.88 | 3.24 | 80 | 1.60 | 1.66 |
| 51 | 2.80 | 3.15 | 81 | 1.54 | 1.60 |
| 52 | 2.73 | 3.06 | 82 | 1.49 | 1.54 |
| 53 | 2.66 | 2.97 | 83 | 1.44 | 1.49 |
| 54 | 2.59 | 2.88 | 84 | 1.40 | 1.44 |
| 55 | 2.52 | 2.80 | 85 | 1.37 | 1.40 |
| 56 | 2.45 | 2.73 | 86 | 1.36 | 1.39 |
| 57 | 2.40 | 2.66 | 87 | 1.35 | 1.37 |
| 58 | 2.34 | 2.59 | 88 | 1.33 | 1.35 |
| 59 | 2.28 | 2.52 | 89 | 1.32 | 1.34 |
| 60 | 2.23 | 2.45 | 90 | 1.27 | 1.29 |
| 61 | 2.19 | 2.39 | 91 | 1.23 | 1.24 |
| 62 | 2.14 | 2.33 | 92 | 1.19 | 1.20 |
| 63 | 2.09 | 2.28 | 93 | 1.15 | 1.16 |
| 64 | 2.05 | 2.22 | 94 | 1.11 | 1.12 |
| 65 | 2.01 | 2.17 | 95 | 1.10 | 1.10 |
| 66 | 1.97 | 2.13 | 96 | 1.09 | 1.09 |
| 67 | 1.93 | 2.08 | 97 | 1.07 | 1.07 |
| 68 | 1.90 | 2.04 | 98 | 1.06 | 1.06 |
| 69 | 1.86 | 2.00 | | | |
| 70 | 1.83 | 1.96 | | | |
| 71 | 1.80 | 1.92 | | | |
| 72 | 1.78 | 1.88 | | | |
| 73 | 1.75 | 1.85 | | | |
| 74 | 1.73 | 1.81 | | | |

## Death Benefit Factors

| Attained Age | Policy Years 11+ | | Attained Age | Policy Years 11+ | |
|---|---|---|---|---|---|
| | Male | Female | | Male | Female |
| 55 | 2.29 | 2.59 | 80 | 1.29 | 1.35 |
| 56 | 2.23 | 2.51 | 81 | 1.27 | 1.33 |
| 57 | 2.16 | 2.44 | 82 | 1.26 | 1.30 |
| 58 | 2.10 | 2.37 | 83 | 1.24 | 1.28 |
| 59 | 2.04 | 2.30 | 84 | 1.23 | 1.26 |
| 60 | 1.99 | 2.23 | 85 | 1.21 | 1.24 |
| 61 | 1.93 | 2.17 | 86 | 1.20 | 1.23 |
| 62 | 1.88 | 2.10 | 87 | 1.19 | 1.21 |
| 63 | 1.83 | 2.04 | 88 | 1.18 | 1.19 |
| 64 | 1.79 | 1.99 | 89 | 1.17 | 1.18 |
| 65 | 1.74 | 1.93 | 90 | 1.16 | 1.17 |
| 66 | 1.70 | 1.88 | 91 | 1.15 | 1.15 |
| 67 | 1.66 | 1.83 | 92 | 1.14 | 1.14 |
| 68 | 1.62 | 1.78 | 93 | 1.12 | 1.13 |
| 69 | 1.58 | 1.74 | 94 | 1.11 | 1.12 |
| 70 | 1.55 | 1.69 | 95 | 1.10 | 1.10 |
| 71 | 1.52 | 1.65 | 96 | 1.09 | 1.09 |
| 72 | 1.48 | 1.61 | 97 | 1.07 | 1.07 |
| 73 | 1.45 | 1.57 | 98 | 1.06 | 1.06 |
| 74 | 1.43 | 1.53 | 99 – 115 | 1.04 | 1.04 |
| 75 | 1.40 | 1.50 | | | |
| 76 | 1.38 | 1.47 | | | |
| 77 | 1.35 | 1.43 | | | |
| 78 | 1.33 | 1.41 | | | |
| 79 | 1.31 | 1.38 | | | |

**PREMIUMS**

We will accept any amount you send us as a premium payment while this policy is in force, subject to the Premium Limitation provision and these conditions:

1. The minimum initial premium shown in the Policy Data is payable on or before the Policy Date. Subsequent premiums may be sent to our Administrative Office or you may pay them to an agent we authorize. We will give you a receipt if you ask for one. Premiums received on or before the Policy Date will only begin to earn interest as of the Policy Date.

2. You must pay the Required Premium Per Year for the Base Policy for the Required Premium Period shown in the Policy Data. These premiums may be paid cumulatively in advance. At the end of each year in the Required Premium Period, we will calculate the cumulative total of all gross premiums paid for the base policy, less any partial surrenders and surrender penalty free withdrawals. We will divide this total by the number of years since the Policy Date. This amount must equal or exceed the Required Premium Per Year for the Base Policy for each year in the Required Premium Period, or your policy will enter the grace period.

   If you request an increase in the face amount of this policy, then you must also pay the Layer Required Premium Per Year for that layer's Required Premium Period; the layer's Required Premium Period begins on the layer effective date. These premiums may be paid cumulatively in advance. At the end of each layer year in the layer's Required Premium Period, we will calculate the cumulative total of all gross premiums paid for that layer, less any partial surrenders and surrender penalty free withdrawals taken from that layer. We will divide this total by the number of years since the layer date. This amount must equal or exceed the Layer Required Premium Per Year for that layer's Required Premium Period. If this amount does not equal or exceed the Layer Required Premium Per Year, we will: (i) determine the cumulative total of all gross premiums paid for the base policy and any other layers, less any partial surrenders and surrender penalty free withdrawals; and, (ii) compare that total to the corresponding required premiums. If there is not enough extra premium to make up the difference, then your policy will enter the grace period.

3. You may pay premiums at any time prior to policy anniversary nearest age 100. Each premium must be at least $25 and may not exceed the limits described in the Premium Limitation provision below.

   If you stop paying premiums after the Required Premium Period, your coverage will continue until the net cash value is insufficient to pay the monthly deduction due. At that time, your policy will enter the grace period. (See Grace Period provision.)

Beginning with the policy anniversary nearest age 100, billing will cease and no further premium payments will be accepted.

**Premium Limitation** -- We reserve the right to refund any unscheduled premium during a particular policy year if the total premium paid:

(a)   increases the difference between the death benefit and the accumulation value; and,

(b)   is more than $20 per thousand of face amount and more than three times the total of the monthly deductions for the last year.

We also reserve the right to refund any unscheduled premiums that exceed $25,000 in any 12-month period.

We will not refund any amount if doing so would cause your policy to enter the grace period before the next anniversary.

As of the end of any policy year, if the premiums paid exceed the amount allowable if this policy is to continue to qualify as a life insurance contract under Section 7702 of the Internal Revenue Code, as such Section in effect at the time this policy is issued, and the regulations thereunder, we will remove the excess amount of premiums paid from the policy, with interest, as of the end of that policy year. We will refund to you this excess amount (including interest) within 60 days after the end of that policy year.

Such an excess amount could occur, for example, as a result of a partial surrender or other change in the benefits or terms of the policy, since the premium amount allowable for the policy may be reduced.

The amount refundable will not exceed the net cash value of the policy. If the entire net cash value is refunded, we will treat the transaction as a full surrender of your policy.

**Continuation of Insurance** -- If you stop paying premiums, we automatically continue your policy at the same face amount and with any additional benefits provided by rider, subject to the grace period and any minimum premium requirements that may be in effect. Refer to the Premiums provision and the Monthly Deduction provision for further explanation.

**Grace Period** -- During the Required Premium Period, a grace period is a period of 60 days beginning on: (a) a policy anniversary on which the cumulative Required Premium Per Year for the Base Policy has not been paid (see first paragraph under number 2 of the Premiums provision); or, (b) a monthly policy date when the accumulation value minus any existing loan is less than the monthly deduction due. After the Required Premium Period and prior to the policy anniversary nearest age 100, a grace period is a period of 60 days beginning on a monthly policy date when the net cash value is less than the monthly deduction due.

If you request an increase in the face amount of this policy, then during the layer's Required Premium Period, a grace period is a period of 60 days beginning on: (a) a layer anniversary on which the cumulative Layer Required Premium Per Year has not been paid (see second paragraph under number 2 of the Premiums provision); or, (b) a monthly policy date when the accumulation value minus any existing loan is less than the monthly deduction due. After the layer's Required Premium Period and prior to the policy anniversary nearest age 100, a grace period is a period of 60 days beginning on a monthly policy date when the net cash value is less than the monthly deduction due for that layer and for all other layers and the base policy.

After policy anniversary nearest age 100, a grace period is a period of 60 days beginning on a policy anniversary on which the loan interest due has not been paid in cash and the accumulation value minus any existing loan is less than the loan interest due.

If your policy enters the grace period, we will let you know by sending a notice to your last known address. The notice will tell you the amount you must pay. The amount must be large enough to keep the base policy and any layers in force. You must pay this amount before the grace period ends. If you do not pay enough, your policy will lapse at the end of the 60 days. If there is any net cash value remaining at the end of the grace period, we will apply it to the Nonforfeiture Option. (See Nonforfeiture Option provision.) If there is no net cash value remaining at the end of the grace period, your policy will lapse.

During the grace period, we will not charge interest on the amount
due.   If the Insured dies during the grace period and before you
pay the amount, we will subtract from the death benefit the amount
required to provide insurance to the date the Insured died.

**Premium Qualification Credit** -- At the end of each policy year
for the Required Premium Period, we will calculate the total of
gross premiums paid for the base policy. (See first paragraph under
number 2 of the Premiums provision.)   From this total, we will
subtract any partial surrenders and surrender penalty free
withdrawals.   If this result equals or exceeds the Required Premium
Per Year for the Base Policy for each year of the Required
Premium Period, we will deposit a premium qualification credit to
your policy's accumulation value at the beginning of the next policy
year.

If you request an increase in the face amount of this policy, then at
the end of each layer year for the layer's Required Premium Period,
we will also calculate the total of gross premiums paid for that
layer. (See second paragraph under number 2 of the Premiums
provision.)   From this total, we will subtract any partial surrenders
and surrender penalty free withdrawals taken from that layer.   If
this result equals or exceeds the Layer Required Premium Per Year
for each year of the layer's Required Premium Period, we will
deposit a premium qualification credit to that layer's accumulation
value at the beginning of the next layer year.

We must receive enough premium as described above by the end
of each policy year or layer year in the premium qualification
period, or you will not receive a premium qualification credit for
that policy year or layer year.

The amount of the credit will be a specific percentage of the
Required Premium Per Year for the Base Policy and the Layer
Required Premium Per Year.   The Premium Qualification Credit
Percentage and the Premium Qualification Credit Period are shown
in the Policy Data.

**Reinstatement** -- If this policy lapses, it may be reinstated provided
it was not surrendered.   To reinstate the policy, you must meet the
following conditions:

1.  You must request reinstatement in writing within three years
    after the date of lapse and before the Maturity Date.

2.  The Insured must still be insurable by our standards.

3.  If any loans existed when the policy lapsed, you must repay or
    reinstate them, with interest.   Interest will be compounded
    annually from the date of lapse.   Interest will be at the loan
    reinstatement interest rate of 5.50% (5.21 in advance) for a
    Class A loan and 8.00% (7.40 in advance) for a Class B loan.

