# EXHIBIT C – Part 2

# EXHIBIT 4



TRANSAMERICA
OCCIDENTAL LIFE® ™

Transamerica Occidental
Life Insurance Company
1150 South Olive Street
Los Angeles, CA 90015

**POLICY FORM TSSL-EA**
Individual Life Insurance

| JOINT INSUREDS | EMORY L THOMPSON LOIS V THOMPSON | | POLICY NUMBER |
|---|---|---|---|
| FACE AMOUNT | $500,000 | JUL 01 2000 | DATE OF ISSUE |

While this policy is in force, Transamerica Occidental Life Insurance Company will pay the death benefit to the Beneficiary if both Joint Insureds die before the policy anniversary nearest Exact Age 115, or will pay the net cash value, if any, to the Owner on the policy anniversary nearest Exact Age 115 if both or either Joint Insured is living on that date. All payments are subject to the provisions of this policy.

Signed for the Company at Los Angeles, California, on the date of issue.

*James W. Dedier*

*Change Ewan*

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

**Right to Examine and Return Policy Within 10 Days** -- At any time within 10 days after you receive this policy, you may return it to us or the agent through whom you bought it. We will cancel the policy and void it from the beginning. We will refund to you any premiums paid.

Joint and Last Survivor Life Insurance
Minimum Premium Requirement
for the First Five Policy Years
Flexible Premiums Payable Thereafter During
Life of the Survivor of the Joint Insureds
Subject to the Limitations Described
in the Premiums Provision

Death Benefit Payable at Death of
Survivor Before Exact Age 115
Net Cash Value, If Any, Payable at
Policy Anniversary Nearest
Exact Age 115

Nonparticipating - No Annual Dividends

**THIS POLICY CONTAINS A PREMIUM QUALIFICATION CREDIT PROVISION. TO RECEIVE THIS CREDIT, YOU MUST PAY SPECIFIC PREMIUMS ON OR BEFORE THEIR DUE DATE. SEE DETAILS ON PAGE 10.**



Δ π EXHIBIT 16
Deponent_____
Date_____ Rptr_____
WWW.DEPOBOOK.COM

A-001

This policy is a legal contract between you, the Owner of this policy, and Transamerica Occidental Life Insurance Company.

## READ YOUR POLICY CAREFULLY

### POLICY SUMMARY

We will pay the death benefit to the beneficiary if both Joint Insureds die while the policy is in force, before the policy anniversary nearest Exact Age 115.

You must pay at least the minimum premium per year during the first 5 policy years, or your policy will lapse or be changed to Paid—Up Life Insurance or Extended Term Insurance.  After that, you may vary the amount of premiums and how often you pay them, within certain limits, as described in the Premiums provision.  Generally, you may pay premiums as long as one of the Joint Insureds is living, up to the policy anniversary nearest Exact Age 100.  If both or either Joint Insured is living at the policy anniversary nearest Exact Age 115, we will pay the net cash value, if any, to you.

If the Joint Insureds die simultaneously, any death benefit payable under the base policy will be paid as though the older Joint Insured died first.

Additional benefits, if any, are provided by rider.

This is only a brief description.  The insurance is fully described in the various provisions of the policy.

### GUIDE TO POLICY PROVISIONS

| | Page |
|---|---|
| Accumulation Values | 12,13 |
| Application Copy | after 26 |
| Beneficiary's Rights | 6,7 |
| Cash Value | 14 |
| Change of Beneficiary | 7 |
| Death Benefit | 7,8 |
| Definitions | 5,6 |
| Guaranteed Values | 12–14 |
| Grace Period | 10 |
| Misstatement of Age or Sex | 24 |
| Nonforfeiture Options | 17–19 |
| Option to Change the Face Amount | 17 |
| Option to Split the Policy | 19–23 |
| Ownership and Beneficiary Provisions | 6,7 |

| | Page |
|---|---|
| Payment of Cash Value and Loans | 23 |
| Payment of Death Benefit | 7,8 |
| Policy Data | 2–4 |
| Policy Loans | 14–16 |
| Policy Statements and Illustrations | 23 |
| Premium Qualification Credit | 10 |
| Premiums | 8–10 |
| Reinstatement | 10–12 |
| Riders | after 26 |
| Simultaneous Deaths of Joint Insureds | 8 |
| Table of Guaranteed Maximum Monthly Deduction Rates | 3 |
| Table of Policy Values | 4 |

Case 2:18-cv-05422-CAS-GJS  Document 108-4  Filed 09/24/19  Page 5 of 106  Page ID
#:1451
Case 2:18-cv-05422-DMG-JC  Document 1-1  Filed 06/18/18  Page 4 of 43  Page ID #:50

POLICY DATA

CLASS A LOAN
INTEREST RATE   5.66% IN ADVANCE                    JUN 04, 2000   POLICY DATE

CLASS B LOAN                                                AGE OF FIRST INSURED
INTEREST RATE   7.40% IN ADVANCE                            AGE OF SECOND INSURED

REINSTATEMENT                                              POLICY NUMBER
INTEREST RATE   6.00%
                                                   JUL 01, 2000  DATE OF ISSUE

FIRST INSURED   EMORY L THOMPSON
SECOND INSURED  LOIS V THOMPSON

FACE AMOUNT  $500,000                                        CLASS OF RISK:
                                           PREFERRED NONSMOKER FIRST INSURED
DEATH BENEFIT                              STANDARD NONSMOKER SECOND INSURED
      OPTION  OPTION 1

          OWNER  GAIL THOMPSON FINLEY & MARSHA  THOMPSON MORGAN

--------------------------------------------------------------------------

MINIMUM INITIAL PREMIUM: $2,186
PLANNED PERIODIC PREMIUMS: $13,118      ANNUAL

REQUIRED PREMIUM PER YEAR FOR THE BASE POLICY AND ALL
ADDITIONAL RIDERS IN POLICY YEARS 1-5: $13,118

REQUIRED PREMIUM PER YEAR FOR THE BASE POLICY
IN POLICY YEARS 1-5: $13,118

PREMIUM QUALIFICATION CREDIT PERIOD: 5 YEARS
PREMIUM QUALIFICATION CREDIT PERCENTAGE: 2%

GUARANTEED MAXIMUM MONTHLY POLICY FEE: POLICY YEAR 1: $6.00
                                       POLICY YEARS 2 AND LATER: $10.00

GUARANTEED MAXIMUM MONTHLY EXPENSE CHARGE
PER THOUSAND: YEARS 1-5: $1.0358

NONFORFEITURE INTEREST RATE: 4.0%

GUARANTEED MINIMUM INTEREST RATE: 4.00%

SELECT MONTHLY PREMIUM:       $1,093.09
SELECT PERIOD: 28 YEARS

--------------------------------------------------------------------------

NOTE: THIS POLICY MAY TERMINATE PRIOR TO EXACT AGE 115 IF:
    (1) THE CASH VALUE MINUS ANY LOAN(S) IS LESS THAN THE MONTHLY
        DEDUCTION DUE, OR
    (2) THE REQUIRED PREMIUMS IN THE FIRST 5 YEARS ARE NOT PAID FOR
        THE BASE POLICY AND ALL ADDITIONAL RIDERS.

1-17806196                                                      PAGE  2

A-003

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 6 of 106   Page ID
#:1452
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 5 of 43   Page ID #:51

POLICY DATA (CONTINUED)

TABLE OF GUARANTEED MAXIMUM MONTHLY DEDUCTION RATES PER $1,000
FOR BASE POLICY*

| POLICY YEAR | POLICY EXCLUDING RIDERS | POLICY YEAR | POLICY EXCLUDING RIDERS | POLICY YEAR | POLICY EXCLUDING RIDERS |
|---|---|---|---|---|---|
| 1  | 0.005912133  | 34 | 0.000000000 | | |
| 2  | 0.012862992  | 35 | 0.000000000 | | |
| 3  | 0.026794150  | 36 | 0.000000000 | | |
| 4  | 0.050480575  | 37 | 0.000000000 | | |
| 5  | 0.085524367  | 38 | 0.000000000 | | |
| 6  | 2.695529967  | 39 | 0.000000000 | | |
| 7  | 3.397732633  | 40 | 0.000000000 | | |
| 8  | 4.157722967  | 41 | 0.000000000 | | |
| 9  | 4.976626817  | 42 | 0.000000000 | | |
| 10 | 5.859085008  | 43 | 0.000000000 | | |
| 11 | 6.810647658  | | | | |
| 12 | 7.842028358  | | | | |
| 13 | 8.941442908  | | | | |
| 14 | 10.107751150 | | | | |
| 15 | 11.328289758 | | | | |
| 16 | 12.610389950 | | | | |
| 17 | 13.967854567 | | | | |
| 18 | 15.443804250 | | | | |
| 19 | 17.068835675 | | | | |
| 20 | 18.883862800 | | | | |
| 21 | 20.815133333 | | | | |
| 22 | 22.447276533 | | | | |
| 23 | 23.275885667 | | | | |
| 24 | 26.443350058 | | | | |
| 25 | 31.311714958 | | | | |
| 26 | 39.580770742 | | | | |
| 27 | 54.654260525 | | | | |
| 28 | 83.333333333 | | | | |
| 29 | 0.000000000  | | | | |
| 30 | 0.000000000  | | | | |
| 31 | 0.000000000  | | | | |
| 32 | 0.000000000  | | | | |
| 33 | 0.000000000  | | | | |

------------------------------------------------------------------------

* TO FIND THE AMOUNT OF MONTHLY DEDUCTION DURING EACH POLICY YEAR,
SEE THE GUARANTEED VALUES SECTION.  A MONTHLY POLICY FEE OF $6.00
WILL BE ADDED INTO EACH MONTHLY DEDUCTION FOR THE FIRST POLICY YEAR.
IN SUBSEQUENT YEARS, THE MONTHLY POLICY FEE WILL NOT EXCEED $10.00.
A MONTHLY EXPENSE CHARGE PER THOUSAND WILL ALSO BE ADDED TO EACH
MONTHLY DEDUCTION FOR THE FIRST 5 POLICY YEARS.  THE GUARANTEED
MAXIMUM MONTHLY EXPENSE CHARGE PER THOUSAND IS SHOWN ON POLICY DATA
PAGE 2.

THE RATES SHOWN ABOVE FOR THE FIRST 5 POLICY YEARS ARE CURRENT
RATES THAT ARE GUARANTEED FOR THE FIRST 5 POLICY YEARS.  THE RATES
FOR YEARS 6 AND AFTER ARE THE GUARANTEED MAXIMUM RATES.

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 7 of 106   Page ID
#:1453
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 6 of 43   Page ID #:52

P O L I C Y   D A T A   ( C O N T I N U E D )

ADDITIONAL BENEFITS

THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS
SHOWN BELOW.  ONLY A BRIEF DESCRIPTION IS GIVEN.  THE COMPLETE PROVISIONS
ARE INCLUDED IN THE RIDER.
--------------------------------------------------------------------------------

| RIDER NUMBER | ADDITIONAL BENEFIT | ANNUAL PREMIUM |
|---|---|---|
| 1-093 11-196 | GUARANTEED POLICY SPLIT OPTION RIDER | NO CHARGE |

PAGE  3A

A-005

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 8 of 106   Page ID
#:1454
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 7 of 43   Page ID #:53

P O L I C Y   D A T A   (C O N T I N U E D)

TABLE OF POLICY VALUES AND BENEFITS

ILLUSTRATIVE PREMIUMS (1)
GUARANTEED BASIS (2)

| END OF POLICY YEAR | PLANNED ANNUALIZED PREMIUM | DEATH BENEFIT | ACCUMULATION VALUE (3) | CASH VALUE (4) |
|---|---|---|---|---|
| 1 | $13,118 | $500,000 | $5,957 | $0 |
| 2 | $13,118 | $500,000 | $12,335 | $0 |
| 3 | $13,118 | $500,000 | $18,888 | $0 |
| 4 | $13,118 | $500,000 | $25,568 | $7,578 |
| 5 | $13,118 | $500,000 | $32,320 | $15,450 |
| 6 | $13,118 | $500,000 | $30,926 | $15,181 |
| 7 | $13,118 | $500,000 | $25,083 | $10,463 |
| 8 | $13,118 | $500,000 | $14,263 | $768 |
| 9 | $13,118 | $500,000 | $0 | $0 |
| 10 | $13,118 | $500,000 | $0 | $0 |
| 11 | $13,118 | $500,000 | $0 | $0 |
| 12 | $13,118 | $500,000 | $0 | $0 |
| 13 | $13,118 | $500,000 | $0 | $0 |
| 14 | $13,118 | $500,000 | $0 | $0 |
| 15 | $13,118 | $500,000 | $0 | $0 |
| 16 | $13,118 | $500,000 | $0 | $0 |
| 17 | $13,118 | $500,000 | $0 | $0 |
| 18 | $13,118 | $500,000 | $0 | $0 |
| 19 | $13,118 | $500,000 | $0 | $0 |
| 20 | $13,118 | $500,000 | $0 | $0 |

EXACT
AGE 60

EXACT
AGE 65

------------------------------------------------------------------------

(1) THE ACCUMULATION AND CASH VALUES RESULT FROM THE INTEREST RATES,
MONTHLY DEDUCTIONS, PREMIUM QUALIFICATION CREDITS AND THE TIMELY
PAYMENT OF THE PLANNED ANNUALIZED PREMIUMS.  PARTIAL SURRENDERS,
SURRENDER-PENALTY-FREE WITHDRAWALS OR LOANS MAY CHANGE THESE
RESULTS.

(2) RESULTS CALCULATED ON A GUARANTEED BASIS REFLECT GUARANTEED
MAXIMUM MONTHLY DEDUCTIONS AND THE GUARANTEED MINIMUM INTEREST
RATE OF  4.00%.

(3) ACCUMULATION VALUES ILLUSTRATED ON A GUARANTEED BASIS REFLECT
ACCUMULATED NET PREMIUMS AND PREMIUM QUALIFICATION CREDIT AMOUNTS
PLUS INTEREST AT THE GUARANTEED MINIMUM INTEREST RATE OF  4.00%
LESS GUARANTEED MAXIMUM MONTHLY DEDUCTIONS WHICH INCLUDE THE
POLICY FEE, THE GUARANTEED MAXIMUM MONTHLY EXPENSE CHARGE
PER THOUSAND, AND THE COST OF ANY RIDERS. WHILE A POLICY LOAN(S)
EXISTS, THE INTEREST RATE APPLICABLE TO THE CASH VALUE SECURING
THE LOAN(S) MAY DIFFER FROM THE INTEREST RATE APPLICABLE TO THE
CASH VALUE NOT SECURING THE LOAN(S).

A-006

Case 2:18-cv-05422-CAS-GJS  Document 108-4  Filed 09/24/19  Page 9 of 106  Page ID
#:1455
Case 2:18-cv-05422-DMG-JC  Document 1-1  Filed 06/18/18  Page 8 of 43  Page ID #:54

P O L I C Y   D A T A   ( C O N T I N U E D )

THE REDUCED PAID-UP VALUES (MAXIMUM NET SINGLE PREMIUMS AND FACE AMOUNTS
PER THOUSAND) ARE SHOWN ON POLICY DATA PAGES 4C AND 4D.

(4) THE DIFFERENCE BETWEEN THE ACCUMULATION VALUE AND THE CASH VALUE
    IS THE SURRENDER PENALTY.

PREMIUMS ARE SUBJECT TO REFUND UNDER CONDITIONS DESCRIBED IN THE POLICY.

CURRENT MONTHLY DEDUCTION RATES ARE NOT GUARANTEED AFTER POLICY YEAR
5, NOR ARE THEY ESTIMATES FOR THE FUTURE.

TABLE OF GUARANTEED SURRENDER PENALTIES PER
$1,000 OF BASE POLICY COVERAGE FACE AMOUNT

| POLICY YEAR | SURRENDER PENALTY FACTOR | POLICY YEAR | SURRENDER PENALTY FACTOR | POLICY YEAR | SURRENDER PENALTY FACTOR |
|---|---|---|---|---|---|
| 1 | 44.98 | 8 | 29.24 | 15 | 13.49 |
| 2 | 42.73 | 9 | 26.99 | 16 | 11.25 |
| 3 | 40.48 | 10 | 24.74 | 17 | 9.00 |
| 4 | 38.23 | 11 | 22.49 | 18 | 6.75 |
| 5 | 35.98 | 12 | 20.24 | 19 | 4.50 |
| 6 | 33.74 | 13 | 17.99 | 20 | 2.25 |
| 7 | 31.49 | 14 | 15.74 | 21 | 0.00 |

TO CALCULATE THE FULL SURRENDER PENALTY FOR THE BASE POLICY, FIND
THE FACTOR FOR THE CURRENT POLICY YEAR.  MULTIPLY THIS FACTOR BY
THE NUMBER OF THOUSANDS OF FACE AMOUNT OF THE BASE POLICY.

A-007

P O L I C Y   D A T A   (C O N T I N U E D)

TABLE OF DEATH BENEFIT FACTORS

| POLICY YEAR | DEATH BENEFIT FACTOR | POLICY YEAR | DEATH BENEFIT FACTOR | POLICY YEAR | DEATH BENEFIT FACTOR |
|---|---|---|---|---|---|
| 1 | 1.77 | 34 | 1.04 | | |
| 2 | 1.70 | 35 | 1.04 | | |
| 3 | 1.63 | 36 | 1.04 | | |
| 4 | 1.57 | 37 | 1.04 | | |
| 5 | 1.51 | 38 | 1.04 | | |
| 6 | 1.45 | 39 | 1.04 | | |
| 7 | 1.41 | 40 | 1.04 | | |
| 8 | 1.38 | 41 | 1.04 | | |
| 9 | 1.35 | 42 | 1.04 | | |
| 10 | 1.32 | | | | |
| 11 | 1.29 | | | | |
| 12 | 1.27 | | | | |
| 13 | 1.25 | | | | |
| 14 | 1.23 | | | | |
| 15 | 1.22 | | | | |
| 16 | 1.20 | | | | |
| 17 | 1.19 | | | | |
| 18 | 1.17 | | | | |
| 19 | 1.16 | | | | |
| 20 | 1.15 | | | | |
| 21 | 1.14 | | | | |
| 22 | 1.13 | | | | |
| 23 | 1.12 | | | | |
| 24 | 1.10 | | | | |
| 25 | 1.09 | | | | |
| 26 | 1.07 | | | | |
| 27 | 1.06 | | | | |
| 28 | 1.04 | | | | |
| 29 | 1.04 | | | | |
| 30 | 1.04 | | | | |
| 31 | 1.04 | | | | |
| 32 | 1.04 | | | | |
| 33 | 1.04 | | | | |

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 11 of 106   Page ID
#:1457
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 10 of 43   Page ID #:56

POLICY DATA (CONTINUED)

TABLE OF PAID-UP INSURANCE PER $1,000 OF NET CASH VALUE

| POLICY YEAR | PAID-UP INSURANCE | POLICY YEAR | PAID-UP INSURANCE | POLICY YEAR | PAID-UP INSURANCE |
|---|---|---|---|---|---|
| 1 | $1,702.53 | 34 | $1,000.00 | | |
| 2 | $1,639.18 | 35 | $1,000.00 | | |
| 3 | $1,582.15 | 36 | $1,000.00 | | |
| 4 | $1,530.81 | 37 | $1,000.00 | | |
| 5 | $1,484.63 | 38 | $1,000.00 | | |
| 6 | $1,443.13 | 39 | $1,000.00 | | |
| 7 | $1,405.84 | 40 | $1,000.00 | | |
| 8 | $1,372.29 | 41 | $1,000.00 | | |
| 9 | $1,342.03 | 42 | $1,000.00 | | |
| 10 | $1,314.65 | 43 | $1,000.00 | | |
| 11 | $1,289.86 | | | | |
| 12 | $1,267.35 | | | | |
| 13 | $1,246.91 | | | | |
| 14 | $1,228.32 | | | | |
| 15 | $1,211.36 | | | | |
| 16 | $1,195.77 | | | | |
| 17 | $1,181.32 | | | | |
| 18 | $1,167.84 | | | | |
| 19 | $1,155.24 | | | | |
| 20 | $1,143.45 | | | | |
| 21 | $1,132.46 | | | | |
| 22 | $1,122.12 | | | | |
| 23 | $1,111.32 | | | | |
| 24 | $1,097.76 | | | | |
| 25 | $1,083.49 | | | | |
| 26 | $1,068.72 | | | | |
| 27 | $1,053.95 | | | | |
| 28 | $1,040.00 | | | | |
| 29 | $1,000.00 | | | | |
| 30 | $1,000.00 | | | | |
| 31 | $1,000.00 | | | | |
| 32 | $1,000.00 | | | | |
| 33 | $1,000.00 | | | | |

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 12 of 106   Page ID
#:1458
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 11 of 43   Page ID #:57

## POLICY DATA (CONTINUED)

TABLE OF MAXIMUM NET SINGLE PREMIUMS FOR PAID-UP INSURANCE PER $1,000

| POLICY YEAR | NET SINGLE PREMIUM | POLICY YEAR | NET SINGLE PREMIUM | POLICY YEAR | NET SINGLE PREMIUM |
|---|---|---|---|---|---|
| 1 | $587.36 | 34 | $1,000.00 | | |
| 2 | $610.06 | 35 | $1,000.00 | | |
| 3 | $632.05 | 36 | $1,000.00 | | |
| 4 | $653.25 | 37 | $1,000.00 | | |
| 5 | $673.57 | 38 | $1,000.00 | | |
| 6 | $692.94 | 39 | $1,000.00 | | |
| 7 | $711.32 | 40 | $1,000.00 | | |
| 8 | $728.71 | 41 | $1,000.00 | | |
| 9 | $745.14 | 42 | $1,000.00 | | |
| 10 | $760.66 | 43 | $1,000.00 | | |
| 11 | $775.28 | | | | |
| 12 | $789.05 | | | | |
| 13 | $801.98 | | | | |
| 14 | $814.12 | | | | |
| 15 | $825.52 | | | | |
| 16 | $836.28 | | | | |
| 17 | $846.51 | | | | |
| 18 | $856.28 | | | | |
| 19 | $865.62 | | | | |
| 20 | $874.55 | | | | |
| 21 | $883.03 | | | | |
| 22 | $891.17 | | | | |
| 23 | $899.83 | | | | |
| 24 | $910.95 | | | | |
| 25 | $922.94 | | | | |
| 26 | $935.70 | | | | |
| 27 | $948.81 | | | | |
| 28 | $961.54 | | | | |
| 29 | $1,000.00 | | | | |
| 30 | $1,000.00 | | | | |
| 31 | $1,000.00 | | | | |
| 32 | $1,000.00 | | | | |
| 33 | $1,000.00 | | | | |

END OF POLICY DATA

1-17806196

A-010

## DEFINITIONS

In this policy:

**We**, **our** or **us** means Transamerica Occidental Life Insurance Company.

**You** and **your** means the **Owner** of this policy.

**Accumulation Value** is the policy's total value as described in the Accumulation Values provision.

**Administrative Office** means Transamerica Occidental Life Insurance Company, Box 419521, Kansas City, Missouri 64141-6521.

