Stephen J. Fearon, Jr.
Paul V. Sweeny
**SQUITIERI & FEARON, LLP**
32 E. 57th St., 12th Floor
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAIL THOMPSON, et al., | Case No. 2:18-cv-05422 (CAS) (GJSx) |
| Plaintiffs, | |
| v. | **CLASS ACTION** |
| TRANSAMERICA LIFE INSURANCE COMPANY, | **OBJECTIONS TO THE SETTLEMENT AND CLASS FEE AND EXPENSE APPLICATION, MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS, AND NOTICE OF INTENTION TO APPEAR** |
| Defendant. | |

# **TABLE OF CONTENTS**

OVERVIEW ........................................................................................................... 1

OBJECTIONS ........................................................................................................ 3

A. Objector Levi Katz ......................................................................................... 3

   B. Objector Angela Terry ................................................................................. 4

   C. Heightened Standard of Review for Precertification Class Settlements ................................................................................................ 6

   D. The Parties Are Not Providing Critical Information About the Settlement ................................................................................................. 7

   E. The Class Notice Was Not The Best Notice Practicable Under the Circumstances ...................................................................................... 9

   F. The Class Representatives Cannot and Did Not Adequately Represent A Settlement Class Consisting of Many Terminated Policyowners .......................................................................................... 10

   G. The Court Should Not Approve A Conflicted Settlement that Sacrifices the Interests of Terminated Policyowners and In-Force Policyholders Who Are Not Maintaining the No-Lapse Guarantee ........... 13

   H. The Settlement Is Unfair and Inadequate Because the Court Lacks Jurisdiction Over Out-of-State Class Members' Claims Under Bristol-Meyers Squibb ............................................................................ 17

   I. The Settlement Is Unfair and Inadequate Because It Does Not Provide a Reinstatement Option for Terminated Policyholders ................. 18

   J. The Settlement Is Unfair Because It Permanently Sanctions TLIC's Improper and Illegal MDR Increases ........................................... 20

K.   The Settlement's Distribution Method Allows Transamerica to Avoid Actual Payment of Settlement Relief and to Recapture the Rest of the Settlement Relief ..................................................................21

L.   The Court Should Reduce the Disproportionate Class Fee Award, Including to Account for Opt-Outs and the Illusory Distribution of Settlement Relief to No-Lapse Guarantee Policies ....................................26

CONCLUSION .........................................................................................................27

# TABLE OF AUTHORITIES

Cases

*37 Besen Parkway, LLC v. John Hancock Life Ins. Co (U.S.A.)*,
No. 1:15-cv-09924-PGG-HPB, Doc. No. 133-2  (S.D. July 20, 2018) ................23

*Allen v. Bedolla*,
787 F.3d 1218 (9th Cir. 2015) ........................................................................6

*Bristol-Meyers Squibb v. Superior Ct.*,
137 S. Ct. 1773 (2017) ................................................................................17

*Brown v. Am. Airlines, Inc.*,
285 F.R.D. 546 (C.D. Cal. 2011) .................................................................12

*Clark v. Experian Information Solutions, Inc.*,
Nos. 00–1217–24, 2001 WL 1946329 (D.S.C. Mar.19, 2001), ...........................14

*Eubank v. Pella Corp*,
753 F.3d 718 (7th Cir 2014) ........................................................................22

*Evans v. Jeff D.*,
475 U.S. 717 (1986)......................................................................................25

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y.1982)..................................................................14

*Fleenor v. CNO Fin. Group, Inc.*,
No. 2:16-cv-00308-JRG-MCLC  (E.D. Tenn. Nov. 28, 2016)............................19

*Fleischer, et al. v. Phoenix Life Ins. Co., et al.*,
No. 1:11-cv-08405-CM-JCF (S.D.N.Y. May 29, 2015).....................................23

*Gen. Tel. Co. of Nw., Inc. v. EEOC*,
446 U.S. 318 (1980) .......................................................................................11

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ......................................................................11

*Healthy Future of Texas v. Dep't of Health and Human Services*,
   326 F.R.D 1 (D.D.C. 2018)............................................................................6

*In re Bluetooth Headset Prod. Liability Litig.*,
   654 F.3d 935 (9th Cir. 2011) ................................................................ 24, 25

*In re Conseco Life Ins. Co. Cost of Ins. Litig.*,
   MDL No. 10:1610-AHM (Mcx) (C.D. Cal.) .................................... 18, 20

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008)................................................................12

*In re Shopping Carts Antitrust Litig.*,
   M.D.L. No. 451-CLB, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983).........................6

*In Re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL No. 1917, No. 3:07-cv-05944-JST (N.D. Cal. November 8, 2018), ...........14

*Knisley v. Network Assoc.*,
   312 F.3d 1123 (9th Cir. 2002); .................................................................25

*McElmurry v. U.S. Bank Nat. Ass'n*,
   495 F.3d 1136 (9th Cir. 2007) ......................................................................9

*Onderdonk, et al. v. Conseco Life Ins. Co., et al.*,
   No. 2004-10-5073-E (Tex. Dist. Ct. Oct. 4, 2004) .................................19

*Pearl v. Allied Corp.*,
   102 F.R.D. 921 (E.D. Pa. 1984)................................................................14

*In Re: Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 3:07-cv-05944-JST, MDL No. 1917 (N.D. Cal. November 8, 2018) .............2

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ......................................................................9

OBJECTIONS TO THE PROPOSED SETTLEMENT AND CLASS FEE AND EXPENSE APPLICATION,
MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS, AND NOTICE OF INTENTION TO APPEAR

*Roes, 1-2 v. SFBSC Mgmt. LLC*,
   944 F.3d 1035 (9th Cir. 2019) .................................................................1

*Spann v. J.C. Penney Corp.*,
   314 F.R.D. 312 (C.D. Cal. 2016)...........................................................11

*Thompson v. Am. Tobacco Co.*,
   189 F.R.D. 550 (D. Minn. 1999)............................................................14

*True v. Am. Honda Motor Co.*,
   749 F. Supp. 2d 1052 (C.D. Cal. 2010) .................................................24

*Vu v. Fashion Inst. Design & Merchandising*,
   No.: CV 14-08822 SJO (Ex), 2016 WL 6211308 (C.D. Cal. Mar. 22, 2016).......15

*Wenokur v. AXA EquitableLife Ins.*,
   No. CV-17-00165-PHX-DLR, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017).........18

*Yue v. Conseco Life Ins. Co.*,
   11-cv-09506-DSF-SH (C.D. Cal), ................................................. 10, 18

## INFORMATION ABOUT OBJECTORS
## REQUIRED BY CLASS ACTION NOTICE

**1.** The Case Name and Number:

*Thompson, et al. v. Transamerica Life Insurance Company,* Case No. 2:18-cv-05422 (CAS) (GJSx).

**2.**  The Objectors' names, policy numbers, addresses, and telephone numbers:

**Peck Et Al Policy Holdings LLC**
By: Levi Katz, Managing Member
Policy Number: 60049627
5 Rosepark Crescent
Lakewood, NJ 08701
(848) [redacted and will be provided by counsel below if necessary].

