VIVIAN I. ORLANDO (SBN 213833)
vorlando@hinshawlaw.com
Hinshaw & Culbertson LLP
350 South Grand Ave. Suite 3600
Los Angeles, CA 90071-3476
Telephone:  213-680-2800
Facsimile:   213-614-7399

THOMAS F.A. HETHERINGTON*
tom.hetherington@mhllp.com
JARRETT E. GANER*
jarrett.ganer@mhllp.com
HUTSON B. SMELLEY*
hutson.smelley@mhllp.com
ERIN E. BENNETT*
erin.bennett@mhllp.com
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
Telephone:  713-337-5580
Facsimile:   713-337-8850
*Admitted *Pro Hac Vice*

Attorneys for Defendant
TRANSAMERICA LIFE INSURANCE COMPANY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAIL THOMPSON, et al.,<br><br>        Plaintiffs,<br><br>vs.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>        Defendant. | Case No. 2:18-CV-05422 CAS (GJSx)<br>(Honorable Christina A. Snyder )<br><br>CLASS ACTION<br><br>**DEFENDANT TRANSAMERICA LIFE INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO OBJECTIONS TO THE PROPOSED SETTLEMENT**<br><br>Hearing Date: August 31, 2020<br>Time: 10:00 a.m.<br>Court: Courtroom 8D<br><br>First Am. Compl. Filed: May 8, 2019 |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND .......................................................................................... 3

I.    The Life Insurance Policies, Litigation, and the Settlement ...................... 3

  A.    The Policies Are TransUltra 115 And TransSurvivor 115 Adjustable
        Rate Flexible Premium Universal Life Policies. ............................. 3

  B.    Most Class Policies Include An Endorsement That Guarantees
        Coverage If Fixed Level Premium Requirements Are Satisfied. ...... 4

  C.    In 2017 and 2018, TLIC Implemented MDR Increases On
        TransUltra 115 And TransSurvivor 115 Policies. ........................... 5

  D.    The Litigation and Settlement ........................................................... 6

II.   Counsel For The Katz and Terry Objectors Tries To Repeat The Same
      Pattern of Obstruction As In *Feller*, But Without Class Members As
      Clients ...................................................................................................... 6

  A.    Objector Katz is not a Settlement Class Member. ............................ 8

  B.    Objector Terry is not a Settlement Class Member. .......................... 9

III.  The Vitales and the Sher Family Trust are Class Members Whose
      Objections Present Individualized Issues ................................................. 9

ARGUMENT .......................................................................................................... 10

I.    Katz and Terry Lack Standing to Object to the Settlement Because They
      Are Not Settlement Class Members, And Even So, Their Objections
      Largely Recycle The Same Meritless Objections Raised In *Feller*. ......... 10

  A.    Neither Katz nor Terry have standing to object to the Settlement
        because they are not Settlement Class Members. ........................... 10

  B.    Katz And Terry's Objections Largely Assert The Same Objections
        That Fearon Abandoned in *Feller* ................................................. 12

II.    The Vitales' Objection Does Not Appear to Relate to The Subject Matter of the Litigation ........................................................................... 20

III.   The Sher Family Trust's Objection Simply Demonstrates the Individualized Issues that Could Have Precluded Class Certification .... 21

    A.    The Sher Family Trust Avoided Adverse Impact From The MDR Increase ........................................................................................ 22

    B.    The Sher Family Trust Misunderstands the MDR Increases .......... 23

    C.    Individualized Issues Like Those Raised by the Sher Family Trust Show Why Class Certification Would Not Have Be A Foregone Conclusion ...................................................................................... 25

    D.    The Sher Family Trust's Specific Objections to the Settlement Are Without Merit................................................................................... 26

    E.    TLIC's Correspondence Was Accurate ......................................... 28

CONCLUSION............................................................................................. 29

### TABLE OF AUTHORITIES

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952 (9th Cir. 2013) ...........................26

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................27

*Bristol-Meyers Squibb v. Superior Court*, 137 S. Ct. 1773 (2017) ..............13, 17, 18

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011)...............................26

*Emerson v. Sentry Life Ins. Co.*, Case Nos. 18-cv-379-jdp, 18-cv-254-jdp,
    2018 WL 4380988 (W.D. Wis. Sept. 14, 2018)....................................................7

*Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579 (5th Cir. 2007) .......11

*Feller v. Transamerica Life Ins. Co.*, Case No. 16-cv-01378-CAS-GJS (C.D. Cal.) 7

*Feury v. Richemont North America, Inc.*, No. C-05-4525 EMC, 2008 WL 3287154
    (N.D. Cal. Aug. 6, 2008) ....................................................................................20

*In re Conseco Life Ins. Co. Cost of Ins. Litig.*,
    MDL No. 10:1610-AHM (C.D. Cal.)....................................................................19

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
    33 F.3d 29 (9th Cir. 1994) ..................................................................................11

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012)................................26

*Shupe v. Transamerica Life Ins. Co.*, Case No. 19-cv-000945 (N.D. Iowa)..............7

*True v. Am. Honda Motor Co.*, 49 F. Supp. 2d 1052 (C.D. Cal. 2010) ....................20

*Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036 (2016)....................26

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)..............................................26

*Yue v. Conseco Life Ins. Co.*, No. 11-cv-09506-DSF-SH (C.D. Cal.) .....................19

**Statutes**

N.J. Stat. Ann. § 42:2C-68.........................................................................................15

**Rules**

Fed. R. Civ. P. 17......................................................................................................15

Fed. R. Civ. P. 23.........................................................................................15, 30, 31

MEM. OF POINTS AND AUTHORITIES IN OPPOSITION TO OBJECTIONS TO THE PROPOSED SETTLEMENT

### INTRODUCTION

Defendant Transamerica Life Insurance Company ("TLIC") submits this Memorandum of Points and Authorities in response to the three objections to the proposed settlement submitted by non-class members Levi Katz and Angela Terry (ECF 164), class members John and Philomena Vitale (ECF 165), and class member the Sher Family Trust (ECF 166).

This litigation was filed against TLIC on behalf of a putative class that includes owners of active and terminated TransUltra 115 and TransSurvivor 115 universal life insurance policies (the "Policies")[1] that permit TLIC to adjust the insurance rates, referred to in the policies as Monthly Deduction Rates ("MDRs"), which are used to determine the Monthly Deductions ("MDs") taken from each policy's Accumulation Value. TLIC increased the MDR schedule used to determine MDs on TransUltra 115 Policies in 2017 and on TransSurvivor 115 Policies in 2018.  After engaging in extensive motion practice and discovery, the parties reached a proposed settlement (ECF 143-1), which was preliminarily approval by the court (ECF 151).[2]

The first of the three objections (ECF 164) is a brazen attempt by a professional objectors' attorney Stephen J. Fearon, Jr. ("Fearon"), to extract unearned attorneys' fees, and is filed on behalf of life settlement investor Mr. Katz, apparently as manager of Peck Et Al Policy Holdings LLC ("Peck"), and another

---

[1] Exemplars of the TransUltra 115 and TransSurvivor 115 Policies are attached as Exhibit 3 (ECF No. 117-3) and Exhibit 4 (ECF No. 1170-4) to the Declaration of Andy Friedman (ECF No. 117) in Support of Notice of Motion and Motion to Certify Class. Exhibit 3 is cited herein as "TransUltra Policy" and Exhibit 4 is cited herein as "TransSurvivor Policy." The key difference between the two types of Policies is that TransUltra 115 Policies insure one life while TransSurvivor 115 Policies insure two lives and pay death benefits only after both insureds die. *See* TransUltra Policy at Page ID#2 of 51; TransSurvivor Policy at Page ID#2 of 43.