4.  The reinstated policy will be subject to the minimum premium
    requirement during the Required Premium Period. (See first
    paragraph under number 2 of the Premiums provision.)   Any
    increase in the face amount of the base policy will also be
    subject to the minimum premium requirement during the layer's
    Required Premium Period. (See second paragraph under number
    2 of the Premiums provision.)   This means that the Required
    Premium Period will be calculated from the original Policy Date
    or original layer date; it will not start anew.

If the policy lapsed during any Required Premium Period and is reinstated in a different policy year, you must pay a premium large enough to meet the minimum premium requirement at the time of reinstatement, with interest. Interest will be compounded annually at the reinstatement interest rate of 6%. If the policy lapsed after any Required Premium Period, or if it lapsed during one year of any Required Premium Period and is reinstated in the same policy year, you must pay a premium large enough to cover two monthly deductions due when the policy lapsed and three monthly deductions due when the policy is reinstated.

5. If you reinstate the policy during any Required Premium Period, you must repay any net cash value given to you at the time of lapse, with interest. Interest will be compounded annually at the reinstatement interest rate of 6%.

6. If the policy is reinstated within the first 10 policy or layer years, any applicable surrender penalties in effect for the reinstated policy will be calculated from the original Policy Date or original layer date.

The effective date of a reinstatement will be the date of your request. If a person other than the Insured is covered by any attached rider, that person's coverage will be reinstated under the reinstatement terms of that rider.

The accumulation value of the reinstated policy will be: the surrender penalty assessed at the time of lapse; plus any net cash value we paid you at the time of lapse; plus any loan repaid or reinstated; plus 93% of any premium you pay at reinstatement; minus any monthly deductions due at the time of lapse.

**GUARANTEED VALUES**

**Accumulation Values** -- The accumulation value of the policy (or any layer) on the Policy Date (or layer date) is equal to all net premiums paid for the policy (or layer). The accumulation value of the policy (or any layer) on any monthly policy date after the Policy Date (or the layer date) is equal to:

1. its accumulation value on the last monthly policy date, plus interest on that amount;

plus 2. any premium qualification credit amount deposited to it on the last monthly policy date, plus interest on that amount;

plus 3. all net premiums paid into it less any refunds since the last monthly policy date, plus interest from the date each premium is received in the Administrative Office to the monthly policy date;

minus 4. the monthly deduction charged against it on the last monthly policy date, plus interest on that amount;

minus 5. any partial surrenders and surrender penalty free withdrawals charged against it, including pro rata surrender penalties, since the last monthly policy date, plus interest on that amount from each partial surrender date and/or surrender penalty free withdrawal date to the monthly policy date.

The accumulation value of the policy (or any layer) on any specified date that falls between any two monthly policy dates is equal to:

1. the accumulation value on the last monthly policy date, plus accrued interest from the last monthly policy date to the specified date;

| plus | 2. | any premium qualification credit amount deposited to it on the last monthly policy date, plus accrued interest on that amount; |
|---|---|---|
| plus | 3. | all net premiums paid into it less any refunds since the last monthly policy date, plus accrued interest from the date each premium is received in the Administrative Office to the specified date; |
| minus | 4. | the monthly deduction charged against it on the last monthly policy date, plus accrued interest on that amount; |
| minus | 5. | any partial surrenders and surrender penalty free withdrawals charged against it, including pro rata surrender penalties, since the last monthly policy date, plus accrued interest on that amount from each partial surrender date and/or surrender penalty free withdrawal date to the specified date. |

A Table of Policy Values is included in this policy. It is based on the information you gave us when the policy was issued. The values shown may change as the declared interest rates, your premium payments, and other factors change from the illustrated data. Every year, we will send you a statement of actual policy values.

**Guaranteed Interest Rates** -- Except for premium received before the Policy Date, the net premium accrues interest from the date we receive it in the Administrative Office. Interest is credited monthly on each monthly policy date.

Premiums received on or before the Policy Date will only begin to earn interest as of the Policy Date. The guaranteed minimum interest rate for all policy years is shown in the Policy Data.

Prior to the policy anniversary nearest age 100, we may declare an interest rate higher than the guaranteed minimum at any time. We will never declare an interest rate that is lower than the guaranteed minimum interest rate. We may change this rate at any time without notice.

Beginning at policy anniversary nearest age 100, the policy accumulation value will accrue interest at the guaranteed minimum interest rate.

For Class A loans, the interest rate for any portion of the accumulation value equal to the amount of any existing policy loan will be the effective annual loan interest rate.

For Class B loans, the interest rate for any portion of the accumulation value equal to the amount of any existing policy loan will be the effective annual loan interest rate less 2.5%.

**Monthly Deduction Rates** -- We will determine the monthly deduction rate for each policy month at the beginning of that policy month. The monthly deduction rate for the base policy will depend on: the face amount of the policy; the Insured's sex; the Insured's smoker or nonsmoker status; the Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and the Insured's issue age.

A table of guaranteed maximum monthly deduction rates for the base policy is shown in the Policy Data. We may use rates lower than these guaranteed maximum monthly deduction rates. We will never use higher rates.

If you request an increase in the face amount of this policy, we will determine the monthly deduction rate for that layer at the beginning of each policy month. The monthly deduction rate for each layer will depend on: the face amount of the policy; the Insured's sex; the Insured's smoker or nonsmoker status; the Insured's class of risk as of the layer date; the number of years that the layer has been in force; and the Insured's layer issue age.

A table of guaranteed maximum monthly deduction rates for that layer will be shown in supplemental Policy Data pages that will be issued on the layer date. We may use rates lower than these guaranteed maximum monthly deduction rates. We will never use higher rates.

Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

**Guaranteed Maximum Monthly Expense Charge Per Thousand --** The guaranteed maximum monthly expense charge per thousand is shown in the Policy Data. We may use an expense charge which is lower than this guaranteed maximum monthly expense charge per thousand. We will never use higher expense charges.

**Monthly Deduction --** At the beginning of each policy month, we will take the monthly deduction for that policy month from the accumulation value of the policy (or of each layer, respectively). The monthly deduction is equal to:

(a)   the monthly deduction rate, times .001, times the difference between the death benefit and the accumulation value of the policy (or of each layer, respectively) at the beginning of the policy month;

plus  (b)   the monthly deduction for any riders;

plus  (c)   the policy fee;

plus  (d)   the monthly expense charge per thousand times .001, times the face amount of the policy (or of each layer, respectively).

If a layer does not have enough accumulation value to pay a monthly deduction that is due, the monthly deduction for that layer will be taken from the accumulation value of the base policy.

**CASH VALUE**

You may borrow the cash value, or take part of it or all of it as a partial or full surrender of the policy. All of these transactions are described in this section. We guarantee that the cash value always equals or exceeds the amount required by the law in effect at the time of issue in the jurisdiction in which the application for this policy was signed. Policy loans, partial surrenders and surrender penalty free withdrawals will be divided proportionately among the accumulation value of the base policy and its layer(s).

**Policy Loans --** If you request a policy loan prior to the tenth policy anniversary, we will handle it as a Class B loan. After the tenth policy anniversary, we will handle one loan request per year as a Class A loan, subject to the limitation shown in number 3 under the Class A Policy Loans provision. After the tenth policy anniversary, we will treat any loan request after the first request in any policy year as a Class B loan.

**Class A Policy Loan** -- After the tenth policy anniversary, we will make Class A loans subject to the following conditions:

1. Such a loan will only be allowed one time during a policy year.

2. The maximum amount allowed as a Class A loan in any one policy year will be the lesser of 10% of the accumulation value as of the request date or the maximum loan amount, as described in number 3 below.

3. The maximum loan amount is the accumulation value as of the date of the loan request, minus:

   a. any existing policy loan(s); and,

   b. interest on the amount of the loan to the end of the policy year; and,

   c. the full surrender penalty or two monthly deductions, whichever is greater.

4. You must pay interest on the total loan balance each year in advance. The interest is due on the policy anniversary. The annual effective loan interest rate is 5.50% (5.21% in advance). If you do not pay the interest when it is due, we will add the amount of interest to the loan. We will charge interest on this amount at the same interest rate being charged on the loan.

5. You must assign the policy to us to the extent of the outstanding loan. If the Insured dies, we will deduct the outstanding loan from the death benefit before we pay the death benefit to the Beneficiary.

6. The loan will be secured by that portion of the accumulation value equal to the amount of the loan.

**Class B Policy Loan** -- We will make Class B loans subject to the following conditions:

1. The maximum amount allowed as a Class B loan is the accumulation value as of the date of the loan request, minus:

   a. any existing policy loan(s); and,

   b. interest on the amount of the loan to the end of the policy year; and,

   c. the full surrender penalty or two monthly deductions, whichever is greater.

2. You must pay interest on the total loan balance each year in advance. The interest is due on the policy anniversary. The loan interest rate is 8.00% (7.40% in advance). If you do not pay the interest when it is due, we will add the amount of interest to the loan. We will charge interest on this amount at the same interest rate being charged on the loan.

3. You must assign the policy to us to the extent of the outstanding loan. If the Insured dies, we will deduct the outstanding loan from the death benefit before we pay the death benefit to the Beneficiary.

4. The loan will be secured by that portion of the accumulation value equal to the amount of the loan.

**Loan Repayment** -- You may repay any part of any outstanding loan at any time while the Insured is living and before the Maturity Date.

If you wish to make a loan repayment, you must tell us that the payment you send us is for that purpose. Unless your payment is clearly marked as a loan repayment, we will assume it is a premium payment unless it is received after the policy anniversary nearest age 100. When we receive a loan repayment, we will apply it to the portion of the accumulation value that secures the loan. If a payment would cause the policy to fail to qualify as a life insurance contract under Section 7702 of the Internal Revenue Code as such Section is in effect at that time, and the regulations thereunder, the portion of the payment that cannot be accepted as premium will be applied against any outstanding policy loans before a refund is made.

Loan repayments will first be applied to any outstanding Class B loans. Then, they will be applied to any outstanding Class A loans. Within the Class A and Class B loan categories, the repayments will be applied first to the loans with the most recent loan dates.

Your policy will not automatically lapse if you do not repay a loan. However, the net cash value must be large enough to cover the monthly deduction due and any loan interest due not paid in cash. (See Grace Period provision for details.)

If the policy loan interest due is not paid in cash by you, a new loan of the same class (A or B) will be created to cover the interest. The new loan will have the same interest rate as the loan to which it is added (Class A or B). Any loan interest paid in cash by you will apply first to Class B loans, and then to Class A loans.

**Partial Surrender** -- At any time following the tenth day after you have received this policy, you may surrender a portion of this policy's net cash value by sending us a written request, subject to the limitations described below.

During the first 10 policy or layer years, a pro rata surrender penalty will be assessed on any surrender amount you request that exceeds the amount eligible for Surrender Penalty Free Withdrawal as described on the next page. Minimum pro rata surrender penalty is $25. Surrender Penalties are shown in the Policy Data.

We deduct from the policy's accumulation value: (a) the surrender amount you request; plus (b) the pro rata surrender penalty on the surrender amount that exceeds the amount eligible for surrender without penalty. If you chose Death Benefit Option 1, we will also deduct from the policy's face amount: (a) the surrender amount you request that exceeds the amount eligible for surrender without penalty; plus (b) the pro rata surrender penalty on the surrender amount that exceeds the amount eligible for surrender without penalty. If the new face amount would be less than our published minimum for this plan, then the partial surrender will not be allowed.

In any policy year, the maximum amount that you may request and receive by partial surrender is:

      1)  the accumulation value;

minus  2)  any existing policy loans;

minus  3)  the sum of 3 monthly deductions;

minus  4)  the greater of $25 or the full surrender penalty.

If you ask for an amount larger than the maximum described above, we will treat it as a request for full surrender of the policy.