**Base Policy** is this policy, excluding any riders.

The **Beneficiary** is the person to whom we will pay the death benefit if the Survivor dies.

**Cash Value** means the accumulation value, less any surrender penalty.

**Exact Age** means the age of the younger of the two Joint Insureds on that Insured's nearest birthday.

**First Death** means the first to die of the Joint Insureds.

A **Gross Premium** is 100% of any premium you pay.

**Home Office** means Transamerica Occidental Life Insurance Company, Box 2101, Los Angeles, California, 90051-0101.

**Joint Insureds** means the two persons whose lives are insured under the policy.

**Lapse** means termination of the policy at the end of the grace period due to insufficient premium or unloaned accumulation value. If there is remaining net cash value at the end of the grace period it will be applied to the Nonforfeiture Option.

The **Maturity Date** is the policy anniversary nearest Exact Age 115.

The **Maximum Loan Value** is the largest amount you may borrow under the loan provisions.

A **Monthly Deduction** is an amount we withdraw from the accumulation value of the policy at the beginning of each policy month.

The **Net Cash Value** is the cash value less any existing loans.

A **Net Premium** is 91% of any gross premium you pay. We take 9% of any gross premium as an administrative charge. All net premium payments will become part of the accumulation value.

The **Policy Fee** is part of the monthly deduction. We may change the policy fee at any time after the first policy year. The guaranteed maximum policy fees are shown in the Policy Data.

A-011

A **Policy Loan** is indebtedness to us for a loan secured by this policy.

**Reinstate** means to restore coverage after the policy has lapsed or been changed to Paid-Up Life Insurance or Extended Term Insurance, subject to the requirements in the Reinstatement provision.

The **Required Premium Per Year** for the Base Policy in Policy Years 1-5 is the minimum amount of premium you must pay in each of the first five policy years.

A **Rider** is an attachment to the policy that provides an additional benefit.

**Survivor** means the second to die of the Joint Insureds.

**Written request** means a signed request in a form satisfactory to us that is received at our Administrative Office.

We will send any **notice** under the provisions of this policy to your last known address and to any assignee of record.

We will use the **Policy Date** shown in the Policy Data to determine the monthly policy dates, policy anniversaries and policy years.

**OWNERSHIP**

**Owner of the Policy** -- The Joint Insureds together will be the Owner, unless someone else is shown as the Owner in the application or in any supplemental agreement attached to the policy. The Joint Insureds, as owners, are entitled to the rights granted under the policy while both are alive. After the First Death, the Survivor will be the sole Owner if the policy was jointly owned. If the Owner is an individual other than the Joint Insureds, and dies before the Joint Insureds, the rights of the Owner belong to the executor or administrator of the Owner's estate unless otherwise provided in the policy. If the Owner is a partnership, the rights belong to the partnership as it exists when a right is exercised.

**Assignment of the Policy** -- We are not responsible for the adequacy of any assignment. However, if you file the assignment with us and we record it at our Administrative Office, your rights and those of any revocable Beneficiary will be subject to it.

**THE BENEFICIARY**

**Who Receives the Death Benefit** -- If the Survivor dies while this policy is in force, we will pay the death benefit to the Beneficiary. The Beneficiary is as designated in the application, unless changed as shown under "How to Change a Beneficiary" below. If the Beneficiary is a partnership, we will pay the death benefit to the partnership as it exists when the Survivor dies.

**Protection of the Death Benefit** -- To the extent permitted by law, no death benefit will be subject to the claims of the Beneficiary's creditors or to any legal process against the Beneficiary.

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 15 of 106   Page ID
#:1461
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 14 of 43   Page ID #:60

**If the Beneficiary Dies** -- If any Beneficiary dies before the Survivor, that Beneficiary's interest in the death benefit will end. If any Beneficiary dies at the same time as the Survivor, or within 30 days after the Survivor, that Beneficiary's interest in the death benefit will end if no benefits have been paid to that Beneficiary. If the interest of all designated Beneficiaries has ended when the Survivor dies, we will pay the death benefit to you. If you are not living at that time, we will pay the death benefit to the executor or administrator of your estate.

**How to Change a Beneficiary** -- You may change the designated Beneficiary while the Survivor is living, by sending a written notice to us. The change will not be effective until we record it at our Administrative Office. Even if the Survivor is not living when we record the change, the change will take effect as of the date it was signed. However, any benefits we pay before we record the change will not be subject to the change.

A Beneficiary designated irrevocably may not be changed without the written consent of that Beneficiary.

**PAYMENT OF THE DEATH BENEFIT**

**Proof of Death** -- Any death benefit payable because of the death of the Survivor will be paid when we receive due proof of the death of both Joint Insureds while this policy was in force. Upon the Survivor's death, such proofs must be sent to us at our Administrative Office. We must be notified of the First Death within a reasonable time; but in no event later than one year after the date of the First Death. We will send appropriate forms to the Beneficiary upon request. Any of our agents will help the Beneficiary fill out the forms without charge.

**Death Benefit** -- The amount of the death benefit may be affected by other policy provisions such as Policy Loans, Misstatement of Age or Sex and Partial Surrenders.

**Death Benefit Option** -- The death benefit before policy anniversary nearest Exact Age 100 will be based on whether you have chosen Option 1, Option 2 or Option 3, as shown on the Policy Data. If you do not choose an option in the application, Option 1 will automatically take effect. Prior to the policy anniversary nearest Exact Age 100, the death benefit is defined as follows:

Option 1: The death benefit will be the greater of:

(a) the total face amount of the base policy; or

(b) the death benefit factor multiplied by the accumulation value of the base policy in effect as of the date of the Survivor's death.

Option 2: The death benefit will be the greater of:

(a) the total face amount of the base policy plus the accumulation value of the base policy in effect as of the date of the Survivor's death; or

(b) the death benefit factor multiplied by the accumulation value of the base policy in effect on the date of the Survivor's death.

Option 3:  The death benefit will be the greater of:

(a)   the total face amount, plus all gross premium payments for the base policy, minus any withdrawals, surrenders, partial withdrawals, partial surrenders, surrender penalty free withdrawals, and premium refunds as of the date of the Survivor's death; or,

(b)   the death benefit factor multiplied by the total accumulation value of the base policy as of the date of the Survivor's death.

Beginning with the policy anniversary nearest Exact Age 100, the death benefit will be:  the death benefit factor multiplied by the total accumulation value of the base policy as of the current policy month.

(See Accumulation Values provision for details.)

We will reduce the death benefit by any existing policy loans and by the portion of any grace period premium payment necessary to provide insurance to the date of the Survivor's death.

The death benefit factors will be the greater of the factors in the Table of Death Benefit Factors on the Data Page, or the factors applicable to joint and last survivor insurance set forth in the Internal Revenue Code of 1986 ("IRC"), as in effect at the time the policy is issued and the regulations thereunder.

This policy is intended to qualify under Section 7702 of the Internal Revenue Code as a life insurance contract for federal tax purposes. The death benefit under this policy is intended to qualify for the federal income tax exclusion.   The provisions of this policy (including any rider or endorsement) will be interpreted to ensure tax qualification, regardless of any language to the contrary.

At no time will the amount of the death benefit under the policy ever be less than the amount needed to ensure tax qualification.  To the extent that the death benefit is increased, appropriate adjustments will be made in any monthly deductions or supplemental benefits as of that time, retroactively or otherwise, that are consistent with such an increase.  Such adjustments may be made by right of setoff against any death benefits payable.

**SIMULTANEOUS DEATHS OF THE JOINT INSUREDS**

If the Joint Insureds die simultaneously, any death benefit payable under the base policy will be paid as though the older Joint Insured died first.

**PREMIUMS**

We will accept any amount you send us as a premium payment while this policy is in force, subject to the Premium Limitation provision and these conditions:

1.   The minimum initial premium shown in the Policy Data is payable on or before the Policy Date. Subsequent premiums may be sent to our Administrative Office or you may pay them to an agent we authorize.  We will give you a receipt if you ask for one.  Premiums received on or before the Policy Date will only begin to earn interest as of the Policy Date.

2. You must pay the Required Premium Per Year for the base policy in Policy Years 1–5 for the first 5 Policy Years. These premiums may be paid cumulatively in advance. At the end of each of the first 5 policy years, we will calculate the cumulative total of all gross premiums paid for the base policy, less any partial surrenders and surrender penalty free withdrawals. We will divide this total by the number of years since the Policy Date. This amount must equal or exceed the Required Premium Per Year for the base policy in Policy Years 1–5 for each year in the required premium period, or your policy will enter the grace period.

3. You may pay premiums at any time prior to policy anniversary nearest Exact Age 100. Each premium must be at least $25 and may not exceed the limits described in the Premium Limitation provision on this page.

If you stop paying premiums after the required premium period, your coverage will continue until the net cash value is insufficient to pay the monthly deduction due. At that time, your policy will enter the grace period. (See Grace Period Provision.)

Beginning with the policy anniversary nearest Exact Age 100, billing will cease and no further premium payments will be accepted.

**Premium Limitation** -- We reserve the right to refund any unscheduled premium during a particular policy year if the total premium paid:

(a) increases the difference between the death benefit and the accumulation value; and,

(b) is more than $10 per thousand of face amount and more than three times the total of the monthly deductions for the last year.

We also reserve the right to refund any unscheduled premiums that exceed $25,000 in any 12-month period.

We will not refund any amount if doing so would cause your policy to enter the grace period before the next anniversary.

As of the end of any policy year, if the premiums paid exceed the amount allowable for this policy to continue to qualify as a life insurance contract under Section 7702 of the Internal Revenue Code, as such Section is in effect at the time this policy is issued and the regulations thereunder, we will remove the excess amount of premiums paid from the policy, with interest, as of the end of that policy year. We will refund to you this excess amount (including interest) within 60 days after the end of that policy year.

Such an excess amount could occur, for example, as a result of a partial surrender or other change in the benefits or terms of the policy, since the premium amount allowable for the policy may be reduced.

The amount refundable will not exceed the net cash value of the policy. If the entire net cash value is refunded, we will treat the transaction as a full surrender of your policy.

1–17806196

PAGE 9

A-015

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 18 of 106   Page ID
#:1464
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 17 of 43   Page ID #:63

**Continuation of Insurance** -- If you stop paying premiums, we automatically continue your policy at the same face amount and with any additional benefits provided by rider, subject to the grace period and any minimum premium requirements that may be in effect. Refer to the Premiums provision and the Monthly Deduction provision for further explanation.

**Grace Period** -- During the first five policy years, a grace period is a period of 60 days beginning on: (a) a policy anniversary on which the cumulative Required Premium Per Year for the policy in Policy Years 1–5 has not been paid (see number 2 of the Premiums provision); or, (b) a monthly policy date when the accumulation value minus any existing loan is less than the monthly deduction due. After the fifth policy anniversary and prior to the policy anniversary nearest Exact Age 100, a grace period is a period of 60 days beginning on a monthly policy date when the net cash value is less than the monthly deduction due.

After the policy anniversary nearest Exact Age 100, a grace period is a period of 60 days beginning on a policy anniversary on which the loan interest due has not been paid in cash, and the accumulation value minus any existing loan is less than the loan interest due.

If your policy enters the grace period, we will let you know by sending a notice to your last known address. The notice will tell you the amount you must pay. The amount must be large enough to keep the policy in force. You must pay this amount before the grace period ends. If you do not pay enough, your policy will lapse at the end of the 60 days. If there is any net cash value remaining at the end of the grace period, we will apply it to the Nonforfeiture Options. (See Nonforfeiture Options provision.)

During the grace period, we will not charge interest on the amount due. If the Survivor dies during the grace period and before you pay the amount, we will subtract from the death benefit the amount required to provide insurance to the date the Survivor died.

**Premium Qualification Credit** -- At the end of each policy year for the first 5 policy years, we will calculate the total of gross premiums paid for the base policy (see number 2 in the Premiums provision). From this total, we will subtract any partial surrenders and surrender penalty free withdrawals. If this result equals or exceeds the Required Premium Per Year for the base policy in Policy Years 1–5 for each year of the required premium period, we will deposit a Premium Qualification Credit to your policy's accumulation value at the beginning of the next policy year.

We must receive enough premium as described above by the end of each policy year in the premium qualification period, or you will not receive a premium qualification credit for that policy year.

The amount of the credit will be a specific percentage of the Required Premium Per Year for the base policy in Policy Years 1–5. The Premium Qualification Credit Percentage and the Premium Qualification Credit Period are shown in the Policy Data.

**Reinstatement** -- If this policy lapses or is changed to Paid–Up Life Insurance or Extended Term Insurance, it may be reinstated provided it was not surrendered. To reinstate the policy, you must meet the following conditions:

A-016

1. You must request reinstatement in writing within three years after the date of lapse or change to Paid—Up Life Insurance or Extended Term Insurance, and before the Maturity Date.

2. If only one Joint Insured is alive when you request reinstatement, the other Joint Insured's death must have occurred prior to the end of the grace period, and proof of such death must have been submitted prior to the reinstatement.

3. Evidence of insurability satisfactory to us must be given to us by:

   (a) Both Joint Insureds, if the lapse or change to Paid—Up Life Insurance, or change to Extended Term Insurance, occurred while both Joint Insureds were living; or

   (b) The Survivor, if the lapse or change to Paid—Up Life Insurance, or change to Extended Term Insurance, occurred after the first death.

4. If any loans existed when the policy lapsed or was changed to Paid—Up Life Insurance or Extended Term Insurance, you must repay or reinstate them with interest. Interest will be compounded annually from the date of lapse or change to Paid—Up Life Insurance or Extended Term Insurance. Interest will be at the loan reinstatement interest rate of 6.0% (5.66% in advance) for a Class A loan and 8% (7.40% in advance) for a Class B loan.

5. The reinstated policy will be subject to the minimum premium requirement during the first 5 policy years. (See Premiums provision, number 2.) This means that the required premium period will be calculated from the original policy date; it will not start anew.

   If the policy lapsed or was changed to Paid—Up Life Insurance or Extended Term Insurance, during any required premium period, and is reinstated in a different policy year, you must pay a premium large enough to meet the minimum premium requirement at the time of reinstatement, with interest. Interest will be compounded annually at the reinstatement interest rate of 6%. If the policy lapsed or was changed to Paid—Up Life Insurance or Extended Term Insurance, after any required premium period, or if it lapsed or was changed to Paid—Up Life Insurance or Extended Term Insurance, during one of the first 5 years of any required premium period, and is reinstated in the same policy year, you must pay a premium large enough to cover two monthly deductions due when the policy lapsed or was changed to Paid—Up Life Insurance or Extended Term Insurance, and three monthly deductions due when the policy is reinstated.

6. If you reinstate the policy during any required premium period, you must repay any excess net cash value given to you at the time of change to Paid—Up Life Insurance, with interest. Interest will be compounded annually at the reinstatement interest rate of 6%.

7. If the policy is reinstated within the first 20 policy years, any applicable surrender penalties in effect for the reinstated policy will be calculated from the original policy date.

   The effective date of a reinstatement will be the date of your request.

The accumulation value of the reinstated policy will be: the net cash value of any Paid-Up Life Insurance or Extended Term Insurance on the date of reinstatement; plus the surrender penalty assessed at the time of lapse or change to Paid-Up Life Insurance or Extended Term Insurance; plus any excess net cash value we paid you at the time of change to Paid-Up Life Insurance; plus any loan repaid or reinstated; plus 91% of any premium you pay at reinstatement; minus any monthly deductions due at the time of lapse or change to Paid-Up Life Insurance or Extended Term Insurance.

**GUARANTEED VALUES**

**Accumulation Values** -- The accumulation value of the policy on the Policy Date is equal to all net premiums paid for the policy. The accumulation value of the policy on any monthly policy date after the Policy Date is equal to:

1. its accumulation value on the last monthly policy date, plus interest on that amount;

plus 2. any premium qualification credit amount deposited to it on the last monthly policy date, plus interest on that amount;

plus 3. all net premiums paid into it less any refunds since the last monthly policy date, plus interest from the date each premium is received in the Administrative Office to the monthly policy date;

minus 4. the monthly deduction charged against it on the last monthly policy date, plus interest on that amount;

minus 5. any partial surrenders and surrender penalty free withdrawals charged against it, including pro rata surrender penalties, since the last monthly policy date, plus interest on that amount from each partial surrender date and/or surrender penalty free withdrawal date to the monthly policy date.

The accumulation value of the policy on any specified date that falls between any two monthly policy dates is equal to:

1. the accumulation value on the last monthly policy date, plus accrued interest from the last monthly policy date to the specified date;

plus 2. any premium qualification credit amount deposited to it on the last monthly policy date, plus accrued interest on that amount;

plus 3. all net premiums paid into it less any refunds since the last monthly policy date, plus accrued interest from the date each premium is received in the Administrative Office to the specified date;

minus 4. the monthly deduction charged against it on the last monthly policy date, plus accrued interest on that amount;

minus 5. any partial surrenders and surrender penalty free withdrawals charged against it, including pro rata surrender penalties, since the last monthly policy date, plus accrued interest on that amount from each partial surrender date and/or surrender penalty free withdrawal date to the specified date.

A-018

A Table of Policy Values is included in this policy. It is based on the information you gave us when the policy was issued. The values shown may change as the declared interest rates, your premium payments, and other factors change from the illustrated data. Every year, we will send you a statement of actual policy values.

**Guaranteed Interest Rates** -- Except for premium received before the Policy Date, the net premium accrues interest from the date we receive it in the Administrative Office. Interest is credited monthly on each monthly policy date.

Premiums received on or before the Policy Date will only begin to earn interest as of the Policy Date. The guaranteed minimum interest rate for all policy years is shown in the Policy Data.

Prior to the policy anniversary nearest Exact Age 100, we may declare an interest rate higher than the guaranteed minimum at any time. We will never declare an interest rate that is lower than the guaranteed minimum interest rate. We may change this rate at any time without notice.

Beginning at policy anniversary nearest Exact Age 100, the policy accumulation value will accrue interest at the guaranteed minimum interest rate.

For Class A loans, the interest rate for any portion of the accumulation value equal to the amount of any existing policy loan will be no greater than the effective annual loan interest rate less .5%.

For Class B loans, the interest rate for any portion of the accumulation value equal to the amount of any existing policy loan will be at the effective annual loan interest rate less 2.5%.

**Monthly Deduction Rates** -- We will determine the monthly deduction rate for each policy month at the beginning of that policy month. The monthly deduction rate will depend on: the face amount of the policy; each Joint Insured's sex; each Joint Insured's smoker or nonsmoker status; each Joint Insured's class of risk as of the Policy Date; the number of years that the policy has been in force; and each Joint Insured's issue age.

A table of guaranteed maximum monthly deduction rates for the base policy is shown in the Policy Data. We may use rates lower than these guaranteed maximum monthly deduction rates. We will never use higher rates.

Any change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors. Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

**Guaranteed Maximum Monthly Expense Charge Per Thousand** -- The guaranteed maximum monthly expense charge per thousand is shown in the Policy Data. We may use an expense charge which is lower than this guaranteed maximum monthly expense charge per thousand. We will never use higher expense charges.

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 22 of 106   Page ID
#:1468
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 21 of 43   Page ID #:67

**Monthly Deduction** -- At the beginning of each policy month, we will take the monthly deduction for that policy month from the accumulation value of the policy.  The Monthly Deduction is equal to:

(a)   the monthly deduction rate, times .001, times the difference between the death benefit and the accumulation value of the policy at the beginning of the policy month;

plus   (b)   the monthly deduction for any riders;

plus   (c)   the policy fee;

plus   (d)   the monthly expense charge per thousand, times .001, times the face amount of the policy.

**CASH VALUE**

You may borrow the cash value, or take part of it or all of it as a partial or full surrender of the policy.  All of these transactions are described in this section.  We guarantee that the cash value always equals or exceeds the amount required by the law in effect at the time of issue in the jurisdiction in which the application for this policy was signed.

**Policy Loans** --   If you request a policy loan prior to the twentieth policy anniversary, we will handle it as a Class B loan. After the twentieth policy anniversary, we will handle one loan request per year as a Class A loan, subject to the limitation shown in number 3 under the Class A Policy Loans provision.  After the twentieth policy anniversary, we will treat any loan request after the first request in any policy year as a Class B loan.

**Class A Policy Loan** --   After the twentieth policy anniversary, we will make Class A loans subject to the following conditions:

1.   Such a loan will only be allowed one time during a policy year.

2.   The maximum amount allowed as a Class A loan in any one policy year will be the lesser of 10% of the accumulation value as of the request date or the maximum loan amount, as described in number 3 below.

3.   The maximum loan amount is the accumulation value as of the date of the loan request, minus:

a.   any existing policy loan(s); and,

b.   interest on the amount of the loan to the end of the policy year; and,

c.   the full surrender penalty or two monthly deductions, whichever is greater.

4.   You must pay interest on the total loan balance each year in advance.  The interest is due on the policy anniversary.  The annual effective loan interest rate is 6.0% (5.66% in advance). If you do not pay the interest when it is due, we will add the amount of interest to the loan.  We will charge interest on this amount at the same interest rate being charged on the loan.

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 23 of 106   Page ID
#:1469
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 22 of 43   Page ID #:68

5.   You must assign the policy to us to the extent of the outstanding loan.  If the Survivor dies, we will deduct the outstanding loan from the death benefit before we pay the death benefit to the Beneficiary.