**Frank 2000 Irrevocable Trust dated January 1, 2000**
By: Angela Terry, Trustee
Policy Number: 60060573
1346 Summit Avenue
Cardiff, CA 92007
(760) [redacted and will be provided by counsel below if necessary].

Mr. Katz and Ms. Terry are current and former owners, respectively, of TransSurvivor 115 Policies sold by Transamerica Life Insurance Company ("TLIC") and subjected to MDR Increases that cumulatively raise MDRs on the Policies by over 168%.[1]

Ms. Terry is the plaintiff in a similar cost of insurance action that is pending against Transamerica in the Northern District of Iowa (*Terry v. Transamerica Life Ins. Co.*, 1:19-cv-00118-LTS-KEM (N.D. Ia, filed on October 23, 2019). Ms. Terry was a member of the national and California classes alleged by Plaintiffs in their First Amended Complaint (she is not a senior policyowner). *See* First Amended

---

[1] Capitalized terms have the meaning given to them in the Settlement Agreement and Release (Doc. No. 143-1).

Complaint at ¶ 111 (Dkt. 91). Now, to protect the unfair and inadequate settlement, the Parties have improperly attempted to exclude from the Settlement Class Ms. Terry and similarly situated plaintiffs in cases against TLIC. *See* Settlement Agreement and Release ¶ 60(e).

Ms. Terry sought a stipulation from TLIC to voluntary dismiss that suit without prejudice so that she could challenge the Settlement, but TLIC would only stipulate to voluntarily dismiss Ms. Terry's suit with prejudice. As described further below, in addition to other objections, Ms. Terry objects to the Settlement Class definition to the extent it purports to exclude Policyowners challenging the MDR Increases in pending lawsuits against TLIC. *See* Settlement Agreement and Release ¶ 60(e)

**3.** Represented by Counsel:

> Stephen J. Fearon, Jr.
> Paul V. Sweeny
> **SQUITIERI & FEARON, LLP**
> 32 East 57th Street, 12th Floor
> New York, New York 10022
> Tel:   (212) 421-6492
> Fax:   (212) 421-6553
> stephen@sfclasslaw.com
> paul@sfclasslaw.com

**4.** The basis for the objections:

> Mr. Katz and Ms. Terry object to the Settlement Agreement and Release and the Class Fee and Expense Application for the reasons described below.

**5.** A statement of whether you intend to appear at the Final Approval Hearing, either with or without counsel.

> Mr. Katz and Ms. Terry will appear by counsel.

1

2    Dated: August 3, 2020                    **Peck Et Al Policy Holdings LLC**

3

4                                             By: Levi Katz, Managing Member

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: August 3, 2020                    **Frank 2000 Irrevocable Trust**

_____

By: Angela Terry, Trustee

## OVERVIEW

The Parties have agreed to a conflicted, unfair, and disproportionate Settlement and an award of attorneys' fees that cannot satisfy the heightened standard of review that applies to precertification class settlements in the Ninth Circuit. *See Roes, 1-2 v. SFBSC Mgmt. LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019).

This action challenges TLIC's improper and illegal efforts to wipe unprofitable Policies off its books by imposing MDR Increases as high as 168% in 2017 and 2018. TLIC implemented the MDR Increases to either have Policyowners pay more than they were contractually required to pay or force Policyowners to cancel their policies, creating a windfall for TLIC. By imposing crushing MDR increases, TLIC understood that a significant percentage of Policyowners would lapse or surrender their policies, thus enabling TLIC to avoid paying the death benefits on hundreds of millions, or more likely billions, of dollars in insurance policies. This proposed Settlement is part of TLIC's strategy and is a way for TLIC to continue the challenged MDR Increases, allow its "shock-lapse" strategy to go unimpeded, and allow TLIC to further collect hundreds of millions of dollars in additional Monthly Deductions.

If the Court approves the Settlement, hundreds or thousands of Terminated Policyowners will receive Settlement Relief worth <u>less than $2 million with no reinstatement option</u> after having collectively lost hundreds of millions of dollars or more in insurance coverage and paying hundreds of millions of dollars in premiums to TLIC—with many Terminated Policyowners only receiving a $200 minimum payout. To make matters worse, the Class Notice does not provide Settlement Class Members with an opportunity to determine their *pro rata* share of the Settlement Relief and withholds other critical information that the Court and Settlement Class need to weigh the fairness and benefits of the Settlement, including disclosing the disproportionate $2 million amount of Settlement Relief being distributed to Terminated Policyowners.

The Ninth Circuit and courts throughout the country have repeatedly warned against class-wide settlements that favor certain class members while releasing the claims of differently situated class members in exchange for disproportionate relief—the precise type of Settlement being proposed here. *See In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-cv-05944-JST, MDL No. 1917, Doc. No. 5362 (N.D. Cal. November 8, 2018) ("[P]itting one set of clients' claims against those of another is a classic indication of a potential conflict of interest."). The Settlement releases claims potentially worth billions of dollars by Terminated Policyowners for less than $2 million without any hope of reinstatement. That relief was obtained by Co-Lead Class Counsel who previously negotiated a $28 million fee award in *Feller* and by Class Representatives who predominantly own In-Force Policies and have incentives at odds with the Terminated Policies. The Settlement distribution is too lopsided and conflicted to withstand scrutiny.

The Settlement is also unfair and disproportionate because an undisclosed, but likely significant, portion of Settlement Relief is being credited to accumulation values of Policies that are protected by the Endorsement to Modify Grace Period (the "No-Lapse Guarantee"). Under the No-Lapse Guarantee, a Policy will remain in force—even after the Policy would otherwise lapse — as long as a Policyowner owners pays a fixed "Select Monthly Premium" independent of the Policy's accumulation value (unlike the adjustable premiums traditionally needed to keep a universal life insurance policy out of the grace period). The Settlement Relief credited to No-Lapse Guarantees Policies' accumulation values will not provide a tangible financial benefit to the Settlement Class because it cannot be used to pay Select Monthly Premiums and the Policies provide no other realistic way to convert the additional Accumulation Value into cash.[2] The

---

[2] For example, a No-Lapse Guarantee Policyowner must elect to receive Death Benefit Option 1 which will undoubtedly result in No-Lapse Guarantee Policyowners receiving the face amount of the Policy. *See* Ms. Thompson's Policy, Exhibit A at 7 (Dkt. 1-1).

Settlement Relief being credited to No-Lapse Guarantee Policies is illusory and will not help the Settlement Class but, instead, inflates the value of the Settlement and the basis for Co-Lead Class Counsel's $19 million fee request.

The Settlement was negotiated by largely conflicted representatives in the wrong jurisdiction. As TLIC itself has argued, this Court has no jurisdiction over non-California class members who are bringing their claims against an Iowa-based company. Plaintiffs were facing an uncertain future in a forum that—as TLIC has consistently argued—has no jurisdiction over the claims of absent class members living outside of California. Faced with this jurisdictional weakness, Plaintiffs cobbled together a Settlement that short-changes the Settlement Class (particularly Terminated Policyowners) and will result in Transamerica recouping a significant portion of the Settlement Relief that it allocates to In-Force Policyowners. As set forth below, the Court should demand more information from the Parties and deny final approval.