[2] All capitalized terms not specifically defined herein have the meaning defined within the Policies or the Settlement Agreement (ECF No. 143-1).

1

individual, Ms. Terry, who has filed a separate lawsuit against TLIC in Iowa. Neither Mr. Katz, nor Peck, nor Ms. Terry are Settlement Class Members, and as such, lack standing to object to the Settlement.  Moreover, most of their objections simply rehash the same meritless objections that their Fearon raised and later abandoned in *Feller v. Transamerica Life Ins. Co.*, Case No. 16-cv-01378-CAS-GJS (C.D. Cal.) (hereafter "*Feller*").  The Court should overrule their objections.

The second objection (ECF 165) filed by the Vitales does not address the merits of the proposed settlement.  Rather, it appears that many years ago the Vitales became involved in an investment scheme that somehow culminated in their ownership of a TLIC policy insuring an unrelated third-party.  After allowing the policy to lapse in 2017, the Vitales were unable to reinstate coverage due to the insurability status of the third-party insured.  To the extent the Vitales' complaints even relate to the subject matter of this lawsuit, these individualized issues do not impact the overall fairness or adequacy of the proposed settlement.  As such, this objection should be overruled.

Finally, the third objection (ECF 166), filed by the Sher Family Trust, exemplify TLIC's arguments below regarding individualized damages.  The Sher Family Trust owns a policy with an active secondary guarantee that largely insulates it from being impacted in any way by an MDR increase.  So while the Sher Family Trust claims that it will not benefit from the settlement's ***credit*** to accumulation value, ***reductions*** to the Accumulation Value were the only potential adverse impact to the Policy resulting from the challenged MDR increases.  The balance of the Sher Family Trust's objection focuses on complaints regarding TLIC's customer service.  Though TLIC strongly disagrees with the Sher Family Trust's allegations, this topic is completely irrelevant to the claims asserted in this litigation or the settlement thereof.  Thus, this objection should be overruled.

**FACTUAL BACKGROUND**

I.      **The Life Insurance Policies, Litigation, and the Settlement**

     A.      **The Policies Are TransUltra 115 and TransSurvivor 115 Adjustable Rate Flexible Premium Universal Life Policies.**

This case involves TransUltra 115 and TransSurvivor 115 universal life insurance policies that were subject to MDR increases implemented by TLIC in 2017 and 2018 (the "MDR Increases"). Each Policy gives its owner flexibility in the premiums they pay so long as certain minimums are met. The premiums paid are applied to a Policy's Accumulation Value, which is guaranteed to earn interest at no less than a minimum rate set in the Policies. *See* TransUltra Policy at Page ID#18 of 51; TransSurvivor Policy at Page ID#20 of 43. Each month, TLIC deducts a MD from the Accumulation Value. *See* TransUltra Policy at Page ID#17-18 of 51; TransSurvivor Policy at Page ID#19-20 of 43. The MD is calculated by multiplying the MDR for that policy year by the difference between the death benefit and the Accumulation Value, plus any applicable fees. *See* TransUltra Policy at Page ID#18-19 of 51; TransSurvivor Policy at Page ID#20-21 of 43.

Each Policy contains a table or schedule of guaranteed MDRs, which shows the maximum MDR that can be charged in any given policy year. *See* TransUltra Policy at Page ID#5 of 51; TransSurvivor Policy at Page ID#5 of 43. When a Policy is issued, there is a "current" MDR schedule that is actually used to calculate the MDs with rates set at or below the guaranteed MDRs. Subject to certain contractual restrictions, the Policies broadly permit TLIC to adjust MDRs so long as the rates charged do not exceed the guaranteed MDR for a given year. *See* TransUltra Policy at Page ID#18-19 of 51; TransSurvivor Policy at Page ID#20 of 43.

MDRs generally increase each year, so that as the insured ages, the required MDs increase. This year-over-year increase in MDRs occurs separate and apart from what is challenged in this lawsuit, which was a global prospective increase to

the MDRs on the schedule used to determine MDs.

### B. Most Class Policies Include an Endorsement That Guarantees Coverage If Fixed Level Premium Requirements Are Satisfied.

Policy performance varies based on how a policyowner funds premiums into the Policy, the credited interest rates, and the MDRs.  When a Policy is purchased, an illustration is provided that includes a projection of how the Policy is guaranteed to perform assuming the policyowner's planned premiums are paid—essentially a worst-case scenario based on the maximum MDRs and minimum credited interest. The illustration also shows how the Policy would perform at the then-current credited interest rates and the then current MDR schedule, but this projection is not guaranteed.  The illustrations advise that performance will likely vary and it may become necessary for the policyowner to pay additional premiums in the future to maintain the coverage.

Most of the Class Policies include an endorsement called the Endorsement to Modify Grace Period, also referred to as the Assured Coverage Endorsement or "ACE," which provides the policyowners a way to remove the uncertainty of the future performance of their Policies.  *See* TransSurvivor Policy at Page ID#38-39 of 43 (attaching the two-page ACE); Declaration of Aliza Klau ("Klau Decl."), ¶ 7. The ACE was designed to ensure coverage remains in place for a set period of time (the "Select Period") so long as a fixed periodic premium (the "Select Monthly Premium")[3] is paid, there are no outstanding Policy loans, or withdrawals or partial surrenders in excess of stated limits, and death benefit option 1 (the policy face amount as its death benefit)[4] is selected.  If the Accumulation Value is insufficient

---

[3] The "Select Period" and "Select Monthly Premium" are defined terms in the ACE. *See* TransSurvivor Policy at Page ID#38 of 43.

[4] The Policies permitted the purchaser to elect one of three available death benefit options. Generally speaking, Option 1 is the face amount of the Policy, Option 2 is the face amount of the Policy plus its Accumulation Value, and Option 3 is the face amount of the Policy plus a return of premiums. *See* TransUltra Policy at Page ID#11 of 51; TransSurvivor Policy at Page ID#14-15 of 43.

to cover a MD, or even if the Accumulation Value is zero, the ACE ensures the Policy will not enter the grace period and thus will not lapse during the Select Period.  In contrast, for the Policies without the ACE or where the ACE is not active because the policyowner has not satisfied the ACE criteria, if the Accumulation Value on a Policy decreases to a point that it will not cover the MDs, the policyowner must increase the premiums or the Policy will go into the grace period and lapse.

For each Policy with the ACE, the Policy data pages specify both the Select Period and the Select Monthly Premium required.  *See* Klau Decl., ¶ 8 & Ex. D, at p. 88-89.  Generally speaking, for TransUltra policies, the Select Period extends until the insured reaches age 100.  *Id.*  For TransSurvivor policies, the Select Period extends until the youngest of the two insureds reaches age 100.  *Id.*  By way of example, for the TransSurvivor 115 Policy insuring Linda and Stanley Sher, the Select Period is 39 years (until the younger Linda Sher would be 100) and the Select Monthly Premiums is $3,332.78. *Id.* ¶ 18 & Ex. D, at p. 54.

The ACE protects against the need to ever pay increased premiums to maintain coverage, even if the MDR schedules are increased or only the minimum credited interest is being earned.