During any required premium payment period, the sum of all surrender penalty free withdrawals and partial surrenders may not exceed the sum of all gross premiums paid, less the sum of all required premiums since the Policy Date. (See number 2 of the Premiums provision.)

**Surrender Penalty Free Withdrawal** -- At any time after the first policy year, you may make a withdrawal without incurring a pro rata surrender penalty.   Such a withdrawal is subject to the limits outlined below.   The minimum amount of a surrender penalty free withdrawal is $100.

When you request a partial surrender in the second or later policy year, we will calculate the amount eligible for withdrawal without penalty.  This amount will be the lesser of:

    (a) 10% of the policy's accumulation value as of the last monthly policy date, minus the sum of all surrender penalty free withdrawals since the last policy anniversary; or,

    (b) the maximum amount available as a partial surrender described on page 18.

During any required premium payment period, the sum of all surrender penalty free withdrawals and partial surrenders may not exceed the sum of all gross premiums paid less the sum of all required premiums since the Policy Date. (See number 2 of the Premiums provision.)

Whenever you request a partial surrender after the first policy year, we will process the amount that is eligible as a surrender penalty free withdrawal.  The remainder of any amount you request will be processed as a partial surrender.

We will deduct the full partial surrender amount you request from the policy's accumulation value.  We will not deduct that portion of your request that we treat as a surrender penalty free withdrawal from the policy's face amount.

**OPTION TO CHANGE
THE FACE AMOUNT**

**Decreasing the Face Amount** -- You may request a decrease in the face amount of this policy if all the following conditions are met:

1. You must make a written request to us.
2. At the request date, this policy must be in force and the insured must be living.
3. The amount of the reduction in face amount must be at least $25,000.
4. The new face amount may not be less than our published minimum face amount for this plan.
5. The decrease of the face amount of this policy may cause a change in the monthly deduction rates to be charged.
6. A surrender penalty will result from the decrease in the face amount if the decrease is made during the 10 year surrender penalty period of the base policy or any layer.
7. If you request an increase in the face amount of this policy, and then at a later time you request a decrease in the face amount of this policy, we will apply the decrease in the following order.   We will first apply the decrease to the newest layer.  We will then successively apply the decrease in reverse order to any previous increases; we will begin with the next most recent layer.   If the amount of the decrease is greater than the total of all previous increases, we will then apply the remaining decrease to a portion of the original face amount of this policy.

We will issue new Policy Data pages showing the new face amount. After the decrease, the monthly deduction rates and any future surrender penalties will be based on the new total face amount of this policy.

If the face amount of this policy is decreased during any Required Premium Period, we will recalculate the required premium per year for the remainder of the Required Premium Period based on the new face amount.

**Increasing the Face Amount** -- You may request an increase in the face amount of this policy. The following conditions will apply:

1. You must make a written request to us.
2. At the request date, this policy must be in force and the Insured must be living.
3. At the request date, the Insured must not be older than age 80.
4. The amount of the increase in face amount must be at least $25,000.
5. You must submit satisfactory evidence that the Insured is still insurable by our standards.
6. The amount of the increase will be contestable and subject to the suicide limitation for two years after the effective date of the increase.
7. The death benefit option for the layer must be the same as the base policy.
8. If the base policy has a Waiver Provision attached, the layer must also.

The new coverage will be issued as a separate layer on this policy. It will have a Layer Required Premium Per Year, beginning on the layer date. It will also have its own surrender penalty period for 10 years, beginning on the layer date. The monthly deductions and values for that layer will be based on: the face amount of the layer; the Insured's sex; the Insured's smoker or nonsmoker status; the Insured's class of risk as of the layer date; and the Insured's layer issue age.

We will issue new Policy Data pages showing the new face amount. After the increase, the monthly deduction rates for the increase layer will be based on the new total face amount of this policy. Any future surrender penalties for that layer will be based on the face amount of that layer.

**NONFORFEITURE OPTION**

You may surrender this policy and all layers for the net cash value.

There is a Table of Surrender Penalties shown in the Policy Data. We will use the factors in the table to determine the surrender penalty we will apply. To calculate the full surrender penalty for the base policy, find the factor for the current policy year. Multiply this factor by the number of thousands of face amount of the base policy. This is the full surrender penalty for the base policy. There is no surrender penalty for the base policy after 10 policy years.

If you request an increase in the face amount of this policy, the new layer will have its own separate 10 year surrender penalty period. To calculate the full surrender penalty for that layer, find the factor for the current layer year. Multiply this factor by the number of thousands of face amount of that layer. This is the full surrender penalty for that layer. There is no surrender penalty for that layer after 10 layer years.

If you request a full surrender within 30 days of a policy anniversary, the surrender value will not be less than the surrender value on that anniversary, including any premium qualification credit, less any loans, partial surrenders (including pro rata surrender penalties), and surrender penalty free withdrawals made after the last policy anniversary.

**ALTERNATIVE PAID-UP
LIFE INSURANCE
OPTION**

You may purchase Alternative Paid-Up Life Insurance.  You may exercise this option on or after the fifth policy anniversary, but before policy anniversary nearest age 100.

You must surrender the base policy and all layers when you elect to purchase Alternative Paid-Up Life Insurance.

When you send a written request to us, we will exchange this policy for Alternative Paid-Up Life Insurance policy(ies).  The face amount will be the amount that the policy's net cash value will purchase at the current net single premium rate in effect when you choose the option.

The current rates will vary by: the Insured's attained age when you exercise the option; the Insured's sex; the Insured's smoker or nonsmoker status; and the Insured's classes of risk on this policy and any layers as recorded at the time you exercise this option.

You may purchase Alternative Paid-Up Life Insurance if you meet these conditions:

1.     You must send a written request and the policy to us.  We must receive the request within 60 days of the date you signed it and while this option is still in force.  You will surrender all rights under this policy in exchange for the Alternative Paid-Up Life Insurance.

2.     This policy must have net cash value above any existing loan and surrender penalty when you request the option.

3.     You must agree to accept a new policy loan interest rate provision.  The new rate may be a variable one.

4.     You must agree that all riders attached to this policy will terminate.  We will add the cash value, if any, of the riders attached to this policy to the policy's cash value.  We will use the total amount to determine the amount of Alternative Paid-Up Life Insurance you may purchase.

5.     The Insured's age nearest birthday is no older than 99.

**Evidence of Insurability** -- When you request this option, we will calculate the difference between the amount(s) of Alternative Paid-Up Life Insurance and the net single premium(s).  We will compare that amount to the difference between the death benefit(s) and the accumulation value(s) under this policy on the date you choose this option.  If the total difference between the sum of the amount(s) of Alternative Paid-Up Life Insurance and the sum of the net single premium(s) (which is equal to the net cash value of the original policy and all layers) is greater than the total difference (base policy and all layers) between the sum of the death benefit(s) and the sum of the accumulation value(s), the Insured must give us satisfactory evidence of insurability.

If the Insured does not send us satisfactory evidence of insurability, we will reduce the amount of Alternative Paid-Up Life Insurance accordingly.  If there is any net cash value left over after you purchase Alternative Paid-Up Life Insurance, we will refund it to you.

**Alternative Paid-Up Life Insurance Policy** -- We will issue and date the Alternative Paid-Up Life Insurance policy as of the date you exercise this option.  If your request occurs within 30 days after a policy anniversary, the surrender value of the Alternative Paid-Up Life Insurance will not be less than the surrender value on that anniversary, less any loans, partial surrenders (including pro rata surrender penalties), and surrender penalty free withdrawals made after the last policy anniversary.

We will include in each Alternative Paid-Up Life Insurance policy a table of cash values for that policy and a description of the basis we use to calculate those values. The cash values will not be less than the minimum values required by the jurisdiction in which the application for the policy is signed. There will be a new policy loan interest rate provision in the Alternative Paid-Up Life Insurance policy.

This option is no longer in force when the first of these events occur: (1) the Insured dies; (2) you surrender the policy for its net cash value; (3) you exercise this option; or (4) this policy is terminated.

**PAYMENT OF CASH VALUE AND LOANS**

We may delay paying you the partial or full surrender values of this policy for up to 6 months after we receive your written request for the surrender. We may delay making a loan to you for up to 6 months after we receive your written request for the loan. We will not delay any loan made to pay premiums due us on any policy.

**POLICY STATEMENTS AND ILLUSTRATIONS**

We will send you a statement at least once a year without charge showing: the face amount; accumulation value; cash value; loans; partial surrenders; surrender penalty free withdrawals; premium qualification credits; premiums paid; and charges as of the statement date. Upon written request at any time, we will send you an illustration of your policy's benefits and values. There will be no charge for the first such illustration in each policy year. We reserve the right to charge a reasonable fee for any illustration after the first in any policy year.

**BASIS OF COMPUTATION**

The guaranteed cash values of the policy are not less than the minimum values required by the jurisdiction in which the application for this policy was signed. The guaranteed cash values are equal to the accumulation value based on the guaranteed monthly deductions and the guaranteed minimum interest rate shown in the Policy Data, less any surrender penalty.

Calculation of minimum cash values and nonforfeiture benefits are based on the Commissioners 1980 Standard Ordinary Smoker or Nonsmoker Ultimate Mortality Tables for males or females, age nearest birthday. Deaths are assumed to occur at the end of the policy year.

As required, we have filed the method we used to compute minimum cash values and nonforfeiture benefits with the supervisory official of the jurisdiction in which the application for this policy was signed.

**GENERAL PROVISIONS**

**Incontestability of the Policy** -- Except for fraud or nonpayment of premiums, this policy will be incontestable after it has been in force during the Insured's lifetime for two years from the date of issue. This provision does not apply to any rider providing benefits specifically for disability or death by accident.

If you request an increase in the face amount of this policy, this incontestability provision will start anew with respect to the increase, beginning on the layer date. The new incontestability period will be applicable only to the face amount of that layer.

**Amount We Pay is Limited in the Event of Suicide** -- If the Insured dies by suicide, while sane or insane, within one year from the date of issue, we will be liable only for the amount of premiums paid, less any partial surrenders, surrender penalty free withdrawals, loans and loan interest due.

If you request an increase in the face amount of this policy, this suicide provision will start anew with respect to the increase, beginning on the layer date. The new suicide period will be applicable only to the face amount of that layer.

**Misstatement of Age or Sex in the Application** -- If there is a misstatement of the Insured's age or sex in the application, we will adjust the excess of the death benefit over the accumulation value to that which would be purchased by the most recent monthly deduction at the correct age or sex. There will be no adjustment beyond age 100.

**The Policy is our Contract with You** -- We have issued this policy in consideration of the application and your initial premium payment. A copy of the application is attached and is part of this policy. The policy, including the application and any endorsements and riders, forms our contract with you. All statements made by or for the Insured will be considered representations and not warranties. We will not use any statement made by or for the Insured to deny a claim unless the statement is in the application and the application is attached to this policy when we issue or deliver it.

**Who Can Make Changes in the Policy** -- Only our President or a Vice President together with our Secretary have the authority to make any change in this policy. Any change must be in writing.

**Termination of Insurance** -- This policy will terminate at the earliest of:

1.   the date we receive your written request to surrender or terminate;

2.   the Maturity Date; or

3.   the date of lapse.

**No Dividends are Payable** -- This is nonparticipating insurance. It does not participate in our profits or surplus. We do not distribute past surplus or recover past losses by changing the monthly deduction rates.

**SETTLEMENT PROVISIONS**

When the Insured dies while the policy is in force, we will pay the death benefit in a lump sum unless you or the Beneficiary choose a settlement option. You may choose a settlement option while the Insured is living. The Beneficiary may choose a settlement option after the Insured has died. The Beneficiary's right to choose will be subject to any settlement agreement in effect at the Insured's death.