6.   The loan will be secured by that portion of the accumulation value equal to the amount of the loan.

**Class B Policy Loan --**  We will make Class B loans subject to the following conditions:

1.   The maximum amount allowed as a Class B loan is the accumulation value as of the date of the loan request, minus;

   a.   any existing policy loan(s); and,

   b.   interest on the amount of the loan to the end of the policy year; and,

   c.   the full surrender penalty or two monthly deductions, whichever is greater.

2.   You must pay interest on the total loan balance each year in advance. The interest is due on the policy anniversary.  The loan interest rate is 8.0% (7.4% in advance).  If you do not pay the interest when it is due, we will add the amount of interest to the loan.  We will charge interest on this amount at the same interest rate being charged on the loan.

3.   You must assign the policy to us to the extent of the outstanding loan.  If the Survivor dies, we will deduct the outstanding loan from the death benefit before we pay the death benefit to the Beneficiary.

4.   The loan will be secured by that portion of the accumulation value equal to the amount of the loan.

**Loan Repayment --** You may repay any part of any outstanding loan at any time while either Joint Insured is living and before the Maturity Date.

If you wish to make a loan repayment, you must tell us that the payment you send us is for that purpose.  Unless your payment is clearly marked as a loan repayment, we will assume it is a premium payment, unless it is received after the policy anniversary nearest Exact Age 100.  When we receive a loan repayment, we will apply it to the portion of the accumulation value that secures a loan.  If a payment would cause the policy to fail to qualify as a life insurance contract under Section 7702 of the Internal Revenue Code as such Section is in effect at that time, and the regulations thereunder, the portion of the payment that cannot be accepted as premium will be applied against any outstanding policy loans before a refund is made.

Loan repayments will first be applied to any outstanding Class B loans.  Then, they will be applied to any outstanding Class A loans.  Within the Class A and Class B loan categories, the repayments will be applied first to the loans with the most recent loan dates.

Your policy will not automatically lapse or be changed to Paid-Up Life Insurance or Extended Term Insurance if you do not repay a loan.  However, the net cash value must be large enough to cover the monthly deduction due and any loan interest due not paid in cash. (See Grace Period provision for details.)

If the policy loan interest due is not paid in cash by you, a new loan of the same class (A or B) will be created to cover the interest. The new loan will have the same interest rate as the loan to which it is added (Class A or B). Any loan interest paid in cash by you will apply first to Class B loans, and then to Class A loans.

**Partial Surrender** -- At any time following the tenth day after you have received this policy, you may surrender a portion of this policy's value by sending us a written request, subject to the limitations described below.

During the first 20 policy years, a pro rata surrender penalty will be assessed on any surrender amount you request that exceeds the amount eligible for Surrender Penalty Free Withdrawal as described below. Minimum pro rata surrender penalty is $25. Surrender penalties are shown in the Policy Data.

We deduct from the policy's accumulation value (a) the surrender amount you request; plus (b) the pro rata surrender penalty on the surrender amount that exceeds the amount eligible for surrender without penalty. If you chose Death Benefit Option 1, we will also deduct from the policy's face amount  (a) the surrender amount you request that exceeds the amount eligible for surrender without penalty; plus (b) the pro rata surrender penalty on the surrender amount that exceeds the amount eligible for surrender without penalty. If the new face amount would be less than our published minimum for this plan, then the partial surrender will not be allowed.

In any policy year, the maximum amount that you may request and receive by partial surrender is:

      1)  the accumulation value;

minus  2)  any existing policy loans;

minus  3)  the sum of 3 monthly deductions;

minus  4)  the greater of $25 or the full surrender penalty.

If you ask for an amount larger than the maximum described above, we will treat it as a request for a full surrender of the policy.

During any required premium payment period, the sum of all surrender penalty free withdrawals and partial surrenders may not exceed the sum of all gross premiums paid, less the sum of all required premiums since the Policy Date. (See number 2 of the Premiums provision.)

**Surrender Penalty Free Withdrawal** -- At any time after the first policy year, you may make a withdrawal without incurring a pro rata surrender penalty. Such a withdrawal is subject to the limits outlined below. The minimum amount of a surrender penalty free withdrawal is $100.

When you request a partial surrender in the second or later policy year, we will calculate the amount eligible for withdrawal without penalty. This amount will be the lesser of:

   (a)  10% of the policy's accumulation value as of the last monthly policy date, minus the sum of all surrender penalty free withdrawals since the last policy anniversary; or,

   (b)  the maximum amount available as a partial surrender described above.

A-022

During any required premium payment period, the sum of all surrender penalty free withdrawals and partial surrenders may not exceed the sum of all gross premiums paid less the sum of all required premiums since the policy date. (See number 2 of the Premiums provision.)

Whenever you request a partial surrender after the first policy year, we will process the amount that is eligible as a surrender penalty free withdrawal. The remainder of any amount you request will be processed as a partial surrender.

We will deduct the full partial surrender amount you request from the policy's accumulation value. We will not deduct that portion of your request that we treat as a surrender penalty free withdrawal from the policy's face amount.

**OPTION TO CHANGE THE FACE AMOUNT**

**Increasing the Face Amount** -- An increase in the face amount of this policy will not be allowed.

**Decreasing the Face Amount** -- You may request a decrease in the face amount of this policy if all the following conditions are met:

1. You must make a written request to us.
2. At the request date, this policy must be in force and at least one of the Joint Insureds must be living.
3. The decrease of the face amount of this policy may only be effective as of a policy anniversary.
4. The amount of the reduction in face amount must be at least $25,000.
5. The new face amount may not be less than our published minimum face amount for this plan.
6. The decrease of the face amount of this policy may cause a change in the monthly deduction to be charged.
7. A surrender penalty will result from the decrease in the face amount if the decrease is made during the 20 year surrender penalty period of the base policy.

We will issue new Policy Data pages showing the new face amount. After the decrease, the monthly deduction rates and any future surrender penalties will be based on the new total face amount of this policy.

If the face amount of this policy is decreased during any required premium period, we will recalculate the required premium per year for the remainder of the required premium period based on the new face amount.

**NONFORFEITURE OPTIONS**

If you do not pay the minimum cumulative required premiums during the first 5 policy as described under number 2 in the Premiums provisions, your policy will enter the grace period. After the first 5 policy years, if you stop paying premiums your coverage will continue until the cash value minus any loan is insufficient to pay the monthly deduction due. At that time, your policy will enter the grace period (see Grace Period provision).

At the end of the grace period, if there is any remaining net cash value, we will apply the net cash value to one of the Nonforfeiture Options described in this section. The Nonforfeiture Options will be effective no later than 60 days after the date on which the premium was due. You may choose Option 1, Paid-Up Life Insurance any time within the 60 day grace period, up to the policy anniversary nearest Exact Age 100; or, you may choose Option 2, Extended Term Insurance, or Option 3, Full Surrender, any time within the 60 day grace period. If you do not choose an option in writing, Option 1, Paid-Up Life Insurance, will automatically take effect.

If you choose Option 3, Full Surrender, the surrender value within 60 days from the date the premium was due will not be less than the surrender value as of the date the premium was due, less any loans, partial surrenders (including pro rata surrender penalties) and surrender penalty free withdrawals made after the date the premium was due.

Option 1. Paid-Up Life Insurance -- Subject to the conditions of this option, this policy may be continued as single premium Paid-Up Life Insurance.

The following conditions will apply:

(a) If the policy has not reached the end of the grace period as described above and you wish to continue it as Paid-Up Life Insurance, the policy must be in force on the date you request the change.

(b) When you exercise this option, this policy will be continued as Paid-Up Life Insurance.

(c) The amount of Paid-Up Life Insurance is calculated by using the net cash value divided by the net single premium, times $1,000. The net single premium is based on each Joint Insured's sex, each Joint Insured's smoker or nonsmoker status, and each Joint Insured's attained age. The net single premiums are shown in the Policy Data.

If the difference between the amount of Paid-Up Life Insurance and the net single premium (net cash value of the original policy) for the Paid-Up Life Insurance is greater than the difference under this policy between the death benefit and the accumulation value on the date this option is exercised, then the amount of the Paid-Up Life Insurance elected under this option will be reduced accordingly. Any excess net cash value remaining after the purchase of Paid-Up Life Insurance will be refunded to you.

(d) The effective date of the Paid-Up Life Insurance will be the date the premium was due before entering the grace period.

(e) The net single premiums used for the single premium Paid-Up Life Insurance will be those in effect as of the date this option was exercised. However, they will not exceed the rates which are shown in the Table of Maximum Net Single Premiums for Paid-Up Life Insurance per $1,000 on the Policy Data.

(f) There is a Table of Paid-Up Life Insurance per $1,000 of Net Cash Value following the Table of Maximum Net Single Premiums for Paid-Up Life Insurance per $1,000 in the Policy Data.

Case 2:18-cv-05422-CAS-GJS  Document 108-4  Filed 09/24/19  Page 27 of 106  Page ID
#:1473
Case 2:18-cv-05422-DMG-JC  Document 1-1  Filed 06/18/18  Page 26 of 43  Page ID #:72

(g) The Paid—Up Life Insurance will have cash values. The cash value of the Paid—Up Life Insurance is equal to the net single premium for the face amount of the Paid—Up Life Insurance, less any loans made after the effective date of the Paid—Up Life Insurance. The net single premium is based on each Joint Insured's sex, each Joint Insured's smoker or nonsmoker status, and each Joint Insured's attained age.

(h) When you exercise this option, all riders will terminate.

**Option 2.** Extended Term Insurance —— Unless a class of risk shown on the Policy Data for the base policy is "Rated," you may continue this policy as non—participating extended term insurance. These conditions will apply:

(a) The policy must be in force when you request the change.

(b) You will surrender all rights under this policy except the right to reinstate, in exchange for the extended term policy.

(c) We will calculate the face amount of the extended term policy in this way: this policy's face amount less any loans as of the date of your request equals the extended term face amount.

(d) We will calculate the length of the coverage period of the extended term policy by applying the net cash value of this policy as a net single premium for the extended term coverage.

(e) We will issue and date the extended term policy as of the date you surrender this policy.

(f) When you exercise this option, all riders will terminate.

**Option 3.** Full Surrender —— You may surrender this policy for the net cash value.

There is a Table of Surrender Penalties shown on the Data Page. We will use the factors in the table to determine the surrender penalty we will apply. To calculate the full surrender penalty for the base policy, find the factor for the current policy year. Multiply this factor by the number of thousands of face amount of the base policy. This is the full surrender penalty for the base policy. There is no surrender penalty for the base policy after 20 policy years.

If you request a full surrender within 30 days of a policy anniversary, the surrender value will not be less than the surrender value on that anniversary, less any loans, partial surrenders (including pro rata surrender penalties), and surrender penalty free withdrawals made after the last policy anniversary.

**OPTION TO SPLIT THE POLICY**

**Benefit** – Subject to the following conditions and restrictions, you have an option ("the option") to apply for exchange of this policy for individual policies, one on each of the Joint Insureds, upon the occurrence of either of the contingent events listed on page 20. An individual policy issued in exchange for this policy is referred to in this section as the "new policy". A new policy may not exceed 50% of the face amount shown on Data Page 2 of this policy.

If both of the Joint Insureds receive a new policy equal to 50% of the face amount of this policy, then the accumulation value and any outstanding policy loans under this policy will be divided and allocated equally to each new policy.

A-025

If either or both of the Joint Insureds receives a new policy that is less than 50% of the face amount of this policy, then the accumulation value and any outstanding policy loans under this policy will be divided and allocated to each new policy according to the split percentages of the face amounts of the new policies ("the pro rata portion").

If two new policies are issued and the face amount of at least one of the new policies is less than 50% of the face amount of this policy; or if a new policy on the life of only one of the Joint Insureds is issued, we will refund a pro rata portion of the net cash value to you.

**Contingent Events** – You may apply for the option upon the occurrence of either of the following contingent events:

1.  A final divorce decree has been issued with respect to the marriage of the Joint Insureds. The Joint Insureds must have been married to each other when this policy was issued.

2.  A change to federal estate tax provisions of the Internal Revenue Code of 1986 (IRC) has occurred which results in either (a) or (b):

    (a)  IRC Section 2056(a), or its successor, is amended so as to eliminate or reduce the federal estate tax unlimited marital deduction.

    (b)  IRC Section 2001, or its successor, is amended so that the federal estate tax rates are reduced. The reduction must be such that the amount of federal estate tax that would be due at the death of the Survivor is 50% or less of the tax that would have been due before the change to the IRC.

We will not notify you of any tax law changes which may affect this policy.

A policy split may have possible tax consequences. You should consult a qualified tax advisor.

**Effective Date** – If we approve the exchange, the effective date of the exchange will be the date the option is exercised.

**Application** – To apply for this option, you must notify our Administrative Office in writing within 6 months of the date that either of the contingent events occurs. In the case of events involving changes to the Internal Revenue Code, the 6 months will be counted from the date the change in the law is effective.

We must also receive all of the following in order to process the exchange.

1.  The release of any lien against or assignment of this policy. However, you may instead submit written approval by the lienholders or assignees of the exchange of policies in a form satisfactory to us with such other documents as we may require.

2.  Evidence of insurability satisfactory to us.

3.  This policy.

Case 2:18-cv-05422-CAS-GJS  Document 108-4  Filed 09/24/19  Page 29 of 106  Page ID
#:1475
Case 2:18-cv-05422-DMG-JC  Document 1-1  Filed 06/18/18  Page 28 of 43  Page ID #:74

4. A policy change application containing the request to exercise this option, a request to surrender this policy, and your written consent to the exchange.

5. A copy of the final divorce decree, if applicable.

6. Payment of any amount due for the exchange, if applicable.

The application for this policy and the policy change application will be considered to be the application for each new policy.

**New Policy** – The exchange must be to a flexible premium adjustable life plan, on a form designated by us for such purpose. We will have at least one form available for exchanges. Each new policy issued will be based on the sex, age, class of risk and smoking status of the applicable Joint Insured as of the date of the exchange. The premiums for each new policy will be based on our published rates in effect on the date of the request to split this policy. Riders that form a part of this policy, and any new riders requested will become a part of each new policy only if we agree to provide them on the date of the exchange. Each new policy will take effect immediately upon termination of this policy. Under no circumstances will we pay a death benefit under both this policy and the new policy on the same insured.

The policy date of the new policy will be the date the option is exercised.

**Loans and Assignment** – Any policy loan will be divided and transferred on a pro rata basis to each new policy. If there is an assignment on this policy and you want to carry over that assignment to the new policy, you will need to execute a new assignment.

**Exchange Adjustments** – The following adjustments may be made at the time of the exchange:

1. If one of the Joint Insureds does not receive a new policy and this policy is still in the surrender penalty period, a pro rata surrender penalty will be deducted from the portion of the accumulation value, less any pro rata loans, attributable to that Joint Insured.

2. If one or both of the Joint Insureds receive a new policy for less than 50% of the face amount of this policy and this policy is still in the surrender penalty period, we will deduct a pro rata surrender penalty from the accumulation value less any loans not applied to the new policy. We will also deduct the pro rata portion of the loan not applied to the new policy from any cash value refunded.

3. If both Joint Insureds receive a new policy for 50% of the face amount of this policy, and this policy is in the surrender penalty period, we will waive the pro rata surrender penalty applicable to this policy.

4. The surrender penalty period, if any, of the new policy will begin on the issue date of the new policy.

A-027

5. The minimum initial premium for each new policy will be equal to a one time premium which is the cumulative total of the required annual premiums applicable to the new policy for the number of years that this policy was in force, less the total accumulation value transferred into the new policy, less any loans transferred into the new policy.

This one time premium will be applied to the new policy as a gross premium.

**Evidence of Insurability** – When you request this option, we will require satisfactory evidence of insurability.

**Ownership** – If the Joint Insureds are the owners of this policy, each will be the owner of the new policy on his or her own life. If the owner of this policy is someone other that the Joint Insureds, the owner of this policy will be the owner of each new policy. If the requested owner(s) on either new policy is different than that in this policy, we will require a transfer of ownership form completed by the owner(s) of this policy, and we may require evidence of insurable interest in the life of the insured under the new policy.

**Suicide and Incontestability** – If we approve the exchange, the period for which the Joint Insureds were covered prior to the date of the exchange will be used to offset the time period for the suicide exclusion and incontestability provision under the new policies.

**Beneficiary** – The Beneficiary of the new policies will be the same as this policy. If, however, the requested beneficiary(ies) on either new policy is different than in this policy, we will require a change of beneficiary form completed by the owner(s) of this policy, and we may require evidence of insurable interest in the life of the insured under the new policy.

**Termination of Option** – This option terminates on the earliest of the following dates:

1. the date of the First Death.

2. the date you elect to exchange this policy under the Guaranteed Policy Split Option Rider or the Option to Split the Policy provision of this policy.

3. the date this policy is changed to paid-up insurance.

4. the date this policy is surrendered or terminated.

5. the date this policy lapses under this policy's grace period provision.

**Misstatement of Age** – We will follow these rules:

1. If a misstatement of either Joint Insured's age is found before this option is used and this policy's death benefit is reduced as a result, we will proportionately reduce the face amount of each new policy.

2. If a misstatement of either Joint Insured's age is found after this option is used, the death benefit amount under the new policy will be subject to the Misstatement of Age provision of the new policy.

**Policy Changes** – If the face amount of this policy is changed for any reason, we will proportionately change the benefit amount of the option.

**PAYMENT OF CASH VALUE AND LOANS**

We may delay paying you the partial or full surrender values of this policy for up to six months after we receive your written request for the surrender. We may delay making a loan to you for up to six months after we receive your written request for the loan. We will not delay any loan made to pay premiums due us on any policy.

**POLICY STATEMENTS AND ILLUSTRATIONS**

We will send you a statement at least once a year, without charge, showing the face amount; accumulation value; cash value; loans; partial surrenders; surrender penalty free withdrawals; premium qualification credits; premiums paid; and charges as of the statement date. Upon written request at any time we will send you an illustration of your policy's benefits and values. There will be no charge for the first such illustration in each policy year. We reserve the right to charge a $25.00 administrative fee for any illustration after the first in any policy year.

**BASIS OF COMPUTATION**

The guaranteed cash values of the policy are not less than the minimum values required by the jurisdiction in which the application for this policy was signed. The guaranteed cash values are equal to the accumulation value based on the guaranteed monthly deductions and the guaranteed maximum interest rate shown in the Policy Data, less any surrender penalty.

Cash values will always meet or exceed minimum values on the statutory nonforfeiture basis. The basis for the extended term values is the Commissioners 1980 Extended Term Mortality Tables, Sex Distinct, Smoker Distinct age nearest birthday. The basis for all other values is the Commissioners 1980 Standard Ordinary, Sex Distinct, Smoker Distinct, Ultimate Mortality Table, age nearest birthday. Deaths are assumed to occur at the end of the policy year.

As required, we have filed the method we used to compute minimum cash values and nonforfeiture benefits with the supervisory official of the jurisdiction in which the application for this policy was signed.

**GENERAL PROVISIONS**

**Incontestability of the Policy** -- This policy will be incontestable with respect to either Joint Insured after it has been in force during the lifetime of that Joint Insured for two years from the date of issue. This provision does not apply to any rider providing benefits specifically for disability or death by accident.

We must be notified of the First Death if it occurs during the first two years the policy is in force. If the policy is rescinded for any contestable reason (e.g. material misrepresentation), we will be liable only for the amount of premiums paid, less any partial surrenders and any outstanding loans and loan interest due. The policy will be rescinded as of the Policy Date.

**Amount We Pay is Limited in the Event of Suicide** -- If either Joint Insured dies by suicide, while sane or insane, within two years from the date of issue, we will be liable only for the amount of premiums paid, less any partial surrenders, surrender penalty free withdrawals and loans, and loan interest due. The policy will be rescinded as of the Policy Date.

A-029

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 32 of 106   Page ID
#:1478
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 31 of 43   Page ID #:77

**Misstatement of Age or Sex in the Application** -- If there is a misstatement of both or either Joint Insureds' age or sex in the application, we will adjust the excess of the death benefit over the accumulation value to that which would be purchased by the most recent monthly deduction at the correct age or sex. There will be no adjustment beyond Exact Age 100.

**This Policy is Our Contract with You** -- We have issued this policy in consideration of the application and your initial premium payment. A copy of the application is attached and is a part of this policy. The policy, including the application and any endorsements and riders, forms our contract with you. All statements made by or for a Joint Insured will be considered representations and not warranties. We will not use any statement made by or for a Joint Insured to deny a claim unless the statement is in the application and the application is attached to this policy when we issue or deliver it.

**Who Can Make Changes in the Policy** -- Only our President or a Vice President together with our Secretary have the authority to make any change in this policy. Any change must be in writing.

**Termination of Insurance** -- This policy will terminate at the earliest of:

1. the date we receive your written request to surrender or terminate;

2. the Maturity Date;

3. the date the policy is exchanged under the Guaranteed Policy Split Option Rider or the Option to Split the Policy provision of this policy; or

4. the date of lapse.

**No Dividends are Payable** -- This is nonparticipating insurance. It does not participate in our profits or surplus. We do not distribute past surplus or recover past losses by changing the monthly deduction rates.

**SETTLEMENT PROVISIONS**

When the Survivor dies while the policy is in force, we will pay the death benefit in a lump sum unless you or the Beneficiary choose a settlement option. You may choose a settlement option while the Survivor is living. The Beneficiary may choose a settlement option after the Survivor has died. The Beneficiary's right to choose will be subject to any settlement agreement in effect at the Survivor's death.

You may also choose one of these options as a method of receiving the surrender or maturity proceeds, if any are available under this policy.

When we receive a satisfactory written request, we pay the benefit according to one of these options:

**Option A:   Instalments for a Guaranteed Period** -- We will pay equal instalments for a guaranteed period of from one to thirty years. Each instalment will consist of part benefit and part interest. We will pay the instalments monthly, quarterly, semi-annually or annually, as requested. See Table A on the last page.

**Option B:   Instalments for Life with a Guaranteed Period --** We will pay equal monthly instalments as long as the payee is living, but we will not make payments for less than the guaranteed period the payee chooses.   The guaranteed period may be either 10 years or 20 years.   We will pay the instalments monthly.   See Table B on the last page.

**Option C:   Benefit Deposited with Interest --** We will hold the benefit on deposit.   It will earn interest at the annual interest rate we are paying as of the date of death, surrender or maturity.   We will not pay less than 2 1/2% annual interest.   We will pay the earned interest monthly, quarterly, semi-annually or annually, as requested.   The payee may withdraw part or all of the benefit and earned interest at any time.