## OBJECTIONS

### A.    Objector Levi Katz

Levi Katz resides in New Jersey and owns and manages Peck Et Al Policy Holdings, LLC, an investor in life insurance policies. In 2020, Globalstar 11 Holdings LLC—Peck Et Al's predecessor—assigned to Peck Et Al ownership of a TransSurvivor 115 Policy with a face amount of $5,000,000 (Policy No. 60049627). Peck Et Al paid the premiums needed to cover the Policy's Monthly Deductions but did not pay the Select Monthly Premiums needed to benefit from the No-Lapse Guarantee.[3]

---

Likewise, a No-Lapse Guarantee Policyowner cannot take out a policy loan, and the Policy's accumulation value will be too depleted to benefit from the Policy's partial surrender provisions. *Id.* at 15-17.

[3] In a Grace Period Final Notice dated October 8, 2019, TLIC informed Globalstar 11 that it would have to pay $990,325 to "maintain the no-lapse death benefit guarantee."

In May 2018, TLIC increased the MDRs on Peck Et Al's Policy by 39%, and in August 2019, TLIC informed Peck Et Al—then Global Star—that the Policy's MDRs "would increase by approximately 39% on a compound basis on each of the two following policy anniversaries." The MDR Increases will cumulatively raise the costs on Mr. Katz's Policy by over 168%.

From January 2019 to January 2020, Mr. Katz paid approximately $103,000 in premiums to cover the Policy's Monthly Deductions, meaning it may be impossible for Mr. Katz to sustain the premiums needed to cover future Monthly Deductions impacted by TLIC's compounding MDR Increases. Mr. Katz—like hundreds or thousands of other In-Force Policyowners not benefitting from the No-Lapse Guarantee—finds himself in a position where Peck Et Al may lose the Policy despite paying hundreds of thousands of dollars in premiums.

In late June 2020, Peck Et Al received the Class Notice stating that TLIC had identified Peck Et Al "as a current or former owner of a life insurance policy that is included in the proposed Settlement[.]" On or about July 23, 2020, Mr. Katz contacted the Settlement Administrator for an estimate of the Settlement Relief that would be provided to Peck Et Al if the Court approved the Settlement. The Settlement Administrator responded that it could not provide an estimate of the Settlement Relief or a Policy illustration reflecting the Settlement's impact until after the Final Approval Hearing. Thus, Mr. Katz and other Settlement Class Members are unable to calculate their potential recovery and cannot meaningfully weigh the benefits of being bound by the Settlement.

Peck Et Al—by Mr. Katz—objects to the Settlement.

## B.   Objector Angela Terry

Ms. Terry is a resident of California. In January 1985, Ms. Terry's family purchased a TransSurvivor 115 universal life insurance policy from TLIC with a face amount of $1,000,000 (Policy No. 60057155) and placed it in the Frank Trust to assure the family's security when Ms. Terry's parents—the joint insureds—died.

Ms. Terry and her family paid approximately $10,000 per year in premiums from the time the policy was issued, or approximately $172,000 in total premiums.

In May 2019, Ms. Terry surrendered her policy after receiving a February 2019 notice from TLIC stating that it anticipated increasing Ms. Terry's monthly deduction rate by approximately 39% on each policy anniversary after May 2019 and that those increases "would be on a compound basis and . . . in addition to customary increases associated with age." The MDR Increases on Ms. Terry's Policy would have cumulatively raised MDRs by over 168%, making it impossible for Ms. Terry to continue paying the premiums needed to sustain coverage.[4] Ms. Terry, like hundreds or thousands of other Terminated Policyowners who were subjected to these improper increases, now finds herself without $1,000,000 in insurance coverage and without the realistic ability to reinstate the coverage.

In October 2019, Ms. Terry, on behalf of the Frank Trust, filed an individual action against TLIC in the Northern District of Iowa. *Terry v. Transamerica Life Ins. Co.*, 1:19-cv-00118-LTS-KEM (N.D. IA). Ms. Terry was a member of the national and California classes alleged by Plaintiffs in their First Amended Complaint (she is not a senior policyowner). *See* First Amended Complaint at ¶ 111 (Dkt. 91). Now, to protect the unfair and inadequate settlement, the Parties have improperly excluded Ms. Terry and similarly situated plaintiffs in cases against TLIC from the Settlement Class. *See* Settlement Agreement and Release ¶ 60(e).

Therefore, in addition to the other objections described below, Ms. Terry objects to the Settlement Class definition to the extent it purports to exclude plaintiffs in pending lawsuits against TLIC. The Parties designed the Settlement Class definition to head-off likely challenge and short-circuit the final approval

---

[4] Ms. Terry and her family had not been paying the Specified Monthly Premiums needed to benefit from the Policy's No-Lapse Guarantee.

process. The Parties' chosen Settlement Class definition runs contrary to the protections provided by Rule 23(e) and was intended to shield an unfair and conflicted class-wide settlement from the heightened scrutiny of precertification class-wide settlements. As a Terminated Policyowner affected by the MDR Increases, Ms. Terry should decide whether she wants to participate in or challenge the Class Settlement, and the Court should reject the Parties' improper tactics.[5]

Ms. Terry objects to the Settlement on behalf of the Frank Trust.

## C.   Heightened Standard of Review for Precertification Class Settlements

"The settlement of a class action must be fair, adequate, and reasonable." *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015) (citing Fed. R. Civ. P. 23(e)). "A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Id.*

The Ninth Circuit has "set a high procedural standard for settlements that . . . occur without a certified class." *Id.* at 1223 (vacating and remanding final approval for "a more searching inquiry into the fairness of the negotiated distribution of funds[.]"). Because "settlement class actions present unique due process concerns for absent class members . . . the district court has a fiduciary duty to look after the interests of those absent class members." *Id.* (citations omitted). Thus, when reviewing precertification class settlements, "the district court abuses its discretion if it fails to apply 'an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e).'" *Roes, 1-2,*

---

[5] In their Motion for Class Certification (at 8 n.3), Plaintiffs suggest that they can exclude litigants in pending cases who would otherwise qualify as class members by citing far-flung and inapplicable authority. *See Healthy Future of Texas v. Dep't of Health and Human Services*, 326 F.R.D 1, 1 (D.D.C. 2018) (The defendant argued that class definition was not certifiable under Rule 23(b)(2) because it functioned as an "impermissible 'opt-out' mechanism" and opt-out rights are not typically given to Rule 23(b)(2) class members); *In re Shopping Carts Antitrust Litig.*, M.D.L. No. 451-CLB, 1983 WL 1950, at *10-18 (S.D.N.Y. Nov. 18, 1983) (The settlement class definition was not challenged by improperly excluded class members).