**C.    In 2017 and 2018, TLIC Implemented MDR Increases on TransUltra 115 and TransSurvivor 115 Policies.**

In 2017, TLIC approved a 58% MDR increase over the then-current MDR schedule for the 1998 and 1999 versions of the TransUltra 115 Policies and began implementing the increase on Policy anniversaries in October 2017.  Klau Decl., ¶ 4.

In 2018, TLIC approved a one-time 47% MDR increase over then-current MDR schedule for the 1997 version of the TransSurvivor 115 Policies.  *Id.* ¶ 5. TLIC approved three consecutive, compounding 39% increases over the then current MDR schedule for the 1998 and 1999 versions of the TransSurvivor 115

Policies. *Id.* ¶ 6.  The MDR increases for the TransSurvivor 115 Policies were
implemented on Policy anniversaries beginning in June 2018. *Id.* ¶¶ 5-6.

### D. The Litigation and Settlement

The Complaint was filed on June 18, 2018 and the parties engaged in
substantial briefing and discovery for nearly two years.  As detailed more
extensively in the Settlement Agreement (ECF 143-1), Plaintiffs and TLIC
negotiated an arms' length settlement that provides each side with benefits and
required each side to make compromises.  Throughout this litigation, TLIC has
consistently maintained that its actions were permitted under the Policies, and that
Plaintiffs' claims are without merit.  TLIC also maintained that this Court lacked
personal jurisdiction over it with respect to claims asserted on behalf of non-
California putative class members.

Additionally, had briefing been completed on Plaintiffs' now mooted motion
for class certification (ECF 107), TLIC would have asserted what it believes to be
strong arguments against class certification.  Principal among these would have
been the highly individualized issues related to the impact (or lack thereof) of an
MDR increase on Policies with an ACE provision.  The settlement reached by the
parties reflects an acknowledgment of the inherent uncertainty and risks associated
with continued litigation, including the risk of denial of class certification, and does
not represent a windfall for either side. It is a fair and reasonable compromise.

## II. Counsel for Katz and Terry Tries to Repeat the Same Pattern of Obstruction as in *Feller*, but without Class Members as Clients.

Fearon, counsel for the Katz and Terry Objectors,[5] makes a business of filing
copycat lawsuits and later objecting to proposed class action settlements in the first-
filed suit.  *See, e.g.*, *Emerson v. Sentry Life Ins. Co.*, Case Nos. 18-cv-379-jdp, 18-

---

[5] TLIC refers to the objector for Policy No. 60049627 as the "Katz Objector"
to follow the verbiage used in the Fearon Objections, ECF No. 164 (hereafter
"Fearon Obj."), which confusingly oscillates between referring to the objector as
Katz and as Peck, the LLC that Katz allegedly manages.

cv-254-jdp, 2018 WL 4380988, *1-3 (W.D. Wis. Sept. 14, 2018) (staying duplicative insurance case filed by Fearon pending resolution of the earlier case); Final Order Approving Plaintiffs' Motion for Final Certification of Settlement Class and Final Approval of Proposed Nationwide Class Settlement Agreement, ¶ 8, *Feller*, ECF No. 444 (noting that Fearon filed an objection "on behalf of two plaintiffs in duplicative lawsuits Fearon filed in the Northern District of Iowa . . . long after *Feller* commenced"). In *Feller*, as this Court is aware, Fearon moved to intervene asking the Court to reconsider its order granting preliminary approval of the proposed class action settlement. *Feller*, ECF No. 411. After the motion was denied, Fearon's clients objected to the proposed settlement and noticed their intent to appear at the Final Fairness Hearing. *Id.*, ECF No. 424. Their objections to the *Feller* settlement were later withdrawn at the Fairness Hearing with this Court's approval. *Id.*, ECF No. 444, ¶ 8. The impetus for the Katz and Terry Objections to the *Thompson* settlement follows the same pattern.

On April 18, 2019, Fearon filed the first of two lawsuits in the Northern District of Iowa relating to the 2017 and 2018 MDR Increases. *Shupe v. Transamerica Life Ins. Co.*, Case No. 19-cv-000945 (N.D. Iowa). *Shupe* was filed as a putative class action 10 months after *Thompson*. *See Shupe*, ECF No. 1. Shupe brought claims on behalf of both in-force and terminated TransUltra 115 policyowners subject to the 2017 MDR increase – alleging that her claims were typical of all putative class members. *Id.*, ¶¶ 117, 120. Accordingly, TLIC moved to stay *Shupe* in favor of the first-filed *Thompson*. *Id.*, ECF Nos. 7, 28. In granting TLIC's motion to stay as to Shupe's class allegations, the court explained:

> Shupe's complaint in relevant part mirrors the *Thompson* complaint and Shupe filed motions for preliminary injunction and class certification a mere 43 days after filing her complaint, and a day after [TLIC] filed its motion to stay. Shupe's counsel likely anticipated the motion to stay, as counsel has been unsuccessful on numerous other occasions in proceeding with duplicative class-action suits.

1    *Id.*, ECF No. 28, at 6 (citations omitted).

2       On October 23, 2019 Fearon filed *Terry v. Transamerica Life Ins. Co.*, Case

3 No. 19-cv-00118 (N.D. Iowa)—approximately one month after the *Thompson*

4 plaintiffs filed their motion for class certification on both in-force and terminated

5 policy classes. *Terry*, ECF No. 1; *Thompson*, ECF No. 107. The *Terry* case is set

6 for trial on September 6, 2021, following Terry's July 2, 2020 motion for an

7 extension of the case schedule in advance of a then-upcoming expert disclosure

8 deadline. *Terry*, ECF No. 22. The case has not progressed far. The parties

9 exchanged initial written discovery, but Terry's central focus has been to obtain

10 unredacted copies of the *Thompson* class certification briefing and expert

11 declarations rather than any substantive documents relating to her claims. *See*

12 Declaration of Erin E. Bennett ("Bennett Decl."), ¶ 3. And despite noting that

13 TLIC declined to consent to dismissal of *Terry* without prejudice, which was only

14 requested in a misguided effort to remove an impediment to objecting here, Terry

15 has not yet moved to dismiss the Iowa case. *See id.*, ¶ 4.

16      **A.**    **Objector Katz is not a Settlement Class Member.**

17       Levi Katz objects to the Settlement as the Managing Member of Peck Et Al

18 Policy Holdings, LLC ("Peck"), asserting that Globalstar 11 Holdings LLC

19 assigned ownership of Policy No. 60049627 to Peck in 2020. Fearon Obj. at 1, 3.

20 But based on Katz's own factual recitation, Peck is not a Settlement Class Member.

21 The Settlement Class is defined to include all persons or entities (with certain

22 exceptions) who own or owned a Policy as of the Policy Status Date (i.e.,

23 December 31, 2019).[6] Accordingly, under the Settlement, Globalstar 11 Holdings

24 LLC is the defined Settlement Class Member for this Policy. Katz provides no

25 evidence as to whether Globalstar's assignment to Peck included all legal claims

26 relating to Policy No. 60049627.

27

28       [6] *Thompson*, ECF No. 143-1, Page ID 16602-04.

Peck is a life settlement investor.  Fearon Obj. at 3.  Like most life settlement investors who minimally fund their policies, Peck did not pay the Select Monthly Premium need to keep what Peck calls the "No-Lapse Guarantee" (i.e., the ACE) in effect.  *Id.*  Katz does not allege that Peck ever intends to pay the Select Premium in the future.