You may also choose one of these options as a method of receiving the surrender or maturity proceeds, if any are available under this policy.

When we receive a satisfactory written request, we will pay the benefit according to one of these options:

**Option A: Instalments for a Guaranteed Period** -- We will pay equal instalments for a guaranteed period of from one to thirty years. Each instalment will consist of part benefit and part interest. We will pay the instalments monthly, quarterly, semi-annually or annually, as requested. See Table A on the last page.

**Option B: Instalments for Life with a Guaranteed Period --**
We will pay equal monthly instalments as long as the payee is living, but we will not make payments for less than the guaranteed period the payee chooses. The guaranteed period may be either 10 years or 20 years. We will pay the instalments monthly. See Table B on the last page.

**Option C: Benefit Deposited with Interest --** We will hold the benefit on deposit. It will earn interest at the annual interest rate we are paying as of the date of death, surrender or maturity. We will not pay less than 2 1/2% annual interest. We will pay the earned interest monthly, quarterly, semi-annually or annually, as requested. The payee may withdraw part or all of the benefit and earned interest at any time.

**Option D:   Instalments of a Selected Amount --** We will pay instalments of a selected amount until we have paid the entire benefit and accumulated interest.

**Option E: Annuity --** We will use the benefit as a single premium to buy an annuity. The annuity may be payable to one or two payees. It may be payable for life with or without a guaranteed period, as requested. The annuity payment will not be less than what our current annuity contracts are then paying.

The payee may arrange any other method of settlement as long as we agree to it. The payee must be an individual receiving payment in his or her own right. There must be at least $10,000 available for any option and the amount of each instalment to each payee must be at least $100. If the benefit amount is not enough to meet these requirements, we will pay the benefit in a lump sum.

We will pay the first instalment under any option on the date of death, maturity or surrender, whichever applies. Any unpaid balance we hold under Options A, B or D will earn interest at the rate we are paying at the time of settlement. We will not pay less than 3% annual interest. Any benefit we hold will be combined with our general assets.

If the payee does not live to receive all guaranteed payments under Options A, B, D or E or any amount deposited under Option C, plus any accumulated interest, we will pay the remaining benefit as scheduled to the payee's estate. The payee may name and change a successor payee for any amount we would otherwise pay the payee's estate.

### TABLE A
#### Instalments for Each $1,000 Payable under Option A

Multiply the Monthly Instalment by 11.83495 for Annual, by 5.96322 for Semi-Annual, or by 2.99253 for Quarterly Instalments

| Guaranteed Period (Yrs.) | Monthly Instalment | Guaranteed Period (Yrs.) | Monthly Instalment | Guaranteed Period (Yrs.) | Monthly Instalment |
|---|---|---|---|---|---|
| 1 | $84.47 | 11 | $8.86 | 21 | $5.32 |
| 2 | 42.86 | 12 | 8.24 | 22 | 5.15 |
| 3 | 28.99 | 13 | 7.71 | 23 | 4.99 |
| 4 | 22.06 | 14 | 7.26 | 24 | 4.84 |
| 5 | 17.91 | 15 | 6.87 | 25 | 4.71 |
| 6 | 15.14 | 16 | 6.53 | 26 | 4.59 |
| 7 | 13.16 | 17 | 6.23 | 27 | 4.48 |
| 8 | 11.68 | 18 | 5.96 | 28 | 4.37 |
| 9 | 10.53 | 19 | 5.73 | 29 | 4.27 |
| 10 | 9.61 | 20 | 5.51 | 30 | 4.18 |

### TABLE B
#### Monthly Instalment for Each $1,000 Payable under Option B

**Male Payee**

| Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | $2.90 | $2.89 | 26 | $3.20 | $3.19 | 41 | $3.77 | $3.71 | 56 | $4.92 | $4.59 | 71 | $7.27 | $5.42 |
| 12 | 2.91 | 2.91 | 27 | 3.22 | 3.21 | 42 | 3.82 | 3.76 | 57 | 5.03 | 4.66 | 72 | 7.48 | 5.45 |
| 13 | 2.93 | 2.92 | 28 | 3.25 | 3.24 | 43 | 3.88 | 3.81 | 58 | 5.15 | 4.73 | 73 | 7.68 | 5.46 |
| 14 | 2.94 | 2.94 | 29 | 3.28 | 3.27 | 44 | 3.94 | 3.86 | 59 | 5.27 | 4.80 | 74 | 7.88 | 5.48 |
| 15 | 2.96 | 2.96 | 30 | 3.31 | 3.30 | 45 | 4.00 | 3.91 | 60 | 5.40 | 4.87 | 75 | 8.08 | 5.49 |
| 16 | 2.98 | 2.97 | 31 | 3.34 | 3.33 | 46 | 4.07 | 3.97 | 61 | 5.53 | 4.94 | 76 | 8.27 | 5.50 |
| 17 | 3.00 | 2.99 | 32 | 3.38 | 3.36 | 47 | 4.14 | 4.02 | 62 | 5.68 | 5.00 | 77 | 8.46 | 5.50 |
| 18 | 3.01 | 3.01 | 33 | 3.41 | 3.39 | 48 | 4.21 | 4.08 | 63 | 5.83 | 5.07 | 78 | 8.63 | 5.51 |
| 19 | 3.03 | 3.03 | 34 | 3.45 | 3.43 | 49 | 4.28 | 4.14 | 64 | 5.98 | 5.13 | 79 | 8.79 | 5.51 |
| 20 | 3.05 | 3.05 | 35 | 3.49 | 3.46 | 50 | 4.36 | 4.20 | 65 | 6.15 | 5.18 | 80 | 8.94 | 5.51 |
| 21 | 3.08 | 3.07 | 36 | 3.53 | 3.50 | 51 | 4.44 | 4.26 | 66 | 6.32 | 5.24 | 81 | 9.07 | 5.51 |
| 22 | 3.10 | 3.09 | 37 | 3.57 | 3.54 | 52 | 4.53 | 4.32 | 67 | 6.50 | 5.28 | 82 | 9.18 | 5.51 |
| 23 | 3.12 | 3.11 | 38 | 3.62 | 3.58 | 53 | 4.62 | 4.39 | 68 | 6.68 | 5.33 | 83 | 9.28 | 5.51 |
| 24 | 3.14 | 3.14 | 39 | 3.67 | 3.62 | 54 | 4.71 | 4.46 | 69 | 6.88 | 5.36 | 84 | 9.36 | 5.51 |
| 25 | 3.17 | 3.16 | 40 | 3.72 | 3.67 | 55 | 4.81 | 4.52 | 70 | 7.07 | 5.40 | 85 | 9.42 | 5.51 |

**Female Payee**

| Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. | Age | 10 Yrs. | 20 Yrs. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | $2.83 | $2.83 | 26 | $3.08 | $3.07 | 41 | $3.54 | $3.52 | 56 | $4.51 | $4.35 | 71 | $6.73 | $5.36 |
| 12 | 2.84 | 2.84 | 27 | 3.10 | 3.10 | 42 | 3.59 | 3.56 | 57 | 4.61 | 4.42 | 72 | 6.94 | 5.40 |
| 13 | 2.86 | 2.85 | 28 | 3.12 | 3.12 | 43 | 3.63 | 3.60 | 58 | 4.71 | 4.50 | 73 | 7.16 | 5.43 |
| 14 | 2.87 | 2.87 | 29 | 3.15 | 3.14 | 44 | 3.68 | 3.65 | 59 | 4.82 | 4.57 | 74 | 7.38 | 5.48 |
| 15 | 2.88 | 2.88 | 30 | 3.17 | 3.17 | 45 | 3.73 | 3.69 | 60 | 4.94 | 4.65 | 75 | 7.60 | 5.47 |
| 16 | 2.90 | 2.90 | 31 | 3.20 | 3.19 | 46 | 3.78 | 3.74 | 61 | 5.06 | 4.72 | 76 | 7.82 | 5.48 |
| 17 | 2.91 | 2.91 | 32 | 3.23 | 3.22 | 47 | 3.84 | 3.79 | 62 | 5.19 | 4.80 | 77 | 8.04 | 5.49 |
| 18 | 2.93 | 2.93 | 33 | 3.26 | 3.25 | 48 | 3.90 | 3.85 | 63 | 5.33 | 4.88 | 78 | 8.25 | 5.50 |
| 19 | 2.95 | 2.94 | 34 | 3.29 | 3.28 | 49 | 3.96 | 3.90 | 64 | 5.47 | 4.95 | 79 | 8.45 | 5.51 |
| 20 | 2.96 | 2.96 | 35 | 3.32 | 3.31 | 50 | 4.03 | 3.96 | 65 | 5.63 | 5.02 | 80 | 8.64 | 5.51 |
| 21 | 2.98 | 2.98 | 36 | 3.35 | 3.34 | 51 | 4.10 | 4.02 | 66 | 5.79 | 5.09 | 81 | 8.82 | 5.51 |
| 22 | 3.00 | 2.99 | 37 | 3.39 | 3.37 | 52 | 4.17 | 4.08 | 67 | 5.96 | 5.15 | 82 | 8.97 | 5.51 |
| 23 | 3.02 | 3.01 | 38 | 3.42 | 3.41 | 52 | 4.25 | 4.14 | 68 | 6.14 | 5.21 | 83 | 9.11 | 5.51 |
| 24 | 3.04 | 3.03 | 39 | 3.46 | 3.44 | 54 | 4.33 | 4.21 | 69 | 6.33 | 5.27 | 84 | 9.23 | 5.51 |
| 25 | 3.06 | 3.05 | 40 | 3.50 | 3.48 | 55 | 4.42 | 4.28 | 70 | 6.53 | 5.32 | 85 | 9.32 | 5.51 |

Ages younger than 11 are the same as shown for age 11, and ages older than 85 are the same as shown for age 85.

## RIGHT TO EXAMINE AND RETURN POLICY WITHIN 20 DAYS

### ENDORSEMENT

Transamerica Occidental Life Insurance Company has issued this endorsement as a part of the policy to which it is attached. It replaces the Right to Examine and Return Policy Within 10 Days provision on page 1 of the policy.

**Right to Examine and Return Policy Within 20 Days** -- The owner may, at any time within 20 days after receipt of this policy, return it for cancellation to us or to the agent through whom it was purchased. The return of the policy will void it from the beginning and any premium paid will be refunded to the owner.

Signed for the Company at Los Angeles, California, on the date of issue of the policy.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

1-001 45-178

## TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY

### EXTRA SURRENDER PENALTY FREE WITHDRAWAL ENDORSEMENT

Transamerica Occidental Life Insurance Company has issued this endorsement as part of the policy to which it is attached.

Wherever the term "Surrender Penalty Free Withdrawal" appears in the policy to which this endorsement is attached, it is also meant to include the term "Extra Surrender Penalty Free Withdrawal". There is only one exception; that is in the section of the policy titled "Surrender Penalty Free Withdrawal", "(a)". That calculation of the eligible amount for surrender without penalty will NOT include "Extra Surrender Penalty Free Withdrawals".

### DEFINITIONS

In this endorsement:

**Extra Withdrawal** means Extra Surrender Penalty Free Withdrawal.

**We** means Transamerica Occidental Life Insurance Company.

**Withdrawal** means Surrender Penalty Free Withdrawal.

**You** means the Owner.

This Extra Withdrawal may be taken in addition to the Withdrawal in the policy to which this endorsement is attached. If requested at the same time, the Extra Withdrawal will be processed first. Then, the Withdrawal will be processed based on the remaining accumulation value.

At any time after the first policy year, you may make an Extra Withdrawal without a partial surrender penalty; the limits are outlined below.