**Option D:   Instalments of a Selected Amount --** We will pay instalments of a selected amount until we have paid the entire benefit and accumulated interest.

**Option E:   Annuity --** We will use the benefit as a single premium to buy an annuity.   The annuity may be payable to one or two payees.   It may be payable for life with or without a guaranteed period, as requested.   The annuity payment will not be less than what our current annuity contracts are then paying.

The payee may arrange any other method of settlement as long as we agree to it.   The payee must be an individual receiving payment in his or her own right.   There must be at least $10,000 available for any option and the amount of each instalment to each payee must be at least $100.   If the benefit amount is not enough to meet these requirements, we will pay the benefit in a lump sum.

We will pay the first instalment under any option on the date of death, maturity or surrender, whichever applies.   Any unpaid balance we hold under Options A, B or D will earn interest at the rate we are paying at the time of settlement.   We will not pay less than 3% annual interest.   Any benefit we hold will be combined with our general assets.

If the payee does not live to receive all guaranteed payments under Options A, B, D or E or any amount deposited under Option C, plus any accumulated interest, we will pay the remaining benefit as scheduled to the payee's estate.   The payee may name and change a successor payee for any amount we would otherwise pay the payee's estate.

## TABLE A
### Instalments for Each $1,000 Payable under Option A

Multiply the Monthly Instalment by 11.83895 for Annual, by 5.96322 for Semi-Annual, or by 2.99263 for Quarterly Instalments

| Guaranteed Period (Yrs.) | Monthly Instalment | Guaranteed Period (Yrs.) | Monthly Instalment | Guaranteed Period (Yrs.) | Monthly Instalment |
|---|---|---|---|---|---|
| 1 | $84.47 | 11 | $8.86 | 21 | $5.32 |
| 2 | 42.86 | 12 | 8.24 | 22 | 5.15 |
| 3 | 28.99 | 13 | 7.71 | 23 | 4.99 |
| 4 | 22.06 | 14 | 7.26 | 24 | 4.84 |
| 5 | 17.91 | 15 | 6.87 | 25 | 4.71 |
| 6 | 15.14 | 16 | 6.53 | 26 | 4.59 |
| 7 | 13.16 | 17 | 6.23 | 27 | 4.48 |
| 8 | 11.68 | 18 | 5.96 | 28 | 4.37 |
| 9 | 10.53 | 19 | 5.73 | 29 | 4.27 |
| 10 | 9.61 | 20 | 5.51 | 30 | 4.18 |

## TABLE B
### Monthly Instalment for Each $1,000 Payable under Option B

**Male Payee**

| Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | $2.90 | $2.89 | 26 | $3.20 | $3.19 | 41 | $3.77 | $3.71 | 56 | $4.92 | $4.59 | 71 | $7.27 | $5.42 |
| 12 | 2.91 | 2.91 | 27 | 3.22 | 3.21 | 42 | 3.82 | 3.76 | 57 | 5.03 | 4.66 | 72 | 7.48 | 5.45 |
| 13 | 2.93 | 2.92 | 28 | 3.25 | 3.24 | 43 | 3.88 | 3.81 | 58 | 5.15 | 4.73 | 73 | 7.68 | 5.46 |
| 14 | 2.94 | 2.94 | 29 | 3.28 | 3.27 | 44 | 3.94 | 3.86 | 59 | 5.27 | 4.80 | 74 | 7.88 | 5.48 |
| 15 | 2.96 | 2.96 | 30 | 3.31 | 3.30 | 45 | 4.00 | 3.91 | 60 | 5.40 | 4.87 | 75 | 8.08 | 5.49 |
| 16 | 2.98 | 2.97 | 31 | 3.34 | 3.33 | 46 | 4.07 | 3.97 | 61 | 5.53 | 4.94 | 76 | 8.27 | 5.50 |
| 17 | 3.00 | 2.99 | 32 | 3.38 | 3.36 | 47 | 4.14 | 4.02 | 62 | 5.68 | 5.00 | 77 | 8.46 | 5.50 |
| 18 | 3.01 | 3.01 | 33 | 3.41 | 3.39 | 48 | 4.21 | 4.08 | 63 | 5.83 | 5.07 | 78 | 8.63 | 5.51 |
| 19 | 3.03 | 3.03 | 34 | 3.45 | 3.43 | 49 | 4.28 | 4.14 | 64 | 5.98 | 5.13 | 79 | 8.79 | 5.51 |
| 20 | 3.05 | 3.05 | 35 | 3.49 | 3.46 | 50 | 4.36 | 4.20 | 65 | 6.15 | 5.18 | 80 | 8.94 | 5.51 |
| 21 | 3.08 | 3.07 | 36 | 3.53 | 3.50 | 51 | 4.44 | 4.26 | 66 | 6.32 | 5.24 | 81 | 9.07 | 5.51 |
| 22 | 3.10 | 3.09 | 37 | 3.57 | 3.54 | 52 | 4.53 | 4.32 | 67 | 6.50 | 5.28 | 82 | 9.18 | 5.51 |
| 23 | 3.12 | 3.11 | 38 | 3.62 | 3.58 | 53 | 4.62 | 4.39 | 68 | 6.68 | 5.33 | 83 | 9.28 | 5.51 |
| 24 | 3.14 | 3.14 | 39 | 3.67 | 3.62 | 54 | 4.71 | 4.46 | 69 | 6.88 | 5.36 | 84 | 9.36 | 5.51 |
| 25 | 3.17 | 3.16 | 40 | 3.72 | 3.67 | 55 | 4.81 | 4.52 | 70 | 7.07 | 5.40 | 85 | 9.42 | 5.51 |

**Female Payee**

| Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. | Age | Guaranteed Period 10 Yrs. | 20 Yrs. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | $2.83 | $2.83 | 26 | $3.08 | $3.07 | 41 | $3.54 | $3.52 | 56 | $4.51 | $4.35 | 71 | $6.73 | $5.36 |
| 12 | 2.84 | 2.84 | 27 | 3.10 | 3.10 | 42 | 3.59 | 3.56 | 57 | 4.61 | 4.42 | 72 | 6.94 | 5.40 |
| 13 | 2.86 | 2.85 | 28 | 3.12 | 3.12 | 43 | 3.63 | 3.60 | 58 | 4.71 | 4.50 | 73 | 7.16 | 5.43 |
| 14 | 2.87 | 2.87 | 29 | 3.15 | 3.14 | 44 | 3.68 | 3.65 | 59 | 4.82 | 4.57 | 74 | 7.38 | 5.48 |
| 15 | 2.88 | 2.88 | 30 | 3.17 | 3.17 | 45 | 3.73 | 3.69 | 60 | 4.94 | 4.65 | 75 | 7.60 | 5.47 |
| 16 | 2.90 | 2.90 | 31 | 3.20 | 3.19 | 46 | 3.78 | 3.74 | 61 | 5.06 | 4.72 | 76 | 7.82 | 5.48 |
| 17 | 2.91 | 2.91 | 32 | 3.23 | 3.22 | 47 | 3.84 | 3.79 | 62 | 5.19 | 4.80 | 77 | 8.04 | 5.49 |
| 18 | 2.93 | 2.93 | 33 | 3.26 | 3.25 | 48 | 3.90 | 3.85 | 63 | 5.33 | 4.88 | 78 | 8.25 | 5.50 |
| 19 | 2.95 | 2.94 | 34 | 3.29 | 3.28 | 49 | 3.96 | 3.90 | 64 | 5.47 | 4.95 | 79 | 8.45 | 5.51 |
| 20 | 2.96 | 2.96 | 35 | 3.32 | 3.31 | 50 | 4.03 | 3.96 | 65 | 5.63 | 5.02 | 80 | 8.64 | 5.51 |
| 21 | 2.98 | 2.98 | 36 | 3.35 | 3.34 | 51 | 4.10 | 4.02 | 66 | 5.79 | 5.09 | 81 | 8.82 | 5.51 |
| 22 | 3.00 | 2.99 | 37 | 3.39 | 3.37 | 52 | 4.17 | 4.08 | 67 | 5.96 | 5.15 | 82 | 8.97 | 5.51 |
| 23 | 3.02 | 3.01 | 38 | 3.42 | 3.41 | 53 | 4.25 | 4.14 | 68 | 6.14 | 5.21 | 83 | 9.11 | 5.51 |
| 24 | 3.04 | 3.03 | 39 | 3.46 | 3.44 | 54 | 4.33 | 4.21 | 69 | 6.33 | 5.27 | 84 | 9.23 | 5.51 |
| 25 | 3.06 | 3.05 | 40 | 3.50 | 3.48 | 55 | 4.42 | 4.28 | 70 | 6.53 | 5.32 | 85 | 9.32 | 5.51 |

Ages younger than 11 are the same as shown for age 11, and ages older than 85 are the same as shown for age 85.

A-032

## GUARANTEED
## POLICY SPLIT OPTION
## RIDER

Transamerica Occidental Life Insurance Company has issued this rider as part of the policy to which it is attached. ("The Original Policy"). You do not pay any separate premium for this rider.

**Benefit.** Subject to the conditions and restrictions of this rider, this benefit provides you with an option ("the option") to apply for exchange of the Original Policy for two individual policies, one on each of the Joint Insureds, upon the occurrence of either of the contingent events listed below. An individual policy issued in exchange for the Original Policy is referred to in this Rider as the "New Policy". A New Policy may not exceed 50% of the face amount shown on page 2 of the data page of the Original Policy.

If both of the Joint Insureds receive a New Policy equal to 50% of the face amount of the Original Policy, then the accumulation value and any outstanding policy loans under the Original Policy will be divided and allocated equally to each New Policy.

If either or both of the Joint Insureds receives a New Policy that is less than 50% of the face amount of the Original Policy, then the accumulation value and any outstanding policy loans under the Original Policy will be divided and allocated to each New Policy according to the split percentages of the face amounts of the New Policies ("the pro rata portion").

If two New Policies are issued and the face amount of at least one of the New Policies is less than 50% of the face amount of the Original Policy; or if a New Policy on the life of only one of the Joint Insureds is issued, we will refund a pro rata portion of the net cash value to you.

**Contingent Events.** You may apply for the option upon the occurrence of either of the following contingent events.

1. A final divorce decree has been issued with respect to the marriage of the Joint Insureds. The Joint Insureds must have been married to each other when the Original Policy was issued.

2. A change to federal estate tax provisions of the Internal Revenue Code of 1986 ("IRC") has occurred which results in either (a) or (b):

   (a) IRC Section 2056(a), or its successor, is amended so as to eliminate or reduce the federal estate tax unlimited marital deduction.

   (b) IRC Section 2001, or its successor, is amended so that the federal estate tax rates are reduced. The reduction must be such that the amount of federal estate tax that would be due at the death of the Survivor is 50% or less of the tax that would have been due before the change to the IRC.

The Company will not notify you, the owner(s), of any tax law changes which may affect the Original Policy.

A policy split may have possible tax consequences. You should consult a qualified tax advisor.

**Effective Date.** If we approve the exchange, the effective date of the exchange will be the date the option is exercised.

**Application.** To apply for this option, the owner(s) must notify the Administrative Office of the Company in writing within 6 months of the date that either of the contingent events occurs. In the case of events involving changes to the Internal Revenue Code, the 6 months will be counted from the date the change in the law is effective.

We must also receive all of the following in order to process the exchange, .

1. The release of any lien against or assignment of the Original Policy. However, you may instead submit written approval by the lienholders or assignees of the exchange of policies in a form satisfactory to us with such other documents as we may require.

2. The Original Policy.

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 36 of 106   Page ID
#:1482
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 35 of 43   Page ID #:81

3. A policy change application containing the request to exercise the option, a request to surrender the Original Policy, and written consent of the owner(s) to the exchange.

4. A copy of the final divorce decree, if applicable.

5. Payment of any amount due for the exchange, if applicable.

The application for the Original Policy and the policy change application will be considered to be the application for each New Policy.

**New Policy.** The exchange must be to a flexible premium adjustable life plan, on a form designated by the Company for such purpose. The Company will have at least one form available for exchanges. Each New Policy issued will be based on the sex, age, class of risk and smoking status of the applicable Joint Insured as of the date the original policy was issued. The premiums for each New Policy will be based on our published rates in effect on the date of the request to split the Original Policy. Riders that form a part of the Original Policy, and any new riders requested, will become a part of each New Policy only if the Company agrees to provide them on the date of the exchange. Each New Policy will take effect immediately upon termination of the Original Policy. Under no circumstances will we pay a death benefit under both the Original Policy and the New Policy on the same insured.

The policy date of the New Policy will be the same date as the policy date of the Original Policy.

**Loans and Assignment.** Any policy loan will be divided and transferred on a pro rata basis to each New Policy. If there is an assignment on the Original Policy and you want to carry over that assignment to the New Policy, you will need to execute a new assignment.

**Exchange Adjustments.** The following adjustments may be made at the time of the exchange:

1. If one of the Joint Insureds does not receive a New Policy and the Original Policy is still in the surrender penalty period, a pro rata surrender penalty will be deducted from the portion of the accumulation value, less any pro rata loans, attributable to that Joint Insured.

2. If one or both of the Joint Insureds receive a New Policy for less than 50% of the face amount of the Original Policy and the Original Policy is still in the surrender penalty period, we will deduct a pro rata surrender penalty from the accumulation value less any loans not applied to the New Policy. We will also deduct the pro rata portion of the loan not applied to the New Policy from any cash value refunded.

3. If both Joint Insureds receive a new policy for 50% of the face amount of the Original Policy, and the Original Policy is in the surrender penalty period, we will waive the pro rata surrender penalty applicable to the Original Policy.

4. The surrender penalty period, if any, of the new policy will be considered to have begun on the issue date of the Original Policy.

5. The minimum initial premium for each New Policy will be equal to a one time premium which is the cumulative total of the required annual premiums applicable to the New Policy for the number of years that the Original Policy was in force, less the total accumulation value transferred into the New Policy, less any loans transferred into the New Policy.

   This one time premium will be applied to the New Policy as a gross premium.

**Ownership.** If the Joint Insureds are the owners of the Original Policy, each will be the owner of the New Policy on his or her own life. If the owner of the Original Policy is someone other than the Joint Insureds, the owner of the Original Policy will be the owner of each New Policy. If the requested owner(s) of either New Policy is different than that in the Original Policy, we will require a transfer of ownership form completed by the owner(s) of the Original Policy, and we may require evidence of insurable interest in the life of the insured under the New Policy.

1-093 11-196

PAGE 2

A-034

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 37 of 106   Page ID
#:1483
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 36 of 43   Page ID #:82

**Suicide and Incontestability.** If we approve the exchange, the period for which the Joint Insureds were covered prior to the date of the exchange will be used to offset the time period for the suicide exclusion and incontestability provision under the New Policies.

If the Original Policy is contested, subject to the incontestability provision of the Original Policy, we will cancel this rider. If the Original Policy's premiums are refunded under its Suicide exclusion, we will cancel this rider.

**Grace Period.** This rider is subject to the Grace Period provision of the Original Policy.

**Beneficiary.** The beneficiary of the New Policies will be the same as the Original Policy. If, however, the requested beneficiary(ies) on either New Policy is different than in the Original Policy, we will require a change of beneficiary form completed by the owner(s) of the Original Policy, and we may require evidence of insurable interest in the life of the Insured under the New Policy.

**No Cash Value or Dividends.** This rider does not have cash value, and does not participate in our profits or surplus.

**Termination of Rider.** This rider terminates on the earliest of the following dates:

1. the date of the First Death.

2. the date you elect to exchange the Original Policy under this rider or the Option to Split the Policy provision of the Original Policy.

3. the date the Original Policy is changed to paid-up insurance.

4. the date the Original Policy is surrendered or terminated.

5. the date the Original Policy lapses under the Original Policy's grace period provision.

**Reinstatement of the Rider.** If the Original Policy and rider lapse, you may reinstate the rider at the same time the Original Policy is reinstated. We will, however, require acceptable proof of insurability on both Joint Insureds.

**Misstatement of Age.** We will follow these rules:

1. If a misstatement of either Joint Insured's age is found before this option is used and the Original Policy's death benefit is reduced as a result, we will proportionately reduce the face amount of each New Policy.

2. If a misstatement of either Joint Insured's age is found after this option is used, the death benefit amount under the New Policy will be subject to the Misstatement of Age provision of the New Policy.

**Policy Changes.** If the face amount of the Original Policy is changed for any reason, we will proportionately change the benefit amount of the option.

Signed for the Company at Los Angeles, California on the date of issue of this policy.

*James W. Dedrer*

Executive Vice President, General Counsel
And Corporate Secretary

*Thomas J. Curah*

President and CEO

Case 2:18-cv-05422-CAS-GJS Document 108-4 Filed 09/24/19 Page 38 of 106 Page ID
#:1484
Case 2:18-cv-05422-DMG-JC Document 1-1 Filed 06/18/18 Page 37 of 43 Page ID #:83

## AUTOMATIC PREMIUM LOAN ENDORSEMENT
### (for policies containing a Required Annual Premium)

Transamerica Occidental Life Insurance Company has issued this endorsement as a part of the policy to which it is attached.

When the Automatic Premium Loan provision is made effective by the owner in the application at the time of issue, any portion of the required annual premium which remains unpaid at the end of a grace period will be paid by automatic premium loan. These rules will apply:

(1) We will process an automatic premium loan if there is enough net cash value to pay both the required annual premium due and interest due on the automatic premium loan. If there is not enough net cash value to pay both the required annual premium due and the interest on the automatic premium loan, we will not make an automatic premium loan. The policy will then lapse subject to the nonforfeiture provision.

(2) The Automatic Premium Loan will also be subject to all sections of this policy that pertain to policy loans.

(3) If the Automatic Premium Loan provision is made ineffective by the owner in the application at the time of issue, this provision may be requested by the owner. The request must be in the form of a written notice filed at our Home Office. This provision may also be cancelled by written notice by the owner filed in our Home Office.

The Automatic Premium Loan Provision will terminate at the end of the required annual premium period.

Signed for the Company at Los Angeles, California, on the date of issue of the policy.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

1-D02 65-187

A-036

## TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY

## ENDORSEMENT TO MODIFY GRACE PERIOD

Transamerica Occidental Life Insurance Company has issued this endorsement as part of the policy to which it is attached.

While this policy is in force and subject to the terms of this endorsement, certain death benefits of this policy including any layers, Supplemental Adjustable Life Insurance Riders, Full Death Benefit Rider, and the benefits of any Waiver Provision will continue.

### DEFINITIONS

In this endorsement:

**Grace Period** is the 60-day period starting on a monthly policy date or policy anniversary, as described in the policy.

**Net Deposits** mean the total premiums paid, less the sum of any premium refunds, partial surrenders, and surrender penalty free withdrawals since the policy date. In calculating the Net Deposits, premium paid in a policy year prior to the policy year in which it is due will reflect a time value of money at 4 percent per annum.

**Select Monthly Premium** is the amount payable each month during the Select Period to maintain this endorsement. This amount is shown in the Policy Data. This amount may be paid cumulatively in advance.

**Select Period** is the period this endorsement is in effect. This period is shown in the Policy Data.

**We** means Transamerica Occidental Life Insurance Company.

**You** means the Owner.

### HOW IT WORKS

If the Accumulation Value is insufficient to allow the policy to remain in force, it will not enter a grace period and certain death benefits will continue to be available during the Select Period provided that at all times during the Select Period:

(i) there is no outstanding loan; and

(ii) Net Deposits equal or exceed cumulative Select Monthly Premiums due since the Policy Date; and

(iii) the Death Benefit Option in effect is Option 1 and has always been Option 1.

During the period of such continuation, the death benefit will consist of the death benefits under the Base Policy, including any layers, Supplemental Adjustable Life Insurance Riders and Full Death Benefit Rider. The benefits of any Waiver Provision will be continued until the end of the Select Period subject to the same conditions. Any riders other than those specified above will be terminated when the death benefit continuation period begins. Any conversion privileges contained within such other riders must be exercised at that time or forfeited.

If any of the three conditions listed above are not met, the policy and all riders shall enter the 60-day Grace Period as specified in the policy and the policy may lapse. During the Select Period while the Base Policy is in force, this endorsement can be placed back in force after it terminates, by payment of premiums to meet the Net Deposits requirement in (ii) above, provided that all other requirements above are met as well.

We will continue to deduct the monthly deductions from the Accumulation Value as they come due; interest will accrue on the Accumulation Value while the policy remains in force under the terms of this endorsement.

### WAIVER PROVISION

If the policy contains a Waiver Provision benefit and a disability claim is approved while this endorsement is effective, the Select Monthly Premium will be waived. The Select Monthly Premium will be waived for the same length of time that the policy is on waiver. The Select Period will not be extended.

## POLICY CHANGES

If a requested increase or decrease in the face amount of the policy is processed during the Select Period, the Select Monthly Premium will be adjusted from that point forward. The Select Period will not be adjusted.

## AUTOMATIC TERMINATION

This endorsement will automatically terminate upon the first of the following to occur:
1. the cumulative Net Deposits to date are less than cumulative Select Monthly Premiums due since the Policy Date; or,
2. the Select Period has ended; or,
3. the Death Benefit Option on the policy has been changed from Option 1 to another option; or,
4. the policy terminates for any reason.

Signed for Transamerica Occidental Life Insurance Company at Los Angeles, California, and effective on the date of issue of the policy to which this endorsement is attached.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

Case 2:18-cv-05422-CAS-GJS Document 108-4 Filed 09/24/19 Page 41 of 106 Page ID
#:1487
Case 2:18-cv-05422-DMG-JC Document 1-1 Filed 06/18/18 Page 40 of 43 Page ID #:86

## ACCELERATED DEATH BENEFIT OPTION ENDORSEMENT

Transamerica Occidental Life Insurance Company has issued this endorsement as a part of policy number 60060850 ("the policy").

**NOTICE:** Benefits advanced under this option may be taxable. As with all tax matters, the Owner should consult a personal tax advisor to assess the impact of this benefit on the Owner and the policy.

While the policy is in force, we will pay an Accelerated Death Benefit to you, upon your request, subject to all the provisions and limitations of this endorsement.