944 F.3d 1035 at 1043.

For a precertification class-wide settlement to withstand appellate review, a district court must explore all relevant factors comprehensively; give a reasoned response to all non-frivolous objections; and "look for and scrutinize any 'subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Allen*, 787 F.3d at 1222 (citation omitted). "This exacting review is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Roes, 1-2*, 944 F.3d at 1043 (citation and internal quotations omitted).

Here, the Settlement—which was negotiated and agreed to prior to class certification—cannot satisfy the heightened scrutiny required by the Ninth Circuit. The Settlement is fundamentally marred by procedural and substantive deficiencies, including a critical lack of information for the Court and Settlement Class Members, conflicted representatives, and disproportionate and disparate treatment of certain segments of the Settlement Class, all indications of a conflicted and an unfair class-wide settlement that should be denied.

**D.   The Parties Are Not Providing Critical Information About the Settlement**

The Court cannot undertake the required heightened review here because the Parties have failed to provide information that the Court needs to understand the actual recovery for each portion of Settlement Class compared to their potential damages, as well as the reasonableness of the Class Fee and Expense Application. To aid its heightened duties here, the Court should demand that the Parties provide the following information about the Settlement before considering final approval:

1. The total number of Terminated Policies in the Settlement Class. Although Plaintiffs state that "over 7,800 Policies . . . benefit from the Settlement[,]" *see* Memorandum of Law in Support of Final Approval Class Counsel at 2 (Dkt. 157), Plaintiffs fail to disclose how many

Terminated Policies are included in the Settlement Class. The Court and the Terminated Policyowners need this information to determine whether the Terminated Policyowners' $2 million recovery adequately compensates Terminated Policyowners for losses that could easily eclipse $1 billion.[6]

2. The Terminated Policies' total face amount and the total premiums Terminated Policyowners paid. The Court and Terminated Policyowners need this information to determine whether the Terminated Policyowners' $2 million recovery under the Settlement adequately compensates them for their substantial losses.

3. The total face amount of In-Force Policies in the Settlement Class *not* benefitting from the No-Lapse Guarantee. Many In-Force Policyowners who are not benefitting from the No-Lapse Guarantee will soon lapse on or surrender their Policies due to compounding MDR Increases. The Court and In-Force Policyowners need this information to determine whether their portion of the Settlement Relief is fair and adequate when compared with the amount of prospective insurance liability TLIC will shed if the MDR Increases continue.

4. The total amount of Settlement Relief being credited to No-Lapse Guarantee Policies' Accumulation Values. The Court needs that information to determine whether the Settlement is fair and adequate or inflated by illusory relief that will immediately be remitted to TLIC.

5. The total amount of additional Monthly Deductions that TLIC anticipates collecting if the Court approves the Settlement and the MDR Increases continue. The Court and the Settlement Class need that information to determine the adequacy of the Settlement Relief compared with the

---

[6] TLIC's "shock-lapse strategy" allowed it to shed hundreds of millions of dollars—but likely more than a billion dollars—in insurance liability. In the *Feller* settlement, Class Counsel represented that roughly 20% of the class policies were terminated policies (13,193/59,754 class policies). *Feller*, Friedman Declaration in Support of Final Approval at ¶ 71 (Dkt. 422). In this case, assuming a similar 20% proportion (1,560/7,800 Class Policies), and multiplying that number by the rough average face amount of the Policies owned by the Class Representatives ($900,000, *see* First Amended Complaint at ¶¶ 9-17), yields a $1.4 billion figure for the face value of the Terminated Policies.

amount of money TLIC will earn if the MDR Increases continue.

The foregoing information is pivotal to conduct the "exacting review" required by the Ninth Circuit. *See Roes, 1-2*, 944 F.3d at 1049. Because the Settlement would permanently sanction the MDR Increases, the Settlement could realistically provide TLIC with billions of dollars in current and prospective benefits in exchange for grossly inadequate settlement consideration, particularly if TLIC will be distributing a sizeable portion of the In-Force Policies Settlement Common Fund to In-Force Policyowners maintaining the No-Lapse Guarantee.

The Parties have not yet provided critical information that the Court needs to determine whether the precertification Settlement satisfies the Ninth Circuit's heightened standard of review and the Settlement Class members need to determine whether they should participate in the settlement. The Court should deny final approval until the Parties that information.

**E.    The Class Notice Was Not The Best Notice Practicable Under the Circumstances**

"In a class action, once the district court certifies a class under Rule 23, all class members are bound by the judgment unless they opt out of the suit." *McElmurry v. U.S. Bank Nat. Ass'n*, 495 F.3d 1136, 1139 (9th Cir. 2007). Thus, "the court must direct the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Settlement class notice also must "generally describe[] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and come forward and be heard[.]" *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962-63 (9th Cir. 2009).

Settlement class notices in this type of litigation should provide class members with an opportunity to receive an estimate of their settlement relief or an opportunity to receive a policy illustration showing the impact of the settlement relief. *See Feller*, Class Notice at 10 (Dkt. 401-1 at 55 of 63) ("You can obtain . .

9

an estimate of the amount you may be entitled to . . . and  . . . obtain an illustration depicting  the potential impact of the Settlement Relief[.]"); *Yue v. Conseco Life Ins. Co.*, 11-cv-09506-DSF-SH (C.D. Cal), In-Force Policy Class Notice at 2 (Dkt. 168 at 73 of 156) ("Ask for Policy Illustration"). Settlement relief estimates in cases like this are practicable and necessary because the estimates are easily calculable by the insurer (but not settlement class members) due to the technical and proprietary nature of cost of insurance rates and the impact of cost of insurance rate increases.

Here, Class Counsel departed from their prior practices (including in *Feller* and *Yue*) and failed to provide an opportunity for Settlement Class Members to determine the amount of their *pro rata* portion of the Settlement Relief. The Parties' failure to provide easily calculable damage estimates to the Court and to Settlement Class Members indicates that the *pro rata* distribution of the Settlement Relief is so low that it will have no impact on Policy performance and would likely lead to objections and exclusion requests if provided. The Class Notice also fails to provide the critical information described above (Section D), including the face amount of terminated or soon-to-be Terminated Policies and that Terminated Policyowners will only be receiving $2 million in Settlement Relief. *See* Class Notice at 9-10 (Dkt 143-1).

The Court should deny final approval until the Parties provide the required best practicable notice—notice that provides the details needed to understand the relief and meaningfully weigh the benefits of participating in the Settlement.

## F.    The Class Representatives Cannot and Did Not Adequately Represent A Settlement Class Consisting of Many Terminated Policyowners

The Class Representatives are predominantly In-Force Policyowners and are therefore not typical of—and cannot adequately represent—Terminated Policyowners. *See Thompson*, First Amended Complaint at ¶¶ 101-09. Most glaringly, Plaintiff Bucci—a Terminated Policyowner—is not listed as a Class

Representative in either the Settlement Agreement or the Court's Preliminary Approval Order, indicating that she may not support the Settlement. *Compare Thompson*, Settlement Agreement and Release ¶ 47 *with* ¶ 60; Preliminary Approval Order ¶ 5. The parties do not explain (including in the Class Notice) why Plaintiff Bucci is not listed as a Class Representative.[7]

"Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23[,]" including the typicality requirement set forth in Rule 23(a)(3) and the adequacy requirement set forth in Fed. R. Civ. P. 23(a)(4). *See Spann v. J.C. Penney Corp.*, 314 F.R.D. 312 (C.D. Cal. 2016).