### B.      Objector Terry is not a Settlement Class Member.

Terry is a California resident who, according to TLIC's records, serves as the trustee of a trust that owned Policy No. 60057155.  *Terry*, ECF No. 1, ¶¶ 11, 41; Klau Decl., ¶ 12 (stating that TLIC's records reflect that Terry was the trustee for Policy No. 60057155).  In 2019, TLIC notified Terry of an MDR increase on Policy No. 60057155.  Klau Decl., ¶ 14 & Ex. B.  Terry surrendered Policy No. 60057155 in return for $123,931.47.  *See id.* ¶¶ 15-16 & Ex. C.

Further, Terry premises her objection on Policy No. 60060573, but Terry is not the authorized trustee for this policy.  *See id.* ¶ 17.  Terry was removed as trustee for Policy No. 60060573 in 2002.  *Id.*  Instead, TLIC's records show that a different trustee is the trustee of record for Policy No. 60060573.  *Id.*  Accordingly, Terry is not authorized to make any decisions relating to Policy No. 60060573.  The authorized trustee for Policy No. 60060573 has not filed an objection to the Settlement.  Bennett Decl., ¶ 5.

Compounding the fact that Terry lacks authority to object on behalf of Policy No. 60060573, Terry filed and still maintains a pending lawsuit against TLIC in the Northern District of Iowa.  *Id.* ¶ 4.  As such, under Paragraphs 60(e) and 61 of the Settlement, Terry is not a Settlement Class Member. *Thompson*, ECF No. 143-1, Page ID 16603-04.

### III.    The Vitales and the Sher Family Trust are Class Members Whose Objections Present Individualized Issues

In contrast to the Katz and Terry Objectors, John and Philomena Vitale and the Sher Family Trust are class members.  But their objections present highly

1   individualized issues.  The Vitales allegedly obtained a policy insuring a third-party
2   through an investment connected to an entity that was apparently engaged in
3   fraudulent business practices.  The Vitales allowed this policy to lapse following
4   the MDR increase, but they do not allege an overt connection between the MDR
5   increase and the lapse and do not substantively challenge the Settlement.  The Sher
6   Family Trust has active ACE protection, and despite the trustee and insured
7   evidently being upset by the MDR increases' impact on the policy's Accumulation
8   Value, they do not address how the Sher Family Trust has actually suffered any
9   economic loss as a result of the MDR increase or explained why the Settlement is
10  unfair or inadequate to the Settlement Class as a whole.

11                                    **ARGUMENT**

12  **I.    Katz and Terry Lack Standing to Object to the Settlement Because They
        Are Not Settlement Class Members, and Even if they were, Their
13      Objections Mostly Recycle the Meritless Objections Raised In *Feller*.**

14          The Court should overrule Katz and Terry's Objections because (A) they
15  lack standing to object to the Settlement as they are not Settlement Class Members,
16  and (B) they offer most of the same objections to the *Thompson* Settlement that
17  Fearon later dropped in *Feller*, and they misrepresent the Settlement Class
18  Members' ability to obtain their estimated Settlement Relief.  None of their
19  objections demonstrate that the Settlement is unfair, unreasonable, or inadequate.
20  To the contrary, their objections highlight the procedural gamesmanship Fearon
21  employs to disrupt hard-fought resolutions of class settlements.  Their objections
22  should be overruled.

23          **A.    Neither Katz nor Terry Have Standing to Object to the Settlement
              Because They Are Not Settlement Class Members.**
24

25          Katz and Terry are not Settlement Class Members. Under the plain text of
26  Federal Rule of Civil Procedure 23 and well-established law, only members of the
27  settlement class may pose objections to a class action settlement.  Fed. R. Civ. P.
28  23(e)(5) (A) ("Any class member may object to the proposal if it requires court

approval under this subdivision (e).”); *see also In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29, 30 (9th Cir. 1994); *Feder v. Electronic Data Systems Corp.*, 248 Fed. Appx. 579, 580 (5th Cir. 2007) (“[A]s a general rule, only class members have standing to object to a proposed settlement.”).  Because neither Katz nor Terry is a Settlement Class Member, they lack standing to challenge the Settlement and their objections should be overruled.

Katz's objection is filed on behalf of Peck.  Katz states that Peck was assigned ownership of Policy No. 60049627 in 2020.  Fearon Obj. at 3.  Under the Settlement, Settlement Class Members are limited to persons or entities who own or owned a Policy as of December 31, 2019.  *Thompson*, ECF No. 143-1, Page ID 16602-04.  Accordingly, Peck is not a Settlement Class Member, and Katz lacks standing to object on Peck's behalf. Katz's objections should be overruled.[7]

Terry lacks standing for two reasons.  First, Terry improperly ties her objection to Policy No. 60060573 for which she has no authority to act because Terry was removed as an authorized trustee for this policy in 2002.  *See* Klau Decl., ¶ 17.  The authorized trustee did not object or opt out of the Settlement. Terry's objections should be overruled on this basis alone.

Second, Terry is not a Settlement Class Member because she is a plaintiff in a lawsuit pending in the Northern District of Iowa, and as such, is excluded from the Settlement Class Member definition.  *Thompson*, ECF No. 143-1, Page ID 16603-04 (excluding "those Policyowners challenging either or both of the MDR Increases in any pending or resolved lawsuit against TLIC other than the Action"); Bennett Decl. ¶ 4 (noting that Terry has not yet moved to dismiss her Iowa action). Nevertheless, Terry argues that the parties' exclusion of parallel litigants from the Settlement Class definition was somehow improper and designed to shield the

---

[7] TLIC objects to capacity in which Katz files his objections to the extent Katz does so as the Managing Member rather than as the Peck LLC. Fed. R. Civ. P. 17; N.J. Stat. Ann. § 42:2C-68 (declining to permit a member to bring an LLC's claims in his own name).

"unfair and inadequate" Settlement from scrutiny.  Fearon Obj. at 5-6.  But it was Terry who indicated her intent to forge her own path when she chose to file an individual action against TLIC in Iowa.  At the time she filed suit, her counsel was well aware that the *Thompson* Plaintiffs had filed a motion for class certification that excluded policyowners with pending lawsuits against TLIC. *Thompson*, ECF No. 142, at Page ID 16563.  Yet, she filed suit anyway.  That Terry's sole purpose in discovery in her Iowa case was to seek the unredacted *Thompson* class certification briefing and related expert declarations underscores the absurdity of this objection.

**B.      Katz and Terry's Objections Largely Assert the Same Objections That Fearon Abandoned in *Feller*.**

Repeating recycled arguments from his objector playbook, Fearon on behalf of Katz and Terry object to the Settlement because:  (1) the parties purportedly failed to provide sufficient information for the Court to determine the reasonableness of the settlement; (2) the Class Notice supposedly should have provided an estimate of the proposed Settlement Relief; (3) the Settlement is purportedly unfair to Terminated Policyowners and Policyowners who do not maintain the ACE; (4) the Court lacks jurisdiction under *Bristol-Meyers Squibb v. Superior Court*, 137 S. Ct. 1773 (2017); (5) the Settlement does not offer reinstatement to Terminated Policyowners; (6) the Settlement permits the MDR Increases to go forward; and (7) the Settlement supposedly permits TLIC to recapture the Settlement Relief (among others objections directed to the Class Representatives or Class Counsel that TLIC does not address here).  TLIC addresses each objection in turn below.