Your Extra Withdrawals may only be taken if we receive written proof that the Insured requires medical care for one of these conditions: heart attack; stroke; cancer (malignant tumor); renal failure; or major organ transplant. This proof will consist of a doctor's certification acceptable to us. We may request additional medical information from the doctor submitting the certification or any doctor we deem qualified. While a request is pending, we reserve the right to obtain a second medical opinion; we also reserve the right to have the Insured examined at our expense.

The minimum amount of an Extra Withdrawal is $100.

When you request an Extra Withdrawal, we will calculate the maximum amount eligible for surrender without a Company imposed penalty, as follows:

|  | 1) | 10% of the policy's current accumulation value as of the request date; |
|---|---|---|
| less | 2) | the sum of all Extra Withdrawals since the last policy anniversary. |

The total amount available from all Withdrawals, Extra Withdrawals and partial surrenders shall not exceed:

|  | 1) | the current accumulation value as of the request date; |
|---|---|---|
| less | 2) | any existing policy loans; |
| less | 3) | the sum of three monthly deductions; |
| less | 4) | the greater of $25 or the full surrender penalty. |

During any required premium period, the total amount available from all Withdrawals, Extra Withdrawals and partial surrenders also may not exceed:

      1) the sum of all gross premiums paid;

less   2) the sum of all required premiums since the policy date.

(See # 2 of the Premiums provision in the policy.)

We will process an Extra Withdrawal for the eligible amount. The remainder, if any, of the amount you request will be processed first as a Withdrawal; any excess over that amount will be processed as a partial surrender.

We will deduct the amount withdrawn from the policy's accumulation value.

Signed for Transamerica Occidental Life Insurance Company at Los Angeles, California on the date of issue of this policy.

*James W. Dedrew*

Executive Vice President, General Counsel
And Corporate Secretary

*Thomas Swank*

President and CEO

## TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY

### ENDORSEMENT TO MODIFY GRACE PERIOD

Transamerica Occidental Life Insurance Company has issued this endorsement as part of the policy to which it is attached.

While this policy is in force and subject to the terms of this endorsement, certain death benefits of this policy including any layers, Supplemental Adjustable Life Insurance Riders, Full Death Benefit Rider, and the benefits of any Waiver Provision will continue.

### DEFINITIONS

In this endorsement:

**Grace Period** is the 60-day period starting on a monthly policy date or policy anniversary, as described in the policy.

**Net Deposits** mean the total premiums paid, less the sum of any premium refunds, partial surrenders, and surrender penalty free withdrawals since the policy date. In calculating the Net Deposits, premium paid in a policy year prior to the policy year in which it is due will reflect a time value of money at 4 percent per annum.

**Select Monthly Premium** is the amount payable each month during the Select Period to maintain this endorsement. This amount is shown in the Policy Data. This amount may be paid cumulatively in advance.

**Select Period** is the period this endorsement is in effect. This period is shown in the Policy Data.

**We** means Transamerica Occidental Life Insurance Company.

**You** means the Owner.

### HOW IT WORKS

If the Accumulation Value is insufficient to allow the policy to remain in force, it will not enter a grace period and certain death benefits will continue to be available during the Select Period provided that at all times during the Select Period:

(i) there is no outstanding loan; and

(ii) Net Deposits equal or exceed cumulative Select Monthly Premiums due since the Policy Date; and

(iii) the Death Benefit Option in effect is Option 1 and has always been Option 1.

During the period of such continuation, the death benefit will consist of the death benefits under the Base Policy, including any layers, Supplemental Adjustable Life Insurance Riders and Full Death Benefit Rider. The benefits of any Waiver Provision will be continued until the end of the Select Period subject to the same conditions. Any riders other than those specified above will be terminated when the death benefit continuation period begins. Any conversion privileges contained within such other riders must be exercised at that time or forfeited.

If any of the three conditions listed above are not met, the policy and all riders shall enter the 60-day Grace Period as specified in the policy and the policy may lapse. During the Select Period while the Base Policy is in force, this endorsement can be placed back in force after it terminates, by payment of premiums to meet the Net Deposits requirement in (ii) above, provided that all other requirements above are met as well.

We will continue to deduct the monthly deductions from the Accumulation Value as they come due; interest will accrue on the Accumulation Value while the policy remains in force under the terms of this endorsement.

### WAIVER PROVISION

If the policy contains a Waiver Provision benefit and a disability claim is approved while this endorsement is effective, the Select Monthly Premium will be waived. The Select Monthly Premium will be waived for the same length of time that the policy is on waiver. The Select Period will not be extended.

## POLICY CHANGES

If a requested increase or decrease in the face amount of the policy is processed during the Select Period, the Select Monthly Premium will be adjusted from that point forward. The Select Period will not be adjusted.

## AUTOMATIC TERMINATION

This endorsement will automatically terminate upon the first of the following to occur:
1. the cumulative Net Deposits to date are less than cumulative Select Monthly Premiums due since the Policy Date; or,
2. the Select Period has ended; or,
3. the Death Benefit Option on the policy has been changed from Option 1 to another option; or,
4. the policy terminates for any reason.

Signed for Transamerica Occidental Life Insurance Company at Los Angeles, California, and effective on the date of issue of the policy to which this endorsement is attached.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

## AUTOMATIC PREMIUM LOAN ENDORSEMENT
### (for policies containing a Required Annual Premium)

Transamerica Occidental Life Insurance Company has issued this endorsement as a part of the policy to which it is attached.

When the Automatic Premium Loan provision is made effective by the owner in the application at the time of issue, any portion of the required annual premium which remains unpaid at the end of a grace period will be paid by automatic premium loan. These rules will apply:

(1) We will process an automatic premium loan if there is enough net cash value to pay both the required annual premium due and interest due on the automatic premium loan. If there is not enough net cash value to pay both the required annual premium due and the interest on the automatic premium loan, we will not make an automatic premium loan. The policy will then lapse subject to the nonforfeiture provision.

(2) The Automatic Premium Loan will also be subject to all sections of this policy that pertain to policy loans.

(3) If the Automatic Premium Loan provision is made ineffective by the owner in the application at the time of issue, this provision may be requested by the owner. The request must be in the form of a written notice filed at our Home Office. This provision may also be cancelled by written notice by the owner filed in our Home Office.

The Automatic Premium Loan Provision will terminate at the end of the required annual premium period.

Signed for the Company at Los Angeles, California, on the date of issue of the policy.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

1-002 65-187

## ACCELERATED DEATH BENEFIT OPTION ENDORSEMENT

Transamerica Occidental Life Insurance Company has issued this endorsement as a part of policy number 60041474 ("the policy").

**NOTICE:** Benefits advanced under this option may be taxable. As with all tax matters, the Owner should consult a personal tax advisor to assess the impact of this benefit on the Owner and the policy.

While the policy is in force, we will pay an Accelerated Death Benefit to you, upon your request, subject to all the provisions and limitations of this endorsement.

### DEFINITIONS

In this endorsement:

**Accelerated Death Benefit** is the amount we pay under this option.

**Administrative Fee** is the $250.00 that will be charged at the time each Accelerated Death Benefit is paid.

**Effective Date** is the date we approve your written request to exercise this option.

**Immediate Family Members** are members of either the Insured's or Owner's family who may be described as follows: spouse (includes common law spouse), children, stepchildren, parents, grandparents, grandchildren, brothers and sisters and their spouses (includes common law spouse).

**Insured** means only the Insured covered under the policy and not any other individuals covered for additional riders or benefits.

**Physician** is an individual, other than the Insured, the Owner, or Immediate Family Member, who is a doctor of medicine or osteopathy, licensed in the jurisdiction in which the advice is given or diagnosis is made and who is acting within the scope of that license.

**Policy Basic Death Benefit** means the death benefit provided by the policy, any policy layer, any Supplemental Adjustable Life Insurance Rider and any level term rider on the life of the Insured. It does not include any death benefit provided by any other riders or benefits attached to the policy.

**Policy Charges** means any monthly deductions, any surrender charges or surrender penalties, or any other charges specified in the policy.

**Terminal Illness** is a medical condition, resulting from bodily injury or disease, or both, and:

- -- which has been diagnosed by a Physician after the issue date of the policy; and,

- -- for which the diagnosis is supported by clinical, radiological, laboratory or other evidence of the medical condition which is satisfactory to us; and,

- -- which is not curable by any means available to the medical profession; and,

- -- which a Physician certifies is expected to result in death within 12 months of diagnosis and the certification is within 30 days of the Accelerated Death Benefit request.

**"You"** and **"Your"** mean the Owner

### LIMITATIONS

1. The availability of this option is subject to all the terms of the policy, including contestability and suicide.

2. No benefit will be paid if Terminal Illness results from intentionally self-inflicted injury(ies) at any time.

3. At each request to exercise this option, there must be at least 2 years remaining from the Effective Date to the expiry or maturity date of each portion of the Policy Basic Death Benefit.

4. The Owner may not exercise this option:

   a) if required by law to use the Accelerated Death Benefit to meet the claims of creditors, whether in bankruptcy or otherwise, or

   b) if required by a government agency to use the Accelerated Death Benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement, or

   c) until there is only one surviving Joint Insured if the policy is a Joint and Last Survivor policy.

5. This option is not available if the maximum Accelerated Death Benefit has been paid.

6. The face amount of the policy on which this option is exercised must be at least $50,000 at the time of the first written request.

1-005 84-195

## AMOUNT OF THE ACCELERATED DEATH BENEFIT

1. The Owner can request an Accelerated Death Benefit payment in any amount subject to the following minimum and maximum. The minimum Accelerated Death Benefit allowed will be $10,000. The maximum Accelerated Death Benefit allowed for all policies combined covering the Insured issued by the Company will be the lesser of $250,000 or 75% of the combined Policy Basic Death Benefit for those policies as of the first Accelerated Death Benefit payment. If the first Accelerated Death Benefit payment is less than the maximum, then no more than the remaining balance of the maximum can be paid out later as an Accelerated Death Benefit.

2. If there is an outstanding loan on the policy, the Accelerated Death Benefit payment may be reduced to repay a prorata portion of the policy loan.

3. At the time we pay the Accelerated Death Benefit, if the policy is in the grace period, we will deduct any unpaid premium in accordance with the grace period provision in the policy.

4. The $250.00 Administrative Fee will be deducted from each Accelerated Death Benefit payment.

### PREMIUM

Premium billing and premium payment requirements will continue, subject to the adjustments described below.

### EFFECT OF THE ACCELERATED DEATH BENEFIT PAYMENT ON THE POLICY

After an Accelerated Death Benefit is paid, the policy and any riders and benefits will remain in force subject to the following adjustments:

1. The Policy Basic Death Benefit after payment of an Accelerated Death Benefit will equal the amount of the Policy Basic Death Benefit before the payment of the Accelerated Death Benefit minus the result of multiplying (a) by (b), where:

    (a) is the Accelerated Death Benefit; and

    (b) is 1 (one) plus an interest rate that is the greater of,

      (i) the federal interest rate under Internal Revenue Code (IRC) section 846(c)(2), or

      (ii) the policy loan effective interest rate.

2. The Policy Basic Death Benefit, and, if applicable, the policy's face amount, accumulation value, cash value, policy loan, and required premium will be adjusted as of the Effective Date. The adjustments to the Policy Basic Death Benefit will be made in the following order: (1) level term rider(s) on the Insured, if any, beginning with the most recent rider; (2) policy layer(s), if any, beginning with the most recent layer; and, (3) remaining portions of the Policy Basic Death Benefit. New Policy Charges and premiums will be based on the rates in effect for the policy's resulting face amount.