### DEFINITIONS

In this endorsement:

**Accelerated Death Benefit** is the amount we pay under this option.

**Administrative Fee** is the $250.00 that will be charged at the time each Accelerated Death Benefit is paid.

**Effective Date** is the date we approve your written request to exercise this option.

**Immediate Family Members** are members of either the Insured's or Owner's family who may be described as follows: spouse (includes common law spouse), children, stepchildren, parents, grandparents, grandchildren, brothers and sisters and their spouses (includes common law spouse).

**Insured** means only the Insured covered under the policy and not any other individuals covered for additional riders or benefits.

**Physician** is an individual, other than the Insured, the Owner, or Immediate Family Member, who is a doctor of medicine or osteopathy, licensed in the jurisdiction in which the advice is given or diagnosis is made and who is acting within the scope of that license.

**Policy Basic Death Benefit** means the death benefit provided by the policy, any policy layer, any Supplemental Adjustable Life Insurance Rider and any level term rider on the life of the Insured. It does not include any death benefit provided by any other riders or benefits attached to the policy.

**Policy Charges** means any monthly deductions, any surrender charges or surrender penalties, or any other charges specified in the policy.

**Terminal Illness** is a medical condition, resulting from bodily injury or disease, or both, and:

-- which has been diagnosed by a Physician after the issue date of the policy; and,

-- for which the diagnosis is supported by clinical, radiological, laboratory or other evidence of the medical condition which is satisfactory to us; and,

-- which is not curable by any means available to the medical profession; and,

-- which a Physician certifies is expected to result in death within 12 months of diagnosis and the certification is within 30 days of the Accelerated Death Benefit request.

**"You"** and **"Your"** mean the Owner

### LIMITATIONS

1. The availability of this option is subject to all the terms of the policy, including contestability and suicide.

2. No benefit will be paid if Terminal Illness results from intentionally self-inflicted injury(ies) at any time.

3. At each request to exercise this option, there must be at least 2 years remaining from the Effective Date to the expiry or maturity date of each portion of the Policy Basic Death Benefit.

4. The Owner may not exercise this option:

   a) if required by law to use the Accelerated Death Benefit to meet the claims of creditors, whether in bankruptcy or otherwise, or

   b) if required by a government agency to use the Accelerated Death Benefit in order to apply for, obtain, or otherwise keep a government benefit or entitlement, or

   c) until there is only one surviving Joint Insured if the policy is a Joint and Last Survivor policy.

5. This option is not available if the maximum Accelerated Death Benefit has been paid.

6. The face amount of the policy on which this option is exercised must be at least $50,000 at the time of the first written request.

1-005 84-195

PAGE 1

Case 2:18-cv-05422-CAS-GJS   Document 108-4   Filed 09/24/19   Page 42 of 106   Page ID
#:1488
Case 2:18-cv-05422-DMG-JC   Document 1-1   Filed 06/18/18   Page 41 of 43   Page ID #:87

## AMOUNT OF THE ACCELERATED DEATH BENEFIT

1. The Owner can request an Accelerated Death Benefit payment in any amount subject to the following minimum and maximum. The minimum Accelerated Death Benefit allowed will be $10,000. The maximum Accelerated Death Benefit allowed for all policies combined covering the Insured issued by the Company will be the lesser of $250,000 or 75% of the combined Policy Basic Death Benefit for those policies as of the first Accelerated Death Benefit payment. If the first Accelerated Death Benefit payment is less than the maximum, then no more than the remaining balance of the maximum can be paid out later as an Accelerated Death Benefit.

2. If there is an outstanding loan on the policy, the Accelerated Death Benefit payment may be reduced to repay a prorata portion of the policy loan.

3. At the time we pay the Accelerated Death Benefit, if the policy is in the grace period, we will deduct any unpaid premium in accordance with the grace period provision in the policy.

4. The $250.00 Administrative Fee will be deducted from each Accelerated Death Benefit payment.

## PREMIUM

Premium billing and premium payment requirements will continue, subject to the adjustments described below.

## EFFECT OF THE ACCELERATED DEATH BENEFIT PAYMENT ON THE POLICY

After an Accelerated Death Benefit is paid, the policy and any riders and benefits will remain in force subject to the following adjustments:

1. The Policy Basic Death Benefit after payment of an Accelerated Death Benefit will equal the amount of the Policy Basic Death Benefit before the payment of the Accelerated Death Benefit minus the result of multiplying (a) by (b), where:

   (a) is the Accelerated Death Benefit; and

   (b) is 1 (one) plus an interest rate that is the greater of,

   (i) the federal interest rate under Internal Revenue Code (IRC) section 846(c)(2), or

   (ii) the policy loan effective interest rate.

2. The Policy Basic Death Benefit, and, if applicable, the policy's face amount, accumulation value, cash value, policy loan, and required premium will be adjusted as of the Effective Date. The adjustments to the Policy Basic Death Benefit will be made in the following order: (1) level term rider(s) on the Insured, if any, beginning with the most recent rider; (2) policy layer(s), if any, beginning with the most recent layer; and, (3) remaining portions of the Policy Basic Death Benefit. New Policy Charges and premiums will be based on the rates in effect for the policy's resulting face amount.

3. We will provide new policy data pages showing the reduced coverage amount resulting from the Accelerated Death Benefit payment.

## EXERCISING THE OPTION

We must receive a written request to exercise this option at the Home Office or our designated Administrative Office within 30 days after the certification of diagnosis of the Terminal Illness, or as soon as reasonably possible. The request should include the name of the Insured, the policy number and, must be signed and dated by the Owner. If the policy has an irrevocable beneficiary, that person(s) must also sign the request. If the policy is assigned, we must receive a completed and signed release of assignment. If the policy was issued in a community property state, we may require your spouse to sign the request.

## PROOF OF TERMINAL ILLNESS

We must receive written proof of the Insured's Terminal Illness before we make an Accelerated Death Benefit payment. This proof will consist of a Physician's certification acceptable to us. We may request additional medical information from the Physician submitting the certification or any Physician we consider qualified.

## PHYSICAL EXAMINATION

While a claim is pending, we reserve the right to obtain a second medical opinion and to have the Insured examined at our expense.

## TIME OF PAYMENT OF CLAIMS

After we receive satisfactory written proof of Terminal Illness, we will pay the Accelerated Death Benefit due.

## PAYMENT OF CLAIMS

If approved, the Accelerated Death Benefit will be paid in a lump sum to the Owner. If the Insured dies before payment is made, we will pay the entire death benefit of the policy to the Beneficiary in accordance with the policy provisions.

## LEGAL ACTIONS

No legal action may be brought to recover the payment requested under this option within 60 days after written proof of Terminal Illness has been given to us. No such action may be brought after 3 years from the time written proof of the Insured's Terminal Illness has been given to us.

## LIVING BENEFIT RIDER

If the policy contains a Living Benefit Rider and there is a simultaneous request to exercise the Living Benefit and the Accelerated Death Benefit Option, the Living Benefit request will be processed first; the Accelerated Death Benefit Option request will be processed second and will be based on the adjusted policy values resulting after payment of the Living Benefit.

## TAX QUALIFICATION

Any amount payable under this option is intended to qualify for federal income tax exclusion (to the maximum extent possible). To that end, the provisions of this endorsement and the policy to which it is attached are to be interpreted to ensure or maintain such tax qualification, notwithstanding any other provisions to the contrary. The Company reserves the right to amend this endorsement and the policy to which it is attached to reflect any clarifications that may be needed or are appropriate to maintain such qualification, or to conform this endorsement and the policy to which it is attached to any applicable changes in the tax qualification requirements. You will be sent a copy of any such amendment.

Signed for the Company at Los Angeles, California, on the date of issue of the policy unless a different date is shown here.

Executive Vice President, General Counsel
And Corporate Secretary

President and CEO

1-005 84-195

PAGE 3

A-041

Transamerica Occidental
Life Insurance Company
1150 South Olive Street
Los Angeles, CA  90015

Policy Form   **TSSL–EA**
Individual Life Insurance

Joint and Last Survivor Life Insurance
Minimum Premium Requirement
for the First Five Policy Years
Flexible Premiums Payable Thereafter During
Life of the Survivor of the Joint Insureds
Subject to the Limitations Described
in the Premiums Provision

Death Benefit Payable at Death of
Survivor Before Exact Age **115**
Net Cash Value, if Any, Payable at
Policy Anniversary Nearest
Exact Age **115**

Nonparticipating – No Annual Dividends

1–17806196

A-042

# EXHIBIT 5

## CONDITIONALLY FILED UNDER SEAL

# EXHIBIT 6

## CONDITIONALLY FILED UNDER SEAL

# EXHIBIT 7

1
2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

3

4   GAIL THOMPSON, HANS SUNDER in his
    capacity as Trustee for the SUNDER
5   IRREVOCABLE TRUST, BELINDA
    BUCCI, in her capacity as Trustee of the
6   NANCY AND CHARLES BARCELONA
    IRREVOCABLE TRUST, DEBRA LEWIS,
7   DIANA LEWIS, MICHAEL H. STEPHENS,
8   SANDRA ROSNER in her capacity as
    Trustee of the ROSNER 1998
9   IRREVOCABLE TRUST DATED 5/19/98,
10  KATHLEEN M. SWIFT, and MARC
    SOBLE, as Trustee for the MARILYN B.
11  SOBLE IRREVOCABLE TRUST DATED
12  11/19/1997, individually and on behalf of
    themselves and all others similarly situated,
13

14          Plaintiffs,

15      vs.

16
17  TRANSAMERICA LIFE INSURANCE
    COMPANY,
18

19          Defendant.

20

Case No. 2:18-CV-05422

Honorable Christina A. Snyder

**DECLARATION OF
DEBRA LEWIS IN
SUPPORT OF
MOTION FOR CLASS
CERTIFICATION**

CLASS ACTION

21      I, Debra Lewis, hereby declare as follows:

22      1.      I make this declaration in support of the Motion for Class Certification.

23  I have personal knowledge of the facts stated herein, and if called upon as a witness,

24
25  I would and could testify competently to the matters set forth herein.

26
27  DECLARATION OF DEBRA LEWIS - 1
28

2.      I was the owner of a TransSurvivor 115 universal life insurance policy (Policy No. 60027700) issued on or about June 3, 1998, with a face amount of $375,000.  The insured passed away on May 28, 2019, and my claim was made on that policy on June 18, 2019.

3.      I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.      I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.      In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.      I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

7.      I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

DECLARATION OF DEBRA LEWIS - 2

1        I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4

5    Executed this _5th_ day of _August_ , 2019 at ___7:30 PM___ .

6

7

8    _____

9               DEBRA LEWIS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   **DECLARATION OF DEBRA LEWIS - 3**

28

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GAIL THOMPSON, HANS SUNDER in his capacity as Trustee for the SUNDER IRREVOCABLE TRUST, BELINDA BUCCI, in her capacity as Trustee of the NANCY AND CHARLES BARCELONA IRREVOCABLE TRUST, DEBRA LEWIS, DIANA LEWIS, MICHAEL H. STEPHENS, SANDRA ROSNER in her capacity as Trustee of the ROSNER 1998 IRREVOCABLE TRUST DATED 5/19/98, KATHLEEN M. SWIFT, and MARC SOBLE, as Trustee for the MARILYN B. SOBLE IRREVOCABLE TRUST DATED 11/19/1997, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>  vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>        Defendant. | Case No. 2:18-CV-05422<br><br>Honorable Christina A. Snyder<br><br>**DECLARATION OF DIANA LEWIS IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>CLASS ACTION |

I, Diana Lewis, hereby declare as follows:

1.    I make this declaration in support of the Motion for Class Certification. I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

DECLARATION OF DIANA LEWIS - 1

2.    I was the owner of a TransSurvivor 115 universal life insurance policy (Policy No. 60026807) issued on or about June 3, 1998, with a face amount of $375,000. The insured passed away on May 28, 2019, and my claim was made on that policy on June 25, 2019.

3.    I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.    I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.    In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.    I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

7.    I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

DECLARATION OF DIANA LEWIS - 2

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3

4

5   Executed this ___3___ day of _August_, 2019 at ___5:19 pm_____.

6

7

8   _____Diane Ls_____

9             **DIANA LEWIS**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   DECLARATION OF DIANA LEWIS - 3

28

# EXHIBIT 9

1
2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

3

4   GAIL THOMPSON, HANS SUNDER in his
    capacity as Trustee for the SUNDER
5   IRREVOCABLE TRUST, BELINDA
    BUCCI, in her capacity as Trustee of the
6   NANCY AND CHARLES BARCELONA
7   IRREVOCABLE TRUST, DEBRA LEWIS,
    DIANA LEWIS, MICHAEL H. STEPHENS,
8   SANDRA ROSNER in her capacity as
9   Trustee of the ROSNER 1998
    IRREVOCABLE TRUST DATED 5/19/98,
10  KATHLEEN M. SWIFT, and MARC
11  SOBLE, as Trustee for the MARILYN B.
    SOBLE IRREVOCABLE TRUST DATED
12  11/19/1997, individually and on behalf of
13  themselves and all others similarly situated,

14          Plaintiffs,

15      vs.

16
17  TRANSAMERICA LIFE INSURANCE
    COMPANY,
18

19          Defendant.

Case No. 2:18-CV-05422

Honorable Christina A. Snyder

**DECLARATION OF
SANDRA ROSNER IN
SUPPORT OF MOTION
FOR CLASS
CERTIFICATION**

CLASS ACTION

20

21          I, Sandra Rosner, hereby declare as follows:

22          1.      I make this declaration in support of the Motion for Class Certification.
23
24  I have personal knowledge of the facts stated herein, and if called upon as a witness,

25  I would and could testify competently to the matters set forth herein.

26

27  DECLARATION OF SANDRA ROSNER - 1

28

2.     I am the Trustee of the Rosner 1998 Irrevocable Trust (the "Rosner Trust"). The Rosner Trust holds a 50% interest in a TransUltra 115 universal life insurance policy (Policy No. 60026965) insuring the life of Elena Rosner, currently 94 years old. The policy was issued on or about January 16, 1999, with a face amount of $500,000.

3.     I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.     I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.     In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.     I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

DECLARATION OF SANDRA ROSNER - 2

7.     I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _6_ day of _August_, 2019 at _Glendale, OH_____.


_Sandra Rosner_____
SANDRA ROSNER

DECLARATION OF SANDRA ROSNER - 3

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

GAIL THOMPSON, HANS SUNDER in his capacity as Trustee for the SUNDER IRREVOCABLE TRUST, BELINDA BUCCI, in her capacity as Trustee of the NANCY AND CHARLES BARCELONA IRREVOCABLE TRUST, DEBRA LEWIS, DIANA LEWIS, MICHAEL H. STEPHENS, SANDRA ROSNER in her capacity as Trustee of the ROSNER 1998 IRREVOCABLE TRUST DATED 5/19/98, KATHLEEN M. SWIFT, and MARC SOBLE, as Trustee for the MARILYN B. SOBLE IRREVOCABLE TRUST DATED 11/19/1997, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

TRANSAMERICA LIFE INSURANCE COMPANY,

Defendant.

Case No. 2:18-CV-05422

Honorable Christina A. Snyder

**DECLARATION OF MARC SOBLE IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

CLASS ACTION

I, Marc Soble, hereby declare as follows:

1.    I make this declaration in support of the Motion for Class Certification. I have personal knowledge of the facts stated herein, and if called

DECLARATION OF MARC SOBLE- 1

upon as a witness, I would and could testify competently to the matters set forth herein.

2.      I am a Co-Trustee of the Marilyn Soble Irrevocable Trust (the "Soble Trust") The Soble Trust is the owner of a TransSurvivor 97 universal life insurance policy (Policy No. 60021270) insuring the lives of Jerome and Marilyn Soble. The policy was issued on or about December 23, 1997, with a face amount of $2,200,000.

3.      I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.      I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.      In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

DECLARATION OF MARC SOBLE- 2

6.      I understand that as a class representative, I will have the duty to
represent the interests of all unnamed class members. To my knowledge, I do not
have any conflicts of interest with the absent class members or individual
interests that could be deemed antagonistic to the interests of the class.

7.      I have never sought to be appointed as a class representative on
behalf of a class in any other litigation.

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.


Executed this ___8th___ day of ___August___, 2019 at 28411 Northwestern
Hwy ; Ste. 1150, Southfield
MI 48034

_____
MARC SOBLE

DECLARATION OF MARC SOBLE- 3

# EXHIBIT 11

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

GAIL THOMPSON, HANS SUNDER in his
capacity as Trustee for the SUNDER
IRREVOCABLE TRUST, BELINDA
BUCCI, in her capacity as Trustee of the
NANCY AND CHARLES BARCELONA
IRREVOCABLE TRUST, DEBRA LEWIS,
DIANA LEWIS, MICHAEL H. STEPHENS,
SANDRA ROSNER in her capacity as
Trustee of the ROSNER 1998
IRREVOCABLE TRUST DATED 5/19/98,
KATHLEEN M. SWIFT, and MARC
SOBLE, as Trustee for the MARILYN B.
SOBLE IRREVOCABLE TRUST DATED
11/19/1997, individually and on behalf of
themselves and all others similarly situated,

        Plaintiffs,

   vs.

TRANSAMERICA LIFE INSURANCE
COMPANY,

        Defendant.

Case No. 2:18-CV-05422

Honorable Christina A. Snyder

**DECLARATION OF
MICHAEL H. STEPHENS
IN SUPPORT OF
MOTION FOR CLASS
CERTIFICATION**

CLASS ACTION

I, Michael H. Stephens, hereby declare as follows:

1.     I make this declaration in support of the Motion for Class Certification.

I have personal knowledge of the facts stated herein, and if called upon as a witness,

I would and could testify competently to the matters set forth herein.

DECLARATION OF MICHAEL H. STEPHENS - 1

2.      I am the owner of a TransUltra 115 universal life insurance policy (Policy No. 60037601). The policy was issued on or about November 25, 1998, with a face amount of $500,000.

3.      I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.      I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.      In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.      I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

7.      I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

DECLARATION OF MICHAEL H. STEPHENS - 2

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4

5    Executed this _6 th_ day of _AUGUST_, 2019 at _DALLAS, TX_                .

6

7

8                                    _Michael H. Stephens_
9                                    MICHAEL H. STEPHENS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    DECLARATION OF MICHAEL H. STEPHENS - 3

28

# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GAIL THOMPSON, HANS SUNDER in his capacity as Trustee for the SUNDER IRREVOCABLE TRUST, BELINDA BUCCI, in her capacity as Trustee of the NANCY AND CHARLES BARCELONA IRREVOCABLE TRUST, DEBRA LEWIS, DIANA LEWIS, MICHAEL H. STEPHENS, SANDRA ROSNER in her capacity as Trustee of the ROSNER 1998 IRREVOCABLE TRUST DATED 5/19/98, KATHLEEN M. SWIFT, and MARC SOBLE, as Trustee for the MARILYN B. SOBLE IRREVOCABLE TRUST DATED 11/19/1997, individually and on behalf of themselves and all others similarly situated, | Case No. 2:18-CV-05422<br><br>Honorable Christina A. Snyder<br><br>**DECLARATION OF HANS SUNDER IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>CLASS ACTION |
| Plaintiffs, | |
| vs. | |
| TRANSAMERICA LIFE INSURANCE COMPANY, | |
| Defendant. | |

I, Hans Sunder, hereby declare as follows:

1.     I make this declaration in support of the Motion for Class Certification. I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

DECLARATION OF HANS SUNDER - 1

2.      I am the Trustee of the Sunder Irrevocable Trust (the "Sunder Trust"). The Sunder Trust TransSurvivor 115 universal life insurance policy (Policy No. 60063911) insuring the lives of Klaus J. Sunder and Monica V. Sunder issued on or about October 1, 2000, with a face amount of $2,000,000.

3.      I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.      I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and will be available and prepared for my deposition.

5.      In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.      I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

DECLARATION OF HANS SUNDER - 2

7.      I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  7th  day of  August , 2019 at  Naty, TX                          .


_____
HANS SUNDER

DECLARATION OF HANS SUNDER - 3

# EXHIBIT 13

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

GAIL THOMPSON, HANS SUNDER in his capacity as Trustee for the SUNDER IRREVOCABLE TRUST, BELINDA BUCCI, in her capacity as Trustee of the NANCY AND CHARLES BARCELONA IRREVOCABLE TRUST, DEBRA LEWIS, DIANA LEWIS, MICHAEL H. STEPHENS, SANDRA ROSNER in her capacity as Trustee of the ROSNER 1998 IRREVOCABLE TRUST DATED 5/19/98, KATHLEEN M. SWIFT, and MARC SOBLE, as Trustee for the MARILYN B. SOBLE IRREVOCABLE TRUST DATED 11/19/1997, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

TRANSAMERICA LIFE INSURANCE COMPANY,

Defendant.

Case No. 2:18-CV-05422

Honorable Christina A. Snyder

**DECLARATION OF KATHLEEN M. SWIFT IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

CLASS ACTION

I, Kathleen M. Swift, hereby declare as follows:

1.     I make this declaration in support of the Motion for Class Certification.

I have personal knowledge of the facts stated herein, and if called upon as a witness,

I would and could testify competently to the matters set forth herein.

DECLARATION OF KATHLEEN M. SWIFT- 1

2.      I am the owner of a TransUltra 115 universal life insurance policy (Policy No. 60041474). The policy was issued on or about April 21, 1999, with a face amount of $250,000.

3.      I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.      I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.      In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.      I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

///

///

///

DECLARATION OF KATHLEEN M. SWIFT- 2

7.     I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _5th_ day of _August_, 2019 at _12:53 p.m._.

_Kathleen M Swift_
KATHLEEN M. SWIFT

DECLARATION OF KATHLEEN M. SWIFT- 3

# EXHIBIT 14

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GAIL THOMPSON, HANS SUNDER in his capacity as Trustee for the SUNDER IRREVOCABLE TRUST, BELINDA BUCCI, in her capacity as Trustee of the NANCY AND CHARLES BARCELONA IRREVOCABLE TRUST, DEBRA LEWIS, DIANA LEWIS, MICHAEL H. STEPHENS, SANDRA ROSNER in her capacity as Trustee of the ROSNER 1998 IRREVOCABLE TRUST DATED 5/19/98, KATHLEEN M. SWIFT, and MARC SOBLE, as Trustee for the MARILYN B. SOBLE IRREVOCABLE TRUST DATED 11/19/1997, individually and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>        Defendant. | Case No. 2:18-CV-05422<br><br>Honorable Christina A. Snyder<br><br>**DECLARATION OF GAIL THOMPSON IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>CLASS ACTION |

I, Gail Thompson, hereby declare as follows:

1.    I make this declaration in support of the Motion for Class Certification. I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

2.     I am elderly and the owner of a TransSurvivor 115 universal life insurance policy (Policy No. 60060850) issued on or about July 1, 2000, with a face amount of $500,000.