Rule 23(a)(3)'s typicality requirement is intended "to limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). Similarly, "[t]he adequacy inquiry

---

[7] Class Representative Thompson's policy "remains in force with Transamerica and was subject to Transamerica's TransSurvivor MDR Increase until the policy lapsed on or about December 4, 2018." *Thompson*, First Amended Complaint at ¶ 102. Based on that allegation and Ms. Thompson's Planned Periodic Payment (which covers the No Lapse Endorsement's Select Monthly Premium), it appears that Ms. Thompson benefits from the No-Lapse Guarantee and her Policy will not terminate so long as she continues to pay sufficient Select Monthly Premiums. Thus, Ms. Thompson's interests are co-extensive with In-Force Policyowners, not Terminated Policyowners. *See* Complaint Ex. A, Ms. Thompson's Policy at 2 (Dkt. 1-1).

Class Representative Swift appears to be the only Terminated Policyowner. If she is a Terminated Policyowner, she would be the only one among the eight Class Representatives, and among the Class Representatives, Ms. Swift has the Policy with the lowest face amount—$250,000. *See Thompson*, First Amended Complaint ¶ 108.

under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "A plaintiff is not an adequate representative if a 'fundamental conflict' exists among a class[,]" *Brown v. Am. Airlines, Inc.*, 285 F.R.D. 546, 558 (C.D. Cal. 2011) (citation omitted), and a "court must ensure that the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented" *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489-90 (N.D. Cal. 2008) (citation omitted).

In the *Feller* case, Class Counsel recognized the fundamental conflicts and differences between in-force policyowners and terminated policyowners. To avoid those conflicts and account for differing injuries, the *Feller* complaint separately alleged in-force and terminated subclasses and sought separate relief for terminated policyowners to remedy their discrete injuries—squandered premiums and the loss of death benefits. *See Feller*, Second Consolidated Amended Complaint, ¶¶ 74-82 and Prayer for Relief ¶ 4 (Dkt. 293). Later, the *Feller* plaintiffs filed two separate motions for class certification—one for in-force policyowners brought by in-force representatives and another for terminated policyowners brought by terminated representatives. *See generally Feller*, Motions for Class Certification (Dkts. 282, 387). At the beginning of *Feller*, Class Counsel understood that terminated policyowners required special treatment due to the nature of their claims and damages but ultimately sought certification of a blended settlement class to facilitate a class-wide settlement with TLIC.

In this case, the diverging incentives and conflicts between Class Counsel and Class Representatives and the Settlement Class are even more pronounced than *Feller*. Even while acknowledging that TLIC imposed the MDR Increases (as high as 168%) to cause widespread shock lapses, the First Amended Complaint does not allege separate classes or seek separate monetary or injunctive relief on behalf of

Terminated Policyowners. *Thompson*, First Amended Complaint at ¶¶ 89-91, Prayer for Relief (Dkt. 98). Likewise, Plaintiffs moved for certification of blended classes of Policyowners and made no mention of separate relief for Terminated Policyowners. *See* Redacted Memorandum of Law in Support of Motion for Class Certification at 20-21 ("Restitution will be computed by the same methodology applicable to every Policy owner in each of the Classes, across both the in-force and terminated Class Policies[.]") (Dkt. 116).

The procedural history of *Thompson* reveals that Class Counsel and their chosen Class Representatives had no real intention of representing the interests of the  dissimilarly situated Terminated Policyowners but, rather, that Terminated Policyholders' separate claims and damages were going to be the key bargaining chip that Co-Lead Class Counsel would leverage during inevitable settlement negotiations with TLIC. That is exactly what occurred—the Parties are proposing a Settlement and Class Fee and Expense Application that provides a billion dollar windfall to TLIC; $88 million to In-Force Policyowners (including an undisclosed and illusory amount to No-Lapse Guarantee Policyowners); $19 million to Class Counsel; and $2 million to Terminated Policyowners with no relief to account for their catastrophic loss of their insurance coverage.

The conflicts between the Class Counsel, the majority of Class Representatives, and the Class—including In-Force Policyowners not benefitting from the No-Lapse Guarantee—calls for denying final approval.

**G.    The Court Should Not Approve A Conflicted Settlement that Sacrifices the Interests of Terminated Policyowners and In-Force Policyholders Who Are Not Maintaining the No-Lapse Guarantee**

The inherent conflicts between Class Counsel, the Settlement Representatives, and the Settlement Class resulted in an unfair "one-size fits all" and irrational distribution of Settlement Relief that heavily disfavors Terminated Policyowners and provides Settlement Relief to In-Force No-Lapse Guarantee Policyowners who will not economically benefit.

Courts frown upon attempts by class counsel and class representatives to favor certain class members and abandon and release claims of other class members to facilitate class certification and class settlement. Courts often deny certification and settlement approval where certain portions of the class are subjected to disparate and inferior treatment. For instance, in *Clark v. Experian Information Solutions, Inc.*, Nos. 00–1217–24, 00–1218–24 & 00–1219–24, 2001 WL 1946329, at *1–*6 (D.S.C. Mar.19, 2001), the proposed named plaintiffs had disclaimed other, more substantial, claims of the class members in favor of a single claim under the Fair Credit Reporting Act, thereby potentially prejudicing class members who may have wanted to pursue other potential claims. *Id.* at *4. The court determined the proposed named plaintiffs did not satisfy the adequacy requirement because their interests were "not aligned with those of the class." *Id*; *see also Thompson v. Am. Tobacco Co.*, 189 F.R.D. 550-51 (D. Minn. 1999) (denying class certification where class representatives sought certification of claims that would jeopardize other class members' ability to pursue personal injury claims); *Pearl v. Allied Corp.,* 102 F.R.D. 921, 922-23 (E.D. Pa. 1984) (finding that class representatives were inadequate where they abandoned their claims for physical injury and diminution in property value); *Feinstein v. Firestone Tire & Rubber Co.,* 535 F. Supp. 595, 606–07 (S.D.N.Y.1982).

More recently, in *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, No. 3:07-cv-05944-JST, MDL No. 1917, Doc. No. 5362 (N.D. Cal. November 8, 2018), the Northern District of California concluded it had erred in approving a class-wide settlement that released the claims of certain class members without compensation. The court expressed concerns about the adequacy of the attorneys who had advocated the terms of the deficient settlement by maintaining that the released claims of the disfavored class members were "worthless." *Id.* at 1-2. The court noted that "pitting one set of clients' claims against those of another is a class indication of a potential conflict of interest" and that class counsel's

continued efforts to convince the court of the low value of the released claims warranted "further exploration of the issue" and potentially appointing separate counsel. *Id.* at 2; *see also Vu v. Fashion Inst. Design & Merchandising*, No.: CV 14-08822 SJO (Ex), 2016 WL 6211308, at *3, 8-9 (C.D. Cal. Mar. 22, 2016) (listing "preferential treatment of . . . segments of the class" as an "obvious deficiency" of a proposed settlement and denying preliminary approval based on the settlement's "one-size fits all" approach to apportioning relief).