**1.      Katz and Terry Object to the Settlement Claiming That the Court Needs Additional Information, but the Court Has Sufficient Details to Judge the Settlement's Fairness.**

As in *Feller*, Katz and Terry object to the Settlement by claiming that the parties are withholding information that the Court needs to know to determine the reasonableness of the Settlement.  This is not true.  The Court has adequate information – the same as it did in *Feller* – to meaningfully evaluate the reasonableness of the Settlement.  Katz and Terry argue, however, that the Court needs additional metrics relating to the total number and face amounts of the In-Force and Terminated Policies, and projections of TLIC's future MDs.  But none of these metrics are necessary for the Court to evaluate the Settlement.  The salient facts relate to the past and future Settlement Relief provided to the Class. Class Counsel has disclosed that Settlement Class Members will receive a large percentage return of past additional MDs that TLIC collected as a result of the 2017 and 2018 MDR Increases (or the $200 minimum) and that In-Force and Terminated Policyowners are treated consistently under the Settlement.  As to future Settlement Relief, Settlement Class Members receive the benefit of a seven-year moratorium on additional MDR increases. This is sufficient information on which to judge the compromise the Settlement reflects.

Instead, Katz and Terry seek data relating to the face amounts of the In-Force and Terminated Policies and TLIC's total projected future collections for the sole purpose of contriving an inflated damage number that finds no basis in reality. Katz and Terry do not cite any authority for their contention that the measure of recoverable damages in this case could ever be the face amount of either In-Force or Terminated Policies.  Comparing face amounts between policyowners who are benefitting from the ACE and those who are not provides no plausible measure of damage or settlement value tied to any issue in this case.  Which of those policies will remain in force or will be paid out as death claims is unknown.  Plus, Katz and Terry's proffered damages construct fails to account for TLIC's costs in providing coverage.  Likewise, using face amount to value the damages or potential settlement value for Terminated Policies is entirely speculative.  Policyowners may

choose to lapse or surrender their policies for any number of reasons unrelated to an MDR increase.  The same holds true for the total amount of TLIC's future MD collections given that TLIC is contractually authorized to raise MDRs.

This objection has no merit and should be overruled.

### 2. Katz Mistakenly Claims That the Estimated Settlement Relief Was Not Available to the Class, Where the Information Was In-Face Available, and the Class Notice Was Adequate.

Katz and Terry object to the Class Notice, arguing that it is inadequate because it fails to provide an estimate of each individual Class Member's Settlement Relief or an illustration as was provided in *Feller*. Their objection is premised on Katz's contact with the Settlement Administrator, Rust Consulting LLC ("Rust"), which allegedly refused to provide Katz with the estimated amount of the proposed Settlement Relief for his Policy. Katz's extrapolation of his unique circumstance to the entire Class is inappropriate and misrepresents the information available to Settlement Class Members.

Just as in *Feller*, TLIC provided estimated proposed Settlement Relief to Rust to provide to Settlement Class Members upon request after the Class Notice was mailed.  *See* Supplemental Declaration of Jason Stinehart ("Stinehart Decl.), ¶ 10; Klau Decl., ¶ 9.  Regrettably, when Katz contacted Rust for an estimate of the Settlement Relief, he was told that the amount of his Settlement Relief could not be provided until after the Final Approval Hearing.  *See* Stinehart Decl., ¶ 8. However, the Rust representative should have informed Katz that the policyowner as of December 31, 2019 possessed the right to participate in the Settlement.  *Id.*

Notably, Katz does not indicate in his Objection that he or Fearon contacted Co-Lead Class Counsel for an estimate of the Settlement Relief – an action taken by the Sher Family Trust. Nor did Fearon contact TLIC's counsel with whom he is actively litigating the *Shupe* and *Terry* cases in Iowa, and upon whom he served

---

14

written discovery seeking a list of the cases excluded from the Settlement and other class certification-related documents.  Bennett Decl., ¶ 3.  Nevertheless, there do not appear to have been any other instances in which Rust representatives were unable to provide the estimated Settlement Relief when requested.  Stinehart Decl., ¶ 11.

Separately, and though it was not required by the Settlement, TLIC prepared its illustration software to provide illustrations depicting potential future policy performance with and without the Settlement Relief.  Klau Decl., ¶ 10.  TLIC provided approximately 20 settlement illustrations.  *Id.* ¶ 11.  Mr. Katz did not request such an illustration. Stinehart Decl., ¶ 8.

Accordingly, Katz and Terry's contrived objection to the adequacy of the Class Notice should be overruled.

### 3. Katz and Terry Fail to Demonstrate That the Settlement is Unfair to Terminated Policyowners and Policyowners Who Do Not Maintain the ACE.

Just as Fearon's clients argued in *Feller*, Katz and Terry argue that the Settlement "heavily disfavors Terminated Policyowners" and also argue that the Settlement provides Settlement Relief "to In-Force No-Lapse Guarantee Policyowners who will not economically benefit."  Fearon Obj. at 13.   Neither objection warrants disapproval of the Settlement.

First, Katz and Terry first take aim at the alleged "disproportionate" recovery for Terminated Policyowners on the grounds that the percentage relief for Terminated Policyowners "pales in comparison" to the amount of recovery for the In-Force Policies or TLIC's alleged "windfall" in not paying death benefits to the Terminated Policyowners. *Id.* at 15.  Beyond being premised on a speculative settlement value tied to an irrelevant face amount metric, Katz and Terry ignore that the Terminated Policyowners are receiving fair compensation tied to the claims alleged in the Complaint – either a return of the additional MDs paid as a result of

the MDR Increases or the minimum $200 settlement amount.  If the Terminated Policies paid more in additional MDs then TLIC would have paid more into the Terminated Policies Settlement Common Fund.  It would not be fair for policyowners like Terry – who surrendered her policy for a six-figure sum – to obtain the face value of her policy while In-Force Policyowners who diligently paid premiums recover pro-rata additional  MDs must continue paying premiums to receive death benefits.  TLIC would never have agreed to such a preposterous settlement structure.  Moreover, Katz and Terry cite no legal authority permitting recovery of a policy's face amount for a dispute involving in-force policy charges, particularly where the Policies permit TLIC to raise MDRs and TLIC has not raised MDRs as much as it could have.

Second, Katz and Terry argue that the Settlement fails to provide a meaningful benefit to the Policies with an active ACE.  Neither Katz nor Terry own a policy with an ACE in effect, and therefore, they lack standing to assert this objection.  But even if Katz or Terry had standing to pursue this objection, it still falls flat.  All In-Force Polices receive the same relief – a deposit of funds into their Accumulation Value proportionate to their share of additional MDs deducted from the Accumulation Value as a result of the MDR increase.  To whatever extent that active ACE policies may not benefit from an increase to Accumulation Value from the Settlement to fund future MDs (because they have elected to pay the Select Premium), they nevertheless benefit from the credit to the Accumulation Value itself.

Therefore, this objection is meritless and should be overruled.

### 4. Katz and Terry Object to the Settlement by Claiming That This Court Lacks Jurisdiction under *Bristol-Myers Squibb*, but They Ignore That TLIC Has Consented to Jurisdiction for the Limited Purpose of the Settlement.