3. We will provide new policy data pages showing the reduced coverage amount resulting from the Accelerated Death Benefit payment.

### EXERCISING THE OPTION

We must receive a written request to exercise this option at the Home Office or our designated Administrative Office within 30 days after the certification of diagnosis of the Terminal Illness, or as soon as reasonably possible. The request should include the name of the Insured, the policy number and, must be signed and dated by the Owner. If the policy has an irrevocable beneficiary, that person(s) must also sign the request. If the policy is assigned, we must receive a completed and signed release of assignment. If the policy was issued in a community property state, we may require your spouse to sign the request.

### PROOF OF TERMINAL ILLNESS

We must receive written proof of the Insured's Terminal Illness before we make an Accelerated Death Benefit payment. This proof will consist of a Physician's certification acceptable to us. We may request additional medical information from the Physician submitting the certification or any Physician we consider qualified.

### PHYSICAL EXAMINATION

While a claim is pending, we reserve the right to obtain a second medical opinion and to have the Insured examined at our expense.

### TIME OF PAYMENT OF CLAIMS

After we receive satisfactory written proof of Terminal Illness, we will pay the Accelerated Death Benefit due.

## PAYMENT OF CLAIMS

If approved, the Accelerated Death Benefit will be paid in a lump sum to the Owner. If the Insured dies before payment is made, we will pay the entire death benefit of the policy to the Beneficiary in accordance with the policy provisions.

## LEGAL ACTIONS

No legal action may be brought to recover the payment requested under this option within 60 days after written proof of Terminal Illness has been given to us. No such action may be brought after 3 years from the time written proof of the Insured's Terminal Illness has been given to us.

## LIVING BENEFIT RIDER

If the policy contains a Living Benefit Rider and there is a simultaneous request to exercise the Living Benefit and the Accelerated Death Benefit Option, the Living Benefit request will be processed first; the Accelerated Death Benefit Option request will be processed second and will be based on the adjusted policy values resulting after payment of the Living Benefit.

## TAX QUALIFICATION

Any amount payable under this option is intended to qualify for federal income tax exclusion (to the maximum extent possible). To that end, the provisions of this endorsement and the policy to which it is attached are to be interpreted to ensure or maintain such tax qualification, notwithstanding any other provisions to the contrary. The Company reserves the right to amend this endorsement and the policy to which it is attached to reflect any clarifications that may be needed or are appropriate to maintain such qualification, or to conform this endorsement and the policy to which it is attached to any applicable changes in the tax qualification requirements. You will be sent a copy of any such amendment.

Signed for the Company at Los Angeles, California, on the date of issue of the policy unless a different date is shown here.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

## TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY

### DEATH BENEFIT FACTORS ENDORSEMENT

Transamerica Occidental Life Insurance Company has issued this endorsement as part of the policy to which it is attached.  You do not pay any premium for this endorsement.

The Death Benefit Factors Tables, as they appear in the policy to which this endorsement is attached, are amended as follows:

### DEATH BENEFIT FACTORS

| Insured's Attained Age | Policy Years 1-10 | | Insured's Attained Age | Policy Years 11+ | |
|---|---|---|---|---|---|
| | MALE | FEMALE | | MALE | FEMALE |
| 16 | 8.49 | 9.71 | 26 | 5.91 | 6.64 |
| 17 | 8.22 | 9.41 | 27 | 5.72 | 6.43 |
| 18 | 7.98 | 9.10 | 28 | 5.54 | 6.22 |
| 19 | 7.75 | 8.81 | 29 | 5.36 | 6.01 |
| 20 | 7.52 | 8.53 | 30 | 5.18 | 5.81 |
| 21 | 7.30 | 8.25 | 31 | 5.01 | 5.62 |
| 22 | 7.08 | 7.99 | 32 | 4.85 | 5.44 |
| 23 | 6.85 | 7.72 | 33 | 4.69 | 5.26 |
| 24 | 6.63 | 7.47 | 34 | 4.53 | 5.08 |
| 25 | 6.41 | 7.22 | 35 | 4.38 | 4.91 |
| 26 | 6.20 | 6.98 | 36 | 4.24 | 4.75 |
| 27 | 6.00 | 6.75 | 37 | 4.10 | 4.59 |
| 28 | 5.80 | 6.52 | 38 | 3.96 | 4.44 |
| 29 | 5.61 | 6.31 | 39 | 3.83 | 4.30 |
| 30 | 5.43 | 6.10 | 40 | 3.70 | 4.16 |
| 31 | 5.25 | 5.90 | 41 | 3.58 | 4.02 |
| 32 | 5.08 | 5.70 | 42 | 3.47 | 3.89 |
| 33 | 4.91 | 5.52 | 43 | 3.35 | 3.77 |
| 34 | 4.75 | 5.34 | 44 | 3.24 | 3.65 |
| 35 | 4.59 | 5.17 | 45 | 3.14 | 3.53 |
| 36 | 4.44 | 5.00 | 46 | 3.04 | 3.42 |
| 37 | 4.30 | 4.84 | 47 | 2.94 | 3.32 |
| 38 | 4.16 | 4.68 | 48 | 2.85 | 3.21 |
| 39 | 4.03 | 4.54 | 49 | 2.76 | 3.11 |
| 40 | 3.90 | 4.39 | 50 | 2.68 | 3.02 |
| 41 | 3.78 | 4.25 | 51 | 2.59 | 2.92 |
| 42 | 3.66 | 4.12 | 52 | 2.51 | 2.84 |
| 43 | 3.55 | 3.99 | 53 | 2.44 | 2.75 |
| 44 | 3.44 | 3.87 | 54 | 2.36 | 2.67 |

Signed for the Company at Los Angeles, California on the date of issue of this policy.

*James W. Dederer*

*Thomas J. Cusack*

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

1-003 86-197



TRANSAMERICA
LIFE COMPANIES ®

Transamerica Occidental Life Insurance Company
Transamerica Assurance Company
Transamerica Life Insurance and Annuity Company

**Life Insurance**

**Buyer's Guide**

This guide can help you when you shop for life insurance.  It discusses how to:

* Find a Policy That Meets Your Needs and Fits Your Budget
* Decide How Much Insurance You Need
* Make Informed Decisions When You Buy a Policy

DIS 2001-196

Prepared by the National Association of Insurance Commissioners

The National Association of Insurance Commissioners is an association of state insurance regulatory officials.   This association helps the various Insurance Departments to coordinate insurance laws for the benefits of all consumers.

## This Guide Does Not Endorse Any Company or Policy

**Important Things to Consider**

1. Review your own insurance needs and circumstances.   Choose the kind of policy that has benefits that most closely fit your needs.  Ask an agent or company to help you.

2. Be sure that you can handle premium payments.  Can you afford the initial premium?  If the premium increases later and you still need insurance, can you still afford it?

3. Don't sign an insurance application until you review it carefully to be sure all the answers are complete and accurate.

4. Don't buy life insurance unless you intend to stick with your plan.  It may be very costly if you quit during the early years of the policy.

5. Don't drop one policy and buy another without a thorough study of the new policy and the one you have now.  Replacing your insurance **may be costly**.

6. Read your policy carefully.   Ask your agent or company about anything that is not clear to you.

7. Review your life insurance program with your agent or company every few years to keep up with changes in your income and your needs.

**Buying Life Insurance**

When you buy life insurance, you want coverage that fits your needs.

**First**, decide how much you need -- and for how long -- and what you can afford to pay. Keep in mind the major reason you buy life insurance is to cover the financial effects of unexpected or untimely death.  Life insurance can also be one of many ways you plan for the future.

**Next**, learn what kinds of policies will meet your needs and pick the one that best suits you.

**Then**, choose the combination of policy premium and benefits that emphasizes protection in case of early death, or benefits is case of long life, or a combination of both.

It makes good sense to ask a life insurance agent or company to help you.  An agent can help you review your insurance needs and give you information about the available policies.  If one kind of policy doesn't seem to fit your needs, ask about others.

This guide provides only basic information.  You can get more facts from a life insurance agent or company or from your public library.

DIS 2001-196

**What About the Policy You Have Now?**

If you are thinking about dropping a life insurance policy, here are some things your should consider:

* If you decide to replace your policy, don't cancel your old policy until you have received the new one.  You then have a minimum period to review your new policy and decide if it is what you wanted.

* It may be costly to replace a policy.  Much of what you paid in the early years of the policy you have now, paid for the company's cost of selling and issuing the policy.  You may pay this type of cost again if you buy a new policy.

* Ask your tax advisor if dropping your policy could affect your income taxes.

* If you are older and your health has changed, premiums for the new policy will often be higher.  You will not be able to buy a new policy if you are not insurable.

* You may have valuable rights and benefits in the policy you now have that are not in the new one.

* If the policy you have now no longer meets your needs, you may not have to replace it. You might be able to change your policy or add to it to get the coverage or benefits you now want.

* At least in the beginning, a policy may not pay benefits for some cause of death covered in the policy you have now.

In all cases, if you are thinking of buying a new policy, check with the agent or company that issues you the one you have now.  When you bought your old policy, you may have seen an illustration of the benefits of your policy.  Before replacing your policy, ask your agent or company for an updated illustration.  Check to see how the policy has performed and what you might expect in the future, based on the amounts the company is paying now.


**How Much Do You Need?**

Here are some questions to ask yourself:

* How much of the family income do I provide?  If I were to die early, how would my survivors, especially my children, get by?   Does anyone else depend on me financially, such as a parent, grandparent, brother or sister?

* Do I have children for whom I'd like to set aside money to finish their education in the event of my death?

* How will my family pay final expenses and repay debts after my death?

* Do I have family members or organizations to whom I would like to leave money?

* Will there be estate taxes to pay after my death?

* How will inflation affect future needs?

As you figure out what you have to meet these needs, count the life insurance you have now, including any group insurance where you work or veteran's insurance.  Don't forget Social Security and pension plan survivor's benefits.   Add other assets you have: savings, investments, real estate and personal property.  Which assets would your family sell or cash in to pay expenses after your death?

DIS 2001-196

**What is the Right Kind of Life Insurance?**

All policies are not the same. Some give coverage for your lifetime and others cover you for a specific number of years. Some build up cash values and others do not. Some policies combine different kinds of insurance, and others let you change from one kind of insurance to another. Some policies may offer other benefits while you are still living. Your choice should be based on your needs and what you can afford.

There are two basic types of life insurance: **term insurance** and **cash value insurance**. Term insurance generally has lower premiums in the early years, but does not build up cash values that you can use in the future. You may combine cash value life insurance with term insurance for the period of your greatest need for life insurance to replace income.

**Term Insurance** covers you for a term of one or more years. It pays a death benefit only if you die in that term. Term insurance generally offers the largest insurance protection for your premium dollar. It generally does not build up cash value.

You can renew most term insurance policies for one or more terms even if your health has changed. Each time you renew the policy for a new term, premiums may be higher. Ask what the premiums will be if you continue to renew the policy. Also ask if you will lose the right to renew the policy at some age. For a higher premium, some companies will give you the right to keep the policy in force for a guaranteed period at the same price each year. At the end of that time you may need to pass a physical examination to continue coverage, and premiums may increase.

You may be able to trade many term insurance policies for a cash value policy during a conversion period -- even if you are not in good health. Premiums for the new policy will be higher than you have been paying for the term insurance.