3.     I am knowledgeable about the nature of this case and am ready and able to serve as a class representative in this action. I am seeking to be a class representative on behalf of others who were also subjected to Transamerica's 2017 Monthly Deduction Rate increase.

4.     I have dedicated a significant amount of time to this matter, including searching for and producing my documents relevant to this action. I have also kept myself reasonably informed as to the status of the case, and will work with my counsel to respond to discovery requests, and be prepared for my deposition.

5.     In addition to appearing for my deposition, I am willing to make myself available to testify at trial.

6.     I understand that as a class representative, I will have the duty to represent the interests of all unnamed class members. To my knowledge, I do not have any conflicts of interest with the absent class members or individual interests that could be deemed antagonistic to the interests of the class.

7.     Aside from the Transamerica cases, I have never sought to be appointed as a class representative on behalf of a class in any other litigation.

/ / /

/ / /

DECLARATION OF GAIL THOMPSON - 2

1      I declare under penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3

4  Executed this _12ᵗʰ_ day of _August_ 2019 at _White Salmon, WA._

5

6

7  GAIL THOMPSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GAIL THOMPSON - 3

# EXHIBIT 15



## <u>**ABOUT THE FIRM**</u>

Bonnett, Fairbourn, Friedman & Balint, P.C. is an AV rated firm of 20 lawyers. Our clients include many individuals and local businesses, as well as major national and international companies in a wide range of civil litigation in both federal and state courts.

The firm has developed a recognized practice in the area of complex commercial litigation, including major class actions and is widely regarded as the preeminent firm in Arizona representing plaintiffs in class action proceedings. Over the last twenty years, the firm has successfully handled more than 100 class action lawsuits. We have represented consumers and victims in a wide range of class action proceedings, including actions alleging antitrust claims, securities fraud, civil rights claims and consumer fraud.

Our antitrust practice includes the prosecution of class claims on behalf of direct purchasers of products as well as indirect purchaser claims. These antitrust cases include, among others, class actions against Microsoft, MasterCard, Apple Computer and sellers of products such as polyester and rubber chemicals, waste management services, financial products and other industries. In addition to our class action practice, the firm also has represented plaintiffs in individual litigation asserting antitrust claims, including Culligan International.

Bonnett, Fairbourn, Friedman & Balint has taken a leading role in numerous important actions on behalf of consumers and investors, and we have been responsible for many outstanding results that have yielded dozens of multi-million dollar recoveries for class members in Arizona and throughout the United States.

**Bonnett, Fairbourn, Friedman & Balint, P.C.**
**2325 E. Camelback Road, Suite 300**
**Phoenix, Arizona 85016**
**Phone: (602) 274-1100**
**Toll Free Number: (800) 847-9094**
**Facsimile: (602) 274-1199**

# PRACTICE AREAS

## CLASS ACTION

Bonnett, Fairbourn, Friedman & Balint represents consumers and investors in major class action cases in federal and state courts throughout the United States. Under the direction of Andrew S. Friedman, the firm's class action section represents plaintiff classes in the following areas:

> Securities Fraud: Protects institutional shareholders and individual investors from corporate fraud and mismanagement.

> Consumer Protection: Protects consumers from defective products and fraudulent marketing practices.

> Antitrust: Protects individuals and businesses from price fixing, unfair business practices and other anticompetitive conduct.

> Civil Rights and Employment: Protects employees and consumers against unfair practices and racial, age, gender, and other forms of discrimination.

> Insurance and Health Care: Represents victims of fraud and unfair sales practices by life insurance companies and HMOs.

> Tobacco: Seeks redress for fraudulent marketing of "Light" cigarettes as a less toxic version of "Full Flavor" varieties.

> False Claims and Whistleblowers: Provides for awards to individuals who uncover false claims for payment submitted to the federal government.

## SECURITIES

Bonnett, Fairbourn, Friedman & Balint has extensive experience in plaintiffs' class action securities cases in and out of the State of Arizona. Its attorneys have recovered substantial verdicts and settlements in various high-profile cases representing bondholders who have suffered significant losses due to the criminal activities of individuals in the securities and banking industries, including victimized investors in the Lincoln Savings scandal.

## APPELLATE LITIGATION

Bonnett, Fairbourn, Friedman & Balint has extensive appellate experience at all levels of the state and federal court systems. Attorneys from the firm have appeared before the Arizona Court of Appeals, the Arizona Supreme Court, and numerous U.S. Circuit Courts. Decisions to appeal a matter are not made lightly by the firm; we carefully analyze the likelihood of a positive result for the client against the potential cost of an unfavorable outcome. Although we draw on the clerking and practical experience of many of our attorneys in making this analysis, a fully informed client is always an integral part of this process.



**ANDREW S. FRIEDMAN** heads the firm's class action, securities fraud, and consumer fraud practice groups. Mr. Friedman is admitted to the State Bar of Arizona and is admitted to practice before the U.S. District Court for the District of Arizona, U.S. Court of Appeals for the Ninth Circuit and the U.S. Supreme Court.

Mr. Friedman's practice is devoted primarily to litigation of major class action cases in federal and state courts in Arizona and throughout the United States. He has represented plaintiff classes in major consumer, securities fraud, antitrust, civil rights and insurance sales practices cases and other complex commercial litigation.

**Securities Fraud**

Mr. Friedman and other members of the firm served as Arizona counsel for the plaintiff class of investors in *In re American Continental Corp./Lincoln Savings and Loan Sec. Litig.*, MDL 834 (D. Ariz.). Mr. Friedman was one of the team of lawyers who represented the class of investors who purchased debentures and/or stock in American Continental Corp., the parent company of the now-infamous Lincoln Savings & Loan. The suit charged Charles Keating, Jr., other corporate insiders, three major accounting firms, law firms and others with racketeering and violations of the securities laws. Plaintiffs' counsel actively participated in bankruptcy proceedings, multi-district litigation and, ultimately, a jury trial in Tucson, Arizona. Plaintiffs successfully recovered $240 million of the $288 million in losses sustained by the investors. After trial, the jury rendered verdicts exceeding $1 billion against Keating and other defendants.

Mr. Friedman also served, along with other members of the firm, on the court-appointed Executive Committee in the *Prudential Limited Partnerships Multi-District Litigation*, representing investors in limited partnerships sponsored by Prudential Securities. This action, which alleged racketeering and securities fraud claims on behalf of a nationwide class, resulted in a settlement providing more than $125 million in benefits to defrauded investors.

Mr. Friedman has served as plaintiffs' counsel in many other securities fraud class actions, including the following major cases: *Persky v. Pinnacle West Corp., et al.* (securities fraud class action - $35 million settlement); *Culligan International Company v. United Catalysts, Inc.* (Antitrust Action); *Sitgraves, et al. v. Allied Signal, Inc.*; *Stein v. Residential Resources, et al.* (Securities Fraud Class Action); *Gould v. Pinnacle West Corp., et al.*; *Shields v. Del Webb Corp., et al.* (Securities Fraud Class and Derivative Suit); *Hoexter v. Valley National Bank, et al.* (Securities Fraud Class Action); *Friedman, et al. v. Emerald Mortgage Investment Corporation, et al.* (Securities Fraud Class Action); *Marks, et al. v. Circle K* (Securities Fraud Class Action); *Krause v. Sierra Tucson, et al.* (Securities Fraud Class Action); *Braunstein, et al. v. Tucson Electric, et al.* (Derivative Suit); *Krause v. Sierra Pacific, et al.* (Securities Fraud Class Action); *Blinn v. Bech, et al.* (Securities Fraud Class Action); *Voss v. Cobra Industries, et al.* (Securities Fraud Class Action); *Hollywood Park Securities Litigation* (Securities Fraud Class Action); *In re America West Sec. Fraud Litig.* (Securities Fraud Class Action); *Orthologic Securities Fraud Litig.* (Securities Fraud Litigation); and *In re Vitamins Antitrust Litigation* (Antitrust Class Action).

Mr. Friedman also served as lead counsel in a number of class action cases seeking relief on behalf of investors victimized by fraudulent investment schemes, brought against professional defendants who allegedly substantially assisted in the fraud. Mr. Friedman served as co-lead counsel for investors in *Facciola, et al. v. Greenberg Traurig LLP, et al.*, a class action asserting claims against law firms and an auditor for allegedly aiding and abetting a Ponzi scheme leading to the collapse of Mortgages, Ltd.

After class certification was granted and at the conclusion of discovery, Plaintiffs secured settlements with the defendants totaling $89 million.  At the conclusion of the case, the Hon. Frederick J. Martone observed:

> Class counsel were retained on a purely contingent basis in a complex case fraught with uncertainty.  Counsel advanced litigation costs in excess of $1.5 million in order to prosecute this action, shouldering the risk of non-payment.  Absent class counsels' willingness to advance these litigation costs, there likely would have been no common fund.  Finally, counsel have demonstrated outstanding expertise, diligence, and professionalism at every stage of this litigation.

Mr. Friedman also served as lead counsel in *Gordon Noble, et al. v. Greenberg Traurig LLP, et al.,* a class action in the California Superior Court asserting claims on behalf of investors against law firms, auditors and a lender for their involvement in an alleged Ponzi scheme orchestrated by a hard money lender.  After several years of hotly contested litigation, plaintiffs obtained settlements for the investor class members totaling $83 million.

Mr. Friedman and other members of the firm served as class counsel in *In re Apollo Group, Inc. Securities Litig.*, an open market securities fraud case seeking redress for allegedly false statements made by the Apollo Group, Inc. in publicly filed registration statements.  After trial, the jury returned a verdict of $275 million for the Apollo shareholders, one of the largest jury verdicts ever obtained in a securities fraud case prosecuted through trial.  At the conclusion of the trial, the presiding judge commented:

> [trial counsel] brought to this courtroom just extraordinary talent and preparation … [F]or the professionalism and the civility that you – and the integrity that you have all demonstrated and exuded throughout the handling of this case, it has just, I think, been very, very refreshing and rewarding to see that…[W]hat I have seen has just been truly exemplary.

**Deceptive Marketing of Insurance Products**

Mr. Friedman served as co-lead counsel for the certified nationwide plaintiff classes in *In re Conseco Life Insurance Company Cost of Ins. Litig.*, MDL 1610 (C.D. Cal.).  The suit charged that Conseco breached the terms of life insurance policies owned by over 90,000 class members. After nearly two years of litigation against an entrenched adversary, the class recovered over $400 million in damages.

Mr. Friedman and the firm were key members of a team of lawyers that brought landmark cases against major life insurance companies challenging the deceptive manner in which life insurance products were marketed to consumers during the 1980's. The first of these cases, against New York Life Insurance Co., arose from events uncovered in Arizona and resulted in a ground-breaking settlement providing benefits to class members exceeding $250 million. This settlement has been praised by regulators and commentators as an innovative solution to sales practice abuses. Subsequently, Mr. Friedman and co-counsel for plaintiffs prosecuted class actions and secured settlements against a host of other major insurance companies, including settlements with *Prudential Life Insurance Company* (exceeding $2 billion), *Metropolitan Life Insurance Company* (exceeding $1 billion), *Manulife* (exceeding $500 million) and more than 20 other companies. Mr. Friedman was instrumental in the prosecution of these actions, was a member of the settlement negotiating team and briefed and argued class certification issues at the trial level and in the appellate courts.

Mr. Friedman served as co-lead counsel in a series of class actions against insurance companies challenging the sale of deferred annuities to senior citizens.  These cases alleged RICO claims and

other theories to obtain redress for allegedly false and misleading representations inducing elderly purchasers to invest their life savings in illiquid and poorly performing annuity products.   Mr. Friedman and co-counsel for plaintiffs prosecuted class actions and secured settlements benefitting thousands of elderly consumers, including settlements with *Allianz Life Insurance Company of North America* ($251 million)*, American Equity Investment Life Insurance Company* ($129 million), *Midland National Life Insurance Company* ($80 million)*,* as well as settlements with *Fidelity and Guaranty Life Insurance Company, National Western Life Insurance Company, Conseco Insurance Company; Jackson National Life Insurance Company,* and *American International Group, Inc.*

**Universal Life Cost of Insurance Increases**

Mr. Friedman served as co-lead counsel for the Plaintiff in *Yue v. Conseco Life Ins. Co.*, CV08-1506 and *Yue v. Conseco Life Ins. Co.,* CV11-9506, class actions challenging the legality of cost of insurance ("COI") increases imposed on universal life policies.   These cases alleged that Conseco Insurance Company unlawfully increased the COI charges in violation of the provisions of the universal life policies allowing such increases based only on worsening mortality experience.   The actions alleged that mortality has improved, not worsened over the years (because people are living longer).   Conseco withdrew the COI increases during the pendency of the first case but then sought to impose a new increase shortly thereafter.   Accordingly, the Plaintiff initiated a new action against Conseco challenging the new COI increase.   The Court certified the proposed class of policyholders and issued an injunction halting the challenged increase.   Plaintiff thereafter moved for summary judgment against Conseco.   A settlement was ultimately reached which required Conseco to roll back the challenged COI increases, thereby providing settlement benefits to class members with a total projected value of $65 million.

Mr. Friedman served as co-lead counsel for the Plaintiffs in *Feller, et. al. v. Transamerica Life Insurance Company*, a class action challenging increases to the monthly deduction rates ("MDR") imposed by Transamerica on various universal life policies.   Plaintiffs alleged that the MDR increases implemented by Transamerica breached a uniform, express contractual term in the standardized Policies prohibiting MDR increases that recoup past losses.   The district court certified a nationwide class of Policyholders and a California state law class of Policyholders.   A settlement was ultimately reached which included a monetary payment to class members and a five-year moratorium on any future MDR increases.   The monetary relief provided under the settlement totaled over $100 million.

**Captive Reinsurance Transactions**

Mr. Friedman represented plaintiffs in cases asserting that life insurance companies have offloaded insurance liabilities to affiliated captive reinsurance companies to weaken policy reserves and falsely inflate reported surplus.   Plaintiffs alleged that the defendant insurance companies used these fraudulent practices to misrepresent their true financial condition to induce consumers to purchase annuities and other insurance products.   These cases, which asserted claims under the federal anti-racketeering statutes, included *Ludwick v. Harbinger Group, et al.* and *Hudson v. Athene Annuity and Life Company, et al.*

**Health Insurance**

Mr. Friedman served as co-lead counsel representing health care providers in *In re Managed Care Litigation*, an MDL proceeding against major managed care companies seeking recovery for allegedly improper claims payment practices.   Mr. Friedman represented the American Psychological Association, the American Podiatric Medical Society, the Florida Chiropractic Association and

numerous individual providers in cases against Humana, Inc., CIGNA, numerous Blue Cross and Blue Shield companies and other managed care companies. Mr. Friedman and his co-counsel secured settlements against CIGNA ($72 million) and Humana, Inc. ($20 million) in these MDL proceedings.

Mr. Friedman also is representing health care providers in proceedings against several major health care companies arising from the use of the Ingenix database to improperly reduce payments to patients, physicians and other providers. Defendants in these class action proceedings include Aetna, CIGNA and WellPoint, Inc. Mr. Friedman represents the New Jersey Psychological Association, the American Podiatric Medical Association, the California Chiropractic Association and the California Psychological Association, among other plaintiffs, in these actions.

Mr. Friedman also represented plaintiffs in class action proceedings in California against Blue Shield of California Life & Health Insurance Company for engaging in postclaims underwriting. Postclaims underwriting is a practice by which insurance companies fail to conduct underwriting before accepting insurance applications but seek to find grounds to rescind health insurance policies when a claim for payment is submitted by the patient or doctor.

Mr. Friedman currently represents plaintiffs in a class action against Magellan and Blue Shield of California for violation of ERISA arising out of defendants' denial or reduction in hours of Applied Behavior Analysis ("ABA") for the treatment of Autistic Spectrum Disorder ("ASD"). Plaintiffs allege that Defendants breached their fiduciary duties by adopting and utilizing medical necessity criteria and claims determination guidelines that are far more restrictive than those that are generally accepted medical practice for the treatment of ASD by the mental health community and the prevailing well-documented scientific research.

**Civil Rights**

Mr. Friedman and the firm, along with several other law firms, have represented African-American policy holders in class action proceedings against life insurance companies seeking relief under the Federal Civil Rights Act for racial discrimination in the sale and administration of life insurance policies. For many decades, life insurance companies routinely charged higher premiums to non-Caucasians for inferior life insurance policies. The first such action, against *American General Life & Accident Company*, resulted in a $250 million settlement providing benefits that included cash refunds, increased death benefits and reduced future premiums. Mr. Friedman and the firm also represent plaintiffs in similar race discrimination class actions against other life insurance companies, including *Metropolitan Life*, *Liberty National*, *American National*, *Monumental Life*, *Western & Southern Life* and *Jefferson-Pilot Life Insurance Company*.

Mr. Friedman served as lead or co-lead counsel in many other actions seeking to hold financial institutions responsible for racial discrimination against minorities. He served as co-lead counsel on behalf of proposed classes of African-American and Latino borrowers asserting claims against mortgage lenders for racial discrimination in violation of the Equal Credit Opportunity Act and the Fair Housing Act. The bank defendants in these actions, among others, include: *Countrywide Financial Corporation; Wells Fargo Bank, N.A.; GreenPoint Mortgage Funding, Inc.; GE Money Bank; First Franklin Financial Corp.; JP Morgan Chase & Chase Bank, U.S.A., N.A.; H&R Block, Inc.; IndyMac Bank, F.S.B.; HSBC Finance Co.,* and *Option One Mortgage Co.* Mr. Friedman also has represented Plaintiffs in cases challenging the use of credit scoring by insurance companies and lenders in a manner that adversely impacts minority consumers.

**Data Breach Litigation**

Mr. Friedman and other lawyers of the firm have represented consumers and health care patients in cases arising from cyber-attacks against companies resulting in the theft of personal information, including credit card and personal health information.

Mr. Friedman represented the Chapter 7 trustee for CardSystems Solutions, Inc. in two separate actions in the Pima County Superior Court. CardSystems was a major credit and debit card processor that collapsed into bankruptcy in 2006.  CardSystems failed to properly encrypt credit card data and was the victim of a hacking intrusion resulting in the disclosure of confidential information and identity theft. The CardSystems security breach, which was the largest reported breach of personal data (exposing as many as 40 million credit cards), sparked a national scandal and hearings before the U.S. Senate.  After obtaining a judgment against former officers of CardSystems in the amount of $7.5 million, Mr. Friedman represented the bankruptcy trustee in an action against the insurance company and ultimately secured a payment of $1.25 million.

**Professional Associations**

Mr. Friedman has lectured at numerous continuing legal education programs, including panel discussions and presentations on the Private Securities Litigation Reform Act (1996 Federal Bar Convention), prosecution of nationwide class actions in state courts (1996 ABA Annual Convention), litigation of life insurance market conduct cases (1997, 1999 and 2000 PLI conferences), class action best practices (2011 Arizona State Bar), consumer rights litigation (2008), the Arizona Securities Act (2013 Arizona State Bar), mediation of complex cases (2016 American Bar Association) and other litigation programs sponsored by the Practicing Law Institute, ALI-ABA, American Bar Association, National Academy of Elder Law Attorneys .

Mr. Friedman testified before the U.S. Congress in connection with proposed legislation to limit the rights of consumers in class action cases.  He also has testified before the Arizona Legislature in connection with legislation on the Arizona Anti-Racketeering Act, the Arizona Securities Fraud Act and proposed legislation to limit the ability of consumers to obtain relief through class actions.

Mr. Friedman received his Bachelor of Arts Degree from the University of Rochester in 1975 (high distinction) and his Law Degree from Duke University School of Law in 1978 (Order of the Coif, high distinction).  He serves as a Board member of Public Justice, a public interest organization and is also a member of the American Association of Justice and Consumer Attorneys of California.  Mr. Friedman was a finalist for the Public Justice Trial Lawyer of the Year in 2008 and a finalist for the CAOC Consumer Attorney of the Year in 2009.

Mr. Friedman served as a Board member of the Public Justice Foundation and currently serves as a Board member of Public Citizen.  Mr. Friedman has performed *pro bono* services on behalf of non-profit organizations, including the Jewish Children and Family Services and private litigants.

Mr. Friedman is a founding member of Bonnett, Fairbourn, Friedman & Balint.



**FRANCIS J. BALINT, JR.**'s practice focuses on consumer class action litigation, qui tam actions under the federal False Claims Act, insurance coverage and defense matters, and appellate work.  He has represented clients in class litigation involving federal and state securities laws, deceptive insurance sales practices, and other consumer claims.  In particular, Mr. Balint served as counsel for the relator in *Todarello v. Beverly Enterprises*, (D. Ariz. & N.D. Cal.) a qui tam action which led to a recovery by the United States Government of $170 million. Successful appellate decisions include: *Atchison, Topeka and Santa Fe Ry. Co. v. Brown & Bryant*, Inc., 159 F.3d 358 (9th Cir. [Cal.] Oct. 14, 1998); *Taylor AG Industries v. Pure-Gro*, 54 F.3d 555 (9th Cir. [Ariz.], Apr. 24, 1995); *Ranch 57 v. City of Yuma*, 152 Ariz. 218, 731 P.2d 113 (Ariz. App. Div. 1, Sept. 2, 1986).  Mr. Balint is a former President of the Arizona Association of Defense Counsel (1999-2000), a former member of its board of directors and former chairman of its Amicus Committee.

Mr. Balint served as co-counsel for the Lead Plaintiffs and the investor class in the litigation arising out of the collapse of the Baptist Foundation of Arizona, the largest charitable institution fraud case in United States history. The recovery achieved for investors, after four years of highly adversarial litigation, exceeded $250 million.

Mr. Balint also served as co-counsel for the Lead Plaintiff, the Policemen's Annuity and Benefit Fund of Chicago, and a class of shareholders seeking relief under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. *In re Apollo Group, Inc.*, CV-04-2147-PHX-JAT (D. Ariz.) was one of only six such cases to have been taken to trial since the passage of the PSLRA. Lead Plaintiff successfully obtained a verdict of approximately $275 million for Apollo shareholders.