Here, if the Court approves the Settlement and Class Fee and Expense Application, Terminated Policyowners will receive a grossly disproportionate $1.8 million dollars (less than 2% of the Settlement Relief) with no reinstatement option or additional relief despite the fact that Terminated Policyowners likely forfeited hundreds of millions of dollars in premiums and lost over a billion dollars in death benefits. *See* Settlement Agreement and Release ¶ 72(b).[8] The Terminated Policyholder's microscopic recovery—which is not even disclosed in the Class Notice—pales in comparison with TLIC's billion dollar windfall and Class Counsel's recovery, which could be $19 million or 19% of the Settlement Relief. *See Roes, 1-2*, 944 F.3d at 1049 (noting that a disproportionate distribution of settlement relief to class counsel is one "subtle" sign of settlement collusion). Such a disproportionate recovery would never be approved standing on its own, and the Terminated Policyowners' recovery here should not be approved simply because the Parties have improperly dragged Terminated Policyowners into the negotiating process.

The Terminated Policyowners' disproportionate recovery (as well as the

---

[8] The Settlement purports to create a separate "Terminated Policies Settlement Common Fund." *See* Settlement Agreement and Release at ¶ 72(b) (Dkt. 143-1). However, the monetary relief being provided Terminated Policyowners does not differ from the monetary relief being provided to In-Force Policyowners—both portions of the class receive a return of MDR overcharges with a minimum payout of $200. *See id.* at ¶ 72(a); Memorandum of Support of Motion for Preliminary Approval at 3 (emphasis supplied).

recovery of In-Force Policyowners not benefiting from the No-Lapse Guarantee) is further objectionable because a substantial amount of Settlement Relief may be credited to the accumulation values of No-Lapse Guarantee Policies. No-Lapse Guarantee Policyowners have no realistic way to use money credited to their accumulation values to pay the Select Monthly Premiums needed to keep the No-Lapse Guarantee in force or otherwise withdraw the Settlement Relief, a fact driven home by the Class Notice:

> Please be aware that the Settlement does not modify the terms and conditions applicable to the [No-Lapse Guarantee], and therefore you must pay or continue to pay the Select Premium or Select Monthly Premium required by the policy in order to receive the benefits provided by the [No Lapse Guarantee].

Class Notice at 9-10 (Dkt. 143 1 at 55 of 63-56 of 62). Distributing Settlement Relief to No-Lapse Guarantee Policies' accumulation values does not alter the economic position of TLIC or the affected Policyowner and does not benefit the Settlement Class. Instead, conflicted representatives agreed to this irrational distribution of Settlement Relief to inflate an inadequate settlement and provide an inflated basis for an unjustifiable $19 million fee request.

The grossly unfair distribution of Settlement Relief indicates that the settlement was the result of overreaching between conflicted representative and TLIC. As a result, the Court should deny final approval. *See Roes, 1-2*, 944 F.3d at 1049 ("[T]he district court had an obligation to question the disproportionate cash distribution to attorneys' fees, substantively address concerns that the settlement value was inflated, and clearly explain why the total benefits to the class justified the fees awarded.").

**H.    The Settlement Is Unfair and Inadequate Because the Court Lacks Jurisdiction Over Out-of-State Class Members' Claims Under *Bristol-Meyers Squibb***

Throughout this case and in *Feller*, TLIC has argued that because TLIC has

16

its headquarters outside of California, the Court could not certify a class that extended to class members living outside of California, relying on *Bristol-Meyers Squibb v. Superior Ct.*, 137 S. Ct. 1773 (2017). In *Feller*, after the Court certified an in-force class extending beyond California, TLIC successfully sought interlocutory appeal from the Ninth Circuit under Rule 23(f). *Feller*, Certification of Interlocutory Appeal (Dkt. 368).

TLIC argued then and continues to argue now that the Supreme Court's reasoning in *Bristol-Meyers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773 (2017)—a case involving personal jurisdiction requirements in mass torts—extends to class actions and that the same principles that forbid litigation of mass-tort claims by plaintiffs without a meaningful connection to the forum state likewise preclude litigation of claims by unnamed class members without a meaningful connection to the forum state. *Thompson*, Memorandum in Support of Motion to Dismiss at 14 (Dkt. 45-1) (collecting cases extending *Bristol-Meyers Squibb* to class actions).

Co-Lead Class Counsel admits that TLIC's invocation of *Bristol-Meyers Squibb* constitutes a significant risk to further litigation, including the risk that the Ninth Circuit would reverse nationwide class certification or the risk of undue delay of likely Supreme Court review. *See* Joint Declaration of Lead Counsel in Support of Final Approval ¶¶ 45, 90 (Dkt. 158).

Rather than risk losing that jurisdictional argument and having their class limited to California residents or being forced to purse the litigation in Iowa, Co—Lead Class Counsel agreed to an inadequate and unfair Settlement that allows TLIC to improperly increase its bottom-line and continue its impermissible shock-lapse practices to the substantial detriment of the Settlement Class. The Court should reject this attempt to push through an inadequate settlement based on jurisdictional defects.

The Court should also separately reject the Settlement because it binds and releases the claims by residents of states other than California—including Mr.

Katz—when *Bristol-Meyers Squibb* holds that a Court does not have jurisdiction over claims brought by out-of-state plaintiffs that bear no material connection to the forum state.[9]   The Court should not allow conflicted representatives to agree to an unfair and inadequate settlement that was molded in significant part by Co-Lead Counsel's fear that the Ninth Circuit would extend *Bristol-Meyers Squibb* and rule that the Court lacked jurisdiction over the claims of out-of-state class members.

## I.   The Settlement Is Unfair and Inadequate Because It Does Not Provide a Reinstatement Option for Terminated Policyowners

Reinstatement provisions are common in class-wide settlements in this type of litigation and provide a necessary component of relief for policyowners who could not afford to fund their policies due to impermissible cost increases such as the 168% MDR Increases TLIC imposed on Mr. Katz's and Ms. Terry's Polices. For example, in *Yue v. Conseco Life Ins. Co.*, 2:11-cv-09056-DSF-SH (C.D. Cal.) ("*Yue II*"), Conseco provided lapsed and surrendered policyholders an opportunity to reinstate their policies without underwriting requirements so long as the lapsed policyholders paid reduced monthly deductions and surrendered policyholders repaid funds disbursed upon surrender. *Yue II*, Amended Stipulation of Settlement at 30-31 (Dkt. 168); *In re Conseco Life Ins. Co. Cost of Ins. Litig.*, MDL No. 10:1610-AHM (Mcx) (C.D. Cal.) (providing a reinstatement option without insurability requirements); *Onderdonk, et al. v. Conseco Life Ins. Co., et al.*, No. 2004-10-5073-E (Tex. Dist. Ct. Oct. 4, 2004) (same).[10] Allowing Terminated policyowners to reinstate their policies places them in the position they would have been absent the unlawful increases and prevents insurers from benefitting from

---

[9] *Wenokur v. AXA EquitableLife Ins*., No. CV-17-00165-PHX-DLR, 2017 WL 4357916, at *4 n.4 (D. Ariz. Oct. 2, 2017) (The court "lacks personal jurisdiction over the claims of putative class members with no connection to Arizona and therefore would not be able to certify a nationwide class.").