As Fearon did in *Feller*, Katz and Terry object to the Settlement by arguing that this Court lacks jurisdiction over out-of-state class members' claims under

16

*Bristol-Meyers Squibb v. Superior Court*, 137 S. Ct. 1773 (2017), in which the Supreme Court held that a California state court lacked specific jurisdiction over the claims of out-of-state plaintiffs in a mass action. *Id.* at 1781.  On this basis, Katz and Terry argue that the Class Plaintiffs agreed to an unfair and inadequate Settlement rather than risk a loss on the jurisdictional argument or pursue the suit in Iowa, where TLIC maintains a home office.  Obj. at 17.  But Katz and Terry (a California resident) ignore that TLIC consented to this Court's exercise of personal jurisdiction in order to resolve this dispute:

> TLIC's consent to the Court's exercise of personal jurisdiction is limited to the Action and is strictly made for the limited purpose of implementing this nationwide class Settlement. TLIC's consent to jurisdiction shall not operate as a waiver in any other litigation. In the event this Settlement Agreement is terminated in accordance with Section XII or if the Final Settlement Date is not attained for any reason, TLIC's consent to the Court's exercise of personal jurisdiction will be considered withdrawn.

Settlement Agreement, ECF No. 143-1, ¶ 122.  Though TLIC believes that the holding of *Bristol-Meyers Squibb* applies with equal force to class actions, there is a dispositive difference between asserting an argument when one is haled into an out-of-state court at the outset of a class action versus when one consents to a jurisdiction to facilitate that class action's resolution.

Because Katz and Terry's objection under *Bristol-Myers Squibb* stems from jurisdictional gamesmanship, this objection should be overruled.

### 5.   Katz and Terry Object to the Settlement Because It Does Not Offer Reinstatement, but Extracontractual Reinstatement Options Were Never a Realistic Settlement Demand.

Again raising objections that their counsel ultimately dropped in *Feller*, Katz and Terry argue that the "lack of reinstatement options is another unfair aspect of the Settlement." Fearon Obj. at 19.  This objection ignores that the Policies already have reinstatement rights – which Terry gave up when she voluntarily surrendered her policy – and that TLIC is unwilling to provide a blanket, guaranteed

"reinstatement option" on a class-wide basis that would rewrite the Policies'
contractual provisions.  Nor, to TLIC's counsels' awareness, have any other
insurers provided unlimited reinstatement options in any MDR-related class
settlement.

First, the Policies already provide reinstatement rights for lapsed (not
surrendered) Policies.  The Settlement does not affect the Settlement Class
Members' currently existing contractual reinstatement rights. Terry's policy, for
example, provided that the policy may be reinstated "provided it was not
surrendered" within 3 years of the lapse subject to meeting certain conditions
including the insurability standards.  *See* Klau Decl., ¶ 13 and Ex. A, at p. 19-20.
Terry chose to surrender her policy, giving up reinstatement rights in exchange for
a six-figure surrender value.  *Id.*, ¶¶ 15-16 and Ex. C.  Accordingly, she has no
grounds to object to that the Settlement does not provide a reinstatement option.
Likewise, the Katz policy remains in force and he has not provided any evidence
that his policy's reinstatement rights could not be exercised in the event that the
policy lapses.

Second, what Katz and Terry propose would rewrite the Policies to require
TLIC to permit reinstatements even where insureds do not meet TLIC's standards
for insurability.  TLIC is unwilling to agree to provide blanket "reinstatement
options" in a class settlement that differ from the pre-existing reinstatement rights
in the Policies. TLIC is not unique among insurers in this respect.  Though Katz
and Terry claim that "[r]einstatement provisions are common in class-wide
settlements in this type of litigation" (Fearon Obj. at 18), counsel for TLIC is
unaware of any modern COI/MDR-related settlement in which an insurer agreed to
reinstatement rights beyond the line of *Conseco* cases cited by Katz and Terry. *Id.*
(citing *Yue v. Conseco Life Ins. Co.*, No. 11-cv-09506-DSF-SH (C.D. Cal.), *In re
Conseco Life Ins. Co. Cost of Ins. Litig.*, MDL No. 10:1610-AHM (C.D. Cal.)).

And even those cases required terminated policyholders to comply with certain insurability requirements.

This objection has no credible basis and should be rejected.

### 6. Katz and Terry Object to the Settlement Because it Permits the MDR Increases to Go Forward, but It Is Undisputed That the Policies Permit TLIC to Raise MDRs.

Katz and Terry next contend that the proposed Settlement is unreasonable and inadequate because it permits the 2017 and 2018 MDR Increases to remain in effect. Fearon Obj. at 19-21. According to Katz and Terry, the proposed Settlement should have provided injunctive relief reducing the amount of the increases going forward. *Id.* 20-21. But this is not the deal that was struck, and for good reason. As Terry admits in her complaint, the Policies authorize TLIC to increase MDRs subject to the guaranteed maximum MDRs and based on TLIC's future expectations of cost factors. *Terry*, ECF No. 1, ¶¶ 27-29. Had Class Plaintiffs not agreed to permit the increases to go forward, TLIC could have simply introduced a new MDR increase to address the latest rounds of Plaintiffs' esoteric actuarial criticisms. Instead, the parties negotiated a seven-year moratorium on additional MDR increases – two years longer than the moratorium that TLIC provided in *Feller*. This was a substantial benefit to the Class because, absent the Settlement, additional MDR increases may have been warranted in the next seven years. Moreover, the MDR Increases imposed are well below the guaranteed maximum MDRs that TLIC is permitted to charge under the Policies.

This objection lacks merit and should be denied.

### 7. Katz and Terry Argue That the Settlement Permits TLIC to Recapture the Settlement Relief, but It Does Not.

Following again the same pattern in *Feller*, the Katz and Terry argue that the Settlement's distribution method (i.e., payment of Settlement Relief via Accumulation Value payments to In-Force Policies) permits TLIC to recapture the

Settlement Relief in contravention of Ninth Circuit law preventing reverter provisions and coupon settlements.  Fearon Obj. at 21-24.  Specifically, the Katz and Terry Objectors argue that the chosen distribution method provides no relief to the In-Force Policyowners electing to keep their ACE in effect, but neither Katz nor Terry fall into this category.  Whether the Settlement Relief is distributed via Accumulation Value payment or check, the Settlement Relief provides policyowners with a credit to their Accumulation Value consistent with a pro-rata amount of the MDs debited as a result of the MDR increases – whether the ACE is in effect or not.

Katz and Terry also compare the Settlement's distribution method to disfavored "coupon" settlements, but it is not the same thing. In the context of evaluating class fee awards, "a coupon is a *discount* on another product or service offered by the defendant in the lawsuit."  *Feury v. Richemont North America, Inc.*, No. C-05-4525 EMC, 2008 WL 3287154, *2 (N.D. Cal. Aug. 6, 2008).  As support for their argument, Katz and Terry cite *True v. Am. Honda Motor Co.*, in which the settlement class members would be provided a rebate on their next Honda purchase. 49 F. Supp. 2d 1052, 1060 (C.D. Cal. 2010)).  But the Settlement does not provide a rebate or discount to class members that is contingent on whether they elect to buy another life insurance policy from TLIC.  Every Settlement Class Member will automatically have value credited to their existing Accumulation Value or receive a check, without needing to purchase a new policy.

This objection is unfounded and should also be denied.

## II.   The Vitales' Objection Does Not Appear to Relate to the Subject Matter of the Litigation

From the contents of the objection filed by John and Philomena Vitale (ECF 165) and the attachments thereto, it appears that sometime in the late 1990s the Vitales invested money with an entity known as Empire State Financial Group ("Empire).  Empire was apparently involved in the fraudulent procurement of life

20

insurance policies.  ECF No. 170, at 1-2, 5-6.  The first two policies the Vitales invested in were purportedly issued on the lives of terminally ill individuals, but these policies were either cancelled by the insurers or lapsed due to non-payment of premiums by Empire.  To make up for this, at some point Empire apparently assigned the Vitals the rights to TLIC policy number 000060102914, which insures unrelated third-party Sid Marcus.  ECF 170-1, at 4-5.  After missing a premium payment required to restore the ACE protection, the policy lapsed on December 23, 2017. ECF 170-2, at 4-6.  The policy did not qualify for reinstatement because Mr. Marcus did not meet TLIC's insurability requirements.  ECF No. 170-3, at 5.