**Cash Value Life Insurance** is a type of insurance where the premium charges are higher at the beginning than they would be for the same amount of term insurance. The part of the premium that is not used for the cost of insurance is invested by the company and builds up a cash value that may be used in a variety of ways. You may borrow against a policy's cash value by taking a policy loan. If you don't pay back the loan and the interest on it, the amount you owe will be subtracted from the benefits when you die, or from the cash value if you stop paying premiums and take out the remaining cash value. You can also use your cash value to keep insurance protection for a limited time or to buy a reduced amount without having to pay more premiums. You can also use the cash value to increase your income in retirement or to help pay for needs such as a child's tuition without cancelling the policy. However, to build up this cash value, you must pay higher premiums in the earlier years of the policy. Cash value life insurance may be one of several types: whole life, universal life and variable life are all types of cash value insurance.

**Whole Life Insurance** covers you for as long as you live if your premiums are paid. You generally pay the same amount in premiums for as long as you live. When you first take out the policy, premiums can be several times higher than you would pay initially for the same amount of term insurance. But they are smaller than the premium you would eventually pay if you were to keep renewing a term policy until your later years.

Some whole life policies let you pay premiums for a shorter period such as 20 years, or until age 65. Premiums for these policies are higher since the premium payments are made during a shorter period.

**Universal Life Insurance** is a kind of flexible policy that lets you vary your premium payments. You can also adjust the face amount of your coverage. Increases may require proof that you qualify for the new death benefit. The premiums you pay (less expense charges) go into a policy account that earns interest. Charges are deducted from the account. If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower. If it keeps dropping, eventually your coverage will end. To prevent that, you may need to start making premium payments, or increase your premium payments, or lower your death benefits. Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value.

**Variable Life Insurance** is a kind of insurance where the death benefits and cash values depend on the investment performance of one or more separate accounts, which may be invested in mutual funds or other investments allowed under the policy. Be sure to get the prospectus from the company when buying this kind of policy and STUDY IT CAREFULLY. You will have higher death benefits and cash value if the underlying investments do well. Your benefits and cash value will be lower or may disappear if the investments you chose didn't do as well as you expected. You may pay an extra premium for a guaranteed death benefit.

## Life Insurance Illustrations

You may be thinking of buying a policy where cash values, death benefits, dividends or premiums may vary based on events or situations the company does not guarantee (such as interest rates). If so, you may get an illustration from the agent or company that helps explain how the policy works. The illustration will show how the benefits that are not guaranteed will change as interest rates and other factors change. The illustration will show you what the company guarantees. It will also show you what could happen in the future. Remember that nobody knows what will happen in the future. You should be ready to adjust your financial plans if the cash value doesn't increase as quickly as shown in the illustration. You will be asked to sign a statement that says you understand that some of the numbers in the illustration are not guaranteed.

## Finding a Good Value in Life Insurance

After you have decided which kind of life insurance is best for you, compare similar policies from different companies to find which one is likely to give you the best value for your money. A simple comparison of the premiums is not enough. There are other things to consider. For example:

* Do premiums or benefits vary from year to year?
* How much cash value builds up under the policy?
* What part of the premiums or benefits is not guaranteed?
* What is the effect of interest on money paid and received at different times on the policy?

Once you have decided which type of policy to buy, you can use a cost comparison index to help you compare similar policies. Life insurance agents or companies can give you information about several different kinds of indexes that each work a little differently. One type helps you compare the costs between two policies if you give up the policy and take out the cash value. Another helps you compare your costs if you don't give up your policy before its coverage ends. Some help you decide what kind of questions to ask the agent about the numbers used in an illustration. Each index is useful in some ways, but they all have shortcomings. Ask you agent which will be most helpful to you. Regardless of which index you use, compare index numbers only for similar policies —— those that offer basically the same benefits, with premiums payable for the same length of time.

Remember that no one company offers the lowest cost at all ages for all kinds and amounts of insurance. You should also consider other factors:

* How quickly does the cash value grow? Some policies have low cash values in the early years that build quickly later one. Other policies have a more level cash value build-up. A year-by-year display of values and benefits can be very helpful. (The agent or company will give you a policy summary or an illustration that will show benefits and premiums for selected years.)

* Are there special policy features that particularly suit your needs?

* How are nonguaranteed values calculated? For example, interest rates are important in determining policy returns. In some companies, increases reflect the average interest earnings on all of the company's policies regardless of when issued. In others, the return for policies issued in a recent year, or a group of years, reflects the interest earnings on that group of policies; in this case, amounts paid are likely to change more rapidly when interest rates change.

---

**SUMMARY OF THE LIFE AND HEALTH INSURANCE PROTECTION ASSOCIATION ACT AND NOTICE CONCERNING COVERAGE LIMITATIONS AND EXCLUSIONS**

---

### INTRODUCTION

Residents of Colorado who purchase life insurance, annuities or health insurance should know that the insurance companies licensed in this state to write these types of insurance are members of the Life and Health Insurance Protection Association. The purpose of this Association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Association will assess its other member insurance companies for the money to pay the claims of insured persons who live in Colorado and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Association is limited, however. As noted in the box below, this protection is not a substitute for consumers' care in selecting companies that are well-managed and financially stable.

---

### IMPORTANT DISCLAIMER

The Life and Health Insurance Protection Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require residency in Colorado. You should not rely on coverage by the Life and Health Insurance Protection Association in selecting an insurance company or in selecting an insurance policy.

Coverage is NOT provided for your policy or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk.

Insurance companies or their agents are required by law to give or send you this notice. However, insurance companies and their agents are prohibited by law from using the existence of the association to induce you to purchase any kind of insurance policy.

---

### SUMMARY

The state law that provides for this safety-net coverage is called the Life and Health Insurance Protection Association Act. Below is a brief summary of this law's coverage's, exclusions and limits. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations under the act or the rights or obligations of the Association.

**Coverage.** Generally, individuals will be protected by the Life and Health Insurance Protection Association if they live in this state and hold a life or health insurance contract, or an annuity, or if they hold certificates under a group life or health insurance contract or annuity, issued by a member insurer. The beneficiaries, payees or assignees of insured persons are protected as well, even if they live in another state.

**(Continued on Next Page)**

---

This Information is Provided By:

| | |
|---|---|
| Life and Health Insurance Protection Association<br>P.O. Box 480025<br>Denver, Colorado   80248-0025<br>(303)   572-1710 | Colorado Division of Insurance<br>1560 Broadway, Suite 850<br>Denver, Colorado   80202<br>(303)   894-7499 |

DIS D040-592

**EXCLUSIONS FROM COVERAGE.** Persons holding such policies or contracts are not protected by this Association if:

\*  they are not residents of the State of Colorado, except under certain very specific circumstances;
\*  the insurer was not authorized or licensed to do business in Colorado at the time the policy or contract was issued;
\*  their policy was issued by a nonprofit hospital or health service corporation (e.g. the "Blues"), an HMO, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company or similar plan in which the policyholder is subject to future assessments, or by an insurance exchange.

The Association also does not provide coverage for:

\*  any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk;
\*  any policy of reinsurance (unless an assumption certificate was issued);
\*  plans of employers, associations or similar entities to the extent they are self-funded or uninsured (that is, not insured by an insurance company, even if an insurance company administers them);
\*  interest rate yields that exceed an average rate;
\*  dividends;
\*  experience rating credits;
\*  credits given in connection with the administration of a policy or contract;
\*  annuity contracts or group annuity certificates not owned by an individual unless and to the extent guaranteed to an individual by the insurer;
\*  annuity contracts or group annuity certificates used by nonprofit insurance companies to provide retirement benefits for nonprofit educational institutions and their employees;
\*  policies, contracts, certificates or subscriber agreements issued by a prepaid dental care plan;
\*  sickness and accident insurance when written by a property and casualty insurer as part of an automobile insurance contract;
\*  unallocated annuity contracts issued to an employee benefit plan protected under the federal Pension Benefit Guaranty Corporation;
\*  policies or contracts issued by an insurer which was insolvent or unable to fulfill its contractual obligations as of July 1, 1991;
\*  policies or contracts covering persons who are not citizens or permanent residents of the United States;
\*  financial guarantees, funding agreements or guaranteed investment contracts not containing mortality guarantees and not issued to or in connection with a specific employee benefit plan or governmental lottery;
\*  any kind of insurance or annuity, the benefits of which are exclusively payable or determined by a separate account required by the terms of such insurance policy or annuity maintained by the insurer or by a separate entity.

**LIMITS ON AMOUNT OF COVERAGE.** The act also limits the amount the Association is obligated to pay out. The Association cannot pay more than what the insurance company would owe under a policy or contract. Also, for any one insured life, the Association will pay a maximum of $300,000 — no matter how many policies and contracts there were with the same company, even if they provided different types of coverage's. Within this overall $300,000 limit, the Association will not pay more than $100,000 in cash surrender values, $100,000 in health insurance benefits, $100,000 in present value of annuity benefits, or $300,000 in life insurance death benefits — again, no matter how many policies and contracts there were with the same company, and no matter how many different types of coverage's.

Transamerica Occidental
Life Insurance Company
Home Office: Los Angeles, CA

**APPLICATION AMENDMENT**

Life Insured: KATHLEEN M SWIFT

The Application for Policy No. ██████474 is amended as follows:

        QUESTION  1  PART 1 :
        ISSUED AT AN ALTERNATE CLASS TRANSULTRA 115
        CASH VALUE CAP, STANDARD NON-SMOKER, KIND CODE
        2061.

I represent, to the best of my knowledge and belief, that since the date of the application for the policy no person to be
covered by the policy has, except as stated below,

1. Had a change in health due to injury or sickness; or
2. Consulted, been examined, or been treated by any physician or practitioner; or
3. Changed occupation, aviation or military status; or
4. Had any life or accident and sickness, or medical service benefits declined, modified, cancelled, or been refused issue
   renewal or reinstatment of such insurance or benefits; or
5. Applied for issuance or reinstatement of any insurance providing income during disability or providing hospital or
   medical expense benefits.

The only exceptions are: (State "none" if there are no exceptions)_____.

It is agreed that this amendment shall be part of the application for the policy.

Signed at _____  on _____ 19, 99

_____
Witness to all signatures (Licensed Resident Agent, as required)

                                    KATHLEEN M SWIFT

APE 2-185

HPR-07-1999  10:31                                                              P.02/20

**TRANSAMERICA LIFE COMPANIES.**     Transamerica Occidental Life Insurance Company    9 0 0 4 1 4 7 4     **Life Insurance Application For One Life   Part 1**
                                     Home Office: Los Angeles                                               APA 40-397

Proposed Insured: _Kathleen_ _M._ _Swift_

Birthdate: Mo.