Other class action cases which Mr. Balint has litigated include *Cheatham v. ADT LLC* (Consumer Protection); *Harshbarger v. The Penn Mutual Life Insurance Company* (Policyholder Protection); *The Apple iPod iTunes Anti-Trust Litigation* (Antitrust); *Facciola v. Greenberg Traurig* (Securities Fraud); *In Re: Prudential Insurance Company of America SGLI/VGLI Contract Litigation* (Policyholder Protection); *Yue v. Conseco Life Insurance Company* (Policyholder Protection); *Orthologic Securities Fraud Litigation*. (Securities Fraud); *In re Skymall* (Securities Fraud); *Rogers v. American Family* (Policyholder Protection).

Mr. Balint received his Bachelor of Arts Degree with high distinction from the University of Virginia in 1979.  He received his law degree in 1982 from the University of Virginia.  Mr. Balint was admitted to the Bar in the Commonwealth of Virginia in 1982, the District of Columbia 1982, the State of Arizona in 1983, and the Commonwealth of Massachusetts in 2010; he is admitted to practice before the U.S. Supreme Court, the U.S. Court of Appeals for the Fourth, Fifth, Seventh, Ninth and Tenth Circuits, and the U.S. District Court for the District of Arizona, the District of Colorado, the Eastern District of Virginia, the Central District of Illinois and the District of Massachusetts.

Mr. Balint was a sole practitioner in Virginia for a short period of time before becoming associated with Evans, Kitchel & Jenkes, P.C., a large Phoenix law firm.  In 1984, Mr. Balint became a founding member of Bonnett, Fairbourn, Friedman & Balint, P.C.

## BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.


## ATTORNEYS


**WILLIAM G. FAIRBOURN**, born Salt Lake City, Utah, April 21, 1947; admitted to bar, 1973, Arizona; Arizona Supreme Court; U.S. District Court, District of Arizona; United States Court of Appeals, Ninth Circuit.  Education:  University of Utah (B.S., 1970); Arizona State University (J.D., 1973).   Member: Maricopa County Bar Association (Member, Board of Directors, 1984-1986); Arizona Association of Defense Counsel (Member, Board of Directors, 1981-1989; President, 1986); American Board of Trial Advocates (President Phoenix Chapter, 1994); Fellow, American College of Trial Lawyers.

**ANDREW S. FRIEDMAN**, born Plainfield, New Jersey, September 26, 1953; admitted to bar, 1978, Arizona; U.S. Court of Appeals, Ninth Circuit; U.S. District Court, District of Arizona; U.S. Supreme Court.  Education:  University of Rochester (B.A., with high distinction, 1975); Duke University (J.D., with high distinction, 1978).  Order of the Coif.  Member: State Bar Committee on Civil Practice and Procedure (1980-1984); State Bar Committee on Bench-Bar Relations (1991); State Bar Bankruptcy Section; National Association of Commercial Trial Attorneys (1991-present); American Bar Association, Trial Practice Committee, Subcommittees and Class and Derivative Actions.

**FRANCIS J. BALINT, JR.**, born Pittsburgh, Pennsylvania, January 9, 1957; admitted to bar, 1982, Virginia and District of Columbia; 1983, Arizona; U.S. District Court, Districts of Arizona and Virginia; U.S. Court of Appeals, Fourth and Ninth Circuits; U.S. Supreme Court.  Education: University of Virginia (B.A., with high distinction, 1979; J.D., 1982).  Former President: Arizona Association of Defense Counsel (Member, Board of Directors 1988 - 2001).

**VAN BUNCH**, born Chattanooga, Tennessee, April 28, 1957; admitted to bar, 1984, Arizona; 2007, West Virginia; U.S. District Court, District of Arizona.  Education: Vanderbilt University (B.A., 1979); University of Tennessee at Knoxville (J.D., with high honors, 1984).  Order of the Coif.

**MICHAEL N. WIDENER**, born Mt. Ranier, Maryland, June 10, 1950; admitted to bar, 1983, Arizona and Tennessee; United States Supreme Court; U.S. Court of Appeals, Ninth Circuit; U.S. District Court, District of Arizona.  Education: University of Virginia (B.A., with distinction, 1972); University of Illinois (M.S., 1974); University of Arizona (J.D., 1982).  Articles Editor, *Arizona Law Review*, 1980-1982.  Law Clerk to Hon. James Duke Cameron, Supreme Court of Arizona, 1982-1983. (Certified Specialist, Real Estate Law, Arizona Board of Legal Specialization).  Adjunct Professor (Land Use and Water Law), Arizona Summit Law School; Zoning Adjustment Hearing Officer, City of Phoenix.

**ROBERT J. SPURLOCK**, born Janesville, Wisconsin, November 23, 1954; admitted to Arizona bar, 1984; U.S. District Court, District of Arizona.  Education: University of Wisconsin-Madison (B.S., with honors, 1976), Arizona State University (J.D., 1984).  Law Clerk to the Honorable D.L. Greer, Arizona Court of Appeals, 1984-1985; Member: Phoenix Association of Defense Counsel; Defense Research Institute; Arizona Association of Defense Counsel; American Bankruptcy Institute.  Adjunct Professor, Sandra Day O'Connor School of Law, Arizona State University.

**C. KEVIN DYKSTRA**, born Phoenix, Arizona, March 30, 1964; admitted to Arizona bar, 1989; U.S. Court of Appeals, Ninth Circuit; U.S. District Court, District of Arizona.  Education: Northern Arizona University (B.S., 1986); California Western School of Law (J.D., 1989).   Director, Arizona Association of Defense Counsel.

**ELAINE A. RYAN**, born Emmetsburg, Iowa, June 15, 1963; admitted to Arizona bar, 1989; Texas bar, 2008; Kansas bar, 2010; Missouri bar, 2010; Washington bar, 2010; Colorado bar, 2011; Utah bar, 2011; Idaho bar, 2011; U.S. District Court, District of Arizona; U.S. District Court, District of Eastern Michigan; U.S. District Court, District of Idaho; U.S. District Court, Western District of Wisconsin; U.S. District Court, Northern District of Illinois.  Education: University of Iowa (B.S., with distinction, 1986); Duke University (J.D., 1989).

**ANDREW Q. EVERROAD**, born Phoenix, Arizona, August 8, 1969; admitted to Arizona bar, 1995; U.S. District Court, District of Arizona.  Education: University of Arizona (B.A., 1992); University of London – Bloomsburg, 1990; Arizona State University (J.D., 1995).  Law Clerk to the Honorable Thomas C. Kleinschmidt, Arizona Court of Appeals, 1995-1996.

**PATRICIA N. SYVERSON**, born San Diego, California, July 16, 1975; admitted to California bar, 1999; Arizona bar, 2000; U.S. District Court, Central and Southern Districts of California; U.S. District Court, District of Arizona.  Education: University of California at San Diego (B.A., 1996); California Western School of Law (J.D., 1999).

**KIMBERLY C. PAGE**, born Washington, D.C., February 16, 1968; admitted to Georgia bar, 1993; Alabama bar, 1993; Arizona bar, 2004; U.S. District Court, Northern, Middle and Southern Districts of Alabama; U.S. Court of Appeals, Eleventh Circuit.  Education: Miami University (B.A., 1990); Cumberland School of Law of Samford University (J.D., *magna cum laude*, 1993).

**CHRISTINA L. PUSATERI**, born Ames, Iowa, September 16, 1968; admitted to Arizona bar, 1995; U.S. Court of Appeals, Ninth Circuit, 1997; U.S. District Court, District of Arizona.  Education: Arizona State University (B.A., *summa cum laude*, 1989); Arizona State University College of Law (J.D., *cum laude*, 1995).  Associate Articles Editor, *Arizona State University Law Journal*, 1994-1995. Law Clerk to Hon. E. G. Noyes, Jr., Arizona Court of Appeals, 1995-1996.

**MANFRED P. MUECKE**, born Inglewood, California, August 28, 1971; admitted to California bar, 2002; U.S. District Court, Southern District of California.  Education: California State University Northridge (B.A., 1996); University of San Diego (J.D., 2002); San Diego State University (M.B.A., 2009).

**WILLIAM F. KING,** born Phoenix, Arizona, October 21, 1978; admitted to Arizona bar, 2005; U.S. District Court, District of Arizona.  Education: Rockhurst College (B.A., 2001); Creighton University School of Law (J.D., *cum laude,* 2005).  Lead Articles Editor, *Creighton Law Review*, 2004-05.

**T. BRENT JORDAN**, born Urbana, Illinois, November 21, 1967; admitted to Minnesota bar, 1993; Pennsylvania bar, 2003; U.S. District Court, Eastern District of Pennsylvania.  Education: University of Illinois (B.A., B.S., *magna cum laude*, 1990); University of Minnesota Law School (J.D., *cum laude*, 1993).  Judicial Clerk, U.S. Magistrate Judge Raymond L. Erickson, U.S. District Court, District of Minnesota, 1993-1995.

**TY D. FRANKEL**, born Phoenix, Arizona, November 13, 1983; admitted to Arizona bar, 2009; U.S. District Court, District of Arizona; U.S. Court of Appeals, Ninth Circuit.  Education: Boston College (B.A., Dean's List, 2006); Boston College Law School (J.D., *cum laude*, 2009).

**CARRIE A. LALIBERTE**, born Juneau, Alaska, December 9, 1989; admitted to Arizona bar, 2015; U.S. District Court, District of Arizona.  Education: Washington State University (B.S., *magna cum laude,* 2012); Arizona State University College of Law (J.D., *cum laude*, 2015).

**LISA T. HAUSER**, born Kansas City, Missouri, March 13, 1956; admitted to bar, 1981, Arizona; Arizona Supreme Court; U.S. District Court, District of Arizona; United States Court of Appeals, Ninth Circuit; U.S. Supreme Court. Education: University of Arizona (B.A., with high distinction, 1978); University of Arizona College of Law (J.D., 1981).  Member: Arthritis Foundation of Arizona Leadership Board 2014-2016; University of Arizona Phoenix Alumnae Board of Directors 2004-2006; Foundation for Arizona's Future 2001-2005; University of Arizona Alumni Association National Board of Directors 1995-1998; State Bar of Arizona Appointments Committee 1991-1995. Coach, Sandra Day O'Connor School of Law ABA National Appellate Advocacy Competition Team 2011.

**NADA DJORDJEVIC**, born Chicago, Illinois, June 25, 1970, admitted to Illinois bar, 2002; U.S. District Court for the Northern District of Illinois, 2002, Trial Bar, 2012; U.S. District Court for the Northern District of Indiana, 2004; United States Court of Federal Claims, 2004.  Education: Grinnell College (B.A., Sociology, 1996); University of Illinois College of Law (J.D., *summa cum laude*, 2002), *University of Illinois Law Review*, Member 2000-2001, Symposium Editor, 2001-2002.

**ANDREA M. WRIGHT**, born Charlotte, North Carolina, February 5, 1990; admitted to Montana bar, 2016, Arizona bar, 2018; District Court, District of Arizona, 2018. Education: University of North Carolina at Chapel Hill (B.A. in English Literature and B.A. in Romance Languages, 2008); University of Virginia (J.D., 2016).

# EXHIBIT 16



### Consumer Watchdog Legal Project

Consumer Watchdog is a non-profit, non-partisan, consumer research and advocacy organization founded in 1985 by consumer attorney and advocate Harvey Rosenfield. Its mission is to provide an effective voice for taxpayers and consumers in an era when special interests dominate public discourse, government, and politics. The organization deploys public interest attorneys, policy experts, strategists, and grassroots activists to expose, confront, and change unjust practices in the private and public sectors.

Consumer Watchdog's Legal Project attorneys advocate for consumers' rights and hold corporations and government officials accountable in federal and state courts and before regulatory agencies.

The Legal Project specializes in highly complex litigation, including class actions in federal and state courts, to address abuses in the marketplace such as illegal overcharges, false advertising, and violation of consumer protection laws. Some of our most notable accomplishments include:

- Settled a class action lawsuit against Anthem Blue Cross over the "narrow network" issue in which plaintiffs alleged Anthem Blue Cross misrepresented which doctors were participating in its EPO and PPO provider networks.  Under the settlement, Anthem Blue Cross provided $15 million in direct payments, an uncapped claims process, and significant programmatic relief.

- Settled a class action lawsuit against Blue Shield over a similar "narrow network" issue in which plaintiffs alleged Blue Shield misrepresented that specific providers were "in network" under their ACA-compliant health service plans, and concealed and failed to disclose the differences between the provider networks available under new ACA-compliant health service plans the pre-ACA Blue Shield Provider network. The settlement provided more than $18 million in direct payments to consumers and a claims process with an uncapped fund.

- Settled six class action lawsuits against Anthem Blue Cross, United Healthcare, Cigna, Anthem, Inc., Coventry Health Care, Inc., and Aetna, Inc. for illegally requiring HIV/AIDS patients to purchase their medications from a mail-order pharmacy, threatening their health and privacy. As a result of the settlements, members prescribed HIV/AIDS medications may purchase their medications at any network pharmacy. Members were also allowed to seek reimbursement for out-of-pocket losses resulting from the mail order requirement.

- Settled a class action against Anthem Blue Cross for illegally making mid-year changes to annual deductibles, co-pays, and other out-of-pocket costs. As a result of the settlement, Anthem reimbursed consumers for out-of-pocket losses resulting from the mid-year changes totaling $8.5 million. The company also agreed not to make mid-year cost increases in the future.

- Settled a class action against Anthem Blue Cross for illegally closing insurance policies and using large rate hikes to force patients into lower-benefit and higher-deductible health coverage – a practice known as the "death spiral."  Relief obtained included a cap on future rate increases and the opportunity for plan members to switch coverage, without medical underwriting, to any open policy regulated by the California Department of Managed Health Care.

2701 Ocean Park Blvd., Suite 112
Santa Monica, CA  90405
Tel: 310-392-0522 • Fax: 310-392-8874

**EXPOSE.** CONFRONT. **CHANGE.**

www.ConsumerWatchdog.org

413 E. Capitol St., SE, First Floor
Washington, D.C. 20003
Tel: 202-629-3064 • Fax: 202-629-3066

- Settled a class action against the Auto Club requiring the insurer to pay $22.5 million in refunds to policyholders who were overcharged for not having prior insurance, a practice that is prohibited by insurance reform Proposition 103.

- Secured a consumer's right to enforce the Insurance Code in court under the state's Unfair Competition Law in a case against Mercury for illegally surcharging drivers without prior insurance.

- Secured a historic $27.5 million fine against Mercury Insurance Company in an administrative enforcement action for charging excessive and unfairly discriminatory rates by allowing its agents to charge illegal broker fees at the point of sale.  (*In the Matter of Mercury Ins. Co., et al.* (Cal. Dept. Ins.), No. NC03027545.)

- Obtained an order from the Insurance Commissioner approving a settlement agreement requiring Farmers Insurance to refund $1.2 million in premium overcharges and pay a $2 million fine to the State of California for utilizing improper homeowners insurance underwriting practices.

- Successfully blocked insurance rate hike requests by dozens of insurance companies, saving Californians $227.4 million in 2017 and over $3 *billion* since 2003 on their auto, homeowners, earthquake, and medical malpractice insurance.

Consumer Watchdog's attorneys have taken the lead role – authored comprehensive appellate briefs and participated in oral argument – in numerous landmark cases resulting in published appellate and California Supreme Court opinions upholding consumer protection statutes:

- *Consumer Watchdog et al. v. Department of Managed Health Care et al.* (2014) 225 Cal.App.4th 862 (counsel for petitioner Consumer Watchdog) – holding that the Department of Managed Health Care can no longer uphold a health plan's denial of coverage for autism treatment provided or supervised by a nationally board-certified individual on the basis that the provider is not licensed.

- *Association of California Insurance Companies v. Poizner* (2009) 180 Cal.App.4th 1029 (counsel for intervenor Consumer Watchdog) – upholding Department of Insurance regulations consistent with the language and purpose of Proposition 103 to promote consumer participation in rate proceedings.

- *In re Tobacco II* (2009) 207 P.3d 20 (counsel for amicus curiae Consumer Watchdog) – holding that Prop 64 standing requirements apply only to named plaintiffs and not unnamed putative class members.

- *Karnan v. Safeco Ins. Co. of America* (2009) 173 Cal.App.4th 814 (counsel for plaintiff) – allowing plaintiff in a UCL action to proceed with pre-certification discovery to locate class members.

- *Fogel v. Farmers Group, Inc.* (2008) 160 Cal.App.4th 1403 (counsel for amicus curiae Consumer Watchdog) – allowing a UCL action to proceed against an insurer challenging as excessive fees paid by policyholders to the insurer's management company.

- *Foundation for Taxpayer and Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1354 (counsel for plaintiff) – overturning an illegal legislative amendment to Proposition 103 that would have allowed illegal surcharges to drivers who lacked prior insurance coverage.

- *State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029 (counsel for amicus curiae FTCR) – upholding against industry challenge Department of Insurance regulations requiring the public disclosure of insurance redlining data submitted to the Insurance Commissioner as required by Proposition 103.

- *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968 (counsel for amicus curiae Consumer Watchdog) – upholding consumers' right to bring a UCL action to enforce Proposition 103.

- *Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473 (counsel for plaintiff) – invalidating an illegal legislative amendment to Proposition 103 that would have decreased the amount of refunds owed to policyholders under the initiative's rate rollback provision.

- *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243 (counsel for intervenor) – Cal. Supreme Court decision invalidating an illegal legislative amendment to Proposition 103 that would have exempted surety insurance from regulation.

- *20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216 (counsel for intervenor) – Cal. Supreme Court decision upholding insurance rate regulations enforcing Proposition 103's prohibition against excessive or inadequate rates.

- *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 (counsel for intervenor) – Cal. Supreme Court decision upholding Proposition 103 against constitutional challenge by the insurance industry.

Consumer Watchdog's Legal Project is currently litigating high impact consumer protection lawsuits and administrative actions, including:

- A class action against Blue Shield for violating California law by routinely closing more desirable health plans to new customers and then forcing out existing policyholders by sharply increasing their premiums without offering them the option to switch to plans with comparable coverage. (*Martin, et al. v. California Physicians' Service, dba Blue Shield of California, et al.* (S.F. Super. Ct.), No. CGC-12-521539.)

- A class action against Anthem Blue Cross for violating state and federal law by canceling consumers' health insurance plans and automatically enrolling them in plans that eliminate coverage for out-of-network doctors without proper notice. (*Simon, et al. v. Blue Cross of California, dba Anthem Blue Cross, et al.* (L.A. County Super. Ct.), No. BC639205.)

## Brief Biographies of Consumer Watchdog Attorneys

**Harvey Rosenfield** (Of Counsel) is one of the nation's foremost consumer lawyers and the founder of Consumer Watchdog (1985). Rosenfield has organized and led countless consumer protection lawsuits and administrative proceedings.

Rosenfield authored insurance reform Proposition 103 and organized the campaign that led to its passage by California voters in 1988. He has also authored or co-authored legislative proposals on patient safety, insurance and utility rate regulation. Rosenfield is the author of the book, Silent Violence, Silent Death: The Hidden Epidemic of Medical Malpractice. (Essential Books, 1994).

Rosenfield has worked for the Federal Trade Commission, the U.S. Congress, as a staff attorney for Public Citizen Congress Watch and as the Program Director for the California Public Interest Research Group (CALPIRG).

Rosenfield graduated magna cum laude from Amherst College (1974) and obtained a joint Law and Masters degree in Foreign Service from Georgetown University (1979).  He received an honorary doctorate from Amherst in 2010. He is admitted to practice in D.C. (1979) and California (1986).

3

**Jerry Flanagan** is Consumer Watchdog's Litigation Director.  Flanagan leads Consumer Watchdog's litigation efforts in the areas of health insurance coverage and access to treatments. He is one of the nation's leading public interest health law analysts and has over 20 years' experience working in public interest and health care policy, legislation and litigation.  Flanagan was admitted to the California Bar in 2010.

Flanagan has spearheaded efforts to address discrimination against those with HIV and other serious illnesses in the era of the Affordable Care Act (aka "Obamacare").  Flanagan leads Consumer Watchdog's efforts to ameliorate the damaging effects of the "narrow" doctor network epidemic in four class action lawsuits against Blue Shield, Health Net, Cigna, and Anthem Blue Cross.

Flanagan is an adjunct professor at Loyola Law School of Los Angeles and currently teaches the class "Health Insurance Regulation: Law, Policy & Politics."

Flanagan exposed the illegal practice of health insurers retroactively canceling coverage and authored a law journal article underscoring the need for reform in health insurance rescission law, Healthy State of Mind: The Role of Intent in Health Plan Rescissions, 43 Loy. L.A. L. Rev. 291 (2009).  An "intentional misrepresentation" standard for coverage rescissions, advocated by the article, was adopted in the ACA.

Prior to joining Consumer Watchdog, Flanagan drafted and won passage of one of the nation's strongest HMO accountability measures, which was signed into law in New Jersey in 2001.

Flanagan received a B.A. in Social/Cultural Anthropology and Rhetoric from the University of California, Berkeley and his law degree from Loyola Law School of Los Angeles. At Loyola, Flanagan was a Note and Comment Editor on the Loyola Law Review. He graduated Magna Cum Laude and is a member of the Order of the Coif, Sayre Macneil Scholars Program, St. Thomas More Law Honor Society, and Alpha Sigma Nu Honor Society.

**Pamela Pressley** is a senior staff attorney and has headed up Consumer Watchdog's regulatory efforts since 1999. Pressley has served as lead counsel in challenges to insurance industry rate hike proposals resulting in savings to California policyholders of over $3 billion since 2003.

Additionally, Pressley has led Consumer Watchdog's efforts to enforce Proposition 103's mandates to protect California insurance policyholders against discriminatory practices and premium overcharges, including through rulemaking proceedings before the California Department of Insurance and court actions. Pressley has also authored numerous appellate briefs and presented oral argument in cases seeking to enforce Proposition 103 and California's consumer protection laws.