[10] The *Onderdonk* settlement can be found at *Fleenor v. CNO Fin. Group, Inc.*, No. 2:16-cv-00308-JRG-MCLC (Dkt. 29-1 at 22-84) (E.D. Tenn. Nov. 28, 2016)

their unlawful conduct through shock lapses.

Co-Lead Class Counsel fully understands how vital a reinstatement option is for Terminated Policyowners like Ms. Terry. In *Feller*, Co-Lead Counsel initially advocated for the option to reinstate terminated policies both in the pleadings and when moving for certification of terminated policyowners, arguing that terminated policyowners needed a reinstatement option to remedy TLIC's unlawful conduct and restore the *status quo ante*. *See Feller*, Redacted Memorandum in Support of Class Certification of Terminated Policy Classes at 1-2 (Dkt. 388).

Here, the lack of reinstatement option is another unfair aspect of the Settlement demonstrating that the Class Representatives were hopelessly conflicted and unconcerned with Terminated Policyowners' interests. *See* Settlement Agreement and Release ¶ 71(b). Co-Lead Counsel and the Class Representatives (who predominantly own In-Force Policies) have negotiated a settlement that may ultimately provide Terminated Policyowners with less than $2 million (not even 2% of the Settlement Relief), a pitiful recovery eclipsed by losses that could easily exceed $1 billion for Terminated Policyowners. Terminated Policyowners—like Ms. Terry—who paid hundreds of thousands of dollars in Premiums and were forced to cancel Policies potentially worth millions of dollars will release their claims and likely receive $200 in Settlement Relief. Meanwhile, Transamerica unjustly retains hundreds of millions of dollars in premiums and likely wipes over a billion dollars of insurance liability from its book.

The Court should reject the Settlement as disproportionate because it lacks a reinstatement option and *de minimis* monetary relief is not a fair and adequate remedy for Terminated Policyowners,

## J.    The Settlement Is Unfair Because It Permanently Sanctions TLIC's Improper and Illegal MDR Increases

The Settlement Relief is unreasonable and inadequate because hundreds or perhaps thousands of In-Force Policyholders who are not benefitting from the No-Lapse Guarantee are going to succumb to compounding MDR Increases (as high as

168%) that will decimate Accumulation Values shortly after the ink dries on the Final Approval Order.

In other cost of insurance class settlements, including ones negotiated by Co-Lead Class Counsel, the parties have ensured that the cost of insurance increases at issue would be greatly reduced going-forward. For example, in *Yue II*, although the challenged cost of insurance rate scale stayed in place, Conseco recalculated policy values to retroactively reduce the cost of insurance increase and agreed to implement a two-phase cost of insurance reduction of the new rate scale prospectively. *See Yue II*, Stipulation of Settlement (Dkt. 168 at No. 168 at 19-22); *see also In re Conseco Life Ins. Co. Cost of Ins. Litig.*, MDL No. 10:1610-AHM (Mcx) (C.D. Cal.) (providing an in-force death benefit extension for in-force policyholders affected by cost of insurance increases).[11] COI class settlements that establish prospective reduced cost of insurance increase the possibility that in-force policyholders will be able to afford their policies in the future and that their beneficiaries will receive the promised death benefits.

In this case, TLIC will continue to impose the devastating MDR increases on In-Force Policyowners. Plaintiffs initially recognized TLIC's "shock-lapse" strategy, alleging that "massive MDR Increases will cause thousands of Class Members to surrender their Policies and cause thousands of other Policies to lapse as the increased Monthly Deduction charges exhaust the funds in the Policies' accumulation accounts." *See* First Amended Complaint ¶¶ 89-90. Now, in order to facilitate an inadequate Settlement, the representatives have agreed to a Settlement that permanently sanctions the MDR Increases, all but assuring that hundreds or thousands of In-Force Policyholders will lapse or surrender their policies and lose

---

[11] Co-Lead Counsel previously distinguished its efforts in *Yue* by arguing that "the average increase by Conseco was 167%[.]" *Feller*, Reply in Further Support of Final Appoval at 20 (Dkt. 432). That argument holds much less weight in this case, where the MDR Increases imposed by TLIC will cumulatively total 168% on TransSurvivor 115 Policies.

the death benefits they have fought so long to keep.

Moreover, because the MDR Increases will almost certainly cause any In-Force Policyowners not benefitting from the No-Lapse Guarantee to forfeit their Policies, the MDR Increase Protection Benefit—which purports to prevent TLIC from imposing additional MDR Increases for seven years—is completely illusory. TLIC has already accomplished its shock-lapse goal by increasing MDRs by as much as 168% and fully understands that the costs of attempting to impose additional MDR Increases (including regulatory, consultant, and litigation fees and costs) would far outpace the benefits of causing further shock-lapses, particularly because a large portion of the remaining Settlement Class is benefitting from the No-Lapse Guarantee and their policies cannot be terminated.

The Court should deny final approval because the Settlement does not provide meaningful injunctive relief and will cause In-Force Policyholders' Monthly Deductions to sharply increase, causing further Policy terminations and unjustly relieving TLIC of even more insurance liability.

## K.   The Settlement's Distribution Method Allows Transamerica to Avoid Actual Payment of Settlement Relief and to Recapture the Rest of the Settlement Relief

The Settlement Agreement allows TLIC to distribute roughly 98% of the Settlement Common Funds directly to the accumulation values of each In-Force Policy, including for In-Force Policies benefitting from the No-Lapse Guarantee. *See* Settlement Agreement and Release ¶ 72(a). The distribution method ensures TLIC will not actually pay Settlement Relief to No-Lapse Guarantee In-Force Policyowners and that TLIC will recapture the vast majority of the In-Force Policies Settlement Common Fund from other In-Force Policyowners.

The Ninth Circuit and federal courts across the country have repeatedly warned about the specter of collusion where class-wide settlements include reverter provisions—i.e., provisions requiring that undistributed settlement funds be returned to defendants. *See Roes, 1-2*, 944 F.3d 1035, 1043 (9th Cir. 2019)

("[S]ubtle signs of collusion . . . include . . . when the parties create a reverter[.]");
*Eubank v. Pella Corp*, 753 F.3d 718, 723 (7th Cir 2014) ( "Still another
questionable provision of the settlement . . . made any reduction in the $11 million
attorneys' fee award revert to Pella.").