The Vitales do not raise any specific objection to the Settlement, and it is unclear to what extent (if any) the Vitale's take issue with the MDR increase or allege that the lapse is somehow connected to the MDR increase.  As such, the Vitales have not demonstrated any reason why the Court should not approve the Settlement.

## III. The Sher Family Trust's Objection Simply Demonstrates the Individualized Issues That Could Have Precluded Class Certification

The objection filed the by the Sher Family Trust by and through its trustee Stuart Brafman and its grantor Stanley Sher is without merit.  Mr. Sher and his spouse Linda are jointly insured by TLIC policy number 00060051266 (the "Sher Policy").  The Sher Family Trust's objections to the settlement are based on fundamental misunderstanding of how the Sher Policy functions.  Although its Accumulation Value was adversely affected by the challenged MDR Increases, the Sher Family Trust has the ability under its policy's ACE provision to preserve the policy in-force irrespective of those increases.  The results of this type of individualized inquiry demonstrate why class certification would have been far from certain in the absence of the Settlement Agreement.  In any event, rather than demonstrating that the Settlement is unfair or inadequate, the circumstances surrounding the Sher Policy demonstrate why it was reasonable for Plaintiffs to accept a compromise rather than continue litigating.

Also, the Sher Family Trust also appear to willfully misinterpret its representatives' prior correspondence with TLIC and TLIC's numerous attempts to emphasize the relevant policy features to the Sher Family Trust's representative. TLIC disagrees with the Sher Family Trust's assertions, and in any ebent its issues with TLIC's customer service response are not relevant to the proposed Settlement.

### A.   The Sher Family Trust Avoided Adverse Impact From The MDR Increase

The Policies impose one financial obligation on policyowners, which is to pay sufficient premiums to keep their Policies in force.  The Policies provide them corresponding property rights in the Policies, namely to collect the death benefits and to surrender or borrow against the Accumulation Values.  Before a policyowner can be harmed, TLIC has to actually infringe on one of their three economic rights in the Policies by (1) making them pay more premiums to sustain their Policy, (2) not paying a death benefit because the Policy lapsed, or (3) not paying as much on a requested surrender or loan as they were entitled to.  While increased MDRs do increase the MDs from policy Accumulation Values, this does not necessarily mean the MDR Increase impacted the other economic options in the Policies.

Many policyowners (such as the Sher Family Trust) have chosen to pay a set premium to exercise the ACE, which is designed to protect against uncertainties like MDR increases that are inherent in adjustable rate universal life policies.  Such policyowners have elected to pay a fixed periodic premium in return for a guaranteed death benefit to age 100 regardless of any future changes by TLIC to nonguaranteed interest rates or MDRs and even if their policy Accumulation Values become zero.

The Sher Family Trust has paid sufficient premiums to satisfy the ACE provision.[8]  So long as it continues to pay the Select Monthly Premium, the Sher

---

[8] The Sher Policy's designated $3,332.78 Select Monthly Premium annualizes to approximately the $40,000 the Sher Family Trust has paid each year.

Policy will stay in effect.  The Sher Family Trust acknowledged this fact in its very first correspondence with TLIC about the MDR Increase, stating

> The premiums under our policy are fixed. This is provided for in our policy by the "Endorsement to Modify Grace Period" which is part of our policy. Every illustration you have provided us as well as the initial disclosure shows no premium increases when the accumulation value is zero. (Attachment 1). We pay a "Select Monthly Premium," an increase cost for this protection, which you call Assured Coverage Endorsement (ACE)

ECF 166 at 16.  While this assertion is not 100% accurate (premiums remain flexible overall, and the Select Monthly Premium required to maintain the ACE is fixed) the Sher Family Trust certainly understood the gist of the ACE protection—it would not have to increase its premium payments to keep the policy in force even if the Accumulation Value were zero.  As a result, the Sher Family Trust was not adversely impacted by the MDR Increase's reduction to its Accumulation Value.

## B.  The Sher Family Trust Misunderstands the MDR Increases

Much of the Sher Family Trust's Objection is based upon a fundamental misunderstanding of how its policy's MDRs are set, how the MDR Increase was implemented, and the ultimate impact (or lack thereof) of the Accumulation Value on the death benefit provided.

The Sher Policy was issued in 1999, when the younger of the two insureds was 61.  The policy includes a schedule of guaranteed MDRs, which are generally set to increase each year the policy is in force as the insureds age.  Consistent with the policy language, when the Sher Policy was issued, TLIC set a schedule of MDRs (i.e. the 'original' MDRs) that were less than the guaranteed MDs and are likewise generally set to increase each year.  *See* Klau Decl., ¶ 2.

Starting in 2018, TLIC increased the MDRs on the Sher Policy by applying three consecutive compounding annual increases of 39% against the MDR for the

1    corresponding year under the original MDR schedule, but keeping the amount of

2    implemented MDR increases at or below the guaranteed rates.  *Id.* ¶¶ 4-6.

3         The Sher Family Trust appears to have misinterpreted the MDR Increase as

4    having been applied against the *prior year's* MDR, as opposed to the *prior*

5    *scheduled* MDR.  This misunderstanding is the root of the Sher Family Trust's

6    inability to replicate the increase percentages by referencing statements from prior

7    years.

8         Moreover, the Sher Family Trust has misinterpreted the timespan for which

9    the already announced and enacted MDR increases were to apply.  TLIC sent the

10   Sher Family Trust a notice in 2018 advising it that the MDR Increase would be

11   phased in starting with a 39% increase on its policy's next anniversary date and

12   would be followed by compounding 39% increases on the 2019 and 2020 policy

13   anniversary dates.  TLIC sent reminder notices in 2019 and 2020, ahead of the

14   second and third phases of TLIC's already-announced MDR Increase.  Under the

15   Settlement Agreement, these three phases of the MDR Increase are all encapsulated

16   by the "MDR schedules implemented through the MDR Increases" that will be

17   maintained going forward.  So contrary to the Sher Family Trust's consternations,

18   these are not new increases enacted by TLIC in some sort of clandestine effort to

19   recoup the Settlement proceeds.  They are the increases the Parties have been

20   litigating about in this case for over two years.

21        Setting aside this misinterpretation, the substance of the Sher Family Trust's

22   Objection is focused on a purported "damage model" showing the *potential* future

23   impact of the MDR Increase on the Accumulation Value.  According to the Sher

24   Family Trust's calculations, by 2029 (when the younger Sher insured would be 91),

25   the MDR Increases will "wipe out" the policy's accumulation account.  As

26   discussed above, this is irrelevant because the ACE would keep the policy in force

27   so long as the Sher Family Trust continues to pay the Select Monthly Premium (and

28   does not take an action that would remove the ACE protection such as changing the

24

death benefit option).