Occupation:

Residence:
| No. & Street | City | State | Zip | Work Phone |

Owner's Name: _____     Birthdate: _____
If other than Proposed Insured                     Mo   Day   Yr        Relationship

Address: _____                                               Soc. Sec. or Tax No.
        No. & Street

Beneficiary's Name and Relationship:

Address: _____
        No. & Street          City          State          Zip          Date of Trust, If Applicable

1. Plan Applied For _Iaaris al Liva 115_, Kind Code: _2065_
   Preferred ☒   Standard ☐
2. Non-Nicotine Qualification ☒   Nicotine Qualification ☐
3. Amount Applied For $ _250,000_
4. Additional Benefits by Rider: ☐ Waiver Provision  ☐ Accident Indemnity  $ _____  ☐ Other _____  $ _____
5. Rating Class of Risk Applied For: ☐ Standard  ☐ Extra Rating of _____
6. Premium Payment Mode: ☐ Annual  ☐ Semi-Annual  ☐ Quarterly  ☒ Monthly/PAC
7. Complete for Flexible Premium Plans:
   Required Premium Per Year (RAP)        $ _2,316.00_
   Planned Periodic Premium               $ _193.00_ Per  ☐ A  ☐ S  ☐ O  ☒ M/PAC
   + Initial Lump Sum                     $ _____
   = Total Initial Premium                $ _193.00_
8. If the Automatic Premium Loan provision is available, it is to be: Effective ☐  Not Effective ☐
9. Total insurance in force with all companies:
   Life Insurance $ _215,000_   Accidental Death $ _____   Waiver Provision Coverage $ _____
10. Mail Additional Premium Notices To:

Address _____
        No. & Street          City          State          Zip

Yes  No
☒ ☐ 11. May insurance, including annuities, in any company be discontinued or changed if the insurance applied for is issued?
        If "Yes", give company names, _TEGLI_
☐ ☒ 12. Is any application for life insurance pending with any other company?  If "Yes", give company name, amount applied for and total amount to be placed.
☐ ☒ 13. Do you intend to travel outside the U.S. or Canada within the next two years, except purely for vacation travel?
        If "Yes" give destination, purpose of travel and length of stay in Remarks.
☐ ☒ 14. In the past two years, have you participated in aeronautics, powered racing or competitive vehicles, skin or scuba diving, mountain climbing, rodeos or competitive skiing?
   15✓ Have you used nicotine at any time?   Date Last Used
☐ ☒    Cigarettes
☐ ☒    Cigar/Pipe/Chewing Tobacco
☐ ☒    Other
   16. Driver's license #: _____   State: _____
       In the past ten years, have you been convicted of or pleaded guilty to:
☐ ☒ a.  Moving violations?  If "Yes", give dates and type.
☐ ☒ b.  Driving under the influence of alcohol and/or other drugs?  If "Yes", give dates.
☐ ☒ c.  Reckless driving?  If "Yes", give dates.
☐ ☒ 17. Do you intend to fly other than as a passenger or have flown other than as a passenger during the past two years? If "Yes", complete Aviation Questionnaire.

HPR-07-1999  10:32

**Remarks:** Give details for any questions answered "YES"

ᗡ∪∪4ᒙᒙᒙᒙ  P.03/20

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

It is represented that the statements and answers given in this Application are true, complete and correctly recorded to the best of my knowledge and belief. It is agreed: (1) This Application shall consist of Part 1 and Part 2 and shall be the basis for any policy issued on this Application; (2) Except as otherwise provided in the conditional receipt, if issued, with the same number as on this Application, any policy issued on this Application shall not take effect until after all of the following conditions have been met: (a) The full first premium is paid, (b) The Owner has personally received the policy during the lifetime of and while the Proposed Insured is in good health, and (c) All of the statements and answers given in this Application to the best of my belief must be true and complete as of the date of Owner's personal receipt of the policy and that the policy will not take effect if the facts have changed; (3) No waiver or modification shall be binding upon Transamerica Occidental Life Insurance Company unless in writing and signed by the President or a Vice President and the Secretary or an Assistant Secretary.

I understand that omissions or misstatements in this Application could cause an otherwise valid claim to be denied under any policy issued from this Application.

## AUTHORIZATION TO OBTAIN INFORMATION

Transamerica Occidental Life Insurance Company ("the Company")

I authorize any physician, medical practitioner, hospital, clinic, other medical or medically related facility, insuring or reinsuring company, the Medical Information Bureau, Inc., consumer reporting agency, or employer having information available as to testing, diagnosis, treatment and prognosis with respect to any physical or mental condition (for example: coronary disease, cancer, HIV related test results or disorders; metabolic, pulmonary, or neurological disorders) and/or treatment of me and any other non-medical information of me to give to the Company or its legal representative, any and all such information.

I understand the information obtained by use of this Authorization will be used by the Company to determine eligibility for insurance and eligibility for benefits under an existing policy. Any information obtained will not be released by the Company to any person or organization except to reinsuring companies, the Medical Information Bureau, Inc., or other persons or organizations performing business or legal services in connection with my application, claim or as may be otherwise lawfully required or as I may authorize.

I know that I may request to receive a copy of this Authorization. I agree that a photographic copy of this Authorization shall be as valid as the original. I agree this Authorization shall be valid for two and one half years from the date shown below. (For Rhode Island applications, this shall be valid for 24 months from the policy issue date.)

I acknowledge receipt of the Notice of Disclosure of Information. I understand that if an investigative consumer report is ordered in connection with this application, I may elect to be interviewed in connection with the preparation of the report and, upon request, I will be provided with a copy of the report. I elect to be interviewed if an investigative consumer report is prepared. ☐ Yes ☐ No

PLEASE MAKE CHECKS PAYABLE TO THE COMPANY. DO NOT MAKE CHECKS PAYABLE TO THE AGENT OR LEAVE PAYEE SPACE BLANK.
Amount paid with this Application $ _193.00_   Check or M.O. # _8605_

Signed at (city/state) ▮▮▮▮▮▮   on (date) _March 31, 1999_

X _Kathleen M Swift_
Signature of Proposed Insured

X ▮▮▮▮▮▮
Owner

X
If Owner is a corporation, an authorized officer, other than Proposed Insured must sign as owner, give Corporate title and full name of corporation.

X
Witness to all signatures

X
Countersigned (Licensed Resident Agent, if your state requires)

APA 40-397

0001806

HPR-07-1999 10:38                Transamerica Center                                    P.18/20
**TRANSAMERICA**              1150 South Olive                          **Application Part 2**
**LIFE COMPANIES**            Los Angeles, CA 90015                     Paramedical Health History

| | Transamerica Occidental Life Insurance Company | Check One | 60041474
| | Transamerica Assurance Company |

**1. PROPOSED INSURED: Print Full Name**          **2. DATE OF BIRTH**
KATHLEEN   M.   SWIFT

**3. FAMILY RECORD: Show age and present health, or if deceased, show age at death and cause of death.**

| | Age | Present Health | Cause of Death | Brothers & Sisters | Ages | Present Health or Cause of Death |
|---|---|---|---|---|---|---|
| Father | | | | No. living | | |
| Mother | | Good | | No. deceased | | |

**4. NAME AND ADDRESS OF YOUR FAMILY PHYSICIAN:**

**5. WHAT MEDICATIONS ARE YOU PRESENTLY TAKING?**

Give details of all "Yes" answers including all dates, diagnoses, durations, outcome and the names and addresses of all attending physicians, clinics and hospitals.

**6. WITHIN THE PAST FIVE YEARS HAVE YOU:**
a. Consulted, been examined or been treated by any physician or practitioner?
b. Had an X-ray, electrocardiogram or any laboratory test or study?
c. Had observation or treatment at a clinic, hospital or sanitarium?
d. Had or been advised to have a surgical operation?
e. Had dizziness, shortness of breath, pain or pressure in the chest?
f. Had any injury requiring treatment?

**7. TO THE BEST OF YOUR KNOWLEDGE, HAVE YOU EVER BEEN TOLD YOU HAD:**
a. Epilepsy, fainting spells, nervous or mental condition, neuritis, paralysis, or any disease or abnormality of the brain or nervous system?
b. Heart attack, murmur, palpitation, or high blood pressure, anemia, varicose veins, or any disease or abnormality of the heart, blood or blood vessels?
c. Tuberculosis, asthma, pleurisy, or any disease or abnormality of the lungs, bronchial tubes, throat or respiratory system?

e. Urinary sugar, albumin or stone, syphilis, menstrual disorder, or disease or abnormality of the breasts, kidneys, prostate, urinary or genital systems?
f. Diabetes, gout, or any disease or abnormality of the thyroid or other glands?
g. Arthritis, rheumatic fever, back trouble, or any disease or abnormality of the joints, muscles or bones?

h. Cancer or tumor?
i. Any physical deformity or defect?
k. An immune deficiency disorder, AIDS or the AIDS related complex (ARC)?

**8. WITHIN THE PAST TEN YEARS, HAVE YOU USED:**
a. Amphetamines, barbiturates or sedatives except as prescribed by a physician?
b. Cocaine, heroin, morphine, LSD, marijuana, PCP or any other hallucinogenic or narcotic drug?

**9. a.** Have any of your close relatives ever had cancer, diabetes, or a nervous or mental abnormality?
b. Has your weight changed more than 15 pounds in the past year?
c. Have you ever received treatment or joined an organization for alcoholism or drug addiction?
d. Has any application for insurance on your life ever been declined, withdrawn, postponed, rated or modified in any way?
e. Are you now pregnant?

The statements and answers given above are true, complete and correctly recorded, to the best of my knowledge and belief. To the extent allowed by law, I waive my rights to prevent disclosure of any knowledge or information about the above questions. This waiver applies to any physician, hospital, official or employee, or other person who has attended or examined me, or who has been consulted by me. I authorize such person to make such disclosures. Such person may also testify to their knowledge. This authorization is made on behalf of myself and any person who shall have or claim any interest in any contract of insurance issued on this application.

Signed at ___Denver, Co___                on ___April 2___, 19 98

Witness _____                    _Kathleen M. Swift_
          Signature of Medical Examiner          Signature of Proposed Insured

APR-07-1999  10:38                                                                    P.19/20

## PARAMEDICAL EXAMINER'S REPORT

*The questions on the reverse side of the form must be completed and signed by Proposed Insured in front of Paramedical Representative.*

60041474

### IDENTIFICATION SECTION

1. Identification of Proposed Insured:

Kathleen M. Swift

Print Name

Social Security #

Address No.                    Street

City              State            Zip Code

2. Agent Identification:

Full Name  Rita Avila

Agency _____  Code 9937

3. Paramedical Firm Identification.

E.M.S.I.
11172 HURON ST. #18
DENVER, CO 80234

4. AMOUNT OF INSURANCE $ 250,000

### MEASUREMENTS
(Please indicate whether measurements are in Metric or English Units)

1. Height _____ Ft. In./cm

2. Weight _____ Pounds/Kg

Did you weigh? _____

7. Pulse Rate _____ per minute.

Irregularities: _____ Give #

**Males Only**

3. A. Chest Expanded _____ Inches/cm

   B. Chest Contracted _____ Inches/cm

   C. Abdomen _____ Inches/cm

4. Blood Pressure     Additional Blood Pressure Readings
                      *(if appropriate)*
                      _____ mm          _____ mm
                      _____ mm          _____ mm

5. Any other observed abnormalities:

   NONE

6. Are you related to the Proposed Insured or Agent?

   ☐ Yes   ☑ No

### INSTRUCTIONS TO EXAMINER

**Check Box if Completed:**

OSBORN ABC *(including hos)*

OSBORN DBS *(including hos)*

HOS Only

Personal Statement *(if applicable)*

ECG

APR Dr. _____

Other _____

635573E

In all cases, complete questions above and mail specimen for laboratory analysis to:

OSBORN LABORATORIES
P.O. Box 2920
Shawnee Mission, Kansas 66201-9890

If you have any confidential information regarding any matter which might adversely affect the risk, please directly mail detail *separately* to the Company at the address below.

Date  April 2, _____ 1999    _____
                                    Signature of Paramedical Representative

**IMPORTANT:** If the requesting agency has the Medical Receiving Privilege, this completed form may be sent to the agency office. Mail all other completed forms to:

Transamerica Life Companies
Individual Underwriting & Issue

Transamerica Occidental
Life Insurance Company
1150 South Olive Street
Los Angeles, CA  90015

Policy Form    **TRUL+-CVC**
Individual Life Insurance
3

Adjustable Life Insurance
Minimum Premium Requirement
Shown in the Policy Data
Flexible Premiums Payable Thereafter
During Life of Insured Prior to Age 100
Subject to the Limitations Described
in the Premiums Provision

Death Benefit Payable at Death of
Insured Before Age 115
Net Cash Value Payable at
Policy Anniversary Nearest Age 115

Nonparticipating - No Annual Dividends

1-11407196