Pressley received her B.A. in Sociology from UCLA and her J.D. from Pepperdine University School of Law. She was admitted to the California Bar in 1995. Before joining Consumer Watchdog, Pressley worked for CALPIRG as its Consumer Attorney and as a staff attorney for the Center for Law in the Public Interest, a non-profit, public interest law firm specializing in consumer, environmental, and civil rights advocacy and litigation.

**Jonathan Phenix** was a staff attorney at Consumer Watchdog through May 2018. His practice focused on complex insurance matters.

Prior to joining Consumer Watchdog, Phenix owned and operated a California-based brokerage firm. During the financial crisis, he worked closely with small business owners to transfer trucks, tractors, and other heavy equipment between business.

Phenix received his B.A. in Economics from UCLA and received his J.D. from UCLA School of Law with a Specialization in Business Law and Policy. While at UCLA Law, he was a vice president of UCLA's prestigious Moot Court Honors

4

Program, a nationally recognized appellate advocacy program that sends teams to compete all across the county. He was also a Managing Editor for the Journal of International Law and Foreign Affairs.

**Benjamin Powell** is a staff attorney on Consumer Watchdog's Litigation Team. While his primary focus is in the area of insurance litigation, he also provides litigation support in other areas.

Powell received a B.A. in Political Science from UCLA and a J.D. from Loyola Law School in Los Angeles. During law school, Powell was a member of the Loyola of Los Angeles Law Review, writing articles for the journal's specialized "Developments in the Law" issue.

His scholarship included an analysis of the shifting employment status of California Uber drivers and a discussion of the fate of class action waivers under California contract law. He also served as a Coordinator for Loyola's Young Lawyers Program, providing students from local high schools with mentorship as well as training for a mock trial experience in front of actual Los Angeles Superior Court judges.

Mr. Powell was admitted to the California Bar in 2016.

# EXHIBIT 17



For more than 25 years, the lawyers at The Moskowitz Law Firm, PLLC ("The Moskowitz Law Firm") have successfully litigated significant class action and complex commercial cases involving the rights of consumers, investors, and businesses. The Firm and its attorneys consistently rank among the most highly regarded litigation attorneys locally and on the national stage — according to clients, judges, opponents, and professional journals — for effectiveness in and out of the courtroom.

**Adam Moskowitz**. Mr. Moskowitz is the Founder and Managing Partner of The Moskowitz Law Firm and is experienced in all forms of class action claims, including RICO. Mr. Moskowitz serves and has served as Lead Counsel in some of the largest class action cases in Florida and nationwide. Mr. Moskowitz has been an Adjunct Professor at the University of Miami School Of Law teaching Class Action Litigation for over 26 years. Adam has received numerous awards for his results including the "Most Effective Lawyer Award" for his work in litigating and resolving numerous nationwide force-placed insurance cases. Mr. Moskowitz filed one of the first class action lawsuits regarding these practices and has since spearheaded class action litigation in over 32 nationwide class actions brought against the largest banks or mortgage servicers and the force-placed insurers across the country, reaching 28 settlements to date totaling over $4.2 billion dollars for the proposed nationwide classes of over 5.3 million homeowners.[1]

---

[1] *See for example Williams v. Wells Fargo Bank, N.A.,* No. 11-cv-21233 (S.D. Fla.)(final approval granted); *Saccoccio v. JPMorgan Chase Bank N.A.,* No. 13-cv-21107 (S.D. Fla.) (final approval granted); *Diaz v. HSBC Bank (USA), N.A.,* No. 13-cv-21104 (S.D. Fla.) (final approval granted); *Fladell v. Wells Fargo Bank, N.A.,* No. 13-cv-60721 (S.D. Fla.) (final approval granted); *Hamilton v. SunTrust Mortg., Inc.,* No. 13-cv-60749 (S.D. Fla.) (final approval granted); *Hall v. Bank of Am., N.A.,* No. 12-cv-22700 (S.D. Fla.) (final approval granted); *Lee v. Ocwen Loan Servicing, LLC,* No. 14-cv-60649 (S.D. Fla.) (final approval granted); *Braynen v. Nationstar Mortg.*, LLC, No. 14-cv-20726 (S.D. Fla.) (final approval granted); *Wilson v. Everbank,* N.A., No. 14-cv-22264 (S.D. Fla.) (final approval granted); *Montoya v. PNC Bank, N.A.,* No. 14-cv-20474 (S.D. Fla.*)* (final approval granted*); Almanzar v. Select Portfolio Servicing,* No. 14-cv-22586 (S.D. Fla.) (final approval granted); *Jackson v. U.S. Bank, N.A.,* No. 14-cv-21252 (S.D. Fla.) (final approval granted); *Circeo-Loudon v. Green Tree Servicing, LLC,* No. 14-cv-21384 (S.D. Fla.); *Beber v. Branch Banking & Trust Co*., No. 15-cv-23294 (S.D. Fla.) (final approval granted); *Ziwczyn v. Regions Bank, No.* 15-cv-24558 (S.D. Fla.) (final approval granted); *McNeil v. Selene Finance, LP,* No. 16-cv-22930 (S.D. Fla.); *McNeil v. Loancare, LLC,* No. 16-cv-20830 (S.D. Fla.) (final approval granted) (final approval granted); *Edwards v. Seterus, Inc.*, No. 15-cv-23107 (S.D. Fla.) (final approval granted); *Cooper v. PennyMac Loan Servicing*, LLC, No. 16-cv-20413 (S.D. Fla.) (final approval granted). *Strickland, et al. v. Carrington Mortgage Services, LLC, et al*., 16-cv-25237 (S.D. Fla.) (final approval granted for three separate settlements); *Quarashi et al v. Caliber Home Loans Inc. et al.;* 16-9245 (D.N.J.) (final approval granted).

Mr. Moskowitz has been appointed Lead and Co-Lead counsel in numerous other state and federal class actions, including resolving one of the nation's largest consumer class actions, *LiPuma vs. American Express*, No. 04-cv-20314 (S.D. Fla.).  In *Pain Clinic et al. v. Allscripts Healthcare Solutions, Inc.*, 12-49371 (Fla 11th Cir. Ct. 2012), Mr. Moskowitz reached a nationwide settlement against Allscripts Healthcare Solution on behalf of thousands of small physician practices regarding the sale and marketing of defective electronic healthcare software. He has also served as Lead, Co-lead or as part of Plaintiffs' counsel in various nationwide class actions including, *In re Marine Hose Antitrust Litig*., No. 08-md-1888 (S.D. Fla.); *Miller v. Dyadic International*, No. 07-cv-80948 (S.D. Fla.); *In re: Mushroom Direct Purchase Antitrust Litig*., 06-cv-00620l (E.D. Pa.); *Louisiana Wholesale v. Becton Dickinson, et al.*, No. 05-cv-01602 (D.N.J.); *Natchitoches Parrish Hospital v. Tyco (In re Sharps Containers)*, No. 05-cv-12024 (D. Mass.); and *Bruhl v. Price Waterhouse Coopers, International, et al.*, No. 03-cv-23044 (S.D. Fla.).

Currently, in *In re Transamerica COI Litigation*, Case No. 2:16-cv-01378-CAS-AJW (C.D. Cal.), Mr. Moskowitz has been appointed as Co-Lead counsel for a certified class of nationwide consumers that purchased life insurance policies from Transamerica Life Insurance Company--a subsidiary of Aegon--one of the world's largest providers of life insurance, pension solutions and asset management products**.**  Further, in *In re Fieldturf Multi District Litigation*, Case No. 3:17-md-02779-MAS-TJB (D.N.J.), U.S. District Judge Michael A. Shipp recently appointed Mr. Moskowitz as Co-Lead counsel for all of the plaintiffs after numerous class actions brought against Fieldturf were consolidated in the District of New Jersey earlier last year. The claims were brought on behalf of municipalities related to the marketing and sale of allegedly defective artificial fields.  Adam is currently lead and co-lead counsel in numerous other class actions currently pending in state and federal courts across the country.

Mr. Moskowitz's practice also encompasses various other complex commercial litigation Matters, arbitrations before FINRA and numerous jury trials. Adam obtained one of the largest jury verdicts in Miami-Dade County (over $100 million dollars) in a jury trial against a global agricultural company on behalf of growers from the United States and Costa Rica.  Adam has also served as chairperson in numerous NASD securities arbitrations, and actively participates in local and national seminars and panels, lectures across the country regarding class action litigation, and has published numerous articles on class action practices and settlements.[2]  Mr. Moskowitz has actively served on numerous state and national class action organizations, including being appointed to the Duke Law Center for Judicial Studies Advisory Council and serves as the Topics Coordinator. The Council brings together all federal judges, experienced plaintiffs' and defense attorneys, and academics to develop practical solutions to legal issues by way of rule changes, best practices, guidelines, and principles.  Adam is married to his wife Jessica and has three children, Serafina, Michael and Samantha and is very active with his children's school Temple Beth Am in Miami, Florida.

---

[2] *See, e.g., The Right Way to Calculate Attorneys' Fees in Class Actions*, December 4, 2015, available at http://www.law360.com/articles/733534/the-right-way-to-calculate-atty-fees-in-class-actions.

***Howard Bushman***.  Howard Bushman is a Partner at The Moskowitz Law Firm and a seasoned litigator with over 17 years of experience prosecuting nationwide class actions and mass tort litigation. Mr. Bushman is a central figure in litigating the lender placed insurance class actions listed in Footnote 1.  Further, Mr. Bushman has effectively litigated the following class actions:  *Kenneth F. Hackett & Associates, Inc. v. GE Capital Information Technology Solutions, Inc. et al.,* Case No.: 10-20715-CIV-ALTONAGA/BROWN (S.D. Fla.) (multi-million dollar settlement on behalf of a nationwide class of copier lessees whom were overcharged for their monthly payments); *Aarons et al. v. BMW of North America, LLC*, Case No. 2:11-cv-07667-PSG (S.D.Cal.) (multi-million dollar settlement on behalf of a nationwide class of owners of defective Mini-Cooper vehicles); *Lockwood et al. v. Certegy Check Services, Inc.*, Case No.: 8:07-CV-01657-SDM-MSS (M.D. Fla.) (nationwide data breach action resulting in a settlement valued at over $75 million dollars; *Brenda Singer v. WWF Operating Company*, Case No.: 13-CV-21232 (S.D. Fla. 2013) (nationwide litigation regarding alleged deceptive marketing of evaporated cane juice; successfully settled nationwide class action over deceptive labeling of evaporated cane juice); *In Re: Countrywide Financial Corp. Customer Data Security Breach Litigation,* Case No. 3:08-MD-01998-TBR (WDKY) (class action on behalf of over 17 million consumers, achieved a settlement valued at over $300 million dollars); *Eugene Francis v. Serono Laboratories, Inc., et al.* ("Serostim"), Case No. 06-10613 PBS (U.S. District Court of Mass.) ($24 million cash settlement in a nationwide class action litigation against multiple entities regarding the deceptive and illegal marketing, sales and promotional activities for the AIDS wasting prescription drug Serostim); *In Re: Guidant Corp. Implantable Defibrillators Products Liability Litigation*, MDL No. 1708 (U.S. District of Minnesota) ($245 million dollar settlement for patients in this nationwide mass tort class action regarding the sale of defective cardiac defibrillators and pacemakers); *In Re: Zicam Cold Remedy Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2096 (mass tort involving over $15 million settlement).

As passionate for the law as he is for giving back to the local community, Howard recently received the Eleventh Judicial Circuit and Miami-Dade County Bar Associations' Put Something Back Pro Bono Service Award.

***Adam Schwartzbaum***. Adam Schwartzbaum is a Senior Associate at The Moskowitz Law Firm, where he plays an important role in managing all aspects of the Firm's class action litigation practice. Adam's responsibilities include case analysis and development, trial court litigation, and appellate work.

Prior to joining the Moskowitz Law Firm, Mr. Schwartzbaum was an associate at Weiss Serota Helfman Cole & Bierman, a large regional law firm well known for representing local governments. As an associate in the litigation department, Mr. Schwartzbaum represented an array of private and municipal clients, at the trial and appellate levels, in state and federal court. In several instances, Mr. Schwartzbaum won significant trial victories and then succeeded in upholding them on appeal. For example, in *SDE Media, LLC v. City of Doral*, Case No. 3D16-2008 (Fla. 11th Jud. Cir.), Mr. Schwartzbaum second-chaired a trial that resulted in the trial court issuing a nineteen-page order finding in the City's favor. On appeal, Mr. Schwartzbaum authored the answer brief, and the Third District Court of Appeal issued a per curiam affirmance. *SDE Media, LLC v. City of Doral*, 228 So. 3d 567 (Fla. 2017). Similarly, in *Brock v. Ochs*, Case No. 2D16-705 (Fla. 20th Jud. Cir.),

Mr. Schwartzbaum helped obtain summary judgment for the Collier County Manager in a
major dispute with the County Clerk regarding the scope of the County Manager's purchasing
power under the Florida Constitution. On appeal, Mr. Schwartzbaum authored the answer
brief, and the Second District Court of Appeal affirmed per curiam. *Brock v. Ochs*, 203 So.
3d 164 (Fla. 2d DCA 2016). Mr. Schwartzbaum achieved similar success in federal court.
For example, in *Edwards CDS, LLC v. City of Delray Beach*, No. 16-15693 (S.D. Fla.), Mr.
Schwartzbaum authored a motion to dismiss that resulted in a an order dismissing $25 million
in federal constitutional claims with prejudice. On appeal, Mr. Schwartzbaum authored the
answer brief, and the Eleventh Circuit Court of Appeals issued a written opinion affirming
the dismissal. *Edwards CDS, LLC v. City of Delray Beach*, 699 Fed. App'x 885 (11th Cir.
2017). As a result, Mr. Schwartzbaum helped the City achieve a very favorable settlement.
Other significant appellate victories include *D'Agastino v. City of Miami*, 220 So. 3d 410
(Fla. 2017) (upholding constitutionality of City of Miami's Civilian Investigative Panel);
*City of Homestead v. Foust*, 2018 WL 575620 (Fla. 1st DCA 2018) (reversing order of Judge
of Compensation Claims after determining, in issue of first impression, that JCC incorrectly
interpreted a statute); *City of Cooper City v. Joliff*, 227 So. 3d 633 (Fla. 4th DCA 2017)
(reversing a multi-million dollar summary judgment for plaintiffs in a class action alleging
a special assessment was unconstitutional and instructing trial court to enter judgment for
the City).

Mr. Schwartzbaum's career began in the litigation department of a large international
law firm, White & Case, where he provided research and writing support on complex
commercial disputes and in significant appellate matters in both state and federal court.
Adam served on the trial team in *Dacra Development v Corp. v. Colombo*, Consolidated Case
Nos. 11-17338 & 10-47846, successfully defending a prominent real estate developer from
a multimillion dollar lawsuit and helping secure a $2 million verdict on the defendant's
counterclaim. Adam also represented the City of Dania Beach in a dispute over the expansion
of the Fort Lauderdale-Hollywood International Airport, ultimately helping to secure a
landmark settlement on behalf of over 850 homeowners impacted by the development. Adam
also made vital contributions to several notable appellate victories, including *North Carillon,
LLC v. CRC 603, LLC*, 135 So. 3d 274 (Fla. 2014) (obtaining a reversal of an opinion that
incorrectly interpreted provision of Florida's condominium law concerning statute governing
placing of deposits into escrow), *Sargeant v. Al-Saleh*, 137 So. 3d 432 (Fla. 4th DCA 2014)
(establishing new Florida law concerning trial court's jurisdiction to compel turn over of
foreign assets), and *200 Leslie Condominium Association, Inc. v. QBE Insurance Corp.*, 616
Fed. App'x 936 (11th Cir. 2015) (affirming judgment in favor of insurer following a bench
trial).

Mr. Schwartzbaum is an active contributor to the South Florida community and a
leader in several prominent organizations. He is a Member of the Board of Directors of Nu
Deco Ensemble, Miami's 21st Century genre-bending orchestra. Mr. Schwartzbaum is also a
Member of the Democratic Executive Committee, the governing body of the Miami-Dade County
Democratic Party. Mr. Schwartzbaum sits on the Board of Directors of Temple Menorah in
Miami Beach, on the Board of the South Florida Israel Bonds Young Investor Society, and
on the American Jewish Committee's Global ACCESS Board. Mr. Schwartzbaum also serves
as J-Street's District Coordinator for Congresswoman Federica Wilson. In addition, Mr.

Schwartzbaum is the Founder and Team Captain for Jewish Community Service's Miami Marathon and Half Marathon Team which raises funds for The Blue Card, an organization benefiting indigent Holocaust Survivors.

**Joseph Kaye.**   Joseph is an Associate Attorney at The Moskowitz Law Firm, whose practice focuses on multi-state consumer class action litigation and complex commercial litigation, involving a range of disputes including force-placed insurance class action litigation, health insurance, and products liability.

Prior to joining The Moskowitz Law Firm, Joseph was an Associate Attorney at Stok Folk + Kon, where he represented businesses and individuals in a range of disputes involving breach of contract, commercial transactions, fraud, business torts, deceptive and unfair trade practices, intellectual property, probate, guardianship and trust litigation.  A life-long Florida native, Joseph attained a Bachelor's degree in Creative Writing from Florida State University (B.A., 2012) and a Juris Doctorate degree from the University of Miami School of Law (J.D., *magna cum laude*, 2015). While at the University of Miami, Joseph was a member of the Race and Social Justice Law Review, served as Dean's Fellow for the Contracts and Elements courses, earned the Dean's Certificate of Achievement in Evidence and Elements courses, received honors in litigation skills, and was on the Dean's List multiple times.

Joseph also gained invaluable experience as a judicial intern for the Honorable Magistrate Judge Jonathan Goodman in the United States District Court for the Southern District of Florida, and as a certified legal intern for the Miami-Dade State Attorney's Office, Misdemeanor Domestic Violence Division.

**Curtis Osceola.**   Curtis is an Associate Attorney with the Moskowitz Law Firm and graduated from the University of Miami School of Law in May 2018. At Miami, Curtis was a member of the Charles C. Papy Moot Court Board and served on their Appeals Committee. Curtis was also a Litigation Skills Fellow where he worked alongside Miami's top litigators to develop students' trial advocacy skills.  Addtionally, Curtis has previously worked as a Judicial Intern for the Honorable Victor J. Wolski at the United States Court of Federal Claims in Washington, D.C.

Curtis was also a Research Assistant for Professor Sergio Campos at the University of Miami. His research was concentrated on mass tort litigation and discovery in toxic tort and securities litigation.  Curtis is a member of the Miccosukee Tribe of Indians of Florida and is the first member of his tribe to attend law school. He attended the University of Miami (B.B.A., 2014) for his undergraduate education where he was a member of the School of Business' honor society, the Hyperion Council. After working for a year at his Tribe's gaming facility as a Business Analyst and Slot Director.

Curtis has an interest in pro bono criminal defense. During his time at Miami, Curtis logged 380 hours of pro bono work in the University of Miami's HOPE program and strives to continue

giving back to indigent and at-risk members of our community.  Curtis is a member of the American Bar Association and the Dade County Bar Association.

### *The Moskowitz Law Firm, PLLC*

The Moskowitz Law Firm focuses only on large-scale class actions and complex commercial litigation, typically against parties represented by larger, premier law firms. Its attorneys have played a leading role in significant class actions and complex litigation across the country that have made a real difference in the world and on behalf of consumers across the country. With deep roots in the local Miami community, the attorneys at the Moskowitz Law Firm have been avid supporters of several non-profit and education related organizations for over two decades, earning the good will of colleagues, clients and neighbors.  After teaching Class Action Litigation at the University of Miami for over 26 years, in 2016, Adam Moskowitz, along with his other co-counsel in the force placed cases, organized the University of Miami Class Action Conference, and annual event which included Class Action Panels with various federal judges, state attorney generals and numerous plaintiff and defense counsel and awards scholarships to students interested in class action litigation.

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

JOYCE SHUPE, on behalf of herself and all others similarly situated,

                            Plaintiff,

        v.

TRANSAMERICA LIFE INSURANCE COMPANY,

                            Defendant.

Case No.: 1:19-cv-00045-KEM

---

**DECLARATION OF PLAINTIFF JOYCE SHUPE IN SUPPORT OF MOTION FOR LIMITED LIFT OF THE STAY**

I, Joyce Shupe, declare as follows:

1.      I am the Plaintiff in this action and I am submitting this Declaration in support of my motion to lift the Court's July 19, 2019 Stay Order (Doc. 28) for the limited purpose of allowing me to pursue my individual claims in this case.

2.      I understand that the Court has stayed this case in favor of a similar potential class action in California, *Thompson v. Transamerica Life Insurance Co.*, No. 2:18-cv-05422-CAS-GJS (C.D. Cal.) ("*Thompson*"), and that the Stay Order provides that "Ms. Shupe could proceed with individual claims in this court if she chooses to do so." Doc. 28 at 8, n.5.

3.      I wish to proceed with my individual claims in this Court and I request that the Court lift the Stay Order for the limited purpose of allowing me to proceed with those individual claims.

4.      I do not want to be part of the *Thompson* case in California and would opt out of the class there if the *Thompson* court were to ever certify a national class. I have no connection to

California for purposes of the claims I assert in this case and I do not want my individual claims to be delayed by the *Thompson* action in California.

5.     Given the Stay Order, I understand that my class claims are stayed and as a result I seek to pursue individual claims, not class claims.

6.     Through my individual claims I seek to stop Transamerica from imposing the improper cost of insurance increase on me and I seek to hold Transamerica accountable for improperly charging me with the increase.

7.     Staying my individual claims would force me to stand in line behind a case (*Thompson*) in which I want no part. A stay of my individual claims deprives me of my right to litigate my claims in Iowa where Transamerica has its headquarters and where there is no question that this Court has jurisdiction over Transamerica.

8.     I want to pursue my individual claims in this Court and I do not want to wait until class certification (or the resolution of the resulting lengthy appeals) in *Thompson*.

9.     Transamerica's cost increase has made the policy prohibitively expensive and has required me to return from retirement to work so that I can pay the cost increase. Transamerica's cost increase has been financially and emotionally devastating to me and has put me at great risk of losing the coverage and losing financial security for the rest of my life.

10.     As a result, I am seeking to move this case as quickly as possible to protect myself against Transamerica's improper cost increase.


I declare under penalty of perjury that the foregoing is true and correct. Executed this __ day of July, 2019, in Albuquerque, New Mexico.


JOYCE SHUPE

2