In this case, the Parties' chosen distribution method for No-Lapse Guarantee
Policies is far more objectionable than often criticized reverter provisions. Policies
benefitting from the No-Lapse Guarantee already have insufficient accumulation
values, and In-Force Policyowners must pay Select Monthly Premiums out-of-
pocket with cash to keep the No-Lapse Guarantee in force. *See* Ms. Thompson's
No-Lapse Guarantee at 1 (Dkt. 1-1 at 38 of 43) ("Hot It Works"); Class Notice at
9-10 (Dkt. 143) ("[Y]ou must pay or continue to pay the Select Premium or Select
Monthly Premium required by the policy in order to receive the benefits."); 
Settlement Agreement and Release ¶ 71(a)(i) ("[D]istributions will be made  . . .
regardless of whether the Policy's accumulation value is negative[.]").[12]

Distributing Settlement Relief directly into the Accumulation Values of No-
Lapse Guarantee In-Force Policies—where it cannot be used to pay Select Monthly
Premiums and will quickly be withdrawn by TLIC through future Monthly
Deductions—is the equivalent of TLIC taking money out of one pocket and
placing it in the other pocket—it is no distribution at all and does not provide
actual relief to Settlement Class Members.

The distribution method for the remaining In-Force Policies (those not
benefitting from the No-Lapse Guarantee) also stands out amongst recent cost of

---

[12] The Select Monthly Premiums needed to sustain the No-Lapse Guarantee are separate
from the adjustable premiums needed to keep a Policy out of the Grace Period. For
instance, TLIC, in its grace period notice to Mr. Katz, informed him that he had two
options: (1) pay $990,325 plus $82,286 dollar per year going forward during the "Select
Period" or (2) pay $39,531.00 to restore the Policy's accumulation value and get out of the
Grace Period. Obviously, Mr. Katz could not afford the former option and opted to
continue paying adjustable premiums.

insurance litigation settlements involving cash payouts to In-Force Policyholders, which have generally required a direct payment to the class member. For example, the class-wide settlement in *Fleischer, et al. v. Phoenix Life Ins. Co., et al.*, No. 1:11-cv-08405-CM-JCF, Doc. No. 299-2 at 13-14 (S.D.N.Y. May 29, 2015) required the $42.5 settlement to be deposited in an escrow account and distributed by the plaintiffs' counsel to class members. Likewise, in *37 Besen Parkway*, *LLC v. John Hancock Life Ins. Co (U.S.A.)*, No. 1:15-cv-09924-PGG-HPB, Doc. No. 133-2 at 43 (S.D. July 20, 2018), the settlement agreement required each settlement class member to receive a check directly.

Here, TLIC eventually will recoup almost all of the money that it pays out to In-Force Policyowners. That money will be distributed into the In-Force Policyholder's accumulation value and then used to pay TLIC for the higher (and improper) Monthly Deduction charges. By distributing the In-Force Policies Settlement Common Fund directly to In-Force Policyowners' accumulation accounts, TLIC anticipates that it will suffer little out-of-pocket cost from the inadequate and unreasonable Settlement and instead will recoup most of the money that it is supposed to pay.

The Settlement Agreement's distribution method for In-Force Policies makes the Settlement akin to a coupon settlement, which courts generally view as a settlement where the consideration provided constitutes a discount on a product or service offered by the defendant in the lawsuit. *See True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1069–70 (C.D. Cal. 2010). Coupon settlements are generally disfavored, and courts regularly subject coupon settlements to heightened scrutiny because they "do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation." *Id.*

Here, although the Parties treat the increase of In-Force Policyowners'

accumulation values as a cash payout, in reality, the adjustment of accumulation values amounts to a brief and meager reduction of the MDRs charged by TLIC for universal life insurance, *i.e.* a coupon settlement. The Settlement Agreement fails to provide meaningful, liquid compensation to Settlement Class Members; allows TLIC to retain its ill-gotten gains; and essentially allows TLIC to recoup the settlement proceeds as class members continue doing business with TLIC despite its protracted course of misconduct. As such, the Settlement bears the hallmarks of a coupon settlement that the Court should reject.

## L.   The Court Should Reduce the Disproportionate Class Fee Award, Including to Account for Opt-Outs and the Illusory Distribution of Settlement Relief to No-Lapse Guarantee Policies

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Prod. Liability Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) (vacating and remanding fee award for further review)

Courts have long recognized that one inherent risk with class-wide settlement agreements, particularly precertification class-wide settlements, "is that class counsel may collude with defendants, 'tacitly reducing the overall settlement in return for a higher attorney's fee." *See Id.* at 946 (citing *Knisley v. Network Assoc.*, 312 F.3d 1123, 1125 (9th Cir. 2002); *Evans v. Jeff D.*, 475 U.S. 717, 733 (1986) (recognizing that "the possibility of a tradeoff between merits relief and attorneys' fees" is often implicit in class action negotiations").

Because collusion may not be overtly evident, the Court "must be particularly vigilant . . . for more subtle signs that class counsel have allowed their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth*, 654 F.3d at 947. Those "subtle signs" include "when class counsel received a disproportionate distribution of the settlement, or when the class

receives no monetary distribution but class counsel are amply awarded[,]" "'clear sailing' arrangements providing for the payment of attorneys' fees separate and apart from class funds[,]" and when the parties agree that unawarded fees revert back to the defendant. *Id.*

Here, the Parties—who previously negotiated a $28 million fee award in *Feller* (*Feller*, Dkt. 444)—have agreed to fee structure that bears the traditional indicia of collusion, albeit in slightly repackaged formats. Class counsel is seeking a grossly disproportionate fee award when compared with Terminated Policyowners' recovery ($19 million in attorneys' fees compared to less than $2 million to Terminated Policyowners); an improper fee award on an undisclosed amount of Settlement Relief being distributed to No-Lapse Guarantee Policies; TLIC has agreed to pay $8 million in fees to Co-Lead Class Counsel in addition to and separate the settlement common funds; and the Settlement is designed to revert and be recaptured by TLIC through future Monthly Deductions.

If the Settlement is approved, the Court should reduce the requested fees to an amount commensurate with the results actually obtained for the Settlement Class, including determining and accounting for the amount of Settlement Relief being disingenuously distributed to No-Lapse Guarantee Policyowners and likely exclusion requests by institutional investors. *See* Co-Lead Counsel's Declaration in Support of Final Approval at ¶ 74.

## CONCLUSION

For the foregoing reasons, Court should deny the Motion for Final Approval and the Class Fee and Expense Application.

Dated: August 3, 2020

Respectfully submitted,

By: /s/ Stephen J. Fearon, Jr.

Stephen J. Fearon, Jr.
Paul V. Sweeny
**SQUITIERI & FEARON, LLP**
32 East 57th St., 12th Floor
New York, New NY 10022

25

Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: paul@sfclasslaw.com
**ATTORNEYS FOR OBJECTORS
LEVI KATZ AND ANGELA TERRY**

OBJECTIONS TO THE PROPOSED SETTLEMENT AND CLASS FEE AND EXPENSE APPLICATION,
MEMORANDUM OF LAW IN SUPPORT OF OBJECTIONS, AND NOTICE OF INTENTION TO APPEAR