Moreover, the fact that the Accumulation Value may eventually deplete (although the Sher Policy will remain in force so long as the Select Premiums are paid) was always a possibility known to the Sher Family Trust.  When the Sher Policy was sold in 1999, an illustration signed by Mr. Sher showed what may happen under then current MDRs and credited interest rates (which were 6.15%), what may happen under guaranteed MDRs and credited interest rates, and what may happen at the midpoint between the two.  *See* Klau Decl., ¶ 20 & Ex. E.  The sales illustration shows the Accumulation Value was projected to become depleted and the policy sustained by the ACE under both the guaranteed and midpoint scenarios. More recent illustrations from 2016 (before the MDR Increase) and 2018 (after the MDR Increase) attached to the Sher Family Trust's objection similarly show the policy sustained by the ACE under different scenarios.

The bottom line is, unless and until the Sher Family Trust were to decide to surrender the policy, take a loan from the Accumulation Value, or stop taking advantage of the ACE, the Sher Policy will remain in-force irrespective of any impact to Accumulation Value from the MDR Increases.

### C.   Individualized Issues Like Those Raised by the Sher Family Trust Clearly Demonstrate Why Class Certification Would Not Have Be A Foregone Conclusion

In the absence of TLIC's agreement to class treatment for purposes of the Settlement, in order to certify a class, plaintiffs would have needed to establish, among other things, "questions of fact and law that are common to the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).  As the Ninth Circuit explained, the Supreme Court "emphasized that commonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'"  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (alteration in

original)).  "Put another way, the key inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather, whether class treatment will 'generate common answers apt to drive the resolution of the litigation.'"  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Wal-Mart*, 564 U.S. at 350).

The MDR Increases neither required policyowners with an active ACE to pay higher premiums nor affected their death benefit.[9]  A policyowner's ability to avoid the impact of the MDR Increases through the ACE is but one of many ways in which a lack of common question with a common answer could have precluded or severely limited class certification due to lack of commonality under Rule 23(a)(2) and due to lack of predominance under Rule 23(b)(3). *Tyson Foods, Inc. v. Bouaphakeo*, — U.S. —, 136 S. Ct. 1036, 1045 (2016) (quoting Fed. R. Civ. P. 23(b)(3)) (Rule 23(b)(3) "requires that, before a class is certified under that subsection, a district court must find that 'questions of law or fact common to class members predominate over any questions affecting only individual members.'"); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-64 (1997) (Predominance under Rule 23(b)(3) "is a more demanding criterion than the commonality inquiry under Rule 23(a)," but incorporates much of the same analysis.).

The Settlement avoids this risk for Plaintiffs, and permits all Settlement Class Members to participate in the Settlement.  The Sher Family Trust's objections merely provided a particular example of an individualized question that would have lacked a common answer for the class writ large.

**D.    The Sher Family Trust's Specific Objections to the Settlement Are Without Merit**

**1.    The Credit to the Class Members is Not *De Minimis***

The Sher Family Trust takes issue with the December 31, 2019 date used to determine allocations of the Settlement fund.  The Sher Family Trust does not

---

[9] *See* TransSurvivor Policy at Page ID#38-39 of 43.

26

believe that the amount of the Accumulation Value credit it will receive as a result

of the Settlement is adequate as compared to its calculation of how much its

Accumulation Value *may* be diminished in the future *if* the insureds live into their

mid-nineties.  But this is comparing apples to oranges, and should be disregarded

for several reasons.

First, the amount of additional MDs collected in the past is a known quantity

that can be neutrally applied to fairly allocate the settlement fund among the

Settlement Class.  A date needed to be chosen to perform this allocation and to

determine the status of each Policy as In-Force or Terminated.  While selecting a

date other than December 31, 2019 may have modestly impacted the allocation of

the settlement fund among the Settlement Class Members, the Sher Family Trust

has not demonstrated why the allocation date chosen was unfair.

Second, while all involved are hopeful that Linda and Stanley Sher and many

other Settlement Class Members will be fortunate enough to live well into their late

90s, the potential that some insureds may experience the impact of MDRs at

advanced ages (as naturally occurs in all MDR tables) does not outweigh the benefit

of providing immediate benefits to the Settlement Class, and certainly does not

make the settlement unfair or unreasonable.

Finally, the Sher Family Trust has not shown that their perceived lack of

benefit from the Settlement is a sentiment generally shared by the Settlement Class

as opposed to simply being the result of their individualized circumstance and

perceptions.  Owning a well-funded policy with an active ACE that is not

dependent on Accumulation Value to stay in force, the Sher Family Trust may not

perceive as much benefit from an increase to Accumulation Value and seven years

certainty around MDR rates as compared to the perceptions of others in the

Settlement Class.

### 2.    TLIC Will Not Recoup the Settlement Fund

The Sher Family Trust speculatively asserts that TLIC will recoup or already

has recouped the settlement fund through additional MDR increases.  As addressed above, TLIC has not instituted additional MDR increases beyond those challenged in this litigation and resolved as part of the Proposed Settlement. Moreover, TLIC has agreed to a seven-year moratorium on additional MDR increases, unless directed to do so by a regulator.  Finally, TLIC is limited in its ability to change rates by the policies, which state that "[a]ny change in the monthly deduction rates will be prospective and will be subject to our expectations as to future cost factors." *See* TransUltra Policy at Page ID#18-19 of 51; TransSurvivor Policy at Page ID#20 of 43.  As such, even after the seven-year moratorium expires, TLIC would not prospectively change rates to recoup the prior cost of settlement.

### 3. The Seven Year Moratorium on MDR Increases for the Policies Provides Value to the Settlement Class

As noted above, the Sher Family Trust appears to conflate the yearly MDR increases that occur naturally as part of an MDR schedule with the overall increase to the MDR schedule that was challenged in this litigation.  The Settlement Agreement expressly states that TLIC will maintain the schedules put in place through the challenged MDR Increases, and states that for seven years it will not further raise MDRs unless directed to do so by a regulator.  As shown with respect to the Sher Policy, TLIC's MDR Increases did not reach the guaranteed rates, meaning that additional MDR increases would be possible in the absence of this provision. As such, TLIC is compromising some of its rights under the Policies for the benefit of the Settlement Class.

### E. TLIC's Correspondence Was Accurate

The Sher Family Trust takes various issues with the customer service responses it received from TLIC.  While TLIC strenuously disagrees with the Sher Family Trust's mischaracterizations of these interactions, none of them are relevant to the inquiry before the Court regarding the fairness and adequacy of the Settlement.  TLIC will therefore not exhaustively respond to those allegations

herein, other than with respect to the Sher Family Trust's mischaracterization of the MDR Increase notice letters.  The Sher Family Trust states that in these notices TLIC repeatedly "urged" it to surrender its policy and provided it "misleading doomsday scenarios."  ECF No. 166, at 1-2.  This is simply not true, and no fair reading of these letters could interpret them as such. Indeed, the letters simply explained "*What's Changing and Why*" along with explaining all of the policyowner's "*Options*" associated with the policy.  *Id.* at 12-13.  This "*Options*" section simply described what was always available to the policyowner under the terms and conditions of the policy, which includes the option to surrender the policy.  *Id.* at 13.  In no way was TLIC pressuring the policyowner to surrender.

### CONCLUSION

For all the foregoing reasons, the Court should deny the Objections to the Proposed Settlement asserted by Levi Katz and Angela Terry (ECF 164), John and Philomena Vitale (ECF 165), and the Sher Family Trust (ECF 166).

Dated: August 17, 2020

MCDOWELL HETHERINGTON LLP

By:   /s/ Jarrett E. Ganer
 Jarrett E. Ganer

-and-

HINSHAW & CULBERTSON LLP

Attorneys for Defendant
TRANSAMERICA LIFE INSURANCE COMPANY